**FILED**

2020 Feb-20  PM 02:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

2020 FEB 20  P 1: 10

U.S. D. ALABAMA

| | |
|---|---|
| WILLIAM M. Pickard III,<br>    Plaintiff, | ) |
| v. | ) |
| | ) |
| HIGHLAND MANOR, LTD; in her | ) |
| capacity as a state actor in these | ) |
| proceedings against the Plaintiff; | ) |
| SPM, LLC; in her capacity as a | ) |
| state actor in these proceedings | ) |
| against the Plaintiff; HONORABLE | ) |
| STEVE MARSHALL, in his | ) |
| capacity as a state actor in these | ) |
| proceedings against the Plaintiff; | ) |
| NORMAN WINSTON JR., individually | ) |
| and in his capacity as a state actor in | ) |
| these proceedings against the Plaintiff; | )   NO. 2:20-cv-00212-AKK |
| JASON H. SMITH, individually | ) |
| and in his capacity as a state actor in | )   **JURY TRIAL DEMAND** |
| these proceedings against the Plaintiff | ) |
| DEBORAH WREN, individually and | ) |
| in her capacity as a state actor in these | ) |
| proceedings against the Plaintiff; | ) |
| NIKESHIA BAILEY, individually and | ) |
| in her capacity as a state actor in these | ) |
| proceedings against the Plaintiff; | ) |
| WILLIAM WELDEN, individually | ) |
| and in his capacity as a state actor in these | ) |
| proceedings against the Plaintiff; | ) |
| ALLEN SMITH, individually and in his | ) |
| capacity as a state actor in these | ) |
| proceedings against the Plaintiff; | ) |
| MOSES WRIGHT, individually and in | ) |
| his capacity as a state actor in these | ) |
| proceedings against the Plaintiff; | ) |

| MIRIAM BEARDEN, individually and | ) |
| in her capacity as a state actor in these | ) |
| proceedings against the Plaintiff; and | ) |
| FICTITIOUS DEFENDANTS A, B, C, | ) |
| D, E, F, G, H, I, J, who caused and/or | ) |
| contributed to the damages complained | ) |
| of in this Complaint, whose identities | ) |
| are presently unknown but will be | ) |
| supplied by amendment when ascertained; | ) |
| Defendants. | ) |

## FIRST AMENDED COMPLAINT
## UNDER 42 U.S.C. § 1983 AND FOR INJUNCTIVE AND DECLARATORY RELIEF, AND SUPPLEMENTAL JURISDICTION

COMES NOW the Plaintiff, pro se, and submits his first amended Complaint pursuant to Rule 15(a)(1)(A), *Fed.R.Civ.P.*, as follows:

### I. PRELIMINARY STATEMENT

The Defendants are subjecting and causing the Plaintiff to be subjected to the deprivation of constitutional and federal rights in the most severe manner by, *inter alia*, attempting to dispossess him of his constitutional property interests in his federally subsidized housing and federal benefits and to render him homeless while acting under color of state law. They are trying to evict him on outrageously false and unconscionable premises. They admit that four of the five lease infractions which are the basis for his eviction are invalid (see Exhibit "A") and are alleging same despite admitting their invalidity in the first action for eviction that they filed. This is all fruit of the poisoned tree wherein Defendant Wren chose to pursue retaliatory eviction process against the Plaintiff instead of complying with due process by performing her duty to open a dialogue, conduct a preliminary interview, meet with Plaintiff regarding his grievances, and work to mediate his grievances as she pledged to do. Instead, she ignored due process, ignored her duty, ignored HUD requirements, ignored

constitutional requirements, ignored federal law, and imposed draconian eviction proceedings that she had pledged not to initiate, hence causing severe trauma and injuries as set out in the Plaintiff's initial action in this District under Case No. 2:19-CV-00885-ACA, a second and admittedly invalid state action for unlawful detainer, removal of said state action, and this Section 1983 Complaint, all uselessly, all preventable, but all the result of the most severe injuries, violations of law and due process, and damages as set out in Plaintiff's causes of action.

In said Case No. 19-CV-885, the Court informed the Plaintiff he could not sue for violation of his constitutional rights such as due process, equal protection, association, speech, *et al.,* in that action. Hence, the Plaintiff has excised these claims and is bringing those that are cognizable in this action under 42 U.S.C. § 1983 where pleading of constitutional violations is not only actionable but where constitutional violations are required to be alleged in order to invoke jurisdiction under this Section.

As the facts show, this action is the regrettable result of **retaliatory eviction actions** in violation of SPM/Highland Manor's own promulgated policies and procedures, HUD Rules and Regulations, federal and state law, the U.S. Constitution, and other provisions of law in violation, *inter alia,* of Plaintiff's rights of due process and equal protection by the Defendants, who are subjecting and causing the Plaintiff to be subjected to false and unconstitutional eviction actions and other unlawful acts under color of state law.

This entire controversy, that includes the existing action #19-cv-885, 13 grievances, invalid lease infractions, two state cases- the first one having been dismissed, extensive legal wranglings, HUD consultations, HUD holdings, controversial legal process, denial of interview requirement, denial of grievance process, denial of rights under HUD, the Housing Act, anti-discrimination laws, federal law and statutes, constitutional law, due process, equal protection, an entire host of issues, could have all been obviated had Defendant Wren complied with her duty and promise to process Plaintiff's grievances, to meet with Plaintiff following a

meeting with Defendant Bailey, to open the dialogue and provide the HUD required interview, and to work to resolve Plaintiff's grievances under her assurances that "we (at SPM) are not about evicting tenants," that 'we care about our tenants and their concerns and grievances'. Instead of working to resolve Plaintiff's grievances and resolving the essential issues that have led to this action, Wren issued a hostile letter with only bald, vague and conclusory allegations instead of responsive statements addressing Plaintiff's grievances. Plaintiff first appealed to HUD, who as Plaintiff was informed does not review such matters, and who referred him forward to federal district court where said existing case was filed on June 10, 2019.

The Defendants responded not by giving Plaintiff the hearing to which he had a right, and by working with him to resolve his grievances as Plaintiff repeatedly requested including an amicable resolution, but Defendants responded by retaliating against the Plaintiff, by initiating malicious action to render him homeless, by filing invalid lease infractions, invalid lease termination letters, and invalid actions to evict him, to deprive him of the most basic constitutional rights that include his continued tenancy in federally and state subsidized housing and his right to federal benefits which cannot be denied him without due process of law, and perhaps most grievously, to take such actions despite his physical and mental disabilities and handicaps as acts of unconstitutional discriminatory acts as set out in the fourth cause of action below.

The Defendants at first refused to respond to Plaintiff's assertions that the four lease infractions were invalid on their face. All were cured under federal/HUD/ CFR and Alabama law and cannot be sustained as a basis for eviction and are due to be dismissed and expunged from Plaintiff's records. One did not even state on its face a lease infraction. The other also failed to stand because it failed to provide sufficient notice and there was no adequate factual basis for the infractions.

**Most conclusively of all, Defendant Bailey admitted under oath in the state hearing on November 21, 2019 that these four infractions were invalid (see affidavit of attorney Jonathan Mok, attached as Exhibit "A".)**

Yet the Defendants have used these admittedly invalid premises to file a second eviction action, arguably a blatant abuse of process and a malicious prosecution.

To re-emphasize, Defendant Bailey **admitted under oath** in state court proceedings that four of these infractions were invalid. Instead of withdrawing them, Defendants, including Defendant Winston, have re-alleged these invalid infractions and premises in still another unlawful detainer action. Again, Defendants continue their malicious vendetta and retaliation against the Plaintiff who presented them with valid grievances and has repeatedly sought an amicable resolution to this controversy. The Defendants maliciously seek to render the Plaintiff homeless on admittedly false premises and in violation of his most basic constitutional rights.

The Plaintiff subsists on SSI Disability payments and cannot afford market rate housing. As the facts and law state herein, he has a constitutional right and property interest in his continued tenancy, and in his entitlement to federal benefits both of which cannot be deprived by the Defendants, who are state actors in this process, without due process of law, particularly in light of his disabilities. The Defendants are acting unconscionably and grievously to attempt to deprive the Plaintiff of these constitutional and civil rights. The Defendants have repeatedly ignored his requests for reasonable accommodation pursuant to his mental and physical disabilities by which he should be afforded the right and accommodation that would permit him to continue his tenancy and avert homelessness.

The Plaintiff has enjoyed decades of superlative relationships with landlords including his last previous landlord at Birmingham Tower apartments, also a HUD facility receiving federal and state subsidy assistance payments like Highland Manor apartments. This action originated with the rogue actions of Defendant Bailey, community manager of Highland Manor, in discriminating against Plaintiff based on his mental health disability, and her subsequent abuse, discrimination, harassment, elder abuse, bullying, intimidation, threats, extortion and other trauma as set out in pertinent part in this action, depriving him of his constitutional rights together with the

other named defendants in this action while acting under color of State law.

The most egregious and unconscionable culpability however lies with Defendant Wren, who alleges 30 years of experience in these matters, yet she abrogated her duty to meet with the Plaintiff for the HUD mandated interview following his presentation of his grievances, and abrogated her duty to attempt mediation of the matter. Defendant Bailey's temperament and qualifications are highly suspect. She is perhaps simply a tragic, incompetent, prejudiced and malicious person as her behavior has demonstrated. But Defendant Wren is an SPM Vice President whom one would assume to be competent, but perhaps she shares Bailey's attributes whom she has shielded and protected. Wren has certainly proven to be incompetent and derelict in her duty and position. However, all other Defendants have joined her. Even a direct appeal to SPM President/CEO and Defendant Welden was not answered. All other Defendants have acted directly against the Plaintiff in concert with Wren and have caused great, immediate and irreparable injuries and damages. All Defendants share liability for this travesty that could have so easily been averted had the Defendants chosen to act pursuant to their obligations and duties, and to act lawfully and without tortious and injurious conduct.

The Defendants apparently are not accustomed to the apparently perceived audacity of a tenant who seeks to enforce and vindicate his constitutional and statutory rights. Their contempt for the rights of their tenants is appalling and shocks the conscience, apparently objecting to anyone seeking the audacity of hope. They have acted under color of State law, statutes, ordinances, regulations, customs, and/or usages in subjecting and causing Plaintiff to be subjected to the deprivation of rights and privileges secured by the U.S. Constitution and laws. This Complaint follows.

## PARTIES

1. The Plaintiff is William Marshall Pickard III ("Pickard"), who resides at 2040 Highland Ave South, Apartment 401, Birmingham, Jefferson County, AL 35205-3834; telephone no. (205) 586- 9055, email: *marshall3d@hotmail.com.*

2. The Defendants are:

(a) Highland Manor, LTD., ("HManor"), whose address is 2040 Highland Ave South, Birmingham, AL 35204: telephone no. (205) 933-7543, is acting under color of State law in subjecting Pickard and causing him to be subjected to the deprivation of rights and privileges secured by the United States Constitution and laws, particularly to due process under the 5th and 14th Amendments thereto, and is therefore liable to Pickard as set out in this Complaint.

(b) SPM, LLC, ("SPM"), whose address is 1103 Richard Arrington, Jr. Blvd. S., Birmingham, AL 35205, telephone no. (205) 933-1020, is acting under color of State law in subjecting Pickard and causing him to be subjected to the deprivation of rights and privileges secured by the United States Constitution and laws, particularly to due process under the 5th and 14th Amendments thereto, and is therefore liable to Pickard as set out in this Complaint.

(c) Honorable Steve Marshall ("Marshall"), Attorney General of Alabama, whose business address is: Office of the Attorney General, 501 Washington Avenue, Montgomery, AL 36104, telephone no. 334-242-7300, is acting under color of State law in enforcing unconstitutional statutory laws regarding Alabama's Landlord-Tenant statutes, and is subjecting Pickard and causing him to be subjected to the deprivation of rights and privileges secured by the United States Constitution and laws, particularly to due process and equal protection under the 5th and 14th Amendments thereto, and is therefore liable to Pickard as set out in this Complaint for injunctive and declaratory relief. In that he is not being sued in his individual or personal capacity, immunity does not attach and injunctive and declaratory relief is available pursuant to 42 U.S.C. § 1983. In such a case, the Eleventh Amendment does not bar suits for specific and/or equitable remedies, or remedies for prospective declaratory or injunctive relief against state officers in their official capacity. Further, the Eleventh Amendment does not prohibit suits to impose individual and personal liability on state officers under § 1983.

U.S.C.A. Const.Amend. 11; 42 U.S.C.A. § 1983.

(d) Norman Winston Jr. ("Winston"), whose business address is 1800 12th Avenue South, Birmingham, AL 35205; telephone 205-933-2300, is acting under color of State law, individually and as agent for the Defendants, in subjecting Pickard and causing him to be subjected to the deprivation of rights and privileges secured by the United States Constitution and laws, particularly to due process under the 5th and 14th Amendments thereto, and is therefore liable to Pickard as set out in this Complaint.

(e) Jason H. Smith (JSmith), whose address is 3326 Posey Rd., Morris, AL 35116, who is acting under color of State law, individually, as agent for the Defendants and as an officer of State Court, in subjecting Pickard and causing him to be subjected to the deprivation of rights and privileges secure by the United States Constitution and laws, particularly to due process under the 5th and 14th Amendments thereto, and is therefore liable to Pickard as set out in this complaint.

(f) Deborah Wren ("Wren"), whose business address is SPM Property Management LLC, 2101 Highland Avenue, Suite 400, Birmingham, AL 35205; telephone no. (205) 933-1020, who is acting under color of State law, individually and in her official capacity, in subjecting Pickard and causing him to be subjected to the deprivation of rights and privileges secured by the United States Constitution and laws, particularly to due process under the 5th and 14th Amendments thereto, and is therefore liable to Pickard as set out in this Complaint.

(g) Nikeshia Bailey ("Bailey"), whose business address is: Highland Manor, 2040 Highland Avenue South, Birmingham, AL 35205-3832; telephone no. (205) 933-7543; is acting under color of State law, individually and in her official capacity, in subjecting Pickard and causing him to be subjected to the deprivation of rights and privileges secured by the United States Constitution and laws, particularly to due process under the 5th and 14th Amendments thereto, and is therefore liable to

Pickard as set out in this Complaint.

(h) William Welden, ("Welden"), whose business address is SPM Property Management LLC, 2101 Highland Avenue, Suite 400, Birmingham, AL 35205; telephone no. (205) 933-1020, is acting under color of State law, individually and in his official capacity, in subjecting Pickard and causing him to be subjected to the deprivation of rights and privileges secured by the United States Constitution and laws, particularly to due process under the 5th and 14th Amendments thereto, and is therefore liable to Pickard as set out in this Complaint.[1]

(i) Allen Smith ("ASmith"), whose business address is SPM Property Management LLC, 2101 Highland Avenue, Suite 400, Birmingham, AL 35205; telephone no. (205) 933-1020, is acting under color of State law, individually and in his official capacity, in subjecting Pickard and causing him to be subjected to the deprivation of rights and privileges secured by the United States Constitution and laws, particularly to due process under the 5th and 14th Amendments thereto, and is therefore liable to Pickard as set out in this Complaint.[2]

(j) Moses Wright ("Wright"), whose business address is SPM Property

---

[1] A corporation and its officers may be held liable for compensatory damages for their failure to ensure the corporation's compliance with the Fair Housing Act (FHA), whether or not the officers directed or authorized the particular discriminatory acts that occurred. *Holley v. Crank*, 258 F.3d 1127, (9th Cir. 2001), certiorari granted 122 S.Ct. 1959, 535 U.S. 1077, 152 L.Ed.2d 1020, vacated on other grounds, 123 S.Ct. 824, 537 U.S. 280,154 L.Ed.2d 753, on remand 386 F.3d 1248. 42 U.S.C.A. § 3604. A plaintiff may sue for breach of the Fair Housing Act under 42 U.S.C. § 1983. *Wallace v. Chicago Housing Authority*, 298 F. Supp. 2d. 710, 718 (N.D. Ill. 2003) (allowing use of § 1983 to sue for breach of Fair Housing Act, citing *Cannon v. University of Chicago*, 441 U.S. 677 (1979).)

[2] A corporation and its officers may be held liable for compensatory damages for their failure to ensure the corporation's compliance with the Fair Housing Act (FHA), whether or not the officers directed or authorized the particular discriminatory acts that occurred. *Holley v. Crank*, 258 F.3d 1127, (9th Cir. 2001), certiorari granted 122 S.Ct. 1959, 535 U.S. 1077, 152 L.Ed.2d 1020, vacated on other grounds, 123 S.Ct. 824, 537 U.S. 280,154 L.Ed.2d 753, on remand 386 F.3d 1248. 42 U.S.C.A. § 3604. A plaintiff may sue for breach of the Fair Housing Act under 42 U.S.C. § 1983.*Wallace v. Chicago Housing Authority*, 298 F. Supp. 2d. 710, 718 (N.D. Ill. 2003) (allowing use of § 1983 to sue for breach of Fair Housing Act, citing *Cannon v. University of Chicago*, 441 U.S. 677 (1979).)

Management LLC, 2101 Highland Avenue, Suite 400, Birmingham, AL 35205; telephone no. (205) 933-1020, is acting under color of State law, individually and in his official capacity, in subjecting Pickard and causing him to be subjected to the deprivation of rights and privileges secured by the United States Constitution and laws, particularly to due process under the 5th and 14th Amendments thereto, and is therefore liable to Pickard as set out in this Complaint.[3]

(k) Miriam Bearden ("Bearden"), whose business address is SPM Property Management LLC, 2101 Highland Avenue, Suite 400, Birmingham, AL 35205; telephone no. (205) 933-1020, is acting under color of State law, individually and in her official capacity, in subjecting Pickard and causing him to be subjected to the deprivation of rights and privileges secured by the United States Constitution and laws, particularly to due process under the 5th and 14th Amendments thereto, and is therefore liable to Pickard as set out in this Complaint.

(l) Designations: the term "Landlord" shall refer hereinafter to all of the above-named Defendants who are employed by SPM and/or HManor as acting in concert as Pickard's Landlord. The term "Tenant" shall refer hereinafter to Pickard. Pickard is the Tenant against whom the Landlord is acting as state actors in depriving Pickard of rights, privileges, or immunities secured by the Constitution and laws of the United States.

(m) The terms "constitution", "constitutional"; "constitutionally" and other references to a constitution refer herein to the constitution of the United States unless otherwise specified.

_____

[3] A corporation and its officers may be held liable for compensatory damages for their failure to ensure the corporation's compliance with the Fair Housing Act (FHA), whether or not the officers directed or authorized the particular discriminatory acts that occurred. *Holley v. Crank*, 258 F.3d 1127, (9th Cir. 2001), certiorari granted 122 S.Ct. 1959, 535 U.S. 1077, 152 L.Ed.2d 1020, vacated on other grounds, 123 S.Ct. 824, 537 U.S. 280,154 L.Ed.2d 753, on remand 386 F.3d 1248. 42 U.S.C.A. § 3604. A plaintiff may sue for breach of the Fair Housing Act under 42 U.S.C. § 1983.*Wallace v. Chicago Housing Authority*, 298 F. Supp. 2d. 710, 718 (N.D. Ill. 2003) (allowing use of § 1983 to sue for breach of Fair Housing Act, citing *Cannon v. University of Chicago*, 441 U.S. 677 (1979).)

(n) Pursuant to 42 U.S.C. § 1983, the terms "under color of state law" and "state actors" have the same meaning and are interchangeable.

## JURISDICTION & VENUE:

A.. This Court has jurisdiction over this action pursuant to Title 28 U.S.C. §§1331 and 1343(3) in that the controversy arises under Title 42 U.S.C. §1983; and, *inter alia,* federal law, federal question jurisdiction, the United States Constitution, and 28 U.S.C. §§2201 and 2202. The Court further has jurisdiction over matters in this Complaint pursuant to 28 U.S.C. § 1651.

B. The Court further has pendent jurisdiction over related federal and state claims under the facts and law of this case pursuant to Title 42 U.S.C. § 1983. The Plaintiff's state law claims in this case arise from common nucleus of operative facts forming basis for plaintiffs' § 1983 federal civil rights violations and therefore are considered along with federal claims in federal court proceedings. *Quinones, infra. UMW v. Gibbs, infra.* 42 U.S.C.A. § 1983; West's F.S.A. § 83.53 et seq. A federal court will consider state claims if both the state and federal claims advanced in a complaint derive from a common nucleus of operative fact. *Quinones v. Durkis,* 638 F.Supp. 856, at 861 (D.C. Fla. 1986), citing *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). (If the claims are considered without regard to their state or federal characteristics, and the claims are such that a plaintiff would be expected to try them in one judicial proceeding there is power in the federal courts to hear the whole. *Id.* 86 S.Ct. at 725.)

C. This Court has jurisdiction and authority to award attorney's fees should Plaintiff be able to obtain assistance of counsel pursuant to 42 U.S.C. §1988.

D. The Plaintiff further invokes the supplemental jurisdiction of this District Court under 28 U.S.C. §1367 to hear and adjudicate state law claims where exercise of such discretion may be necessary.

E. Each and all of the acts (or threats of acts) alleged herein were done by Defendants, or their officers, agents, and employees, under color and pretense of the state statutes, ordinances, regulations and usages of the State of Alabama.

F. Venue is proper in the Northern District of Alabama, Southern Division due to the fact that the events and conduct complained of herein all occurred in this venue.

## PERTINENT FACTS:

1. In October 2018, Pickard stopped by Highland Manor to inquire about applying to reside at the facility. He submitted his application there on October 23, 2018. His application was processed by Ms. Joyce Caddell.

2. On November 12, 2018, Pickard received a Notice of Eligibility from Ms. Caddell stating that his application was approved as eligible and that an interview was scheduled for November 27, 2018. He was provided with a list of documents and information to submit in this process.

3. On November 16, 2018, Pickard received a call from Ms. Caddell stating that one of the documents that he needed to provide was a list of his doctors and his pharmacy pursuant to his medical expenses.

4. On November 19, 2019 Pickard brought the requested information and met with Defendant Nikeshia Bailey, the Manager of Highland Manor. She looked over the list, and asked, "You have two psychiatrists?" Pickard replied yes. Bailey then remarked, "you must really be crazy." Pickard thought that this remark was made in jest, but her tone and expression remained serious. She then stated that, "We don't have crazy folks at Highland Manor, this is not that type of place."

5. Pickard was taken aback. She then said, "Okay, Mr. Pickard, this is all for now." He contacted his psychiatric caseworker, Paul Moffett, who called Bailey regarding this matter for clarification.

6. Pickard would later discover that Bailey has a bias and prejudice against

persons with mental health disabilities, and that she has exhibited this against others.

7. From November 19, 2018 forward, Bailey has harassed, abused, stalked, bullied, threatened, harangued, made false statements, alleged false lease infractions, and inflicted trauma on Pickard who suffers from affective disorder and other mental and physical health conditions. Because of his disabilities and conditions, he is especially susceptible to this trauma and has suffered extreme trauma in addition to repeated, severe violations of his Constitutional rights caused by Bailey's conduct.

8. The actions stated above and subsequent actions under color of State law by Bailey, her superior Defendant Wren, joined by other Defendants, have subjected Pickard to deprivation of his rights under the U.S. Constitution and laws and have caused intense mental suffering, trauma and discrimination against Pickard.

9. This contact on November 19th was Pickard's first and only in-person contact with Bailey until the signing of the lease on March 13, 2019. All subsequent contacts in this interim with Bailey were by phone. She declined Pickard's requests for subsequent in person contacts in this interim.

10. Bailey took numerous actions in an attempt to prevent Pickard from moving in. She required documents and information that have been determined not to have been required and in some cases inappropriately and/or unlawfully requested.

11. In the first week of February, Ms. Caddell called Pickard to inform him that a two bedroom unit was available and would be ready to move in during the first week of March. She advised him to give his 30 day notice at the Birmingham Tower Apartments where he was staying (also a HUD subsidized multi-family facility like Highland Manor.) Pickard gave his notice to move out of Birmingham Towers and thus surrendered his tenancy there. Unless Highland Manor complied with their commitment to complete the Section 8 lease process for his apartment there, Pickard would not have time to apply for and secure another affordable residence and he would be rendered homeless once again.

12. Pickard, who suffers from metabolic syndrome that improves with elevation, inquired about the elevation of the apartment. Ms. Caddell stated that she could not yet tell him the apartment number, but that it was on the fourth floor. She told him to be sure to mention this health issue at the lease signing and he would be placed on the transfer waiting list to move to a higher level apartment pursuant to this medical condition and request for reasonable accommodation.

13. Bailey subsequently called him and told him that his application had been re-processed, that this was required after 90 days from the original application. However, it had been less than 60 days since the original application. She told him that he was not approved where he had previously been approved, but had to have a co-signer or he would be rejected. His existing apartment at Birmingham Tower had already been leased, so he faced the trauma of having nowhere to go, being homeless. His only income is SSI Disability monthly payments. He can only afford subsidized housing, which requires long waiting lists. This prospect of homelessness was exceptionally traumatizing.

14. Pickard stated that it had not been 90 days, and asked why he was rejected when his financial condition and credit report and score had improved. Bailey told him that he would receive a letter within 10 days stating the reasons, but no letter was ever received. When Pickard asked as to why she initiated another such re-processing when 90 days had not expired, she became irritated and refused to answer, only stating that this was done by a "third party" whom she would not identify, nor has anyone at SPM or Highland Manor complied with HUD law by identifying and allowing Pickard to be informed and to appeal this adverse action which could deprive him of his constitutional liberty interests in continued occupancy in federally subsidized housing and receipt of federal benefits, and perhaps the most severe consequence of all, homelessness.

15. Bailey said that he needed to find a co-signer in the next 2-3 days or she would have to give the apartment to the next person on the waiting list.

16. Pickard fortunately found a co-signer, and the prospect of homeliness was averted for the time being.

17. Bailey then called him to tell him that his godson and long-term live-in aide (John Mckinney) including at Birmingham Tower was not approved to be his live-in aide at Highland Manor. Mr. Mckinney had twice been approved as a live-in aide at Birmingham Tower under virtually the same Residential Selection Criteria as Highland Manor. An approved live-in aide was necessary for him to move in to a 2 bedroom apartment, and no other apartment was available. She again told him that he would have to find an approved live aide within 2-3 days or he would be placed back on the waiting list, which again would render him homeless.

18. He asked the reason for this action. Bailey told him that he would receive a letter within 10 days stating the reasons. Again, no letter was ever received. He would not find out the reason until July 30, 2019 in a status conference in federal court.

19. Pickard fortunately was able to find an approved live-in aide. Mr. Walter Hunt.

20. Bailey's disposition since finding out about his mental health issue has been hostile as stated above. She took unusual actions to discourage or prevent him from moving in, and has abused, harassed and traumatized him, his live-in aide and guests from the day that he moved in forward including constant threats of eviction in a thinly veiled attempt to compel and induce him to move out. She has continued to do so to the present. Many of Pickard's friends and guests have stopped visiting him due to Bailey's and Caddell's hostility and hostile treatment, including his live-in aide who began to decline to be present during office hours.

21. Just prior to the lease signing, Pickard submitted his written request for a reasonable accommodation and transfer for medical condition regarding his metabolic syndrome as advised by Ms. Caddell. His psychiatric caseworker faxed the required verification of his condition for this request.

22. Bailey called him immediately and told him that they did not move a tenant

from one 2 bedroom unit to another 2 bedroom unit for <u>any</u> reason. He would have to go back on the waiting list to wait if he wanted a unit at a higher level. Pickard told her what Ms. Caddell had told him to do. Bailey said that this was error. He replied that he did not have the option to go back on the waiting list, that this would render him homeless. She replied that he would have to be homeless then if he persisted in his request regarding his request for reasonable accommodation and medical condition.

23. After all of the obstacles attempted by Bailey, Pickard signed his lease and moved in on March 13, 2019. On that day, Bailey accused him of backing in to and damaging a three-foot section of drain pipe on the back of the building, that she had video evidence of the incident, which she never produced. Pickard was distressed, and tried to simulate the circumstances where his long U-Haul truck might be able to cause this damage to the drain pipe especially without impacting or damaging the surrounding wall, but the alley way was much too narrow and it certainly was not plausible that such damage could be caused to the drain pipe without significant damage also to the wall.

24. Pickard and his live-in aide, Mr. Hunt, also informed Bailey that they had a small business that they had started at Birmingham Tower in compliance with HUD Model Lease Rules there and at Highland Manor. The business was primarily operated by his live-in aide. Pickard received fast speed internet service but no share of the income. Pickard had clarified that the business was in compliance with all conditions stated in the Lease addendum for operation of this business. Bailey asked a few questions, primarily as to whether there was any customer traffic to and from the apartment or anything that would disrupt the facility. Pickard replied that the business was conducted online. This satisfied Bailey at this time. She would later forge and concoct a lease infraction which she backdated to March 20, 2019, long before the small business became an issue. She falsely alleged that Pickard had stated that a "guest" was operating the small business. This was contradicted by Defendant Wren in her letter of June 7, 2019 in which she confirmed that Pickard had stated that his <u>live-</u>

in aide, also a resident on the lease, was operating the business. In a state court hearing, Bailey admitted that the Lease addendum did not proscribe others from assisting a resident in such a business, such as a live-in aide or guest (see affidavit of attorney Jonathan Mok attached as Exhibit "A".)

25. Bailey refused, and continues to refuse to comply with HUD Regulations, specifically, 24 C.F.R. § 247.4(b), by refusing to comply by serving such matters by mail AND by serving an adult at the residence or if no adult was present by placing same **UNDER the door** where possible (there is more than enough room to place any such correspondence under Pickard's apartment door). (The requirement to serve such matters in this manner has been confirmed by HUD Navigate.) This forged and backdated lease infraction was not provided to Pickard until July 29, 2019 when the Defendants issued their Lease Termination Letter. The Defendants are attempting to use this fraudulent document in part as a premise to attempt to evict Pickard despite Bailey's sworn testimony that it is not a violation.

26. During his first week, Bailey began harassing Pickard regarding the number and frequency of his guests. He and his live-in aide have many friends who came to see his new apartment. In her harassment, Bailey described Highland Manor as a sedate facility and that his frequency of guests was disruptive. She began harassing his guests and demanding ID before they could enter. No other resident was observed in having their guests treated in such a hostile manner. As stated above, many of Pickard's guests stopped coming to visit due to Bailey's harassment of them. This includes a friend who was providing house cleaning services in exchange for sitting services. The loss of these services would later be a factor in a falsely alleged lease infraction dated June 13, 2019.

27. Bailey began to make threats of false lease infractions and eviction causing Pickard severe distress and trauma. She continued to stalk, harass and abuse him each time that she saw him. She began a pattern of claiming that she had placed letters and notices on his door. Many of such items were never received by the Pickard, including

three of the four lease infractions alleged in the Lease Termination letter of July 29, 2019, again, in violation of 24 C.F.R. § 247.4(b) as confirmed by HUD Navigate.

28. She also alleged that she happened to see one of his guests in the parking deck whom she believed to be about to use drugs. She did not say how she could have known that this was one of Pickard's guests, and this fact is still uncertain. Since Pickard was not aware of the alleged presence of any such person, and even if this person was to be guest, this person was not yet under his control in order to render him culpable for any misconduct or violations under 24 C.F.R. 5.100. Nevertheless, Bailey called Pickard and his live-in aide to her office, and berated them with a long tirade and told them that she was issuing two lease infractions for the visitor frequency issue and this alleged incident of suspected drug use. She told them that only 4 lease infractions were allowed per year. 2 more lease infractions and she would evict Pickard. Her harangue was so abusive that Mr. Hunt began leaving the premises during office hours when she was present. This caused frequent difficulties for Pickard when he was in need of his live-in aide during these times.

29. Shortly thereafter, Pickard was in Montgomery with the family of a close friend who had passed away suddenly and at a young age, grieving over her loss. His phone was respectfully on silent. He received two calls and voice mail messages from the Highland Manor Office that one of his guests had parked his vehicle on the wrong level of the parking deck. The messages stated that they were about to tow the vehicle. Upon his return, he was told that this was his third lease infraction.

30. Pickard would later learn that none of these lease infractions were factual, but only threatened. None were issued. His distress was extreme however believing that one more misstep and he would be evicted and rendered homeless.

31. Bailey continued to abuse, harass and stalk him at every opportunity. She began making up rules that are not in the Lease/Rules & Regulations that she imposed on Pickard but not other tenants which had a disparate and adverse impact on him. This included the vague and non-specific rules concocted by Bailey limiting Pickard's

guests, the Rule that his guests must be interrogated and show ID upon entry, that Pickard must accompany guests at all times, that Pickard could not allow guests to temporarily use a key and key fob, that no one except Pickard's live-in aide could be present in the apartment when Pickard was out of town, that the small business and members could not receive mail at the apartment, and that anyone objectionable to Bailey could be 'banned' from the property without any other reason or recourse.

32. Pickard also began to have problems with mail delivery.

33. Bailey and Ms. Caddell admitted to withholding mail, particularly that addressed to the members of the small business.

34. Pickard noticed that there is a sign by the mailboxes for the facility that states "No one to handle mail except Manager and Postman." Bailey, who is the Manager, is a private citizen who has no lawful authority to handle U.S. Mail. Pickard lodged his repeated strenuous objections to this behavior. He continues to object, including in grievances to SPM Property Management who manages Highland Manor, but Bailey, SPM and Highland Manor continue to improperly and illegally withhold Pickard's mail. SPM's response again has been to retaliate against Pickard for such objections and grievances by filing to evict him- how dare he challenge them on any issue, especially this issue where apparently Highland Manor employees have had access and have violated residents' rights regarding the U.S. Mail for a long time.

35. On April 11, 2019, she placed two letters on his door demanding that he come to her office no later than the next day regarding a "very serious matter." This matter turned out to be the alleged damage to the drain pipe at the rear of the building mentioned above. As stated above, Bailey's alleged video proof was not produced as she promised. Under extreme duress and threat of a fourth lease infraction and eviction, he was coerced by extortion into signing a promise to pay agreement for the sum of $330.00 with payments of $50.00 of which Pickard has been extorted into paying a payment of $50.00. She did not allow him the opportunity to submit a claim to his auto insurance company, or to take bids and accept the low bid for the repair.

36. Her harassment and abuse intensified.

37. In April. 2019. Pickard submitted an extensive request for assistance to the Alabama Disabilities Advocacy Program in Tuscaloosa and subsequently drove to Tuscaloosa for a meeting. They were very sympathetic, but stated that due to their heavy caseload, they could not consider assisting until eviction was actually filed for, and even then, their caseload might not allow them to assist.

38. On May 24. 2019. Bailey placed two lease infractions on his doorknob. One stated merely that he must live in the unit 'and in the unit'. The second stated that an unauthorized person was living in his apartment. There was no such person. Pickard was extremely traumatized, because he believed that these were his fourth and fifth lease infractions. However, both lease infractions state that this was his second infraction. He was very confused and tried to ask Bailey for clarification, but she would not see him or answer or return his calls.

39. From that time forward, Pickard suffered much increased trauma and extreme anxiety regarding Bailey threats to evict him.

40. The matter escalated until on June 4. 2019. Pickard wrote a letter to Gail Graves, the Vice-President of SPM Property Management who manages Highland Manor and whom he was informed to be a supervisor over Bailey and other Community Managers. The letter detailed the abuses, harassment and trauma suffered by Pickard, and was accompanied by 12 Grievances.

41. Pickard was informed that Deborah Wren would be the person who would handle the matter. He met with her the next morning. June 5th, and she stated that she would review the letter and grievances, consult with Bailey, and then meet with him again the next morning. She was gracious and stated that SPM was not 'about evicting people.' and that she cared about her tenants on par with Highland Manor staff.

42. The following morning, she refused to meet or speak with him. Her assistant told Pickard that she would not be meeting with him and would require another day to respond. This was extremely disconcerting and traumatic for Pickard.

He had been assured that he would get a meeting and fair hearing. and now he was getting no meeting or hearing at all.

43. The next morning. June 7. 2019. she issued a response letter in which most of the issues stated in the Grievances were ignored. and facts for which there is written and other confirmed evidence were denied. The letter contains predominantly conclusory statements. with virtually no substantive facts lacking factual underpinnings. and is vague, ambiguous and uncertain.

44. The letter expresses bias and is non-responsive and mostly devoid of cognizable premises. The letter fails to comport with minimal elements of due process regarding grievances and the alleged lease infractions. including continued failure to provide notice and sufficient facts to provide Pickard with information needed to be informed of and defend against allegations particularly in the infractions issued as of that date.

45. Wren stated that she attempted to deliver the letter that day, but that there was no answer at Pickard's door although Pickard was in his apartment waiting for her to contact him as her assistant had told him she would do. She then insisted that he meet her in the lobby of Highland Manor on Monday. June 10. 2019. Pickard's birthday, to deliver the letter.

46. Pickard was devastated and severely traumatized. She had abrogated the grievance process. She had reneged on her duty and promise to meet with him on June 6, 2019. regarding the matter.

47. Pickard drafted and filed on Monday morning a federal complaint (Case no. 2:19-CV-00885-ACA) appealing Wren's actions together with Bailey's conduct regarding the issues raised in his June 4th letter and grievances. and pleading the violations of his right to reasonable accommodations. his disparate treatment. disability harassment. tortious interference with his business. and other injuries.

48. When Pickard received the letter about an hour later. he was even more devastated by the non-responsiveness and collusion with Bailey's abuse. harassment

and infliction of trauma.

49. He filed a request for a supplemental pleading in federal court to address these additional issues, intending to later amend his complaint after ascertaining more information and giving Wren the opportunity to meet with him as she had promised to do and to address the grievances rather than effectively ignore, mischaracterized and essentially not respond to them. Wren continued to refuse his calls and requests for the promised meeting.

50. It was even repeatedly denied that Pickard had submitted his request for a reasonable accommodation, despite his written requests and the confirmation of this submission by fax and phone by his psychiatric caseworker.

51. Pickard was extremely traumatized and began suffering much more intensive mental suffering as his therapists and physicians have documented. Much concern exists regarding his well-being in light of this trauma.

52. Pickard's physical condition has also severely deteriorated, culminating in a severe cardiac trauma on September 28, 2019 for which he was treated in the trauma unit of Druid City Hospital and was hospitalized for three days.

53. This trauma has continued and he was placed on a cardiac monitor on October 18, 2019, with restricted activity extended until November 26, 2019. It is now clear that these severe injuries suffered are permanent, great, immediate and irreparable.

54. The federal court was responsive to his complaint in the case that he filed (No. 2:19-CV-00885-ACA). A status conference was set for July 30, 2019. On the day before this hearing, July 29, 2019, Pickard received a Lease Termination letter as stated above. Pickard obviously was extremely traumatized.

55. Pickard had not received three of the four alleged Lease Infractions. Only one of the four Lease Infractions alleged as the basis for the Lease Termination was received by him (on May 24, 2019) prior to the issuance of the Termination Letter.

56. A lease infraction was alleged on March 20, 2019, falsely stating that

Pickard had said that "a guest" was operating a business at his apartment. Pickard never made such a statement. Pickard did not receive this infraction until the Lease Termination Letter to which it was attached, on July 29, 2019. The reference to an infraction in Wren's letter was dismissed as another of many falsely alleged and/or falsely threatened infractions by Bailey. Had Pickard received such an infraction, he certainly would have challenged it as assertively as he has challenged all other alleged infractions. It is not credible that Bailey issued such an infraction as alleged. It was forged, backdated and inserted into his file without being delivered to Pickard. Moreover, as stated below, she failed to comply with the due process requirements of 24 C.F.R. § 247.4(b) for service regarding all alleged lease infractions.

57. As stated above, Pickard and his live-in aide had informed Bailey at the lease signing that the business that was primarily being operated by his live-in aide. Wren confirmed that Pickard had stated that it was his live-in aide who was the primary one operating the business. The Rules state that residents can operate a business at the apartment. Pickard and his live-in aide are specifically identified as residents in the Lease.

58. Moreover, the Rules do not limit the members of the business. None of the conditions for a business limit the members either. The Rules allow for a business as stated above. Pickard had confirmed that he met all conditions for operating a business, which is reaffirmed in an Exhibit to his June 4th letter, grievances and federal complaint. This compliance has not been contested by the Defendants. Moreover, Bailey testified under oath in the state hearing held on November 21, 2019 that the Lease allows others, such as a guest, to assist in a resident's small business.

59. Federal rules and due process prohibit *ex post facto* contractual/lease provisions or terms. Any such terms after the execution of the lease must be agreed to by all parties. Defendants are attempting to create rules and impose them in violation of this due process prohibition.

60. **Most significantly, Bailey admitted in her sworn testimony in state**

**court as stated above that the lease did not proscribe others from participation in a resident's small business (see affidavit, Exhibit "A".)**

61. A third infraction was allegedly issued on June 13, 2019 stating that Pickard's apartment was not clean and sanitary on this date. This also is untrue. Pickard's apartment was cluttered on that date. Pickard had been immobilized by limb paroxysms and his live-in aide had been gone attending to his mother. His friend who was assisting with house chores had been harassed by Bailey and was no longer visiting or providing this help which was especially grievous at such times.

62. Under HUD Rules and Regulations, clutter is not an infraction as long as it does not obstruct entrances and exit-ways, which the photos confirm that was not the case.

63. Moreover, Pickard's apartment was entered in violation of HUD Notice requirements requiring 24 hours' notice. This notice not only would have allowed for Pickard to arrange for help to straighten up the clutter, but would have alerted him to Bailey's possible adverse action. As it stands, Bailey did not provide Pickard with a copy of the infraction, which he did not receive until the Lease Termination Letter to which it was attached on July 29, 2019.

64. Pickard's apartment was entered by Highland Manor 6 times in July and August, 2019 and was found to be in its usual uncluttered, clean and sanitary condition.

**65. Most significantly, Bailey admitted in her sworn testimony in state court that this infraction was cured. Under state law (§ 35-9A-421(a), *Code of Alabama 1975*), where a violation is cured, "the rental agreement shall not terminate." (See affidavit, Exhibit "A").**

66. The Lease Termination Letter also contained the Lease Infraction alleging an unauthorized person living in the apartment which is not true, which was received by him on May 24, 2019 as stated above. Pickard had strenuously refuted this allegation as stated above.

67. The Lease Termination Letter included a second infraction dated July 24, 2019, also falsely alleging that an unauthorized person was living in the apartment. A copy of this infraction was also not received until July 29, 2019 with the lease termination letter. These infractions also failed to provide sufficient notice of pertinent facts to allow Pickard to defend against them, including the most important fact regarding the identity of the person alleged to be this unauthorized person. Defendants have been clearly informed that except for his live-in aide and guests, the only persons present in the unit are those involved with the allowed small business and are thus authorized to be there.

**68. Most significantly, Bailey admitted in her sworn testimony in state court that the alleged proof for these infractions was the coming and going of the alleged unauthorized resident. By coming and going, this established that the person was visiting and not living in the unit. Bailey admitted under oath that there was no limitations of visits. Bailey thus admitted that these two infractions were invalid and without factual basis. (See affidavit, Exhibit "A").**

**69. Bailey thus admitted in her sworn testimony that none of the four lease infractions alleged as the basis for eviction were valid, hence, there is no basis for eviction. (See affidavit, Exhibit "A").**

70. None of these 4 lease infractions contain notice including any most basic facts clarifying who, what, when or where, they only quote the rule without any facts as necessary for Pickard to be informed or to defend against them. They did not contain sufficient facts to provide notice giving Pickard the opportunity to challenge the allegations.

71. A crucial fact was also disclosed in the July 30, 2019 hearing: that the reason that Pickard's long-time live-in aide, John Mckinney, had been rejected by SPM/Highland Manor to be his live-in aide was a warrant. Pickard ascertained that this was a failure to appear warrant that was erroneously issued regarding a case that he and Mr. Mckinney believed to be nolle prossed. The notice of the hearing had been

sent in error to his former 2017 address in Vestavia Hills prior to moving to
Birmingham Tower despite the fact that Mr. Mckinney had provided his change of
address directly to the Court and in fact a Court officer had visited him at Birmingham
Tower. It is not at all uncommon for warrants for failure to appear to be erroneously
issued, which was the case in this instance.

      **72. <u>This erroneous warrant has been recalled. Had Bailey/SPM/Highland
Manor provided the letter of explanation to which Pickard had the due process
right to be provided with within 10 days of the erroneous rejection of Mr.
Mckinney as live-in aide, this matter could have been corrected back then. Mr.
Mckinney would have then been approved as Pickard's live-in aide, and three of
the four lease infractions would have had no basis: there would be no basis for
Lease Termination.</u>**

      73. Also in this hearing of July 30, 2019, a possible settlement was suggested in
open court whereby Pickard would cease operation of the business at the apartment
and would only visit with his godson off-site. The attorney for SPM/Highland Manor
agreed to propose it. In the subsequent status hearing on August 6, 2019, SPM's
counsel informed that SPM had rejected such a settlement, confirming that SPM's
objective was to effectuate the retaliatory eviction of Pickard where in their lease
infractions and termination letter the issue they advanced was his godson's status.
SPM made it clear that they had no interest in a just resolution, that "hell or high
water" they intended to evict the Plaintiff regardless of propriety, the United States
Constitution, federal and state law, HUD rules and regulations, the Code of Federal
Regulations, other law, customs, usages, practices, etc.

      74. After the conference, Pickard contacted Jeremy Locklear at HUD regarding
HUD appeal of the Letter, but was informed that HUD vested their authority including
state eviction action and process in the respective private Landlord (Defendants); that
HUD does not render a decision on the merits regarding appeals from lease infractions
such as Pickard's appeals, but only identifies whether there is a scintilla of fact alleged

to support in this instance the lease infractions which constitute the predicates for state eviction action. However, Pickard was later informed of the HUD Navigate program, where tenants can seek, *inter alia*, to elicit HUD compliance by landlords.

75. As stated above, a second status conference was held the next week, on August 6, 2019. SPM/Highland Manor's attorney stated that SPM/Highland Manor had rejected the settlement suggestion. SPM/Highland Manor was also pursuing eviction despite the fact that even if, *arguendo*, the infractions were valid, they certainly had been cured, and by law, the lease termination/eviction process was due to cease as a matter of fact and law.

76. During the time following the issuance of the Lease Termination letter, Defendant Bailey continued her acts of abuse and harassment. She increased her stalking behavior causing Pickard to isolate himself in his apartment most of the time. His quiet enjoyment of his residence has been eviscerated by Bailey's abuse and harassment, with severe pain and suffering and debilitation regarding his health and disability.

77. As stated above, Highland Manor has repeatedly and falsely claimed that they posted letters and notices on Pickard's doorknob that he never received. Federal rules require that such notices be delivered to an adult at the residence or placed **under** the door where feasible (there is much ample room to place notices under Pickard's apartment door), not on the doorknob, **AND** sent by mail. See 24 C.F.R. § 247.4(b). Highland Manor continues to place notices on the door knob, rather than simply place them under the door in compliance with the Code of Federal Regulations, and they continue to refuse to comply by mailing the notices.

78. Since issuance of the Lease Termination letter, Bailey has continued to subject him to disability based harassment including with other residents, a number of whom have been asking him if he is moving in or moving out.

79. Tenants have stated that Bailey had asked about Pickard, specifically if there was noise emanating from his apartment, suspected drug use and inflammatory

inferences. Like in the case of *Gary Neudecker*,[4] Bailey and Wren's disability based abuse has included derogatory dissemination of information regarding Pickard among other residents of the facility to Pickard's serious trauma, detriment and quiet enjoyment of his residence and relationships with other residents.

80. SPM subpoenaed three residents regarding the eviction proceedings. One stated that she had been kept awake on the evening that Pickard moved in to his apartment, but had no complaints since. A second resident who assisted Pickard on the date that he moved in was asked if the property of Mr. Mckinney was included in the items moved into the apartment. He stated that he had no way to know yay or nay. A third resident was questioned about an incident where he was waiting to enter the building elevator on the first floor. Pickard and Mr. Mckinney were exiting the elevator as he was attempting to enter the elevator. A fifth lease infraction would later be issued alleging that Mr. Mckinney pushed this witness as he was exiting the elevator. The "screen shot" appended to the lease infraction refutes such a claim, as the surveillance video is expected to corroborate. In any event, it is viciously false for Bailey to claim that there was any impropriety in this incident. Mr. Mckinney was only seeking to prevent a collision between this person, Pickard and himself. Bailey's abusive and malicious characterization of the incident belies her malice in attempting to falsely evict, threaten to evict and traumatize.

81. Pickard invoked his right to a hearing within the 10 day period from the date of the Lease Termination Letter. He contacted Legal Services of Alabama and obtained their pro bono assistance by attorney Jonathan Mok.

82. On August 7, 2019, Bailey sent Pickard a letter returning his rent payment check for the month of August, 2019, stating that it could not be accepted at this time. However, Highland Manor endorsed the check. Pickard has submitted timely rent checks also for all subsequent months, September, October, November, December and January (2020). These checks were also returned to him. Pickard has left all rent sums

---

[4] *Neudecker v. Boisclar Corp.*, 352 F.3d 3561 (8th Cir. 2003).

on deposit in his account for immediate payment. Pickard attempted to deposit these funds with the state court but was told that he could not do so until the court issued an order for same.

83. On the morning of August 8, 2019, Pickard received notice that the hearing that he had invoked would be held at the office of Norman Winston, attorney, in a few hours that afternoon. The short notice was extremely distressing. Pickard called Mr. Mok at Legal Services of Alabama. Mr. Mok, was also surprised by the short notice, but he managed to attend. It is unclear as to what would have transpired had he not received this abrupt, untimely, same day notice. It constitutes a continuation of the pattern of abuse, inducement of trauma, extortion, harassment and intimidation.

84. The "hearing" was held. There was no hearing officer present, and the hearing was one-sided. Winston, engaged by SPM to represent them in the matter of eviction regarding Pickard, told Pickard that he had one hour to say whatever he wanted to say. Except for Mr. Mok, the only other person present was Miriam Bearden, identified as a "Community Representative" (the same title held by Joyce Caddell), whom Winston stated in his notice letter to have "settlement authority" for the pending federal lawsuit.

85. The "hearing" was a sham hearing and had an abusive and extortionate effect on Pickard. None of the minimum due process requirements for such a hearing were provided for. Defendant Winston and Defendant Bearden, identified as a "Community Representative" (the same title as stated for Joyce Caddell in her Notices) for SPM were present. Again, no Hearing Officer was present. Winston and Ms. Bearden sat silent for most of this hour. Mr. Mok met with Pickard afterward and stated that he had never attended such a hearing where there was no hearing officer or dialogue or effort to resolve the issues.

86. Pickard was told that Bearden only had settlement authority regarding the federal lawsuit, not the eviction action. The clear message to Pickard is that he was being coerced and extorted into settling the federal case.

87. Winston presided over the denial and abrogation of Pickard's constitutional due process rights regarding lease termination proceedings.

88. Pickard was not afforded a proper hearing required by constitutional due process.

89. Pickard affirmed in the meeting that there was no valid lease infraction, that none of the infractions were factually valid. He affirmed that he never told Bailey that "a guest" was operating a business at his apartment, that he was in compliance with all rules and regulations for operation of a business as stated in his lease (this compliance has not been contested as stated above.) He confirmed again that there was no unauthorized person living in the apartment. He confirmed that although his apartment may have been cluttered on the date alleged in the third infraction, it was not unclean or unsanitary as defined by HUD as required to allege a lease infraction. It certainly had been straightened (and had been entered 6 times subsequently in July and August) and was therefore cured. All issues regarding the lease infractions were countered and cured, particularly in light of the fact that none of the infractions were factually valid. Pickard had not committed any lease infraction as the Defendants have admitted under oath (see Exhibit "A").

90. Again, Pickard asserted that the lease infractions were countered as inaccurate or cured. Accordingly, SPM/Highland Manor should stop trying to evict him, referring to the publication provided to him which states that "If you fix the problem within that time, the landlord should stop trying to evict you." There was no response from either Mr. Winston or Ms. Bearden.

91. On August 9, 2019, Pickard requested a proper hearing before a hearing officer. This request was ignored.

92. On August 20, 2019, SPM/Highland Manor subsequently filed their retaliatory complaint for unlawful detainer/eviction in Jefferson County District Court. This first eviction case was later dismissed as stated below.

93. On August 21, 2019, Defendant Norman Winston sent an extortionate

letter to Pickard alleging that he owed $801.99, without any itemization or explanation of the debt. Pickard sent a timely dispute of this alleged claim.

94. On September 19, 2019, Pickard was humiliated by Ms. Caddell in front of other residents and denied his monthly distribution of food from the Food Bank. Qualified residents of Highland Manor, including the Pickard, receive food assistance monthly at Highland Manor through the Food Bank, which is federally subsidized.

95. Due to all of the abuses of Highland Manor and SPM employees, Pickard remains in a state of severe trauma which will be difficult for him to overcome, including the retaliatory action of Ms. Wren who promised to mediate his grievances but instead presided over actions that led to SPM's action to evict. Pickard is thus faced with the severe trauma of homelessness.

96. Pickard also suffers from long-term post-traumatic stress disorder, which has severely compounded this trauma. He is suffering debilitation and decompensation regarding his disabilities as his therapists are confirming. He has suffered cardiac and ischemic injuries that have resulted from this stress and are permanent. The injuries and damages that he is suffering are great, immediate and irreparable.

97. Highland Manor and SPM are directly liable for all injuries and damages, including all actions of all other Defendants and Highland Manor/SPM employees, including failure to properly train, manage and supervise the other Defendants and instate and enforce policies and procedures that would prevent injuries and damages such as those that have occurred in this case, and that would have prevented the injuries and damages suffered by the Plaintiff, including failure to enforce its existing Rules, Policies and Procedures in this matter, in failing in its obligations under federal Constitutional and statutory law, rules and regulations, particularly those of HUD, that relate directly to this action as stated herein, and by failing to act

promptly to ameliorate and stop the injuries and damages suffered by Plaintiff
which continue to the present.

98. On September 28, 2019, Pickard suffered severe cardiac malfunction and
was hospitalized for three days. This trauma was brought on significantly by the stress
exerted in this cause of action, eviction proceedings, his other federal cause of action,
and related stressors.

99. On October 7, 2019, Defendant Winston sent Pickard another extortionate
letter alleging that he owed $1,484.97. Pickard again sent a timely dispute of this
alleged claim.

100. This letter of October 7, 2019 confirmed that Defendant Winston had hired
a process server. This confirmed that Defendant Winston is acting under color of state
law and is a state actor under 42 U.S.C. § 1983 as set out in the causes of action below.

101. On November 19, 2019, Pickard was diagnosed with influenza and
pneumonia. A hearing was set for November 21, 2019 regarding the unlawful detainer
action filed for by SPM. A continuance was denied, and Pickard was compelled to
attend this hearing while severely ill with pneumonia and influenza including a 103
degree fever on the day before this hearing, and on the day of the hearing, another
severe trauma.

102. Pickard's attorney, Kenneth Lay, lodged an initial objection with the Court
that the Lease Termination Letter was defective as a matter of law.

103. In the court hearing on November 21, 2019, Defendant Bailey admitted
that the four alleged lease violations that were the basis for the eviction action were
invalid. Based on her testimony, the case should have been dismissed. Defendant
Winston also harassed Pickard with insinuations that because he took three flights of
stairs despite his severe illness, to avoid exposing other residents, mostly senior many
of whom are highly susceptible to influenza and especially pneumonia which could be
fatal for them, he was not as ill as he was(!) With heartless cruelty, Winston inferred
that Pickard was not as ill as he provably was by his physicians, since he took the

stairs. Unbelievable. Based on the Judge's callous, stark order without the required written opinion against Pickard despite both the issues and facts resolving so clearly in Picakrd's favor in this hearing, Winston apparently elicited prejudice in part by this tactical abuse.

104. On November 26, 2019, Pickard was again hospitalized suffering from the effects of influenza and pneumonia that caused partial paralysis in his extremities rendering him unable to stand or walk. On the same day, he was notified that the State District Judge ruled against him regarding the unlawful detainer case.

105. On December 3, 2019, the District Court dismissed without prejudice the unlawful detainer action on the motion of SPM's attorney.

106. On December 4, 2019, Bailey issued a fifth infraction alleging that Pickard's guest, John Mckinney, pushed another resident when confronted at the first floor elevator. This is provably untrue by the video evidence that Bailey admitted to having. This involved an incident where Pickard and Mr. Mckinney were exiting the elevator on the first floor of Highland Manor. Another resident, Leonard James, was attempting to enter the elevator. Mr. Mckinney extended his hand to prevent a collision between him, Pickard and Mr. James. He did not push him or act as alleged in the lease infraction. This is shown on the screen shot attached to the lease infraction, and is more definitively provable by the video evidence, which Pickard has demanded to be preserved.

107. On December 5, 2019, SPM sent a second Lease Termination Letter alleging the four violations that were previously falsely stated as established in the hearing on November 21, 2019. The fifth falsely alleged infraction stated above was also alleged.

108. On December 12, 2019, Pickard lodged his objection and grievance regarding this falsely alleged, fifth lease infraction.

109. On January 7, 2019, SPM's attorney, Defendant Winston, sent a letter to Pickard responding to Pickard's dispute of Winston's allegation of debt in his letters of

August 21, 2019 and October 7, 2019. Defendant Winston also sent a statement of Pickard's rent from August, 2019, until January, 2020 totaling $1,188.00. Pickard has responded by sending payment for this amount. By invoicing Pickard for the rent due, and by Pickard's tender of the rent. SPM has arguably accepted payment requiring that the present unlawful detainer be dismissed with prejudice under federal and state law.

110. Defendant Winston also stated in this January 7th letter that he and SPM were available for the informal hearing invoked by Pickard, and that he had notified Pickard's attorneys of this availability.

111. On January 13, 2019, SPM filed a second complaint in District Court against Pickard for unlawful detainer.

112. On the same date, Defendant Winston sent a third extortionate letter alleging that Pickard owes $2,320.65. There is no itemization for this amount or other proof of this alleged debt. Less than a week prior, Defendant Winston alleged a debt of $1,188.00. This is the amount of rent due from August, 2019 to January, 2020. Pickard does not owe any other sum. It is just as likely if not more so that a judgment will be rendered in Pickard's favor by the state District Court, and/or in this Section 1983 action, and/or in the concomitant action no. 2:19-CV-00885-ACA.

113. The Defendants are attempting to prosecute an action for unlawful detainer that they admit to be based on falsely alleged and invalid premises: lease infractions.

114. The Defendants are causing the exertion of intense stress and are causing Pickard's health to worsen and deteriorate because he is being subjected to the prohibited actions of abuse, harassment, discrimination, constitutional violations including action to violate his constitutional right and property interest in continued occupancy of his premises and to federal benefits. He is being subjected to exclusion from participation in and discrimination regarding his activities under the residential program of the Defendants who receive federal financial assistance.

115. Numerous other constitutional violations including due process and equal protection are being committed by the Defendants as further stated in the causes of

action that follow.

## FIRST CAUSE OF ACTION
### Fourteenth Amendment Property Rights
### To Occupancy and Benefits
### All Defendants Except Marshall

It is black letter law that procedural due process imposes constraints on governmental decisions which deprive individuals of liberty or property interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment. U.S.C.A. Const.Amends. 5, 14. The Defendants, acting under color of state law, are pervasively violating due process and other constitutional rights in attempting, *inter alia,* to deprive Pickard of his liberty and property interests in his continued occupancy of his federally and state subsidized residence, and in depriving him of federal benefits to which he is entitled. A property interest protected by due process may be terminated or withdrawn by governmental action only for cause. *Goldberg v. Kelly, infra, Caulder, infra, et al.,* U.S.C.A. Const.Amends. 5, 14. The core purpose of procedural due process is ensuring that a citizen's reasonable reliance is not frustrated by arbitrary government action. West's Ann.Cal. Const. Art. 1, § 7(a).

The Defendants, acting under color of state law, are attempting to terminate, *inter alia,* Pickard's constitutional property interest in continued tenancy in federally subsidized housing and in his receipt of federal benefits.

### A. Threshold Requirements for a Claim under 42 U.S.C. § 1983

There are two threshold requirements for establishing jurisdiction to bring a complaint under 42 U.S.C. § 1983.

### (1) A complainant must establish that the defendant(s) are subjecting or attempting to subject him to the deprivation of a constitutional or other federal right.

The general rule is that government must provide procedural due process **before** depriving persons of their property. See *Zinermon v. Burch*, 494 U.S. 113, 127 (1990). Defendants have not provided for requisite procedural due process before their attempts to deprive Pickard of his property interests. Defendants' action to evict must be dismissed and expunged accordingly.

A person's interest in a benefit is a "property interest" for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit. U.S.C.A. Const.Amends. 5, 14; West's Ann.Cal. Const. Art. 1, § 7. There are specific federal and state rules that support Pickard's claim of entitlement to federally subsidized benefits pursuant to *Goldberg, infra,* and its progeny. It is also crucial to note that when a defendant is a tenant of federally subsidized housing, federal law must be followed in addition to state law in a summary process action. United States Housing Act of 1937, § 2 et seq., 42 U.S.C.A. § 1437 et seq. *Housing Authority of City of New Haven v. DeRoche*, 962 A.2d 904 (2009). Only federal courts have sufficient jurisdiction to assess and adjudicate this issue as to whether federal and state law has been followed in this matter.

(a) Property Interest in Continued Occupancy and/or federal benefits: The right of a tenant to remain in his or her residence is a Constitutional property right protected by the Fourteenth Amendment. *Greene v. Lindsey,* 456 .S. 444, 450-51, 102 S.Ct. 1874, 1878, 72 L.Ed.2d 249 (1982) (concluding that continued residency in leasehold property is a "significant interest in property" subject to due process protection); *Ward v. Downtown Dev. Auth.,* 786 F.2d 1526, 1530, 1531 (11th Cir.1986) (holding that under Florida law, continued occupancy, even pursuant to a tenancy at will, is a protected property interest within the meaning of the Takings Clause and the Due Process Clause of the Fifth Amendment); *Joy v. Daniels,* 479 F.2d 1236, at 1239, 1245, (4th Cir. 1973), quoting Reich, The New Property, 73 YALE L.J. 733 (1964); *Jeffries v. Georgia Residential Finance Authority,* 678 F.2d 919, 34 Fed. R. Serv. 2d 500 (11th Cir. 1982) (holding that tenants in federally subsidized housing may claim

rights under the due process clause based on their property interest in continued occupancy); *Swann v. Gastonia Housing Authority*, 502 F.Supp. 362, 365 (W.D.N.C.1980), aff'd in part, 675 F.2d 1342 (4th Cir. 1982) (tenants in federally subsidized housing have a constitutionally protected property interest in the continued occupancy of their rental units and have constitutionally protected property rights in an expectation of continued occupancy and receipt of rent and utility subsidies) – see also: *Brezina v. Dowdall*, 472 F.Supp. 82, 85 (W.D.Ill.1979); *McQueen v. Druker*, 317 F.Supp. 1122 (D.Mass. 1970), *aff'd*, 438 F.2d 781 (1st Cir. 1971) *Bonner v. Park Lake Housing Dev. Fund Corp.*, 333 N.Y.S.2d 277, (N.Y.S.Ct. 1972), note 37; *Tompkins Square Neighbors, Inc. v. Zaragoza*, 326 N.Y.S.2d 665 (New York NYC Civ.Ct. 1971), modified, 328 N.Y.S.2d 363 (NYC Civ.Ct. 1972), *Sinisgallov. Town of Islip Housing Auth.*, 865 F.Supp.2d 307 (E.D. N.Y. 2012) (it was undisputed by the parties that tenants in federally subsidized housing have a constitutionally protected interest in the continued occupancy of their apartment.)

In *Jeffries v. Georgia Residential Finance Authority*, 678 F.2d 919, 34 Fed. R. Serv. 2d 500 (11th Cir. 1982), the 11th Circuit held that tenants may claim procedural due process rights under the due process clause if they have a substantive property interest in continued occupancy, *Joy v. Daniels*, 479 F.2d 1236, at 1239 (4th Cir. 1973) (cited with approval in the 11th Circuit); see also *Board of Regents v. Roth*, 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it ...." *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709; 42 U.S.C. §§ 601-10 (1970). 24. 397 U.S. at 262-66. 25. Id. 26. See. e.g., *Board of Regents v. Roth*, *supra*, 408 U.S. at 570-71, *Perry v. Sindermann*, 408 U.S. 593, 599-603 (1972). *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). 27. 408 U.S. 564 (1972). 28. 408 U.S. 593 (1972). [1973] Catholic University Law Review [Vol. 23:375]. A property interest in a benefit may be established through existing rules or mutually explicit

understandings that support the claim of entitlement to the benefit, or through the construction of statutes and regulations which define and delimit the interest asserted. *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Perry v. Sindermann, supra,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

Plaintiff clearly has a vital need for his property interest in continued occupancy of his apartment, and has a unilateral expectation of it. Otherwise, he will be unable to afford housing and will be rendered homeless, thus being deprived of a most basic human need for shelter.

The Supreme Court, in *Goldberg* and subsequent cases, prescribed the analysis of cases involving a deprivation of government benefit as a two-step process. There must first be an inquiry into whether the particular private interest alleged is a "property" interest within the meaning of the due process clause. There is no question that Pickard's private interest in continued occupancy of his federally subsidized dwelling and in continued receipt of federal benefits is a property interest as set out definitively above.

Second, if such a property interest exists, as it does in this case, then a balancing test is necessary to determine what procedure is required to protect that interest. The standards employed in the determination of whether a particular private interest is a protected property interest within the meaning of the due process clause were established in *Board of Regents v. Roth, supra,* and *Perry v. Sindermann, supra*. The Supreme Court emphasized as stated above that to have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it or unilateral expectation of it as stated above. He must have a legitimate claim of entitlement to it. Pointing to the statute in *Goldberg* defining welfare eligibility as an objective source for this legitimate claim of entitlement, the Court has applied this principle specifically to eligibility for federally subsidized housing such as precisely that which Pickard is receiving.

In the *Sindermann* case, the Court issued a similar ruling that a professor, working under a succession of ten one-year contracts in a state university system which did not have a formal tenure system, should be given the opportunity to show that he had legitimately relied on an understanding fostered by the university administration. This understanding, that there was a de facto tenure system which provided for the indefinite rehiring of faculty members so long as their work was satisfactory, might have been sufficient to invoke due process. The Court stated that [a] person's interest in a benefit is a "property" interest for due process purposes if there are such rules or mutually explicit understandings that support his or her claim of entitlement to the benefit and that he may invoke at a hearing. The Court held that if the professor could make an appropriate showing of such an understanding and his reliance thereon, the college would be required to afford him a hearing prior to a refusal to renew his contract.

The initial determination involved in a suit to contest eviction is whether the fourteenth amendment is applicable, i.e. whether the action of a defendant in seeking to evict a plaintiff-tenant can be said to be "state action." As stated exhaustively and definitively below, the Defendants' action in this case is state action. As set out above, a tenant in a federally subsidized dwelling has a constitutional property interest in his continued tenancy. He also has a constitutional property interest in the continuance of his federal benefits. Therefore, he cannot be deprived of these rights, including under Section 1983, without due process of law. In this case, the Defendants are attempting to deprive him of these civil and constitutional rights without due process of law while acting under color of state law as set out exhaustively below.

The balancing test therefore tips heavily in favor of Pickard who clearly has a constitutionally protected property interest in continued occupancy and federal benefits for which Section 1983 clearly provides protection.

(b) Property Interest in Federal Benefits: Pickard also has a property interest in the continued receipt of federal benefits including the federally subsidized housing

benefits that he is now receiving. A tenant receiving housing assistance possesses the constitutional and statutory entitlement to continue in occupancy in absence of good cause, and is protected by due process clause of the Fourteenth Amendment from suffering the loss of federal benefits without due process, *Goldberg v. Kelly, supra,* 397 U.S. 254, 90 S. Ct. 1011 (1970); see also *Caulder v. Durham Housing Authority,* 433 F.2d 998 (4th Cir.1970) (applying *Goldberg* to benefits of federally subsidized housing).

Tenants in federally subsidized housing possess a constitutionally protected property interest in government benefits and housing subsidies. It is well settled that a constitutionally protected property interest arises where a government benefit may be withdrawn only for cause as set out above.

*Goldberg v. Kelly, supra,* the landmark case in this area, and the standard by which all subsequent claims are be measured, was decided within the context of the erosion of the "right-privilege" distinction. *Goldberg* held that welfare recipients were protected by procedural due process against deprivation or taking of their right to federally subsidized benefits. 12 U.S.C. § 1710S(b) (1971). See, e.g., in *Joy v. Daniels, supra,* the plaintiff enjoys occupancy of an apartment worth $157.00 per month at a cost to her of $48.00. FHA pays the difference, i.e., $109.00 per month, directly to defendant. 24C.F.R. § 5.15(c) (1971). See *Reich, Individual Rights and Social Welfare: The Emerging Legal Issues,* 74 YALE L. J. 1245 (1965) [Hereinafter cited as Reich], a critical account of the doctrine. The granting of a privilege could not be conditioned on the surrender by the recipient of constitutionally protected substantive rights. *Frost & Frost Trucking Co. v. Railroad Comm'n.,* 271 U.S. 583, 592-99 (1926) (substantive due process); *Wieman v. Updegraff,* 344 U.S. 183 (1952) (association); *Speiser v. Randall,* 357 U.S. 513 (1958) (speech); *Sherbert v. Verner,* 374 U.S. 398 (1963) (religion). See also Note, 86 HARV. L. REV. 880, 887-93 for an excellent analysis of the development of the doctrine announced in *Goldberg* and subsequent decisions. [Vol. 23:375].

The Supreme Court further held as stated above that it is well settled that a protected property interest arises where a government benefit may be withdrawn only for cause. *Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1, 11, 98 S.Ct. 1554, 1561, 56 L.Ed.2d 30 (1978); *Arnett v. Kennedy*, 416 U.S. 134, 151, 94 S.Ct. 1633, 1642, 40 L.Ed.2d 15 (1974); *Glenn v. Newman*, 614 F.2d 467, 471 (5th Cir. 1980). It has been held that the statute creating the Section 8 program was the primary source of the legitimate expectation that a Section 8 tenant would not be evicted absent good cause. 42 U.S.C. § 1437f. The Court concluded that the district court properly found that the lease terminations constituted state action despite the involvement of a private owner and that Section 8 existing housing tenants had a property interest requiring due process protection in cases of deprivation. In like manner, the Defendants' complaint for lease termination/unlawful detainer constitutes state action despite the fact that SPM is a private landlord and owner, and that Pickard has a property interest requiring due process protection in this case of deprivation.

Therefore, loss of federal benefits is also a property interest secured and protected by 42 U.S.C. § 1983, as well as the United States Housing Act of 1937, § 8 as amended, 42 U.S.C.A. § 1437f; and other statutes and constitutional provisions as set out herein. Once again, a person's interest in a benefit is a "property interest" for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit. U.S.C.A. Const.Amends. 5, 14; West's Ann.Cal. Const. Art. 1, § 7. There are numerous rules and understandings including those enshrined in the U.S. Code, the C.F.R., HUD Rules and Regulations, the Housing Act, and other authorities that support Pickard's claim to entitlement to the benefit. He therefore has a constitutional liberty interest in continued receipt of federal housing benefits.

The Defendants, acting under color of state law, are attempting to terminate, *inter alia*, Pickard's property interest in continued tenancy in federally subsidized housing and in his receipt of federal benefits.

Defendants have deprived and are subjecting Pickard and/or causing him to be subjected to numerous constitutional and federal rights under color of state law as set out in detail below. Certain wrongs affect more than a single right and, accordingly, can implicate more than one of the Federal Constitution's commands: where such multiple violations are alleged, the courts will not identify as a preliminary matter the claim's "dominant" character, but will examine each constitutional provision in turn. The Supreme Court ruled that constitutional claims, including those asserted under the Fourteenth Amendment, are not properly barred on the theory that the owner's claim is more akin to a challenge against deprivation of property without due process. *Soldal v. Cook County, Ill.*, 506 U.S. 56, 113 S. Ct. 538, 121 L. Ed. 2d 450 (1992). As stated above, tenants in federally subsidized housing have a constitutional property interest in their continued tenancy and in the entitlement to and retention of federal benefits, both of which cannot be terminated without due process of law.

It has become axiomatic in constitutional law that a recipient of a government-dispensed benefit may not be deprived of that benefit without due process protection. The Supreme Court in recent years has greatly expanded the concept of constitutionally protected property interests in this area. In *Goldberg v. Kelly, supra*, the right to federal (welfare) benefits was held to be property in which there exists a constitutional property interest. The impact of the *Goldberg* ruling that includes procedural due process that requires a hearing prior to termination of welfare benefits-was felt initially in litigation arising from public housing evictions. In *Escalera v. New York City Housing Authority, infra.* and *Caulder v. Durham Housing Authority, infra*, evictions absent prior notice and a hearing at which the aggrieved tenant could contest the action were held as violations of due process. "No person in the United States shall, on the ground of race, color, religion, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 42 U.S.C. § 2000(d). FHA regulations authorized under 12 U.S.C. § 1701S(f) denote a right to be free from arbitrary and

221(d)(3) of the National Housing Act. The applicable standard form lease provided for a term of one year, automatically renewable from month to month thereafter; the lease stipulated that either party had the power to terminate by giving thirty days' notice in advance to the other party. Civil No. 72-2479 (4th Cir. June 11, 1973) [Hereinafter cited as *Joy*]. *Goldberg v. Kelly*, 397 U.S. 254 (1970); *Rudder v. United States*, 226 F.2d 51, 53 (D.C. Cir. 1955). "It consists of a welfare benefit in the amount of $122.20, plus $126.00 worth of food stamps at a cost to her of $26.00." *Joy* at 2, n.1. See also note 9 [1973] Catholic University Law Review [Vol. 23:375]. The landlord gave the plaintiff thirty days' notice to vacate without stipulating the cause for eviction. The plaintiff filed an action for declaratory and injunctive relief under 42 U.S.C. § 1483 in federal district court, challenging her threatened eviction as in violation of the due process clause of the fifth and fourteenth amendments. The district court held that she could properly be evicted since her tenancy had expired under the term of the lease, and that no other cause need be given for the eviction.

On appeal to the fourth circuit, the court initially decided that the defendant-landlord's actions in seeking to use state eviction procedures against a tenant in a federally funded, state approved low-income housing project provided sufficient state involvement to constitute "state action." Accordingly, the court held these facts sufficient to satisfy the "under color of" law clause of 42 U.S.C. § 1983, and federal court jurisdiction under 28 U.S.C. § 1343(3).

Proceeding to the second level of its analysis-the determination of plaintiff's substantive rights, the court examined the scheme of the federal housing acts, underlying congressional policies, and various customs and regulations. Finding a protected property interest, or entitlement, in continued occupancy beyond the term of the lease, the court held the landlord's power to terminate without cause at the expiration of the lease invalid, and that he must, before eviction, give tenants a good cause notice and prove that such good cause exists. "In its answer to the complaint the defendant alleged that the plaintiff 'maintained a slovenly and ill-kept apartment;' had

destroyed window screens; failed to pay rent on time; and, used excessive electricity.
The district court found that it could be inferred that these were the reasons defendant
sought eviction, but that such a finding was unnecessary to decision [sic] and thus no
such inference was drawn." *Joy* at 3, n.2. "Since the pleadings do not raise the issue we
need not decide if there is also 'federal question' jurisdiction on the theory the
defendant is an agency of the United States . " *Joy* at 7, n.6. Federal jurisdiction is
dependent upon a finding of state action to invoke 28 U.S.C. § 1343(3) (1970), which
gives the district court jurisdiction over actions "to redress the deprivation under color
of state law" of a federal constitutional right.

The Constitutional Background in *Joy* extends the basic premise of the due
process entitlement doctrine. Procedural protection attaches where a protected property
right is dispensed, not only by the government, but by a private party, i.e. a private
landlord, acting in lieu of the government. Such a result would have been impossible
under the historical doctrine known as the "right-privilege" distinction which
effectively denied all claims founded upon a deprivation of previously provided
government benefits. However, limitations in the doctrine were soon recognized, and
through a gradual and continuous process of judicial erosion by the late 1960's the rule
was no longer constitutionally viable.

As stated above, *Goldberg v. Kelly*, the landmark case in this area, and the
standard by which all subsequent claims would be measured, was decided within the
context of the erosion of the "right-privilege" distinction. As stated above, *Goldberg*
held that welfare recipients were protected by procedural due process against
deprivation of federal benefits (welfare benefits). 12 U.S.C. § 1710S(b) (1971). As
also stated as an example above, the plaintiff in *Joy* enjoys occupancy of an apartment
worth $157.00 per month at a cost to her of $48.00. FHA pays the difference, i.e.,
$109.00 per month, directly to defendant. 24C.F.R. § 5.15(c) (1971). See Reich,
Individual Rights and Social Welfare: The Emerging Legal Issues, 74 YALE L. J.
1245 (1965), a critical account of the doctrine, and Van Alstyne, *The Demise of the*

*Right-Privilege Distinction in Constitutional Law*, 81 HARV. L. REV. 1439 (1968), a statement of the erosion of the doctrine. The granting of a privilege could not be conditioned on the surrender by the recipient of constitutionally protected substantive rights. *Frost & Frost Trucking Co. v. Railroad Comm'n.*, 271 U.S. 583, 592-99 (1926) (substantive due process); *Wieman v. Updegraff,* 344 U.S. 183 (1952) (association); *Speiser v. Randall,* 357 U.S. 513 (1958) (speech); *Sherbert v. Verner,* 374 U.S. 398 (1963) (religion).

The doctrine could not be applied to deny all procedural protection to the recipients of government benefits. *Cafeteria and Restaurant Workers Union v. McElroy,* 367 U.S. 886 (1961) (balancing of interests necessary to decide whether a person can be excluded from employment at a public facility without a hearing); *Dixon v. Alabama State Board of Education,* 294 F.2d 150 (5th Cir.), cert. denied, 368 U.S. 930 (1961) (hearing required before expulsion from a state college). 397 U.S. 254 (1970). See also Note, 86 HARV. L. REV. 880, 887-93 for an excellent analysis of the development of the doctrine announced in Goldberg and subsequent decisions. [Vol. 23:375] *Quasi-Public Housing the termination of such benefits without a prior hearing.* The "right-privilege" distinction was disposed of as the Supreme Court found that qualified individuals were "entitled" to welfare benefits under the Social Security Act. To determine the requisite due process procedure by which the recipients could constitutionally be deprived of their welfare benefits, the Court applied a balancing test, weighing both the private interest in avoiding the interruption of welfare benefits and the government interest in a summary procedure.

The Court found the post-termination evidentiary hearing (that which was required by statute) constitutionally infirm, and a prior hearing necessary. The following elements were held necessary to satisfy due process requirements: [T]he opportunity to be heard [requires that] a recipient have timely and adequate notice detailing the reasons for a proposed termination, and an effective opportunity to defend by confronting any adverse witnesses and by presenting his own arguments and

evidence orally. . . . Finally, the decision maker's conclusion as to a recipient's
eligibility must rest solely on the legal rules and evidence adduced at the hearing. . . .
And, of course, an impartial decision maker is essential.

The law is clear that tenants have a private right of action to pursue claims
related to core constitutional and personal rights under Section 8 of the National
Housing Act of 1937, 42 USC § 1437f, and associated HUD regulations. Being able to
continue shelter versus homelessness by way of their government-subsidized housing
is a core personal right that is protected through the FHA and related regulations and is
enforceable under 42 USC § 1983. *Hyland v. Office of Housing & Community
Development, et al.,* 2018 WL 4119903 (D. Haw. 2018). As such, low-income elderly
tenants have a private right of action to challenge threatened deprivation by the
landlord and its management as state actors in order to retain this housing core
property interest. In other words, maintaining their government subsidized housing is a
property interest that can only be taken away based on good cause and subject to
meaningful due process. Due process here can only mean that these low-income
elderly have some way to address housing abuses in a meaningful way rather than
being given the sole option to go to court. *Hyland, supra.*

**(2) The other essential requirement for jurisdiction to bring an action**
**under 42 U.S.C. § 1983 is that a complainant must establish the state actor**
**requirement, that the Defendants are subjecting or attempting to subject him to**
**the deprivation of a constitutional or other federal right while acting under color**
**of state law.**

When a defendant is a tenant of federally subsidized housing, federal law must
be followed in addition to state law in a summary process action as stated above.
United States Housing Act of 1937, § 2 et seq., 42 U.S.C.A. § 1437 et seq. *Housing
Authority of City of New Haven v. DeRoche,* 962 A.2d 904 (2009). State eviction
procedures cannot be imposed without compliance with applicable federal law.
Landlords, private or otherwise, must comply with federal law in addition to state law

in state eviction action, and are therefore state actors in subjecting or causing to be subjected a tenant who has federal rights that must be protected in state eviction procedures.

(a) Once it is determined there is a personal right to enforce a statute and/or an associated regulation, there is a rebuttable presumption that it is enforceable under Section 1983. See *e.g. Three Rivers Ctr. for Indep. Living v. Hous. Auth. of City of Pittsburgh*, 382 F.3d at 422 (3d Cir. 2004). The prerequisites to seeking due process rights against private parties who provide public benefits to the plaintiff recipients requires state action which in turn requires sufficient government involvement in a program that subjects the activities of the private parties "to an elaborate and pervasive body of government regulation," such as in the case of private entities providing public benefits under a HUD program for low income eligible families. See *e.g. Geneva Towers Tenants' Organization v. Federated Mortgage Investors*, 504 F.2d 483, 487-488 (9th Cir. 1974). This is precisely the case in this instance. SPM/Highland Manor is a private party who provides public benefits to eligible recipients such as Pickard under a HUD program for low income eligible families. SPM/Highland Manor is therefore a state actor and is acting under color of state law in this case.

(b) A landlord such as SPM/Highland Manor's actions in seeking to use state eviction procedures against a tenant in a federally funded, state approved low-income housing project provided sufficient state involvement to constitute state action. *Joy v. Daniels, supra.* Accordingly, it is held that the facts stated above by which Pickard is a tenant in federally funded, state approved low-income housing is **alone, severally** sufficient to satisfy the "under color of state law" clause of 42 U.S.C. § 1983, and federal court jurisdiction under 28 U.S.C. § 1343(3). The Defendants are therefore state actors acting under color of state law in this action.

(c) Evictions by private landlords whose activities are in part federally subsidized and are also in part state subsidized establish that the private landlord is a state actor/acting under color of state law. This applies to developments providing

low-income housing "which have been jointly subsidized and regulated by state and federal governments. Evictions from such developments have generally been held to constitute state action." 73 A.L.R. Fed. 78 (1985) (*When is Eviction of Tenant by Private Landlord Conducted "Under Color of State Law" for Purposes of* 42 USC § 1983*)*; § 8 of the United States Housing Act of 1937 (42 U.S.C.A. § 1437f).

Defendants SPM and Highland Manor received **both federal and state subsidies** and are therefore jointly subsidized by state and federal governments. They receive Section 8 and related and other federally subsidized benefits, and they receive ongoing LIHTC tax credits allocated to them by the State of Alabama. SPM and Highland Manor cannot escape the fact that they are state actors, and that they, together with the other Defendants, are subjecting and causing Pickard to be subjected to the deprivation of federal and constitutional rights under color of state law.

(d) Moreover, eviction of a tenant who received rent subsidies under § 8 of the United States Housing Act of 1937 (42 U.S.C.A. § 1437f), was conducted under color of state law for purposes of 42 U.S.C.A. § 1983; *Swann v Gastonia Housing Authority* 675 F.2d. 1342 (4th Cir. 1982). The court found a substantial continuing state involvement in the tenancy since the government paid a major portion of each month's rent directly to the landlord and would be obliged to pay 80 percent of the rent for up to 60 days if the tenant were to vacate the premises in violation of the lease. Furthermore, the landlord submitted to significant regulation, such as government housing quality standards and equal opportunity requirements, the court noted. There exists precisely these rent subsidies and state involvement in Pickard's case, hence, the Defendants are state actors.

(e) Further, the court in *McClellan v University Heights, Inc.* 338 F.Supp 374 (DC RI 1972) found that a subsidized housing development such as Highland Manor was operated under color of state law within the meaning of 42 U.S.C. § 1983 in determining that federal and state assistance and control over the housing development, which gave strength to the landlord's financial position while providing

for the public purpose of construction of low and moderate income housing. The court further found that the landlord's eviction procedures failed to meet due process requirements and enjoined the eviction of the tenant pending the landlord's adoption of eviction procedures which meet due process requirements. In like manner, Pickard is moving to enjoin the Defendants from continuing eviction procedures which also violate due process and should be enjoined pending adoption of procedures that meet due process requirements. Hence, the Defendants are clearly state actors pursuant to *McClellan* and its progeny.

(f) SPM, Highland Manor and all other Defendants are state actors pursuant to *Gallman v. Pierce*, 639 F.Supp. 472 (N.D.Cal. 1986). Under *Gallman*, the landlords' attempted eviction of tenants who participated in federally subsidized housing program constituted sufficient governmental action to give tenants standing to challenge alleged deficiencies in termination notices on due process and civil rights grounds, in light of significant governmental encouragement of challenged conduct. The Defendants in this case are attempting eviction precisely as set out in *Gallman* and therefore they are state actors.

Further, SPM acquired and refurbished Highland Manor with LIHTC Tax Credits through the State. An apartment building/complex such as Highland Manor whose acquisition and refurbishment is funded through the State acts under color of state law for purposes of 42 U.S.C. § 1983 in attempting to evict tenants. *McQueen v Druker, supra.* The appellate court further affirmed the District Court's injunction forbidding the eviction of the plaintiff tenants in this case as a matter of deprivation of protected rights under § 1983 under color of state law. *Id.* The Court further found state action in *McQueen* when a specific government function, such as the management of a federally subsidized facility such as Highland Manor, is carried out by a subsidized private firm such as SPM, who is subsidized by the state and the federal government, whose freedom of decision-making is therefore circumscribed by this function and involvement. *Id.*

Once the obstacle of a state action finding was hurdled, new developments proceeded apace. In *McQueen*, the court further held that evictions in retaliation for associational activities or petitions to the FHA violated the first amendment. Pickard has petitioned the FHA, drawing the ire of Defendant Bearden in the first (and only) informal hearing, and who asked for the name of the HUD official contacted, and who then contracted this official to prejudice Pickard. *McQueen* and its progeny "depended, not on the procedural due process considerations of *Goldberg*, but on the narrower prohibition of the attachment of unconstitutional conditions to the granting of a government benefit." Such a prohibition, initially, was amenable to abuse where a landlord evicted without announcing his purpose; yet the judicial trend favoring the tenant's right to occupancy where such a result seemed just, led some courts to infer a retaliatory motive from the circumstances of a given eviction. And those landlords who used the device of retaliatory evictions openly as a means to deter future organizational or other "troublemaking" activities were soon forbidden from such a tactic. See also, U.S. Dep't. of Housing and Urban Development, Grievance Procedure in Low Rent Public Housing Projects, HUD Circular RHM 7465.9 (Feb. 22, 1971).

(g) Private entities such as SPM/Highland Manor are deemed to be state actors when the protected property right is government public benefits which a statute authorizes and the implementing regulations greatly restrict the discretion of the people who administer those benefits, *Nozzi v. Housing Authority of City of Los Angeles*, 806 F.3d 1178, 1191 (9th Cir. 2015), as amended on denial of reh'g and reh'g en banc (Jan. 29, 2016), cert. denied, 137 S.Ct. 52, 196 L. Ed. 2d 30 (2016). Nozzi made clear that existing Section 8 tenants have a legitimate claim of entitlement to continued tenancy, including that the Section 8 benefits will continue even upon termination of the lease term subject to reasonable procedures when the project is to be discontinued. Id. at 1191.

(h) When a defendant in an eviction action is a tenant of federally subsidized housing, federal law must be followed in addition to state law in a summary process

action. United States Housing Act of 1937, § 2 et seq., 42 U.S.C.A. § 1437 et seq.
*Housing Authority of City of New Haven v. DeRoche, supra*, 962 A.2d 904 (2009).

A private landlord is therefore bound by federal law in addition to state law in
summary process action such as eviction. The Defendants are therefore state actors
bound by not only federal but state law in the present eviction action.

(i) The Supreme Court has further held that a private actor may be characterized
as a state actor when there is a sufficient "nexus" or symbiotic relationship between
state and private activity. See *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95
S.Ct. 449, 42 L.Ed.2d 477 (1974); *Burton v. Wilmington Parking Authority*, 365 U.S.
715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). "[S]ubstantial coordination and integration
between the private entity and the government are the essence of a symbiotic
relationship." *Brunette v. Humane Society of Ventura County*, 294 F.3d 1205, 1213
(9th Cir.2002). Courts have looked to evidence of a government entity's financial
interdependence with or plenary control over a private entity to determine if a
symbiotic relationship exists. *Id.*

SPM/Highland Manor, a private entity, is financially interdependent with HUD
and the State LIHTC program, and is subject to plenary control by same. Therefore,
there is no question that such a financial interdependence exists between SPM and
Highland Manor and the federal and state governments. SPM and Highland Manor
depend on federal and state subsidies and must submit to federal and state regulation
and controls. Such a symbiotic relationship exists between SPM/Highland Manor and
the FHA/Section 8 program and partnership, and on LIHTC state tax credits, and
therefore based on this relationship the actions of SPM/Highland Manor are
sufficiently attributable to the State, and therefore Defendants are state actors due to
this symbiotic relationship. As such, the daily decisions of the Defendants are, in truth,
the decisions of a state actor, and the Defendants are clearly subjecting Pickard to
deprivation of constitutional and federal rights while acting under color of state law.

(j) The following facts further confirm that the Defendants are state actors. It is

clear that:

(i) Each of the Defendants are acting under color of state law in that eviction of a housing assistance tenant constitutes "state action" inasmuch as there is substantial continuing agency involvement in tenancy, therefore a private landlord submits to significant state regulation and is a state actor prosecuting state action for eviction.

(ii) There is total interdependence between the state and the private landlord regarding the operation of Highland Manor and eviction proceedings. In general, private landlords receiving HUD subsidies are only found to be state actors under circumstances where there is this "total interdependence" between the state and the private landlord.

(iii)   The Defendants are attempting to evict the Tenant pursuant to a state eviction law that is unconstitutional at least in pertinent part (*Code of Alabama* § **35-9A-461)** as set out in detail, definitively below and in the Fourth and Thirty-Seventh Causes of Action;

(iv)   There is a sufficient nexus between the state eviction process action and the private actions of the Defendants (Landlord) in carrying out the challenged eviction procedure to affirm the Defendants as state actors in this process;

(v)  The instant eviction process is not purely private and without constitutional ramifications but has clear cut constitutional ramifications and provisions that the Defendants are attempting to subvert against Pickard as set out comprehensively herein;

(vi)   The nexus between the state and the private action is both firm and close.

(vii)   The state involvement supports the assertion that this nexus exists that establishes each Defendant as a state actor;

(viii)   HUD has confirmed that the Defendants are vested by government with

prosecutorial as well as regulatory authority regarding prosecution of state eviction laws and therefore the Defendants are acting under color of state law under Section 1983 in prosecuting evictions;

(ix)    The Landlord receives and administers rent supplements with governmental, state and federal regulatory authority and therefore is acting under color of state law to include all Landlord/Defendants in their action to evict Pickard/Tenant.

(x) The Landlord has been consequently subjected to federal regulations;

(xi)    The Landlord is utilizing state courts and state law and are state actors acting to prosecute and effectuate the eviction of the tenant from a federally subsidized housing facility under color of state law;

(xii)    The Landlord is utilizing state courts and state law and are state actors acting to attempt to deprive Pickard of constitutionally protected federal benefits, subsidies and entitlements under color of state law;

(xiii)   The Landlord is utilizing state courts and state law and are state actors who are denying Pickard due process in the state court eviction proceedings as circumscribed by Constitutional due process prescribed by the Fourteenth Amendment, thus further establishing the Defendants/Landlord as acting under color of state law, and warrants action enjoining the Defendants/Landlord from evicting the tenants except for good cause which is not present in this case as admitted by Defendants (see Exhibit "A").

(xiv)   The Landlord is, in effect, performing a government function by helping to implement the congressional policy of providing decent housing to low-income families under federal Acts including the Housing Act of 1961, where state action is found in federal subsidies and regulations under this Act. Therefore eviction from the subsidized facility is subject to due process requirements which further establish the Defendants as state actors who must confer such due process rights on the Tenant in any eviction or other

action impinging on the federal, constitutional property interests under said Act(s) pursuant to state law and procedures.

(xv)   The predicate actions, state filing and state prosecution for the eviction of Pickard establishes the Defendants as state actors under the 11th Circuit theory and holding of acting in concert with state officials, including state court officers and personnel.

(xvi)   As affirmed by case authorities, there is a sufficiently close nexus between the State and the challenged action of the regulated entity/Landlord so that the action of the latter may be fairly treated as that of the State itself, hence the Defendants are state actors

(xvii)   The Defendants conduct, even as private citizens, is attributable to the state where the government affirmatively facilitates and authorizes the objectionable practice of eviction in this case.

(xviii)   The 11th Circuit joins the 4th and other Circuits in holding that although intimate government involvement in the form of significant regulation or provision of benefits will not necessarily mandate a finding of state action absent a close nexus between the state and the eviction of tenants receiving HUD/federal housing entitlements and subsidies, these factors and other evidence of state involvement support the conclusion of the lower court that such a nexus exists. In the face of unjust eviction, the mere provision of federal rent subsidies without attendant due process protections would hardly promote the implicit purposes of assuring "an atmosphere of stability, security, neighborliness, and social justice." Accordingly, the Courts have held that a landlord is a state actor in attempting to thwart this constitutionally enshrined purpose, hence, the Defendants in this case are state actors.

(xix)   It has also been held that the participation of HUD and HUD subsidies and entitlements with a facility such as Highland Manor, the FHA and HUD

regulations, and the use of state eviction procedures, so far insinuated the
state into a position of interdependence with the Landlord that the
challenged activity could not be considered purely private. Determining,
therefore, that the Defendants were therefore state actors, and that the
tenants were entitled to due process, the court enjoined the landlord from
evicting the tenants except for cause under state law. *Joy v. Daniels, supra,
Caulder v. Durham Housing Authority, supra.* Such injunctive relief is
sought in this instant case on this and other premises.

(k) There is a merger of interests between the Defendants in this case and those
of the federal and state governments. In *Ressler v. Pierce, infra* , at 1217, the Court
found that the owners of the private Section 8 facility merged with the government's
interest, especially where Pickard is currently receiving benefits and is threatened with
termination of those benefits. The owner's interest deserves less weight in such a case.
Such merger further establishes the Defendants' status as state actors.

(l) It is clear that where a private party acting jointly with or through state
officials becomes so allied with the state as to characterize the party as a state actor,
the private party acts under color of state law. *Cobb v. Georgia Power Co.,* 757 F.2d
1248 (11th Cir.1985). Defendant Winston acted in direct concert with Defendant Jason
H. Smith, a state official and process server, thus establishing state action. The
Defendants are acting in concert in the seizure of Pickard's property/leasehold and
property interests conferred by federal and state benefits and subsidies, further
establishing them as state actors. *Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. 922,
942, 102 S.Ct. 2744, 2756, 73 L.Ed.2d 482 (1982) (A private party's joint participation
with state officials in the seizure of property is sufficient to establish the party as a
'state actor' for the purposes of the Fourteenth Amendment.)

There are three related circumstances when a party is a state actor: (1) when a
private entity has been "delegated a public function by the State"; (2) when the
challenged activity "is 'entwined with governmental policies' "; or (3) "when

government is 'entwined in [the entity's] management or control.' " *Brentwood Academy v. Tennessee Secondary Sch. Athletic Ass'n*. 531 U.S. 288, 296; 121 S.Ct. 924 (2001). The Defendants have been delegated a public function by the State pursuant to the administration of the state grant of LIHTC tax credits, the management of state funded facilities such as Highland Manor, and other public functions cited herein. Further, the challenged activity in this case that includes non-renewal and non-certification regarding the lease, denial of due process procedures, falsely premised lease infractions as basis for eviction, and eviction proceedings are intricately intertwined with governmental policies. In these cases, the government is further entwined in Highland Manor's management and control which further establishes the Defendants as state actors.

(m) Subsidized federal housing is managed and administered in two primary ways: through Public Housing Agencies (PHAs) and through private landlords. As set out further below, private landlords are required to administer and comply with the same landlord-tenant terms, provisions and rights, especially constitutionally protected rights including those enforceable under the due process and equal protection clauses of the Fourteenth amendment to the U.S. Constitution.

A tenant in federally subsidized housing receiving federal benefits does not forfeit these constitutionally protected property rights and other such rights because a private landlord is administering these rights. The private landlord must provide for these rights on par with public housing authorities as local HUD authorities have confirmed. SPM/Highland Manor are therefore bound to enforce, protect and provide for these rights on par with PHAs.

(i.) As HUD has explained and as affirmed by HUD officials consulted in this matter, "PHAs occupy, as a practical matter, substantially the same footing as private landlords." *Commonwealth of Virginia v. Hicks*.2003 WL 1090210 (Appellate Brief) (Va. 2003). PHA's and private landlords have the same legal duty to apply and administer state and federal statutory laws, HUD Rules and

Regulations, applicable Codes of Federal Regulations (primarily § 24 C.F.R.), state laws governing evictions, and related laws and legal codes and regulations. Accordingly, SPM/Highland Manor occupy the same footing as PHAs and have the same legal duty to apply and administer state and federal laws as stated above, and therefore they are acting under color of state law.

(ii.) It is well settled that a PHA is a state actor for purposes of the Fourteenth Amendment to the United States Constitution. *Housing Authority v. Saylors* , 19 Wash.App. 871, 873, 578 P.2d 76 (1978) and may not evade applicable constitutional limitations when imposing conditions on the receipt of public benefits, whether through contractual terms or otherwise. Since private landlords occupy substantially the same footing as PHAs, private landlords such as the landlord Defendants are bound to provide for and protect the same HUD rights and regulations which implicate rights under the U.S. Constitution, and which are protected under Section 1983; *McClean v. Delaware Cty. Housing Auth.*, 220 F.Supp.3d 607, 612-13 (E.D. Pa. 2016), and the due process and other constitutional rights of tenants. See also *Hyland v. Office of Housing & Community Development, et al., supra.*

(iii.) Private landlords administering federally subsidized housing must comply with and enforce applicable HUD laws and regulations, applicable Codes of Federal Regulations, provisions of federal statutes, particularly applicable law under Title 42 of the U.S. Code, and other requirements of the Constitution and law. HUD law and officials confirm that private landlords have the same legal obligations to provide for the Constitutional, due process and other rights of tenants as PHAs. *Hyland v. Office of Housing & Community Development, et al.*, 2018 WL 4119903 (D. Haw. 2018). (*4): ("PHAs are state actors and may not evade applicable constitutional limitations when imposing conditions on the receipt of public benefits, whether through contractual terms or otherwise." In addition, basic principles of contract law and equity call into

question enforcement of a private lease to evict an innocent tenant.)

(iv.) When a defendant is a tenant of federally subsidized housing, federal law must be followed in addition to state law in a summary process action. United States Housing Act of 1937, § 2 et seq., 42 U.S.C.A. § 1437 et seq., *Housing Authority of City of New Haven v. DeRoche, supra,* 112 Conn. App. 355, 962 A.2d 904 (2009). A private landlord is therefore bound by federal law in addition to state law in summary process action such as eviction. The Defendants are attempting precisely such action and are therefore state actors.

(n) The National Housing Act was amended during 1960's to provide for federally subsidized rental housing programs and was passed "in response to growing dissatisfaction with the results that had been achieved by conventional public housing programs. The hope was that private, profit motivated parties could build and operate housing more effectively than the public housing bureaucracies, which were accused of rigidity and inefficiency." Note, *Procedural Due Process in Government Subsidized Housing,* at 883. See *Langevin v. Chenango Court, Inc.,* 447 F.2d 296, 301 (2d Cir. 1971).

Instead, private landlords such as SPM have become rigid, careless, arrogant, deliberately indifferent and otherwise incompetent regarding their obligations and duties, inefficient and incompetent in operating federally subsidized housing. HUD officials have further confirmed this fact and acknowledge that private landlords generally fail to comply with required laws, rules and regulations, particularly regarding HUD, that they are required to comply with on par with PHAs. Three local HUD officials have admitted that private landlords, and specifically SPM in their multiple facilities including Highland Manor, have not been diligent and adequately compliant in enforcing required federal, HUD, state and other requirements in managing their properties and in ensuring the rights of their tenants. This is most obvious in this complaint and concomitant complaints. The Defendants are violating numerous rights including Pickard's due process and equal protection rights as set out

herein while clearly acting under color of state law.

(o) Multiple courts have held that the activities of PHA's constitute state action. See *Davis v. Mansfield Metropolitan Housing Authority*, 751 F.2d 180 (6th Cir. 1984); *Swann v. Gastonia Housing Authority*, 675 F.2d 1342 (4th Cir. 1982); *Billington v. Underwood*, 613 F.2d 91 (5th Cir. 1980); *Chavez v. City of Santa Fe Housing Authority*, 606 F.2d 282, 283 n.3 (10th Cir. 1979); *Escalara v. New York City Housing Authority*, 425 F.2d 853 (2d Cir. 1970), cert denied, 400 U.S. 853 (1970); *Ferguson v. Metropolitan Dev. and Housing Agency*, 485 F.Supp 517 (M.D. Tenn. 1980); *Brezina v. Dowdall*, 472 F.Supp. 82 (N.D. Ill. 1979); and *Staten v. Housing Authority of Pittsburgh*, 469 F.Supp. 1013 (W.D. Pa. 1979). Since PHA's and private landlords occupy the same footing as stated above, they are both state actors as in this instant case.

(p) In *McQueen v. Drucker*, 438 F.2d 781 (1st Cir. 1971), the court found state action present when a specific governmental function is carried out by heavily subsidized private firms or individuals whose freedom of decision-making has .. .been circumscribed substantially more than that generally accorded an independent contractor. It is certainly the fact that Highland Manor is subject to government functions which are carried out by the heavily subsidized firm SPM and the individuals including the Defendants whose freedom of decision-making has been circumscribed substantially more than that generally accorded to an independent contractor. *McQueen* therefore supports the proposition that state action will be found in this situation wherein there is substantial government involvement, hence the Defendants are state actors.

(q) It was within this context of applicable case law that *Joy v. Daniels*, supra, was decided. The defendant-landlord was a recipient of FHA rent supplements and was thus subject to attendant FHA regulations. Also, the landlord had undertaken to utilize the state eviction procedures. See also *Wiegand v. Afton View Apartments*, 473 F.2d 545 (8th Cir. 1973). In *Fletcher v. Grant Villa*, Civil Action No. A71-CA-il at 2,

5 n.1 (W.D. Tex., March 17, 1971) and *McQueen v. Drucker, supra,* 317 F. Supp. 1122, 1132-33 (D. Mass. 1970) aff'd., 438 F.2d 781 (1st Cir. 1971), the courts found sufficient state action in the use of state court summary procedures to evict the tenants. 34. 431 F.2d 1189, 1190. See *Shelley v. Kraemer,* 334 U.S. 1 (1948). 35. 317 F. Supp. 1122, 1133; *Colon v. Tompkins Square Neighbors, Inc.,* 294 F. Supp. 134, 137-38 (S.D.N.Y. 1968). 36. 317 F. Supp. at 1132-33, 438 F.2d at 784-85. 37. See also *Bonner v. Park Lake Housing Dev. Fund Corp.,* 333 N.Y.S.2d 277, 281 (Sup. Ct. 1972), a case involving substantial local involvement wherein the above-mentioned passage is quoted with approval. See *Lavoie v. Bigwood,* 457 F.2d 7 (1st Cir. 1972) which held that the involvement of the state (power delegated to local government) zoning power, combined with the use of state eviction procedures, constituted "state action." [1973] Catholic University Law Review [Vol. 23:375]. The participation of the federal government conditioned upon state approval and the defendant's utilization of the state eviction proceedings had "so far insinuated [the state] into a position of interdependence" with defendant, that there was sufficient state involvement to constitute "state action" as in the instant case with SPM/Highland Manor, who therefore are acting under color of state law.

(r) Further, the Protected Property Interest Protection against arbitrary eviction without notice and a prior hearing in a quasi-public housing project depends upon a finding that the tenant has a constitutionally protected interest in his continued residence therein. This determination, in turn, is dependent upon a proper application of the *Roth* and *Sindermann* criteria stated above. Thus, under a justifiable expectation test, a tenant must have a legitimate claim of entitlement in his continued residency. These issues have been established above: Pickard has a constitutionally protected interest in his continued occupancy of residence and has a legitimate claim of property interest in continued receipt of federal benefits. The enactment of the Housing and Urban Development Act provided for a policy of improving the "living environment of urban areas." Subsequent judicial construction of that act indicated that "this [policy]

include[d] adequate, safe, and sanitary quarters. But it also implie[d] an atmosphere of stability, security, neighborliness, and social justice.'" It is also clear that a party may sue for breach of the Fair Housing Act under Section 1983. *Wallace v. Chicago Housing Authority*, 298 F. Supp. 2d. 710, 718 (N.D. Ill. 2003) (allowing use of § 1983 to sue for breach of Fair Housing Act. (citing *Cannon v. University of Chicago*, 441 U.S. 677 (1979).)

Indeed, the court found both explicit and implicit requirements prohibiting arbitrary and discriminatory government action in the enunciated congressional policies protecting the right to be free of arbitrary and discriminatory action. *Joy v. Daniels, supra,* at 7 quoting *Burton,* supra note 31,. Id. at 9,. Id. at 11, quoting 12 U.S.C. § 1701t. 42. PUB. L. No. 89-117, 79 Stat. 451 (Aug. 10, 1965). *Joy* at 11, quoting *McQueen,* supra, 317 F. Supp. at 1130. [Vol. 23: 375] *Quasi-Public Housing* federally assisted programs. Through perusal of legislative history, the *Joy* court, affirmed in the 11th Circuit, suggested that Congress, with regard to the rent supplement program, had contemplated occupancy entitlement rather than limited leasehold terms. Along the same line, the court emphasized that the tenant's expectation of a degree of permanence was bolstered by "custom": ...one finds that the normal practice in subsidized housing, as in private housing, is to permit tenants to remain beyond the expiration of a lease unless a reason has arisen for eviction; termination is the exception, not the rule.

The court's determination of the existence of a "property right or entitlement to continue occupancy until there exists a cause to evict other than the mere expiration of the lease" was thus dependent on those elements indicating a legitimate claim based on objective understandings. By analogy, legislative policy, rules, and customs indicating such an interest were equal in degree to the entitlement of the *Goldberg* welfare recipient to continued benefits under the Social Security Act. Thus, the lease provision purporting to give the landlord power to terminate without cause after its expiration was held invalid. The laws and regulations were combined with said custom as

establishing that the private landlord was acting under color of state law, customs and usages as in the instant case. Once again, therefore, the Defendants are acting under color of state law.

(s) The Defendants further are state actors by acting in concert with a state official in prosecuting the eviction action against Pickard. It is clear that Defendant Winston is a state actor and acted under color of state law when he engaged process server and Defendant Jason H. Smith and acted in concert with this state official to bring state action to evict Pickard. *Carrasco v. Klien,* 381 F.Supp. 782 (E.D.N.Y. 1974). (See Exhibit "B ": establishing that Winston engaged with and acted in concert with a process server.) The court found it well established that private persons come within the ambit of § 1983 when they are willful participants in joint activity with the state or its agents, which includes process servers under the public function theory. (*Id.*) Under *Lugar v. Edmondson Oil Co. Inc.,* 102 S.Ct. 2744 (1982) joint action with state official to accomplish prejudgment deprivation of constitutionally protected property interest will support claim against a private party as a state actor under § 1983 (1871 civil rights statute).

Defendant Winston acted with the process server, a state official, to elicit prejudgment deprivation of Pickard's constitutionally protected property interests in continued occupancy of his subsidized residence and in his constitutionally protected continued entitlement to federal benefits including rent and utility subsidies. Winston and Smith are therefore state actors. The other Defendants acted in concert with Winston and Smith and thus are state actors as well. Defendants are also state actors on other grounds as stated below.

As Courts have held, a Plaintiff may sue under Section 1983 to enforce sections of the Housing Act and associated HUD regulations. *McClean v. Delaware Cty. Housing Auth.* , 220 F.Supp.3d 607, 612–13 (E.D. Pa. 2016). Plaintiff therefore states valid complaints under Section 1983 for the numerous violations of violations of said Housing Act and HUD regulations.

"A private person may also act 'under color of state law' by being a willful participant in joint action with the State or its agents, or exercising power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Dillard v. Sanchez*, CV 06-3095-PA, at *11 (D. Or. 2007) The Defendants' willful participation in joint action with the Process Server and other State officials and agents and/or their exercise of power possessed by virtue of state law including state contract and eviction law clothes them with authority of state law by which they are state actors. Accordingly, this Complaint alleges facts as stated above that state a legally cognizable § 1983 claim against all of the above named defendants who are state actors.

Courts have often confronted the state action question in other contexts, and have addressed the types of inter-relationships between states and "private" actors which tenants have most frequently cited in arguing that their evictions should be treated as state action. 73 A.L.R. Fed. 78 (1985) (*When is Eviction of Tenant by Private Landlord Conducted "Under Color of State Law" for Purposes of 42 USC § 1983*). These inter-relationships, which should not be considered to be mutually exclusive, include the landlord's use of state legal process to obtain an eviction (Id. § 8) and/or the landlord's joint action with a state official, such as a State process server, in obtaining the eviction (Id. § 9, infra.) Under the public function test, the pervasiveness of state regulations come into play in low-income housing developments which have been jointly regulated by the state and federal governments (Id., § 3 and 4). Evictions from such developments have generally been held to constitute state action. Highland Manor is governed by numerous state and federal regulations which the Defendants are responsible and liable for administering and enforcing, hence the Defendants are acting under color of state law under this holding.

Furthermore, the use of state process has been cited as one factor which, in conjunction with other contacts between a state and a private landlord, has led to a state action finding. (*Id.* Fn.[14]). As referenced above, Courts have ruled that an

eviction of a tenant who received rent subsidies under § 8 of the United States Housing Act of 1937 (42 U.S.C.A. § 1437f), was conducted under color of state law for purposes of 42 U.S.C.A. § 1983.

It is further relevant here, that as set out above, the eviction of a tenant from private housing, which was subsidized by a state under § 8 of the United States Housing Act of 1937 (42 U.S.C.A. § 1437f), was conducted under color of state law for purposes of 42 U.S.C.A. § 1983. *Swann v Gastonia Housing Authority (1982, supra.* The court found a substantial continuing state involvement in the tenancy since the government paid a major portion of each month's rent directly to the landlord. Furthermore, the landlord submitted to significant regulation, such as government housing quality standards and equal opportunity requirements, the court noted. Under § 9[a], a private landlord's joint action with a state official in attempting to obtain a tenant's eviction holds that the eviction was therefore conducted under color of state law for purposes of 42 U.S.C.A. § 1983.

Lengthy regulatory agreements between the landlord and the FHA required the landlord to adhere to FHA standards covering changes in the physical plant; the disposition of property; the amount, duration, and increases of rental agreements; and priorities for admissions of various classes of tenants. Both the state and the FHA retained rights of re-entry for breach of their agreements. In return, the landlord had received FHA mortgage assistance and insurance and favorable tax treatment. The court concluded that the state and federal governments had put the landlord in the position to "do what he does," and that the landlord could not be astounded to find his actions subject to federal and state legal regulation regarding evictions. Thus, the landlord finds that he or she is acting under color of state law as in the instant case.

Most specifically, the fact that a process server, who is clothed with the authority of state law, and a landlord acted to evict a tenant where the tenant had been denied due process, the court in *Carrasco v Klein, supra,* refused to dismiss the tenant's action under 42 U.S.C.A. § 1983. The court found it well established that

private persons come within the ambit of § 1983 when they are willful participants in joint activity with the state or its agents, where the process server was initially brought within the scope of the § 1983 state action requirement under the public function theory. The court found no logical reason to distinguish between such actions with an official state actor clothed with state authority, such as the process server, when the latter is sufficiently public. Thus the Defendants who so acted as willful participants with this state agent are state actors.

(t) Considering an action under 42 U.S.C.A. § 1983, the court in *Joy v Daniels, supra,* 479 F2d 1236, ruled that a landlord who received rent supplements acted under color of state law in evicting a tenant. The court recounted that the landlord participated in a Federal Housing Act program under which the landlord was required to conform to FHA regulations governing, inter alia, the occupancy and daily operations of the project. Emphasizing that the participation of the Federal Government in the housing project was conditioned upon state approval, the court concluded that this approval and the use of state eviction procedures so far insinuated the state into a position of interdependence with the landlord that the challenged activity could not be considered purely private, but rather state action. Determining, therefore, that the tenants were entitled to due process, the court enjoined the landlord from evicting the tenants except for good cause.

(u) The court concluded that eviction from the apartment complex was subject to due process requirements, and issuing a declaratory judgment to this effect, the court enjoined the landlord's eviction of the tenants in the absence of good cause. *Joy v. Daniels, supra,* follows this approach. Thus, in *Caulder, supra,* the court held a **prior** administrative hearing constitutionally required before an eviction from public housing. The requirement of such a hearing and a finding of good cause creates a direct nexus with state eviction process, and therefore the Defendants, who failed in this duty, deprived Pickard of his rights while acting under color of state law.

(v) With no further discussion of the state action issue, the court in *Walton v*

*Darby Town Houses,* Inc., 395 F.Supp 553 (ED Pa 1975), found the requisite state action under 42 U.S.C.A. § 1983 to be present in a landlord's eviction of a tenant because the landlord was utilizing the state courts to effectuate the eviction of the tenant from a federally subsidized housing development, built and operated pursuant to federal housing laws. As stated above, Highland Manor was built pursuant to federal housing laws and by grant of state LIHTC tax credits and ongoing support through LIHTC tax credits. Highland Manor is specifically implicated under *Walton* and numerous other holdings regarding receipt of federal and state subsidies. The court granted a permanent injunction against the eviction which is further warranted in this instant case.

(w) A landlord's eviction of a tenant from an apartment complex was conducted under color of state law for purposes of 42 U.S.C.A. § 1983, the court ruled in *Anderson v Denny*, 365 F.Supp 1254 (WD Va 1973), because of: (1) the landlord's receipt of federal subsidies under the Housing Act of 1968; (2) the landlord's consequent subjection to federal regulations; (3) the state's approval of the participation of the apartment complex in a federal rent supplementation program; and (4) the landlord's attempts to evict the tenants pursuant to unconstitutional provisions in state law. In return for these benefits, the Federal Government regulated many aspects of the management of the apartment complex, including, inter alia, the charging of rent, the admission of tenants, the transfer or conveyance of the property, and accounting practices. SPM and Highland Manor received federal subsidies under the Housing Act of 1968. As landlord, they are consequently subject to extensive federal regulations. Through state regulation of such facilities and grant of LIHTC tax credit consideration and approval by the state, the participation of Highland Manor in the federal rent supplemental programs is given the state's approval. Pursuant to the invalidity of the lease infractions that are the grounds for Pickard's eviction, the invalidity of which is admitted by Defendant Bailey under oath (see Exhibit "A"), the landlord seeks to evict the tenant, Pickard, under state law that is unconstitutional in

pertinent part as set out specifically below, and therefore, the Defendants are acting under color of state law. The second attempt to evict Pickard based on lease infraction premises admitted under oath to be false constitutes the abuse of state legal process which when committed by a private actor such as Highland Manor places eviction under color of state law.

(x) State action has further been found in previous cases involving similar federal subsidies and regulations under the Housing Act of 1961. These cases emphasized the state's approval of the rent subsidy program, and reasoned that the landlords were, in effect, performing a government function by helping to implement the congressional policy of providing decent housing to low-income families. The court concluded that eviction from the apartment complex was subject to due process requirements, and issuing a declaratory judgment to this effect, the court enjoined the landlord's eviction of the tenants in the absence of good cause. The Defendants are engaged in this same state action, and therefore should also be enjoined from eviction proceedings against Pickard as state actors attempting same under color of state law.

(y) It is clear that SPM and Highland Manor are subject to significant and extensive state and federal government regulation and controls.  In such a case "there is such a 'close nexus' between the State and the challenged action [eviction in this instance]' that seemingly private behavior may be fairly treated as that of the State itself. *Brentwood, supra,* 531 U.S. 288, 295 (2001) quoting *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351 (1974). "[A] nominally private entity" [may be treated as a state actor] "when it is 'entwined with governmental policies' or when government is 'entwined in [its] management or control' ", *Brentwood,* 531 U.S. at 296 quoting *Evans v. Newton,* 382 U.S. 296, 299 (1966), or...is controlled by an 'agency of the State' Id. quoting *Pennsylvania v. Board of Directors of City Trusts of Philadelphia,* 353 U.S. 230, 231 ((1957) or "when it has been delegated a public function by the State". *Brentwood,* 531 U.S. at 296. Government is certainly entwined with SPM and Highland Manor's management and controls, and they are subject to the control of the

State in extensive standards, rules, laws and statutes, and regulations. In the instant case, as in *Brentwood,* Section 8 subsidies are funded by HUD (with monies allocated by Congress) which contracts with PHA's and private landlords to administer the program. Here, HUD has contracted with SPM and Highland Manor to administer the Program. SPM and Highland Manor are therefore entwined with governmental policies because they must comply with and are subject to HUD Section 8 and state rules. Clearly therefore, SPM and Highland Manor are acting under the direction of HUD and its "infringement of plaintiff's federal rights [regarding action to evict Pickard] is fairly attributable to the state." *Rendell-Baker v. Kohn,* 457 U.S. 830, 838 (1982). The Defendants therefore are clearly acting under color of state law in subjecting and attempting to subject Pickard to the deprivation of Constitutional and federal rights.

(z) Additionally, the nexus test is met pursuant to the facts stated above in that "there is such a 'close nexus' between the State and the challenged action' that seemingly private behavior may be fairly treated as that of the State itself. *Brentwood, supra,* 532 U.S. at 295. The seemingly private behavior of the Defendants, therefore, should be treated as that of the State itself and hence, the Defendants are clearly acting under color of state law.

**CONCLUSION: It is clear that the Defendants are state actors who are acting under color of law in this matter, and that each one is subjecting and/or causing Pickard to be subjected to the deprivation of rights and privileges secured by the U.S. Constitution and laws, and they are therefore liable in this action under Title 42, § 1983 for redress.**

## SECOND CAUSE OF ACTION
### Violation of Due Process Regarding Direct of Implied Pre-emption
### All Defendants

The first cause of action is set forth by reference and is incorporated as if fully stated herein.

The preemption doctrine is rooted in the Supremacy Clause of the U.S. Constitution. U.S. Const., art. VI, cl. 2. "[T]he purpose of Congress is the ultimate touchstone in every preemption case." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996).

Congress' intent in providing low-income housing, property interests in continued occupancy and federal benefits for such housing, and extensive expressed Congressional intent in this area conflicts with Alabama Landlord-Tenant law that does not adequately provide for same.

Morton does not suggest that Congress expressly preempted state law or intended federal law exclusively to occupy the field of lease terminations. See *English v. Gen. Elec. Co.*, 496 U.S. 72, 78-79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990). State law, however, is also "nullified to the extent that it actually conflicts with federal law." Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982). " Such a conflict arises when compliance with both federal and state regulations is a physical impossibility or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.*

Compliance with HUD and related federal law regarding state unlawful detainer actions is a physical impossibility where state law fails to provide for the panoply of federal constitutional and statutory rights and provisions.

Furthermore, there is no doubt whatsoever, in analyzing federal and state law, that state law stands as an obstacle to the accomplishment and execution of the **full** purposes and objectives of Congress, where state law obstructs the application of such **full** objectives and purposes by failing to provide for the federal and U.S. Constitutional rights as set out in detail in this Complaint, such as notably, the constitutional right and property interest in continued occupancy of federally subsidized housing, and the same right and property interest in retention of federally subsidized benefits, and such other federal rights as that to accommodation due to disabilities, to be free from

housing discrimination, and other rights obstructed by arbitrary and cursory state statutes. See also: *Wyeth v. Levine,* 555 U.S. 555, 129 S.Ct. 1187, 1193-94, 173 L.Ed.2d 51 (2009).

It is further held in this action that HUD must supervise and authorize eviction actions by private landlords, and that there are numerous HUD Rules and Regulations that govern the issues of grievances, informal hearings, impartial hearing officers, notice, and numerous procedural due process that is due in such actions for which state law offers no provision. No tenant in HUD housing or receiving HUD/federal housing benefits should be subject to the arbitrary and constitutionally non-compliant actions of private landlords who are accountable to HUD in such matters especially when pursuing state actions. HUD has the duty and authority delegated by Congress to supervise such matters and pre-empt state regulation and actions that conflict with federal and constitutional law. Along with Congress, "a federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation." *City of N.Y. v. FCC,* 486 U.S. 57, 63-64, 108 S.Ct. 1637, 100 L.Ed.2d 48 (1988) Thus, when "Congress has entrusted an agency with the task of promulgating regulations to carry out the purposes of a statute, ... as part of the pre-emption analysis [courts] must consider whether the regulations evidence a desire to occupy a field completely." *R.J. Reynolds Tobacco Co. v. Durham County, N.C.,* 479 U.S. 130, 149, 107 S.Ct. 499, 93 L.Ed.2d 449 (1986). The constitutional rights at stake in this case mandate that HUD occupy completely the field of lease termination related issues cited herein to protect and vindicate these rights that would otherwise be deprived under state law deficiencies, which is the essence of the purpose of federal pre-emption.

In determining whether a state law presents an "obstacle" to the full implementation of a federal law, however, "it is not enough to say that the ultimate goal of both federal and state law" is the same. *Int'l Paper Co. v. Ouellette,* 479 U.S. 481, 494, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987). "A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach this

goal." Id. Unquestionably, state landlord-tenant law interferes with the numerous methods, statutes, rules, regulations, etc., by which the federal statutes governing federally subsidized housing and federally subsidized housing benefits are designed to reach the applicable goal, *inter alia*, of providing safe and affordable housing to the indigent and enforcing these rights, including the constitutionally protected property rights stated herein, against arbitrary state action that fails to provide for the procedural due process rights of the indigent, who, without government protections and assistance, are most often unable to advocate for and sustain.

In summary, federal law preempts state law where there is a clear statement of congressional intent and where applying state law would conflict with or otherwise frustrate a federal regulatory scheme. *Forest Park v. Hadley*, 336 F.3d 724, 733 (8th Cir.2003); *Horak v. Argosy Gaming Co.*, 648 N.W.2d 137, 146–47 (Iowa 2002) Congress' intent in providing low-income housing, property interests in continued occupancy and federal benefits for such housing, and extensive expressed Congressional intent in this area conflicts with Alabama Landlord-Tenant law that does not provide for same. Given the regulatory scheme that governs the HUD leases, rules and regulations as set out in detail in this Complaint and that would be frustrated by applying Alabama law that fails to provide for, enforce and comply with same, federal pre-emption of this law is mandated. *Forest Park v. Hadley*, 336 F.3d at 733 (federal housing law preempted state law that was in conflict with it on the basis of implied preemption). The Defendants are therefore violating due process by attempting to enforce state laws that are pre-empted by federal law.

### THIRD CAUSE OF ACTION
#### Violation of Due Process and Equal Protection in Application Process and Unlawful Eligibility Determinations by Defendants
#### All Defendants Except Marshall

The first cause of action is set forth by reference and is incorporated as if fully stated herein. Pickard also re-asserts the holding that PHAs occupy substantially the

same footing as private landlords. *Commonwealth of Virginia v. Hicks, supra, McClean v. Delaware Cty. Housing Auth., supra., Hyland v. Office of Housing & Community Development et al. supra.* United States Housing Act of 1937, § 2 et seq., 42 U.S.C.A. § 1437 et seq., *Housing Authority of City of New Haven v. DeRoche,* 112 Conn. App. 355, 962 A.2d 904 (2009). As further confirmed by three local HUD officials, private landlords are charged with compliance with applicable laws and HUD rules and regulations just as PHA's are.

A tenant does not forfeit these rights because he or she is a tenant under a private landlord receiving federal benefits and assistance and obligated to follow the U.S. Constitution, HUD, federal housing laws, rules and regulations, just as a PHA is obligated to follow. These officials further admitted that although the hope expressed above in Procedural Due Process in Government Subsidized Housing, at 883 and *Langevin v. Chenango Court, Inc.,* 447 F.2d 296, 301 (2d Cir. 1971) (see First Cause of Action, *supra,* (I), that private landlords would operate housing more effectively than the public housing bureaucracies, which were accused of rigidity and inefficiency, the fact is that private landlords lack diligence in complying with laws, rules and regulations, and operate housing much less effectively if not slothfully compared with PHA's. These officials stated that such deficiencies are set out in annual reviews of facilities such as Highland Manor by HUD, stating specifically that Highland Manor is significantly culpable for such deficiencies.

When a defendant is a tenant of federally subsidized housing, federal law must be followed in addition to state law in a summary process action. United States Housing Act of 1937, § 2 et seq., 42 U.S.C.A. § 1437 et seq. *Housing Authority of City of New Haven v. DeRoche,* 962 A.2d 904 (2009). Federal law must be followed in the application process.

### I. Issues Regarding the Application Process

With these premises reaffirmed, the Defendants violated Pickard's due process and equal rights regarding his application process, causing unconstitutional eviction

action against him and causing him to suffer extreme physical, mental and emotional distress and injuries.

In *Fletcher v. Housing Auth. of Louisville*, 491 F.2d 793 (6th Cir. 1974), the court applied these principles to the housing context in circumstances similar to those presented in the instant case. *Fletcher* involved the question of whether or not the Housing Authority of Louisville [HAL] could institute a policy that imposed unauthorized conditions of eligibility on housing program applicants. The policy in *Fletcher* provided for accelerated entry into public housing of applicants who could pay higher rent than other low-income applicants. The justification used by HAL was that larger revenues could be generated by the housing agency if the policy were enforced and that HAL's financial stability would thereby be strengthened. *Id.* at 795-96. Even though there was no authorization for such a policy in the United States Housing Act of 1937, as amended, 42 U.S.C. §§ 1401 *et seq.*, the trial court held that the policy represented a rational attempt on the part of the housing agency to deal with its growing financial problems. *Id.* at 795 n. 2. The Court of Appeals for the Sixth Circuit reversed on the grounds that HAL's policy violated the purpose of the United States Housing Act of 1937. The court stated:

> [I]n contracting with HUD for annual federal subsidies, HAL agreed to function according to the terms of the Act. *Barber v. White*, 351 F.Supp. 1091, 1093 (D.Conn. 1972); *Otero v. New York City Housing Authority*, 484 F.2d 1122 (2d Cir. 1973). "When [federal] money is spent to promote the general welfare, the concept of welfare or the opposite is shaped by Congress, not by the states." *Helvering v. Davis*, 301 U.S. 619, 645, 57 S.Ct. 904, 910, 81 L.Ed. 1307 (1937) (Cardozo, J). *Cf. Rosado v. Wyman*, 397 U.S. 397, 422-423, 90 S.Ct. 1207, 25 L.Ed. 442 (1970) (Harlan, J., concurring).

The expression of federal policy in the area of low-income housing is the National Housing Act of 1937, as amended. In like manner, and in fact to a greater degree due to the deficiencies of private landlords versus PHA's, Highland Manor is bound by same just as HAL is. So long as HAL, like Highland Manor, operates under

an annual contributions contract with HUD, it must meet the requirements of the
National Housing Act.

   "***It may not set eligibility criteria unauthorized by Congress***". *King v.
Smith*, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968)  (emphasis added)
(footnotes omitted).

   Eligibility criteria unauthorized by Congress are not permissible when a state
agency dispenses a federally funded benefit. *Id., King v. Smith.*

   Specifically the court found that the state entity, SPM/Highland Manor in this
case, had no authority to impose its own conditions of eligibility including issues of
creditworthiness, resident selection criteria, poverty, handicap, and related factors.

   Local housing agencies' issues in this regard, including financial issues, must be
resolved through negotiations with HUD and by funding decisions of Congress.
*Barhar v. White*, 351 F.Supp. 1091 (D.Conn. 1972); *National Tenants Organization,
Inc. v. Dept. of Housing and Urban Development*, 358 F.Supp. 312 (D.D.C. 1973).
*Id.* at 804 (footnote omitted).

   Among the requirements imposed by Congress is that:

   Notice and hearing procedures must be held for applicants ruled ineligible for
   Section 8 housing unit include notice of rejection to applicant within 15 days of
   application, which notice must include information regarding area legal services
   and other advocacy groups; review by local Department of Housing and Urban
   Development office. *Ressler v. Pierce, infra.*

   As set out in detail below, resident selection based on creditworthiness and on
selection of a live-in aide is crucial part of the application of an applicant who is
handicapped and in need of a live-in aide.

   These issues are set out specifically in *Ressler v. Pierce,* 692 F.2d 1212 (9th Cir.
1982) and in the United States Housing Act of 1937, § 8 as amended 42 U.S.C.A. §
1437f; U.S.C.A. Const. Amends. 5, 14. In *Ressler,* the Plaintiffs are applicants and
potential applicants for HUD rent subsidies under "the Section 8 program". Plaintiffs
allege that they were denied due process and equal protection by the manner in which

the owners of a subsidized apartment complex processed their applications.

Ressler inquired about the Section 8 rent subsidies and was told by an employee of Jewel Lake Villa that none were available, which was untrue. Ressler was not given a written application, nor was she put on a waiting list. Ressler was told that she would be notified if any Section 8 benefits became available.

In like manner, Defendant Bailey of Highland Manor has falsely told an applicant with a mental health handicap that no apartments were available, and refused to give him an application as well so that he could be placed on a waiting list. He too was told that he would be notified if any units became available. Units have repeatedly become available, but he has not been notified as promised. This is only one example, but an egregious one, of Defendant Bailey's, Highland Manor's, SPM's, and likely other Defendants' violations of this HUD requirement herein set out.

Having received no such benefits by November 1977, Ressler filed a civil rights complaint such as this one. Ressler alleged that she had been denied Section 8 rent subsidies improperly for two reasons. First, Ressler contended that the absence of procedural safeguards in the application and selection process was a denial of due process and equal protection. Second, Ressler argued that HUD's failure to require project owners to rent to Section 8 applicants all units for which Section 8 subsidies are available violated the national housing policy and constituted an abuse of discretion by HUD. The parties made cross motions for summary judgment.

While under the Section 8 program "the selection of tenants ... shall be the function of the owner," 42 U.S.C. § 1437f(d)(1)(A) (Supp.1982), the regulations and guidelines promulgated pursuant to the statute **closely circumscribe an owner's discretion**. For example, the regulations dictate what percentage of the Section 8 contract units an owner must rent to "very low-income families" (24 C.F.R. § 886.117(b) (1982)) and require the owner to select eligible tenants in accordance with a HUD-approved marketing plan (*Id.* § 886.121(a)). In addition, HUD's administrative guidelines set eligibility standards for Section 8 applicants, provide detailed

application and instruction forms, establish rules for the calculation of an applicant's income and allowances, and require HUD review of all eligibility issues after determinations have been made by project owners. See HUD Handbook 4352.1, "Loan Management Section 8 Set-Aside," ¶¶ 23–26 ("HUD Handbook").

The instant case is thus similar to *Griffeth v. Detrich*, 603 F.2d 118 (9th Cir. 1979), in which the court found that applicants for general relief had a protectable claim of entitlement to benefits based solely on the limiting language in the authorizing statute and regulations. In rejecting the argument that applicants could have no legitimate claim to benefits because each county had discretion in establishing eligibility criteria, the court held:

> The regulations adopted by San Diego County are detailed. They set forth specific objective eligibility criteria for receipt of aid.... The regulations are comprehensive and definite. They greatly restrict the discretion of the intake eligibility worker (e.g.: Defendant Bailey) ... Here the authorizing statute coupled with the implementing regulations of the county creates a legitimate claim of entitlement and expectancy of benefits in persons who claim to meet the eligibility requirements. *Id.* at 121. Cf. *Jacobson v. Hannifin*, 627 F.2d 177, 180 (9th Cir. 1980) ("A property interest may be created if 'procedural' requirements are intended to operate as a significant substantive restriction on the basis for an agency's actions.").

In addition, Ressler has a constitutionally protected "property" interest in Section 8 benefits by virtue of her membership in a class of individuals whom the Section 8 program was intended to benefit. 42 U.S.C. § 1437f(a) (1978) provides for the purpose of aiding lower-income families in obtaining a decent place to live and of promoting economically mixed housing, and for assistance payments to be made with respect to existing, newly constructed, and substantially rehabilitated housing in accordance with the provisions of this section.

A similar statutory statement of purpose was held to give rise to a legitimate

claim of entitlement in *Geneva Towers Tenants Organization v. Federated Mortgage Investors*, 504 F.2d 483 (9th Cir. 1974). The statute at issue in *Geneva Towers* had a declared purpose like that of SPM/Highland Manor, "to assist private industry in providing housing for low and moderate income families and displaced families." 12 U.S.C. § 1715l (a). This court affirmed the ruling of the district court that beneficiaries of the statute had to be accorded due process safeguards, holding:

> Congress' purpose was ... to provide the tenants with the benefit of low cost housing. The source of the tenants' entitlement is explicit: it lies in the congressionally stated purpose of providing persons of meager economic means with low-priced housing ... and the statutory requirement that the FHA regulate the rents charged by the private developer....504 F.2d at 490 (emphasis added).

The same rationale applies to give Ressler a protectable claim of entitlement to Section 8 benefits. Ressler, like Pickard, is a primary beneficiary of the Section 8 program, and her receipt of benefits is closely monitored by HUD under the implementing regulations and guidelines.

Ressler, like Pickard, thus has a sufficient "property" interest in Section 8 benefits to entitle her to **due process safeguards in the processing of her application**.

In its Judgment filed April 20, 1981, the district court ruled that project owners under the Section 8 program were required to implement certain specified procedures regarding (1) tenant-selection criteria; (2) a waiting list procedure; and (3) notice and hearing procedures. Ressler and HUD claim in their appeals that the procedures ordered by the district court should be modified in several respects.

Both Ressler and HUD agree that the test articulated in *Mathews v. Eldridge*, *supra*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), controls the determination of what process is due. In *Mathews* the Court stated that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an

erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. Id. at 335, 96 S.Ct. at 903.

The parties in Ressler argued at length regarding the weight that each of the *Mathews* factors deserves in the context of the Section 8 program. Ressler refers repeatedly to the statement of the district court that "[t]he 'private interest' of the 'lower income' or 'very low-income' family ... is enormous." (Memorandum and Order filed Nov. 24, 1980, at 5.) Ressler also argues that the government involvement in Section 8 projects is so great that the actions of the project owner are tantamount to those of the government, thus making the only relevant "private interest" that of Section 8 applicants. HUD, on the other hand, urges that every project owner has a substantial interest in ensuring that the application procedure is easy to administer and does not frustrate his efforts to select satisfactory tenants.

Applying the *Mathews* factors in Pickard's case:

    a. First, the same private interest of the "very low-income" person (himself) who is the recipient of SSI income as his sole basis of support, is controlling if not "enormous," and his need for a live-in aide is tantamount, if not "enormous" given that he is not able to adequately function in a dwelling without one.

    b. Second, Pickard has already been subjected to an erroneous deprivation of such interest through the procedures used by SPM/Highland Manor and the arbitrarily, artificially and unlawfully imposed procedures by Defendant Bailey. He was approved for residence, including creditworthiness, and then several weeks later, Bailey alleged that he was not approved due to a second determination by a "third party." Pickard's creditworthiness had not materially changed, and in fact his

credit standing, including "FICO score", had improved as he showed to Bailey. She stated that she had no input into such matter and refused to submit this evidence to this "third party." Bailey then informed Pickard that the first application for a live-in aide, that of John Mckinney, was rejected by a "third party." She refused to state the reasons therefore, and stated that a letter of explanation would be provided within 10 days. No such letter was ever provided. Pickard would learn months later, on July 30, 2019, in a federal court hearing, that the reason was that Mckinney had an outstanding warrant. Pickard inquired into this allegation, and found that there was an erroneous warrant for failure to appear in a case that had been agreed to be nolle prossed. The warrant was recalled, yet Highland Manor has refused to rescind their erroneous non-approval. **Congress alone,** not Defendant Bailey, or a so-called unidentified anonymous "third party," or any other Defendant, or anyone else or any other entity, **sets eligibility criteria. It was and is egregiously unlawful for Bailey, the Defendants or any other to set eligibility criteria as in the instant case. Only Congress may do so. Bailey's and the Defendants actions are unauthorized, and should be enjoined and remedied forthwith.**

Further, and in both cases, Bailey demanded that Pickard find a guarantor within "2-3 days" or he would be placed back on the waiting list. Since he had surrendered his existing Section 8 apartment and no such other housing was immediately available, he would be rendered homeless by Bailey's unlawful actions. Bailey also demanded that he find another live-in aide within "2-3 days" or he would once again be placed back on the waiting list, again rendering him homeless. This obviously is an egregious abuse that is due to be condemned and remedied.

The value of applicable procedural safeguards in this case are not just of probable value, but of vital and essential value since NONE exist at present, as is the case in Alabama, many landlords believe they can abuse and deprive tenants of their rights with impunity, and to a large extent, authorities including Alabama Landlord Tenant Law and Alabama courts, especially District Courts, capitulate to same and turn a blind eye to such abuses and lack of procedural safeguards. District Judges, after all, are elected in Alabama. Landlords, and Landlord lobbies, are far more powerful, wielding political and ballot power, whereas most tenants subjected to eviction are indigent and lacking any such power or influence, and are among the least likely to impact the prospects of the re-election of a Judge. This is not just an unpleasant assertion, it is a reality.

c. Third, as in Ressler's case, the Government's interest, including the function involved and the minor administrative burdens that would provide adequate procedural safeguards in this case are essentially the same as Pickard's, like Ressler's, given the mission of the Government in providing affordable housing to persons such as Pickard. Indeed, the burden on the Government would be minimal in that its role would be one of oversight, ensuring that the private landlords receiving, *inter alia*, Section 8 subsidies in this case would comply with the reasonable procedural safeguards provided. Such safeguards would not unreasonably detract from the interest of any project owner such as SPM, LLC/Highland Manor Ltd. from ensuring an application procedure that is easy to administer and does not frustrate efforts to select satisfactory tenants while providing for procedural due process rights.

A brief review of several basic due process principles is of aid in according the proper weight to the Mathews factors in the instant case. First, having determined that

Ressler, like Pickard, has a sufficient "property" interest in Section 8 benefits to be entitled to due process protection, this court need not look further at the nature of Ressler's interest but must focus primarily on its weight. See *Board of Regents v. Roth*, 408 U.S. 564, 570–71, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). To that end, while "the legitimacy of an alleged interest does not inherently depend upon whether the person has previously been receiving the desired benefit" (*Davis v. United States*, 415 F.Supp. 1086, 1092 (D.Kan.1976), it is indisputable that Pickard has a greatly heightened interest since he is currently receiving benefits and is threatened with termination of those benefits, even versus one such as Ressler who has not yet been vested with such constitutional property interests and rights. See, e.g., *Richardson v. Perales*, 402 U.S. 389, 406–07, 91 S.Ct. 1420, 1430, 28 L.Ed.2d 842 (1971).

HUD laws, rules and regulations prohibit automatic exclusion of an applicant, such as the one who has a mental health disability who is being automatically excluded even from being given an application by Defendant Bailey.

By law, the PHA or private landlord shall not . . . deny to any eligible applicant the opportunity to lease or rent any dwelling in any such housing suitable to its needs. No person shall automatically be excluded from participation in or denied benefits of the Housing Assistance Payments Program because of membership in a class such as recipients of public assistance, disability, etc.

## II. Pickard's Due Process and Equal Protection Rights

Pickard, whom Section 8 housing program was intended to benefit, had a property interest in Section 8 benefits and was entitled to due process protection in application and selection process. *Ressler v. Pierce, supra,* 692 F.2d 1212 (9th Cir. 1982); United States Housing Act of 1937, § 8 as amended 42 U.S.C.A. § 1437f; U.S.C.A. Const.Amends. 5, 14. As stated above, a Plaintiff may sue under Section 1983 to enforce sections of the Housing Act and associated HUD regulations. *McClean v. Delaware Cty. Housing Auth.* , 220 F.Supp.3d 607, 612–13 (E.D. Pa. 2016).

(1) Pickard was denied due process and equal protection by the manner in which Highland Manor processed his application for Section 8 tenancy and rent subsidies. Pickard has a constitutionally protected "property" interest in Section 8 benefits by virtue of his membership in a class of individuals whom the Section 8 program was intended to benefit. *Id.,* at 1215.

42 U.S.C. § 1437f(a) (1978) provides that: For the purpose of aiding lower-income families in obtaining a decent place to live and of promoting economically mixed housing, assistance payments may be made with respect to existing, newly constructed, and substantially rehabilitated housing in accordance with the provisions of this section. *Id.,* at 1216.

As stated above, the general purpose of the Section 8 program is to "[aid] lower-income families in obtaining a decent place to live and . . . promot[e] economical mixed housing. 42 U.S.C. § 1437f(a).

To this end, ***Congress, not Bailey or any Defendant hereto or any other person or entity,*** created very specific eligibility criteria clearly **intended to limit the discretion of the landlord in determining who may participate in the program**. The Senate report on the Section 8 bill provides support for the fact that the applicable case law also supports the conclusion that the defendants' actions are improper. As further held in *King v. Smith, supra,* the Supreme Court dealt with the general issue of local welfare policies not authorized by and conflicting with the purposes of the statutes and regulations creating the program. The *King* Court held that, even though local agencies may have a certain amount of discretion in administering federal programs and even though the local policies in question might further a valid state interest, any conflict between local policies and the purpose and scope of the statutes and regulations of a program would render that policy invalid. In other words, the federal government may impose such terms and conditions as it feels proper on disbursement of the monies for a particular program, and policies inconsistent with those conditions, such as those of SPM and  Highland Manor as imposed by other

Defendants in this action, cannot stand. The unauthorized criteria concocted by Bailey and the other Defendants in this action, hiding behind unarticulated and un-promulgated criteria of a so called, anonymous, amorphous and illegally posited "third party," not accountable to anyone due to its anonymity, and egregiously prohibited by federal law (**Congress sets eligibility criteria, certainly not some anonymous, unlawfully posited "third party"), hence such criteria alleged that is not authorized by Congress cannot stand.**) Pickard is entitled to the reversal of the outrageously unlawful eligibility determinations under this scenario regarding his so-called 'creditworthiness' issue and the rejection of his long-term live-in aide, and that such action be enjoined and enforced by summary judgment as in *King,* if not alternative injunctive relief to end this severe injustice, abuse and violation of due process.

As further held in *Fletcher v. Housing Auth. of Louisville,* 491 F.2d 793 (6th Cir. 1974), the court applied these principles to the housing context in circumstances similar to those presented in the instant case. To recap, *Fletcher* involved the question of whether or not the Housing Authority of Louisville [HAL] could institute a policy that imposed unauthorized conditions of eligibility on housing program applicants. The policy in *Fletcher* provided for accelerated entry into public housing of applicants who could pay higher rent than other low-income applicants. In reversing the lower court, the Sixth Circuit affirmed that a PHA (or private landlord) ***". . . may not set eligibility criteria unauthorized by Congress"***. *King v. Smith,* 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968). Specifically the Supreme Court found that the PHA (or private landlord) had no authority to impose its own conditions of eligibility.

Yet this is exactly what SPM, Highland Manor, Defendant Bailey, and other Defendants have done in arbitrarily setting creditworthiness requirements and implementing resident selection criteria, including for live-in aides, that are by an unnamed, and never identified "third party" whose criteria are not only not authorized by Congress, but are not articulated much less authorized.

**This is an outrageous abuse by the Defendants and an outrageous injustice.**
The rationale for this holding is obvious: otherwise, landlords could impose an
unlimited and unreasonable set of eligibility criteria allowing for the specific abuses of
SPM, Highland Manor, and all Defendants in this action.

In view of the history of the National Housing Act, the Supreme Court further
concluded that tenant admission policies which discriminate against applicants
because of their poverty or eligibility criteria are no longer justified. Once again, the
High Court ruled that **eligibility criteria unauthorized by Congress are not
permissible when a state agency dispenses a federally funded benefit.** *King v.
Smith*, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968).

In further holding that a landlord may not impose unauthorized resident
selection criteria, the Court considered the private interest. The Court took into
consideration that the interest at issue is of an essential nature relating to the livelihood
of the beneficiary, that eligibility for participation in the program is based on the need
of the applicant, and that determination of eligibility requires evaluation of factual
issues that lend themselves to error and require input from participants to determine.
These factors dictate the necessity of a full hearing regarding such issues for
participants in the Section 8 program. The Court applied the principle strictly, even
ruling that a Defendants' policy of excluding persons from the Section 8 program
because of prior indebtedness to a PHA or private landlord, unrelated to that program,
is invalid because it imposes an additional condition of eligibility for the Section 8
program that is: **not authorized by Congress**.

The policy conflicts with HUD regulations and with the Annual Contribution
Contract. The policy amounts to no more than an illegal private collection service to
promote the narrow financial interest of the defendant and thereby circumvented the
purposes of the Section 8 program and state law.

In *King*, where the abuses of the unauthorized conduct of the landlord, such as
SPM, Highland Manor and the Defendants in this case, were unlawful and

unconscionable, **the Court granted summary judgment** for the plaintiffs such as Pickard. In like manner, Pickard is seeking summary judgment in his favor regarding the Defendants' unlawful and unauthorized rejection of his application without a co-signer, and the Defendant's unlawful and unauthorized rejection, also based on erroneous premises, of the application of his live-in aide, be remedied by grant of summary judgment on these issues.

III. Tenant Selection Criteria Imposed/Authorized by Congress

A. The following tenant selection criteria are imposed and authorized by Congress for private project owners:

1. Owners shall establish written tenant selection criteria subject to the approval and authorization of Congress.
2. All prospective applicants must be provided with a copy of the criteria.
3. Tenant selection criteria must relate to the ability of the applicant to fulfill lease obligations and should not automatically deny tenancy to a particular group or category of otherwise eligible applicants.

The Defendants have clearly failed to provide for the above.

B. Waiting List Procedure:

1. If the owner of a project participating in the Section 8 program determines that an applicant is eligible for a unit with Section 8 assistance and is otherwise acceptable and that units are available, the owner will assign the applicant a unit of the appropriate size in accordance with HUD standards. If no suitable unit is available and the owner has suitable units under contract, the owner will place the applicant on a waiting list for the project and notify the applicant of when a suitable unit may become available. Selections from the waiting list shall be made chronologically, according to the date of submission of the application for § 8 benefits, except where certain applicants are entitled to priority as a matter of law.
2. The waiting list will be made available to the applicants upon request in the

office of the project manager.

C. Notice and Hearing Procedures: If the owner determines that an applicant is ineligible for a unit with Section 8 assistance on the reasons related to his ability to fulfill his obligations as a tenant of the project, the owner will notify the applicant in writing within 15 days of that determination and of the specific reasons for it. The written notification shall state:

(1) that the applicant has 14 days from receipt to submit a written response to the notice to the local HUD officials;

(2) that the applicant may have an attorney or other representative prepare a written response, or appear at the local HUD office;

(3) that the applicant's response to the notification does not preclude him from exercising his other rights if he believes he is being discriminated against on the basis of race, creed, religion, sex, handicap or national origin.

(4) The review of either the applicant's written response or of the information provided at the informal meeting will be undertaken by an employee at the local HUD office.

(5) Within **5 working days** of receipt of said written response or of the date of the meeting, HUD shall advise the applicant in writing as to whether the owner's determination is approved or reversed.

(6) If, after review, the owner's finding of ineligibility is reversed, the applicant will be placed in a suitable vacant unit, if available. If no such unit is available, he will be placed on a waiting list.

(7) The owner will be required to maintain in its files for one year the application, the notification of eligibility or ineligibility, the applicant's written request for a meeting or written response to a negative determination, if any, any other written submissions presented by the applicant or his representative in support of his position, and a copy of

HUD's written determination.

(8) Owners are required to maintain a list of local legal service
organizations to assist rejected applicants. This requirement would not
place an undue fiscal or administrative burden on project owners or
HUD which is evidenced by the fact that similar lists must be
maintained by government agencies in other contexts. Thus, supplying
legal services information to rejected applicants is a due process
requirement.

The Defendants have clearly failed to comply with the above.

Once again, Pickard has a constitutionally protected "property" interest in
Section 8 benefits by virtue of his membership in a class of individuals whom the
Section 8 program was intended to benefit. 42 U.S.C. § 1437f(a) (1978). The private
interest of Section 8 applicants in a fair review of rejected applications outweighs
project owners' fears of losing the statutory grant of discretion in selecting among
eligible tenants. In addition, the risk of an erroneous deprivation of the applicants'
protected "property" interest is measurably greater without HUD review.

IV. Defendants' Violation of Pickard's Due Process Rights

1. Pickard was entitled to a copy of the resident selection criteria when he made
his application. He was not given this copy. He was therefore not informed of the due
process rights informed by this document.

2. Pickard, who needs the services of a live-in aide, applied for a two bedroom
apartment by which to accommodate a live-in aide.

3. When Pickard applied in November, 2018, he was notified that his
application was approved and that he was placed on the waiting list.

4. Pickard was notified in February, 2019, that an apartment was available.
Joyce Caddell, who had processed his application, told him to put it his 30 day notice
at his existing Section 8 apartment so that he would be able to transition to the
apartment in March. Section 8 regulations strictly prohibit a tenant from occupying

two Section 8 units at the same time, so he would have to entirely vacate his existing Section 8 unit before being allowed to move into the Highland Manor Section 8 unit. Pickard thus surrendered his existing unit to move into his new unit.

5. Despite having been told by Ms. Caddell that his application process was complete, Bailey began requiring Pickard to submit more documents and other tasks. Shortly before he was to sign his lease, she notified him that applications were reviewed every 90 days and the result of this review required that Pickard have a co-signer, notwithstanding that his relevant factors had not changed and his credit score and standing had improved as stated above. It had not yet been 90 days since his initial review. When he pointed this out to Defendant Bailey, she became irritated and refused to respond. She stated that unless he found a co-signer in the next 2-3 days, he would be passed over for the available apartment and placed back on the waiting list. Because Pickard had surrendered his existing Section 8 unit, he would be rendered homeless as he cannot afford market rents. Bailey told him that he would receive a notice of explanation within 10 days. No such notice was ever received. Even so, he was facing homelessness if he was unable to find a co-signer within 2-3 days. Even if the notice was received, he would not be able to avoid homelessness.

6. Co-signers are difficult to find, especially since Pickard's family is some distance away. The action of Bailey in this regard was unreasonable, violated due process and should have been subject to the appeal procedures set out herein.

7. Pickard was denied his due process right to appeal this action as set out above.

8. When the lease was signed, no co-signer was required. Pickard signed the lease on his own. Bailey claims that a "separate agreement" was signed. No one recalls any such agreement. Even if it existed, it would be undeniably unlawful and not binding since under the mandatory rubrics of contract law, all three parties, landlord, tenant and guarantor, would be required to execute any such agreement. This did not occur. It appears that this was just another effort by Bailey to dissuade Pickard from

becoming a tenant, which she had attempted to prevent, and has attempted to terminate since Pickard has become a tenant.

Moreover, a landlord's use of credit history in the tenant selection process is circumscribed under Section 8 of the Housing Act which is actionable under Section 1983. The Defendants blind, arbitrary and unauthorized use of a so called, anonymous, and unnamed, undisclosed, secret "third party" is an outrageous abuse- **Congress** certainly did not allow the use of such an unauthorized entity to determine when a state dispenses a federally funded benefit(!)

Moreover, in the following cases involving criteria based on credit history, courts have held that the criteria in question could not be used, under the circumstances, in the tenant selection process under Section 8 of the Housing Act of 1937 (42 U.S.C.A. § 1437f). In *Bakos v Flint Housing Com.* (1984, CA6 Mich) 746 F2d 1179, the court reversed a judgment that a Section 8 certificate could be denied because of a $529 arrearage in connection with a previous, non-Section 8 tenancy. The applicant in question previously resided in other public housing operated by the local authority; the other housing was not subsidized under the Section 8 program of the United States Housing Act of 1937. When the tenant vacated the premises, she was $529 in arrears on the rent; the housing authority wrote off this amount as a bad debt. The applicant then applied for Section 8 benefits; the housing authority approved the application and granted a Certificate of Family Participation. After the new Section 8 landlord served on the applicant a notice to quit for reasons other than nonpayment of rent, and a consent order was entered under which the landlord could take possession of the unit, the applicant requested another Certificate of Family Participation so that she and her family could continue to receive Section 8 benefits at another location in the area served by the local housing authority. The housing authority refused to grant the certificate on the ground that the applicant still owed $529 in connection with the previous non-Section 8 tenancy.

The court noted that, pursuant to federal regulations, when a family that

participated in the Section 8 program wished to move from one tenancy to another, it had to obtain another Certificate of Family Participation. The court noted that the handbook of the Department of Housing and Urban Development (HUD) provided, in its requirements applicable to assisted families who wished to move, that if the family owed money for unpaid rent or for other responsibilities under their current lease, the family could be determined ineligible for a desired move with continued assistance. This, said the court, suggested that an authority could deny a certificate if back rent were owed the current landlord, but not if it were owed the authority from a prior non-Section 8 tenancy. Concluding that the applicant in question was entitled to another Certificate of Family Participation, the court reversed the action of the housing authority and stressed that, while a housing authority in a different location would have had the option to treat the family as a new applicant, the local housing authority in question did not have such option, where the applicant had sought another certificate for a tenancy within the same geographic area served by the authority. The court distinguished *Baker v Cincinnati Metropolitan Housing Authority*, 675 F2d 836 (6th Cir 1982) (§ 4[a]), on the ground that it involved an arrearage policy applicable to families initially applying for Section 8 benefits.

Granting summary judgment in favor of a class of applicants who were barred from participation in the Section 8 housing program because of alleged prior indebtedness to the local housing agency, the court, in *Ferguson v Metropolitan Development & Housing Agency, supra,* ruled that the agency's policy of excluding persons from the Section 8 program because of prior indebtedness to the agency—which indebtedness was unrelated to the Section 8 program—was invalid, because it imposed an additional condition of eligibility for the Section 8 program that: **was not authorized by Congress**.

The policy, said the court, conflicted with federal regulations and with the annual contributions contract that authorized the agency's participation in the program. Again, the court reasoned that the policy amounted to no more than an illegal private

collection service to promote the narrow financial interests of the agency, and thereby circumvent the purposes of the Section 8 program and state law. In effect, the policy precluded from the program people who had trouble paying rent, who were the very persons whom the Section 8 program was intended to help, observed the court. The agency's policy, said the court, also conflicted with state laws governing settlement of landlord-tenant disputes.

In *Kohl v Housing Authority of Bloomington*, 537 F.Supp 1207 (CD Ill. 1982), the court held that a local housing authority's rental arrearage policy, as applied to a certain applicant, was being used solely as a collection device to ensure payment of an obligation disputed in good faith, and that the housing authority's decision to deny that applicant a Section 8 Certificate of Participation was arbitrary. Thus, the court made permanent the terms of the preliminary injunction granted solely as to that applicant. While holding that the authority's rental arrearage policy did not violate the applicable statute, regulations, or constitutional rights of applicants as a class, since the arrearage policy was reasonably related to an appropriate governmental interest in fostering fiscal responsibility in the administration of the Section 8 program, the court observed that the particular applicant in question had posed no threat to that fiscal responsibility and, in fact, had been a model tenant in the past, as Pickard has been not only in his prior Section 8 tenancy at Birmingham Tower Apartments, but throughout his life. The housing authority, which established the eligibility requirements for applicants seeking housing under Section 8 (42 U.S.C.A. § 1437f), rejected this particular applicant because she allegedly owed rent on a conventional public housing unit. The alleged debt arose from the applicant's failure to give the authority 30 days' written notice of termination of a prior lease. The applicant and her 12-year-old daughter were both afflicted with multiple disabilities; under the prior lease, they agreed to rent an apartment from the housing authority, but never took possession because the applicant took ill when she was to occupy the apartment, and the stairs were not manageable by her daughter. Although the applicant had been contacted about her intentions either to

move in or to return the key, she did neither until approximately 5 months after she leased the apartment, at which time she returned the key. At an informal hearing, it had been determined that the applicant owed rent through the date when the authority leased the apartment to another tenant. The court noted that the housing authority admitted that the applicant was a desirable tenant who, before the incidents involving the prior lease, always paid her rent and fulfilled her other obligations to the authority.

The arbitrary and capricious action of the Defendants in circumventing Congress by using a so called third party to make unauthorized determinations regarding eligibility requirements is an outrageous violation of Pickard's rights of due process, and should be permanently enjoined.

Defendant Bailey then informed Pickard that his long term live in aide, John Mckinney, who had been twice approved as his live-in aide by HUD Resident Selection Criteria at Birmingham Tower, also a Section 8 facility, that is virtually the same as that of Highland Manor (after all, such criteria is circumscribed by Congress and should be virtually uniform). He was for undisclosed reasons not approved **not pursuant to the resident selection criteria, but the unlawful, unauthorized and outrageously illegal eligibility determination of said rogue "third party," totally unauthorized by Congress**.

Bailey again told Pickard that unless he found another live-in aide within 2-3 days, he could not qualify for the 2 bedroom unit which was the only unit available according to her, and would be placed back on the waiting list, thus he would be homeless. Resident selection of a live-in aide is mandatory for occupancy of a 2 bedroom apartment. Pickard was again facing rejection of his application. Again, this would render him homeless. Again, Bailey told Pickard that he would receive a statement of reasons within 10 days, which he never received. Again, she was going to reject his application within 2-3 days, so even if the notice was received, he would not be able to appeal it as his due process rights required, and he would be homeless.

Bailey ignored and refused to comply with the due process required above.

Pickard, who did not receive the resident selection criteria, notice of these rights, or any other notice when he applied, was unaware of his due process rights.

Live-in aides are difficult to find. They must be capable, compatible, available, responsible, and trustworthy. The action of Bailey in this regard was outrageously unreasonable, violated due process, and should have been subject to appeal pursuant to applicable law, particularly the unambiguous holding that only **Congress** can set and authorize eligibility criteria. See also *Ressler, supra.*

Pickard was denied his due process right to appeal this action as set out above.

As stated above, Pickard would not find out until July 30, 2019, in an open federal court hearing, that the reason for the rejection of Mr. Mckinney was a warrant. This was a shock since Mr. Mckinney had recently undergone background check for recertification with Birmingham Tower at the time that this warrant was active, but he was still approved as a live-in aide.

Upon checking on the matter, the warrant turned out to be a failure to appear warrant on a case that was due to be nolle prossed. The warrant was issued in error, and has been recalled. This is not an unusual error in the judicial system, and it could have been corrected just as promptly when first identified by the Defendants had Pickard been informed of this matter as his due process rights required.

Had Defendants complied with the requirements of due process as set out above, this matter would have been disclosed and it could have been corrected in 2018 when Pickard submitted his application. There admittedly would be no basis to allege uncreditworthiness or to reject Mr. Mckinney. Pickard's application would have been approved and he would have been Pickard's live in aide.

The law is clear that tenants have a private right of action to pursue claims related to core constitutional and personal rights under Section 8 of the National Housing Act of 1937, 42 USC § 1437f, and associated HUD regulations. The rights articulated in this cause of action are core personal rights that are protected through the NHA and related regulations and is enforceable under 42 USC § 1983. See *Hyland v.*

*Office of Housing & Community Development, supra.* Due process here can only mean
that Pickard should have some way to address these abuses in a meaningful way rather
than being given the sole option to go to court. *Hyland, supra.*

This denial of due process is the direct cause of three of the four falsely alleged
and unlawful lease infractions upon which lease termination and eviction action by the
Defendants is based: the first, second and fourth infractions.

(a) These violations of due process by the Defendants in failing to comply with
due process in the application process is the direct cause of the severe injuries, mental
and emotional distress, and other injuries suffered as a result of the Defendants' effort
to evict Pickard under what now are confirmed to be unjust and unwarranted premises.

(b) Three of the four lease infractions upon which the Defendants' attempt to
evict Pickard are entirely without merit, unjust and void, pursuant to the above
violations and unlawful actions of the Defendants toward the unlawfully denied live-n
aide. Without their unlawful acts, these infractions would not have been issued, and
there would be no eviction proceedings.

Moreover, Defendant Bailey admitted in her testimony in the State court
hearing held on November 21, 2019 that all four alleged lease infractions which were
the basis for the unlawful detainer complaint were invalid and without merit. (See
affidavit of attorney Jonathan Mok attached as Exhibit "A".) Penalizing conduct that
involves no intentional wrongdoing by an individual, as in this case, runs afoul of the
Due Process Clause. *Scales v. U.S.*, 367 U.S. 203, 224-25 (1961); *Southwestern Tel. &
Tel. Co. v. Danaher*, 238 U.S. 482, 490 (1915). The Defendants are admittedly
attempting to penalize conduct that involves not only no wrongdoing as they admit,
but no intentional wrongdoing as well, establishing the most grievous violations of due
process.

(c) The entire eviction process is fruit of this poisoned tree.

## RELIEF:

## As in *King v. Smith, supra,* summary judgment should be granted to

**Pickard** on the issues of the Defendants' unauthorized actions regarding the rejection of his application on the unauthorized basis of creditworthiness, and the rejection of his application regarding his live-in aide. In both cases, the actions were unauthorized by Congress and due to be invalidated by summary judgment on these issues. The inequitable rejection of his initial application is due to be reversed requiring Defendants to cure the wrongs, particularly the unlawful rejection of his live-in aide and the unwarranted requirement that a guarantor be required in his case, just as one was not ultimately required. Pickard should be awarded damages as stated at the conclusion of this Complaint for the physical and mental injuries and stress sustained as a result of the Defendants' unlawful conduct.

Pickard's long term live in aide, John Mckinney, whose application as a live in aide was unlawfully rejected, should be instated by summary judgment as Pickard's live in aide as he should have been but for the Defendants' violations of law and HUD regulations as stated above.

Pickard's motion for a preliminary injunction enjoining admittedly and falsely premised eviction proceedings should be granted, followed by a permanent injunction enjoining the same.

<div align="center">

**FOURTH CAUSE OF ACTION**
**Unconstitutionality of Alabama Landlord-Tenant Statutes**
**Defendant Marshall**

</div>

The first cause of action is set forth by reference and is incorporated as if fully stated herein. Finding a subsidized housing development to be operated under color of state law within the meaning of 42 U.S.C.A. § 1983, the court in McClellan v University Heights, Inc. (1972, DC RI) 338 F Supp 374, enjoined the eviction of the plaintiff tenants pending the landlord's adoption of eviction procedures which met due process requirements.

Alabama's Landlord-Tenant Law, *Code of Alabama* §§ 35-9A-101 *et seq.*, is unconstitutional on its face in regard to provision for and enforcement of eviction law

and procedures for persons with constitutional property interests in their continued tenancy under federal and state subsidized housing law that meet the rigors of Constitutional due process, and they further are entitled to Constitutional due process before they can be divested of federal benefits as stated with clear authorities herein. State Landlord-Tenant law does not provide for such Constitutional rights and due process, and is therefore due to be re-enacted or amended to provide for such Constitutional obligations. State law must include provisions and sections that provide for the rights of tenants under both state law and HUD/federal law. The unlawful detainer action against Pickard pursuant to unconstitutional state law is therefore void and due to be dismissed with prejudice or permanently enjoined. Injunctive and declaratory relief is due to be granted pursuant to 42 U.S.C. § 1983 towards Defendant Marshall, who is the state official and state actor who is presiding over these constitutionally infirm state laws and who is not being sued in his individual or personal capacity nor are monetary damages being sought against him.

Alabama's Landlord-Tenant laws are unconstitutional in two primary areas: First, the procedure by which the initial state hearing on unlawful detainer, held in District Court, is essentially a sham hearing and is clearly unconstitutional. This hearing deprives the defendant of essential rights including virtually no pre-trial rights, no discovery, no depositions, no witness lists, no right to counsel, and numerous other rights, perhaps the most critical of which is **the right to trial by jury**. Juries are not elected. Most of all, this should not be an issue. Pickard, like all tenants, should have the right to trial by jury not down the road, but in the initial hearing. Many tenants cannot afford attorneys or are unable to secure pro bono attorneys. They are placed at severe disadvantage and prejudice.

It is arguably self-evident in Alabama that in the initial hearing on actions for unlawful detainer, the deck is stacked against the tenant and the hearing process unconscionably favors the landlord, denying the tenant the most basic due process rights. It is well known in Alabama that the District Courts generally grant

judgment for the landlord peremptorily, often with the simple intention to pass the case on to Circuit Court, not wanting for the Landlord to be ruled against essentially summarily, in that judgment for the tenant, even if obviously due as a matter of fact and/or law, might adversely affect the Landlord, in other words, the tenant should have to prove his case in Circuit Court. The District Courts of Alabama are held by many to be rubber stamp forums for Landlords. Whether Defendant Marshall admits this or not, this is the fact, the cause and effect, of Alabama Landlord-Tenant law.

This is illustrated in Pickard's case. A hearing was held in state District Court on November 21, 2019, regarding the first unlawful detainer action filed by the Defendants against Pickard. Pickard was suffering from influenza and pneumonia, with a fever of 103 degrees. The District Court refused him a continuance. He was hardly in mental or physical condition to attend and endure and adequately function at a court hearing.

At the hearing, Pickard's pro bono attorneys presented the fact that the Lease Termination Notice was unlawful and was not a proper basis for unlawful detainer, which the Landlord's attorney later acknowledged and moved to dismiss the action. Yet the Court did not so acknowledge and ordered the hearing to continue. Defendant Bailey, on cross-examination by Pickard's attorneys, admitted under oath that all four of the lease infractions that were the basis for the eviction were invalid as a matter of fact. (see Exhibit "A"). There were no facts by which to sustain the eviction action. Incredulously, the District Court ruled in favor of the Plaintiffs **without an opinion** in violation of federal and HUD law (see details, infra.) Before Pickard's attorneys could file their appeal, counsel for the SPM/Highland Manor (Defendant Winston) moved to dismiss the case due to the legal deficiency in the lease termination letter. Pickard's attorneys were clearly right on the issues of law which the District Judge had not yet acknowledged, and the Court dismissed the case, without prejudice.

Now, the Defendants have refiled the case based primarily on the same four lease infractions that they admitted to be invalid. Notwithstanding, the District Court did not summarily dismiss the action. They have done so while violating federal and HUD required due process. Under Amendment V of the US Constitution, no person shall be deprived of life, liberty, or property, without due process of law," and that amendment is made applicable to the various states through Amendment XIV, which states, inter alia, "nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. As set out above, the Defendants' action is state action since they are a quasi-government entity subject to the requirements of the due process clause of the US constitution based on SPM/Highland participation in government subsidized Section 8 and state subsidized funding as well as its receipt of substantial federal benefits by way of LITHC tax credits for the construction of the project, and in view of imposition of extensive compliance criteria dictated by HUD regulations and its HUD Handbook. *Hyland, infra, et al.* They must comply with due process in assessing lease infractions, yet they have not done so, and Alabama Landlord-Tenant law imposes no due process obligation to do so. Again, Alabama law fails to provide for mandatory due process rights and is unconstitutional.

As stated above, penalizing conduct that involves no intentional wrongdoing by an individual, as in this case, runs afoul of the Due Process Clause. *Scales v. U.S.*, 367 U.S. 203, 224-25 (1961); *Southwestern Tel. & Tel. Co. v. Danaher*, 238 U.S. 482, 490 (1915). The Defendants are admittedly attempting to penalize conduct that involves not only no wrongdoing as they admit, but no intentional wrongdoing as well, establishing the most grievous violations of due process.

As so clearly illustrated in Pickard's case, it is exactly backwards to hold a sham hearing such as is held in Alabama without due process protections and other rights that should be afforded in the initial court hearing. Civil and criminal defendants in all other areas of law are not subjected to such a sham hearing, after

which they have the opportunity for a proper hearing. This only occurs under Alabama law against tenants in unlawful detainer actions.

It is an axiomatic principle of law that the presumption of correctness is granted to the initial court. The Circuit Courts of Alabama grant the presumption of correctness to the factual and legal findings of lower District Courts. The Courts of Civil and Criminal Appeals of Alabama grant the presumption of correctness to the Circuit Courts of Alabama. The federal Courts of Appeal grant the presumption of correctness to the factual, and in many cases the legal findings of the United States District Courts. Alabama tenants against whom the state District Courts have ruled face the extreme prejudice of this presumption of correctness that is a reality regarding further action in Alabama Circuit Courts.

Alabama District Judges should cry out for jury trials in the original actions for unlawful detainer are brought in Alabama District Courts. This would relieve District Judges of the appearance, if not the reality in many cases, of bias and prejudice. The ends of justice would be greatly served if this one right, to a jury trial, was afforded to tenants in Alabama facing unlawful detainer actions, in the initial court hearing where presumption of correctness attaches, and where jury verdicts are given much weight and generally are not disturbed on appeal. Indeed, a jury trial and verdict in the initial hearing would greatly serve the ends of justice and, together with discovery and other pre-trial rights, would go a long way in reforming Alabama law to make it constitutionally compliant.

Yet this is not the case. The statutory scheme in Alabama by which all of the panoply of these indispensable rights are denied to tenants defending eviction actions in the initial hearing is outrageously unconstitutional. The fact that Alabama has allowed this to continue for so long is a shameful outrage against the citizens of this honorable State. Pickard has been told by persons who were on the congressional committee to revise the previous draconian Alabama Landlord-Tenant law, known as the Sanderson Act, that the compromise statutes that exist

Case 2:20-cv-00212-ACA Document 3 Filed 02/20/20 Page 101 of 251

would be revisited and brought within constitutional norms. This has not occurred.

Defendant Marshall, an honorable man of extraordinary renown and integrity, now has the opportunity to preside over the correction the outrageous injustices born from the outrageously unconstitutional Landlord-Tenant laws in Alabama. The delay in doing so has waxed for far too long a time, with countless persons being victimized by the present unconstitutional law in this area.

A primary issue is that elected judges should not wield such potentially tyrannical and biased power over indigent and in most cases highly disadvantaged parties such as those subject to eviction action. It is not reasonably likely at all that an action such as this could reasonably expect the State of Alabama to reverse its laws by which many judges are elected, and to adopt the much more just system of appointment of judges for terms, preferably life.

However, the Probate Courts of Alabama do have appointees such as administrative law judges and other inferior judges to the elected Probate Judge who are not elected, who often are salaried or otherwise compensated. For example, many Probate Courts employ an administrative judge to hold hearings on civil commitments for persons who may be a danger to self or others.

A very reasonable solution would be for Defendant Marshall to propose, and for the Alabama legislature and Governor to amend Landlord-Tenant law in part by stipulating that jurisdiction over unlawful detainer/eviction actions be vested in the Probate Courts of this State, and that the Probate Judge for each county designate and employ without bias an administrative law judge or other appointee to preside over such actions with the full panoply of rights in the initial hearing, including discovery and pre-trial rights and a jury trial (petit jury could be adopted). Indigent persons, particularly those who are handicapped, especially those who are mentally challenged, could be appointed a guardian ad litem if warranted, and most justly of all, a court attorney could be provided such as those who face civil commitment. How unjust is it for persons facing civil commitment

Page | 101

to have representation of counsel as well as in many cases a guardian ad litem, where the outcome could be hospitalization rather than homelessness, versus persons facing eviction, where the outcome for many could be homelessness and often life-long prejudice in obtaining a leasehold in the future, especially subsidized housing intended, as so many case authorities point out, to prevent homelessness?

It is a fact that most eviction actions are brought due to non-payment of rent. In such a case, there is really no viable defense, except that in the case of federally subsidized housing, the tenant is allowed more opportunity to cure the deficiency than in eviction actions between private landlords and private individuals as tenants. In the event of this vast majority of eviction cases, court proceedings can be greatly streamlined to address this prevalent issue with minimal burden on the administrative court.

However, in the relatively rare case where eviction actions are brought for other alleged cause, the tenant should have due process rights and procedures that are constitutionally compliant at the very least. In Pickard's case, the basis for the eviction action is lease infractions, four out of five of which the landlord admits to be false under oath (see Exhibit "A"), and the fifth being exculpatory based on the photo evidence attached to the lease infraction and video evidence. Yet under the current system, the landlord is being permitted to re-allege these invalid infractions in a subsequent state eviction action. The same District Judge who heard the testimony of Defendant Bailey by which the basis for the first eviction action was vitiated and invalidated was due to hear the same case before action was filed to remove the case to federal court. If remanded, the same District Judge will likely hear this invalid evidence, and the outcome which should be certain in favor of Pickard is very grievously uncertain.

Alabama law should provide for a due process procedure to comply with HUD procedures for same by which to determine the validity of lease infractions,

It is an outrageous injustice for invalid lease infractions to form the basis for
unlawful detainer/eviction actions, especially those admitted under oath to be
invalid. Yet there is no such due process compliance in Alabama law, hence
Alabama law in this area is unconstitutional.

In the much more just and objective procedure where such cases would be
heard by administrative law judges or other appointees of the Probate Judge, this
would not likely be the case, especially if the facts were heard by a petit jury (or
jury of 12) presided over by a judicial official without the pressures of facing re-
election. This procedure would in fact greatly aid the functioning of District
Judges who would no longer be burdened by eviction cases, and would be
resolvable in a forum that would greatly promote judicial economy and the prompt
administration of justice. Hearings would be promptly held, as they should be, but
not in the frenetic and prejudiced procedures that now exist in the District Courts
of Alabama without due process protections for the tenant. Indigent, handicapped,
and/or mentally challenged tenants would have reasonable and cost-effective
representation, many of whom should have guardians ad litem absent eviction
process anyway. The vast majority of cases, those that involve non-payment of
rent, would be quickly, efficiently and justly resolved. The rare cases such as
Pickard's would also be quickly, efficiently, but most of all **justly** resolved as well
in a constitutionally compliant manner, providing for the constitutional rights of
tenants while imposing a minimal burden on government/courts, and in fact less of
a burden than under current Alabama law.

In such a case, Alabama law would be among the model laws for the nation,
particularly since Alabama is hardly the only state to have eviction laws that many
consider unconstitutional and unjust. Another positive outcome is that the intense,
complex and exhaustive court process that has been required in Pickard's case
would most likely be obviated. Even if the Defendants had acted as unlawfully and
unconstitutionally as they have, this case could have been promptly mediated,

particularly given that landlords could no longer count on summary decisions in District Courts, or brought to a petit or full jury, and resolved. Pickard, and his attorneys for other matters, are confident that a jury of his peers would have decided in his favor, particularly when presented with the facts of the case that so heavily resolve in his favor, and most of all, the fact that the Defendants have admitted under oath that four of the five lease infractions without which there is no colorable cause to evict, are invalid (and the fifth is voidable based on the photo evidence attached to the infraction corroborated by clear video evidence.)

The second primary issue is that Alabama Landlord-Tenant law fails miserably and comprehensively to provide for the due process rights of tenants who have federal rights under federal law, prioritized by the Supremacy Clause, and mandated by the United States Constitution.

Alabama law provides no due process or other provisions for Alabama tenants' federal rights, particularly those who have constitutional property interests in continued occupancy in federally subsidized housing and constitutional property interests in federal benefits. Alabama Landlord-Tenant law should have specific statutes enforcing these rights under the United States Constitution, but Alabama law does not have such undeniably required protections.

It is arguable that private tenants leasing or renting from "purely" private landlords, i.e.: those who own their own property or otherwise have no obligations under federally subsidized housing laws, lack the same due process and other rights that tenants have who rent or lease under the extensive laws, rules and regulations under federally subsidized housing. It is also arguable that all tenants should have the same due process rights, whether renting from purely private landlords, or landlords bound by federal law pursuant to federally subsidized housing. Regardless, Alabama law must provide for the rights of tenants under the United States Constitution, laws, statutes, rules, and regulations pursuant to the Constitution and the Supremacy Clause.

When a defendant is a tenant of federally subsidized housing, federal law must be followed in addition to state law in a summary process action. United States Housing Act of 1937, § 2 et seq., 42 U.S.C.A. § 1437 et seq. *Housing Authority of City of New Haven v. DeRoche*, 962 A.2d 904 (2009). A private landlord is therefore bound by federal law in addition to state law in summary process action such as eviction. Yet Alabama law fails miserably and comprehensively to provide for compliance with federal law in eviction proceedings.

State laws must provide for the following tenant rights:

1. Federally subsidized landlords must comply with Constitutional, federal and HUD regulations regarding eviction procedures, as well as state law requirements.

2. Good cause is required for evictions from Subsidized Housing. The statutes and federal regulations on subsidized housing require that tenancy be terminated only where a lease violation is serious, referred to generally as a "good cause" requirement for evictions. A landlord may evict a tenant for material noncompliance with the rental agreement, nonpayment of rent, material failure to carry out obligations under a state landlord and tenant act, certain criminal activity, or other good cause.

3. Good cause must be specific to the tenant: good cause does not include a business or economic reason, or desire to use the unit for other purposes.

4. Additionally, good cause must be previously known by a tenant: a landlord must give prospective notice that certain conduct will be considered good cause for termination before a court will find that such conduct justifies an eviction. Under 24 C.F.R. § 247.3(b), notice of good cause requires that the conduct of a tenant cannot be deemed other good cause under § 247.3(a)(4) unless the landlord has given the tenant prior notice that said conduct shall henceforth constitute a basis for termination of occupancy. Said notice shall be served on the tenant in the same manner as that provided for termination notices in § 247.4(b).

5. Alabama law fails to provide for procedural due process requirements under 24 C.F.C. § 247.4 (c)(1). This section sets out the procedure by which lease

termination can be sought for material noncompliance. The term material noncompliance with the rental agreement includes: (1) One or more substantial violations of the rental agreement. Alabama law fails to require same for lease termination. In Pickard's case, such substantial violations are not alleged.

6. Alabama law fails to provide for procedural due process requirements under 24 C.F.C. § 247.3 (c)(2) wherein lease termination is sought for "Repeated minor violations of the rental agreement" that:

(i)     Disrupt the livability of the project,

(ii)    Adversely affect the health or safety of any person or the right of any tenant to the quiet enjoyment of the leased premises and related project facilities,

(iii)   Interfere with the management of the project, or

(iv)    Have an adverse financial effect on the project;

The Defendants are alleging repeated minor violations of Pickard's lease, yet they do not provide the requisite elements that such violations, to be grounds for lease termination, must disrupt the livability of the project, adversely affect the health or safety of any person or the right of any tenant to the quiet enjoyment of the leased premises and related project facilities, or that the minor violations interfere with the management of the project, or have an adverse financial effect on the project. Because Alabama law does not require a landlord to make such requisite claims for lease termination, Alabama tenants are deprived of procedural due process and the state laws by which eviction are premised are therefore unconstitutional.

7. Tenants Must Receive Adequate Notice. When terminating a tenancy, the landlord must provide written notice that specifically lists the grounds for eviction, as well as the procedural rights that the tenant has. The Defendants failed to inform Pickard of his procedural rights in the Lease Termination Letter which was the basis for which the first unlawful detainer action was unlawful and was dismissed, again not by the District Judge but on motion of SPM/Highland Manor as plaintiffs in the action.

8. All correspondence relating to eviction must be served under 24 C.F.R. §

247.4(b) as follows: (b) Manner of service. The notice . . . shall be accomplished by:
(1) Sending a letter by first class mail, properly stamped and addressed, to the tenant at
his or her address, with a proper return address, and (2) serving a copy of the notice on
any adult person answering the door at the leased dwelling unit, or if no adult
responds, by placing the notice under or through the door, if possible, or else by
affixing the notice to the door. Federal law emphasizes that service shall not be
deemed effective until both notices provided for herein have been accomplished.

   **Not once** have the Defendants complied with this requirement. NONE of the
lease infraction notices were mailed to Pickard. Pickard has notified HUD Navigate of
this violation, and HUD has informed him that this will be brought up in
SPM/Highland Manor's annual review.

   NOT ONE OF ANY OF THE DOCUMENTS were delivered to an adult at
Pickard's residence, nor were any documents placed under or through the door. There
is ample room under Pickard's door for any notice. Yet, the Defendants insist and
persist in placing documents on the doorknob where anyone can retrieve them, and
where Defendants can claim that they placed them when in fact they did not. Why do
the Defendants insist on placing such intensively serious documents on the doorknob
outside the residence? Why do the Defendants not place the documents under the door
pursuant to federal regulations? Plaintiff failed to receive three of the first four lease
infractions. The first infraction was forged and backdated since the issue did not arise
until weeks after the infraction was allegedly issued, and Pickard did not receive a
copy until the Lease Termination letter was issued months later.

   Federal/HUD law is very specific: this notice requirement is absolute- 24
C.F.R. § 247.3(a)(4) unambiguously states that "No termination shall be valid unless it
is in accordance with the provisions of § 247.4." The Defendants have consistently
violated § 247.4, hence the termination filed against Pickard is further invalid and due
to be dismissed with prejudice.

   Alabama law provides for NONE of the above federal and constitutional

requirements, and therefore is unconstitutional.

Federal law under 24 C.F.R. 247.3 *et seq.* specifically holds that "No termination shall be valid unless it is in accordance with the provisions of 24 C.F.R. § 247.4". Alabama law fails to comply with this section and thus again fails to provide procedural due process for Alabama tenants such as Pickard against whom lease termination is being sought.

9. An infraction that is "cured" in a timely manner is not the lawful basis for termination.

**Moreover, Terminating lease without giving opportunity to cure violates procedural due process and is retaliatory just as terminating lease when the breach has been cured violates procedural due process and is retaliatory.**
Landlord's letter to tenant provided sufficient notice to allow termination of lease, as it stated how tenant had violated lease, that tenant could cure default in rent payment, and that she would be able to present defense if there were hearing; furthermore, delivery of letter by slipping it under tenant's door was not defective service because tenant received actual notice of lease termination proceedings. *Cunningham v Lifelink Corp.* (1993, ND Ill) 159 BR 230. This is the reason why federal law requires strict compliance regarding service under 24 C.F.R. 247.4(b).

First, Defendants have admitted that none of the first four lease infractions are valid, but even otherwise, it has not been denied that all such allegations of infractions have been cured. Alabama law states that in such case, "the lease shall not terminate," but the law does not provide any process to enforce this process that is due. There is no process to determine same by which the Landlord must acknowledge that such have been cured, hence, the law has no teeth, is devoid of procedural due process and is therefore unconstitutional.

10. The landlord who seeks to terminate tenancy and or benefits must promptly notify the tenant in writing, specifying the reasons for the denial and the process for requesting an informal review or hearing to contest the action.

11. The landlord must give a thirty (30) day written notice of its intent to the participant. Such notice shall include:

(a) The specific good cause rule or regulation the participant has allegedly violated;

(b) Specific description of the nature of the offense against him including, where applicable, dates of violations and the names of witnesses;

(c) The participant's right to be represented by counsel at the hearing. This invalidates Alabama's contractual ten-day period for tenant to request a hearing or submit a grievance, as set forth in tenant's lease with city housing authority receiving federal assistance under the United States Housing Act of 1937. This conflicts with federal statute and, thus, is unenforceable.

For example, federal statutes entitled a tenant, whose eviction was sought due to her failure to keep the apartment clean and prevent mice infestation, to a 30-day period for filing a grievance after receiving eviction notice. United States Housing Act of 1937, § 6(k)(2), (l)(4)(C), 42 U.S.C.A. § 1437d(k)(2), (l)(4)(C). *Housing Authority of City of Danville v. Love*, 375 Ill. App. 3d 508, 314 Ill. Dec. 528, 874 N.E.2d 893 (4th Dist. 2007).

Congress intended for 42 U.S.C. § 1437(d)(k) and 1437f to benefit tenants, and Congress intended to allow tenants to enforce their rights under § 1437d(k) through § 1983. In *Wright v. City of Roanoke Redevelopment & Housing Authority*, 479 U.S. 418 (1987), the Court rejected the argument that HUD had exclusive authority to enforce the Brooke Amendment explaining that such a holding was "at odds" with the enactment of the § 1437d(k) grievance procedures to resolve tenant disputes. 479 U.S. at 426. "HUD itself has never provided a procedure by which tenants could complain to it about the alleged failure of PHA's to abide by ... HUD regulations; nor has it taken upon itself the task of reviewing PHA grievance procedure decisions." Id.

In *Gonzaga, supra*, the Court reasoned that the lack of a sufficient federal review mechanism permitting tenants to complain of purported non-compliance weighed against a conclusion that Congress intended to preclude enforcement under §

1983. *Gonzaga*, 536 U.S. at 280, 290. It would be anomalous if tenants could contest their rent and utility charges (under the Brooke Amendment) through § 1983 but could not challenge their right under § 1437d(k) not to be arbitrarily terminated from the Section 8 Voucher Program. As a result, multiple courts have concluded that violation of §1437d(k) and its implementing regulations are enforceable under § 1983. See *Gammons v. Massachusetts Department of Housing and Community Development*, 523 F.Supp.2d 76, 85 (D.Mass. 2007)(recognizing cause of action under § 1983 to challenge the sufficiency of evidence supporting defendant's decision to terminate the plaintiffs' Section 8 subsidy); *Stevenson v. Willis*, 579 F. Supp. 2d 913, 921-23 (N. D. Ohio 2008)(tenant's right not to be arbitrarily terminated from Section 8 Voucher program enforceable under § 1983); *Loving v. Brainerd Housing and Redevelopment Authority*, No. 08-1349, 2009 U.S. Dist. LEXIS 8664 (D. Minn. Feb. 5, 2009) (tenants who alleged the defendant PHA violated 24 C.F.R. § 555 (e)(6) by terminating their assistance under the Section 8 Voucher Program based on factual determinations that were contrary to the preponderance of the evidence stated a claim for relief under § 1983); *Basco v. Machin*, 514 F.3d 1177, 1180-84 (11th Cir. 2008); (reversing summary judgment for PHA and finding in favor of plaintiff on § 1983 claim alleging violations under 24 C.F.R. § 982.555(e)(5) and (6) where hearing officer relied upon "legally insufficient evidence" to terminate plaintiff's Section 8 assistance); *Fields v. Omaha Housing Authority*, 8:04CV554, 2006 U.S. Dist. Lexis 10043 at p. 4 (D. Neb. January 23, 2006) (violation of regulation adopted pursuant to § 1437d(k) is actionable under § 1983); accord *Morse v. Philadelphia Housing Authority*, No. Civ. A 03-CV-814, 2003 U.S. Dist. LEXIS 15541 (E.D. Pa. Aug. 12, 2003); Conway v. Housing Authority of City of Ashville, 239 F. Supp. 2d 593, 598-99 (W.D. N.C. 2002); *Saxton v. Housing Authority of City of Tacoma*, 1 F.3d 881, 883-84 (9th Cir. 1993); *Farley v. Philadelphia Housing Authority*, 102 F.3d 697, 702-04 (3d Cir. 1996) and *Samuels v. District of Columbia*, 770 F.2d 184, 193-98 (D.C. Cir. 1985).

Defendant JFCAC's Notice to Plaintiff violated 42 U.S.C. §1437d(k) and 24

C.F.R. §982.555(c)(2)(i). Defendant JFCAC's Notice to plaintiff that FCHA was terminating his assistance (the "Notice") is defective because it does not give a "brief statement" of the reasons for the decision as required by 42 U.S.C § 1437d(k) and 24 C.F.R. § 982.555(c)(2)(i). The Notice simply states that "Housing Participant has violated family obligations: Is a registered Sex Offender". See Complaint, ¶ 34, Ex. C.

Alabama's non-compliance with due process as cited above further renders Alabama law unconstitutional.

12. Pickard therefore has the right to bring violations of Section 1437(f) and 1437(d)k as set out in this Complaint under Section 1983.

Alabama law fails to provide for constitutionally required procedural due process regarding the Termination notice pursuant to 24 C.F.R. § 247.4. Procedural due process requires the following:

(a) Requisites of Termination Notice. The landlord's determination to terminate the tenancy shall be in writing and shall:

(1) State that the tenancy is terminated on a date specified therein;

(2) state the reasons for the landlord's action with enough specificity so as to enable the tenant to prepare a defense;

(3) advise the tenant that if he or she remains in the leased unit on the date specified for termination, the landlord may seek to enforce the termination only by bringing a judicial action, at which time the tenant may present a defense; and

(4) be served on the tenant in the manner prescribed by paragraph (b) of 24 C.F.R. § 247.4(b)..

(b) 24 C.F.R. § 247.4(b) sets for the procedural due process requirements for service. As set out above, the lease termination notice provided for in paragraph (a) of this section shall be accomplished by:

(1) Sending a letter by first class mail, properly stamped and addressed, to the tenant at his or her address at the project, with a proper return address, and

(2) serving a copy of the notice on any adult person answering the door at the leased dwelling unit, or if no adult responds, by placing the notice under or through the door, if possible, or else by affixing the notice to the door. Service shall not be deemed effective until both notices provided for herein have been accomplished. The date on which the notice shall be deemed to be received by the tenant shall be the date on which the first class letter provided for in this paragraph is mailed, or the date on which the notice provided for in this paragraph is properly given, whichever is later.

Alabama law fails to provide for such procedural process for service, which federal law absolutely requires. Alabama law therefore fails again to pass constitutional muster.

13. Under 24 C.F.R. § 247.6(a), a landlord is not permitted to evict any tenant unless it is done in accordance with the requirements of this subpart of 24 C.F.R. Alabama law does not provide for such a requirement, and permits eviction whether or not the process is in accordance with said requirements or not. Alabama law thus violates procedural due process once again and is unconstitutional.

14. Following issuance of the lease termination letter, the tenant may submit a timely request for an informal hearing, which Pickard has done in each case. The landlord may not terminate assistance until an **impartial** hearing officer (not Defendant Winston acting as hearing officer- the extremely biased attorney for SPM/Highland Manor) issues a decision regarding the action. In *Gorsuch Homes, Inc. v Wooten*, 597 NE2d 554 (1992), the trial court erred in evicting tenant in Section 8 federally subsidized housing where, among other reasons, and in violation of tenant's due process rights, landlord had failed to afford her hearing before **impartial adjudicator** with respect to her disputed claims. In *Young v. Maryville Housing Authority*, No. 3:09-CV-37, U.S. Dist. LEXIS 56539 at p. 6 (E.D. Tenn. 2009), the court granted plaintiff's motion for a preliminary injunction reinstating her Section 8 Housing Voucher because it found that there was a substantial likelihood that the

Hearing Officer's decision "did not rely on sufficient evidence and that the lack of evidence was egregious enough to render the decision arbitrary and thus a violation of federal regulations and the plaintiff's rights."

In summary, Alabama law comprehensively fails to provide for the numerous requirements of procedural due process under federal law. Alabama Landlord-Tenant law is extremely deficient in this regard, and is undeniably unconstitutional by violating due process, equal protection and procedural due process pursuant to federal law and U.S. Constitutional Amendments V and XIV.

While in many federal circuits, such a hearing is allowed to be satisfied by a court hearing rather than a pre-termination hearing prior to filing for eviction, there are numerous authorities by which this Circuit split would resolve in favor of the HUD requirement of a pre-termination hearing prior to allowing a landlord to file for eviction regarding tenants receiving federal housing.

The rationale in other circuits is in agreement with HUD, that procedural due process is not adequately provided for without the initial ability of the tenant to challenge the premises for eviction before eviction action is filed for, that this initial layer of procedural due process is constitutionally required.

This would obviate an appeal by Pickard to the U.S. Supreme Court should this become a determinative issue in this cause, to seek certiorari review to resolve this Circuit split.

15. Upon receipt of an appeal request, the landlord shall be obligated to conduct a hearing and shall suspend any further action relating to termination until the appeal procedure is completed. The Landlord must give the tenant-appellant a written explanation of the hearing procedure and inform the appellant of the hearing date, giving sufficient time to prepare for the hearing, at a time during the working day and at a place convenient to appellant. Again, Alabama law fails to provide for such procedural due process.

16. The hearing may be continued at the request of either the landlord or

appellant for good cause, such as illness or other unavoidable absence of a party or witness, or by agreement between the landlord and the tenant-appellant.

17. All hearings shall be conducted by an impartial official or officials.

18. The issue at the hearing shall be whether the landlord has good cause to terminate the tenant's tenancy and Housing Assistance subsidy.

19. For purposes of the hearing, the appellant:

(1) Shall have access to all information on which a decision would be based;

(2) Have the right to confront and cross-examine witnesses;

(3) Have the right to present and establish all relevant facts and circumstances by oral testimony and documentary evidence;

(4) Have the right to be represented by counsel.

20. The hearing decision:

(1) Shall be based solely and exclusively on the evidence presented at the hearing and upon applicable laws and regulations;

(2)Must be in writing, signed, and dated, and must state the findings of fact and the specific reasons for the decision rendered. (No such written decision was provided by the District Court- nothing but a summary statement without any premise, findings, or basis in fact or law.)

(3) The decision shall be final and binding on the landlord, but may be appealed by the tenant.

21. If the landlord does not comply with these rules, it shall be precluded from proceeding to evict the appellant for failure to pay rent or other good cause. Further, if the landlord has not followed the prescribed procedures, that deficiency requires the dismissal of the eviction action.

22. Tenants Must Have a Meaningful Opportunity to Be Heard: Federal law and HUD regulations grant a tenant an opportunity to be heard in a grievance hearing before the landlord initiates an eviction. As stated repeatedly above, Pickard was denied such a hearing, first by Defendant Wren, and repeatedly thereafter.

23. HUD regulations specifically require that an **impartial** hearing officer or panel preside, and that the complainant "be afforded a fair hearing." This includes

(1) an opportunity to examine landlord documents,

(2) representation by counsel or other representative,

(3) an opportunity to have a private hearing,

(4) an opportunity to present evidence, arguments, contesting the landlord's evidence, and examining witnesses, and

(5) the issuance of a decision that is based on the facts presented at the hearing. None of these rights have been afforded to Pickard.

24. Rights Guaranteed to Tenants with Disabilities in Subsidized Housing: This applies most specifically to Pickard, who was comprehensively denied these rights. In addition to protections provided to all tenants in subsidized housing, state and federal law guarantee additional rights to individuals with disabilities, including severe and persistent mental illness. It is important to note that having a mental illness does not mean that a person has a disability per se, but in Pickard's case he undeniably has a life-long mental health disability based upon which he receives SSI Disability benefits. Many individuals with mental illness are high functioning despite also having a disability as in Pickard's case. Additionally, some individuals with mental illness may consider themselves significantly impaired in some circumstances but not others.

25. For those tenants such as Pickard who have an impairment that meets the statutory definition of "disability," state and federal law requires certain procedural and substantive protections, particularly, the right to request and receive a reasonable accommodation. Pickard has requested reasonable accommodations including a social worker, such as the one at his previous subsidized residence, regarding issues of his tenancy at Highland Manor.

26. Additionally, the regulations urge consideration of "mitigating factors," including disability status, before evicting tenants from subsidized housing. Pickard has requested such consideration which has been ignored. His pro bono attorneys on

other matters have been emphasizing this and attempting to obtain just consideration for such factors.

27. Also, the integration mandate of the ADA must be kept in mind when considering evictions of people with mental illness. Under the landmark decision *Olmstead v. L.C.*, 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999), unjustified institutionalization is illegal discrimination under the ADA. *Olmstead* requires that people with disabilities have the opportunity to live in the least restrictive setting that is suitable for them. Evictions of persons with mental illness from subsidized housing that lead to unjustified institutionalization result in *Olmstead* violations. If evicted, Pickard will be homeless which as in the past has always resulted in institutionalization. The Defendants therefore are presiding over and are subjecting and causing Pickard to be subjected to the certainty of *Olmstead* violations.

28. Stopping unjust evictions before they occur is an important way to ensure that the integration mandate of the ADA is upheld for people with mental illness. As affirmed by Exhibit "A" and numerous other facts established by this action, the effort by Defendants to evict Pickard is manifestly unjust and certain to cause such severely unconstitutional injuries and damages including to his mental health.

29. Reasonable Accommodations: critical success in the fight against discrimination in housing came in 1988 with the passage of the Fair Housing Amendments Act of 1988 (FHAA). The FHAA amended Title VIII of the Civil Rights Act of 1968 to include disabilities, thus ensuring that "a housing provider cannot deny a housing opportunity because of characteristics or behavior related solely to a person's disability." Defendants Bailey and Wren are clearly attempting to deny Pickard his housing because of characteristics related solely to his mental health disability as set out in detail in his pending case no. 19-cv-885.

30. After the FHAA, the Fair Housing Act (FHA) requires that landlords make "reasonable accommodations in rules, policies, practices, or services, when such accommodations are necessary to afford such a person equal opportunity to use and

enjoy a dwelling." When applied to the eviction context, compliance with the FHAA "means that even when a tenant without a disability would legitimately be subject to eviction, a landlord cannot necessarily evict a tenant with a disability solely because of behavior related to the tenant's disability" as the Defendants are attempting to do in this case. The landlord must make reasonable changes in policies and practices in order to accommodate a tenant with a disability, which the Defendants refuse to do, while attempting in the most extremely discriminatory fashion to evict Pickard rather than comply with the law. The lawful obligation to provide for reasonable accommodation is not couched in precatory, but mandatory terms. See, *e.g., Majors v. Housing Authority of Dekalb, Georgia, et al.,* 652 F.2d 454 (5th Cir. 1979) (a landlord **shall** make reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped tenant unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program.) (Emphasis added.) The Defendants have not suggested that Pickard's requests for reasonable accommodation would impose any undue hardship- indeed, his requests would require minimal requisites.

31. The requirement that a landlord make a reasonable accommodation to allow a qualified tenant to enjoy the housing applies to any "dwelling," whether or not it is federally subsidized. Alabama law miserably fails in this requirement.

32. Pickard has confirmed his disability pursuant to HUD requirements and has requested reasonable accommodations. The FHAA requires accommodation if the accommodation is reasonable and necessary to afford a person with a disability the equal opportunity to use and enjoy a dwelling. Alabama law fails to provide for this law and the Defendants are taking advantage by denying Pickard of these rights.

33. Failure or refusal to provide a tenant a reasonable accommodation is actionable discrimination, comparable to "affirmative acts of rejection." Yet Alabama law does not proscribe such failure or refusal and provides no remedy for same. Pickard has repeatedly re-asserted his requests for reasonable accommodation

beginning with the time of the execution of his lease. for almost one year now. yet the Defendants continue to ignore and delay. Delay in reasonable accommodation "can be both actual or constructive. as an indeterminate delay has the same effect as an outright denial." *Groome Resources Ltd. v. Parish of Jefferson*. 234 F.3d 192. 199 (5th Cir. 2000). affirmed by the 11th Cir in *U.S. v. Hialeah Housing Authority*. No. 10-12838 (11th Cir. 2011).

34. Under the FHAA, a landlord's failure to consider and reasonably accommodate a person's disability can form the basis for a court's refusal to allow an eviction. Alabama law fails to comply with this law and requirement. hence Pickard, who has strong grounds to petition the courts to refuse to allow an eviction due to Defendants failure to even consider. much less reasonably accommodate his disability, is subjected to this further violation of his rights.

35. A tenant may raise a request for a reasonable accommodation as a defense to an eviction proceeding by demonstrating that the tenant has a disability that the landlord knew or should have known of. that the tenant requested a reasonable accommodation that would be necessary for the tenant to enjoy the apartment. and that the landlord did not grant it. Pickard has raised all these issues. and is entitled to the dismissal of the eviction action against him due to these violations. but Alabama law does not recognize them. rendering Alabama law additionally unconstitutional.

36. Accommodating persons with mental illness "may require thinking outside the box." but acknowledging and working to overcome disabilities--real or perceived--is required under HUD, FHAA and other federal law and regulations in federally subsidized housing.

37. Pickard also suffers from lower limb paroxysms that result in intermittent immobility. This is compounded by severe edema in his lower limbs from congestive heart failure. Accommodations that allow a person with a physiological disability to live in public housing include allowing a personal assistant or aide to live in the unit. The landlord is proscribed from filing for an eviction when a person's conduct that is

related to his disability has led to an alleged lease violation as has occurred in the instant case. As with all of the issues in this section, Alabama law fails to provide for such matters, and is unconstitutional.

38. In an case on point, *Citywide Associates v. Penfield*, 564 N.E.2d 1003 (Mass. 1991) ... a trial court in Massachusetts ruled in favor of a tenant in an eviction action when the tenant was able to show that the basis for eviction was caused by symptoms of her mental illness. Put simply, reasonable accommodations are required under the law, and must be utilized to keep people with mental illness in their housing. Pickard has made such issues repeatedly known, but the callous and malicious disposition of Defendant Bailey and other Defendants has violated this provision of law. As stated above, the delay in reasonable accommodation "can be both actual or constructive, as an indeterminate delay has the same effect as an outright denial." *Groome Resources Ltd. v. Parish of Jefferson, supra; U.S. v. Hialeah Housing Authority, supra.*

Moreover, once again, Alabama law contains no mandatory provision for this issue as in the case of all others cited herein, and must be invalidated until Alabama law is brought into compliance with these laws demanded by the Supremacy Clause.

39. Consideration of Mitigating Circumstances: as a separate and distinct consideration from a reasonable accommodation, landlords are required to consider a tenant's disability status as a mitigating circumstance. This provision illustrates HUD's policy decision to show every consideration in circumstances before a person is cut off from housing benefits. Alabama law provides for no such consideration, and is therefore unconstitutional.

40. Courts Must Weigh an Individual's Right to Live in the Least Restrictive Setting Against an Eviction: The Americans with Disabilities Act (ADA) was a critical success for people with disabilities. The ADA is a civil rights statute, particularly cognizable in Section 1982 cases, intended "to invoke the sweep of congressional authority, including the power to enforce the [F]ourteenth [A]mendment

and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities." Eliminating discrimination on the basis of disability in housing means ensuring that persons with disabilities live independently in housing that is integrated with the broader community. In *Olmstead v. L.C., supra*, the Supreme Court stated that the ADA requires that states provide community-based, integrated services to persons with disabilities. These services are necessary when

> (1) that person wants to live independently,
>
> (2) the person's treating professionals "have determined that community placement is appropriate," and
>
> (3) community placement can be "reasonably accommodated, taking into account the resources available to the [s]tate and the needs of others with ... disabilities." *Olmstead* held that "Recognition that unjustified institutional isolation of persons with disabilities is a form of discrimination that reflects two evident judgments:
>
> > First, institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life ... Second, confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment."

Defending against evictions of people with mental illness from public housing is another way of ensuring that the *Olmstead* mandate is enforced. Yet once again, Alabama law makes no provision for this constitutionally mandated requirement, and is thus unconstitutional.

41. In implementing Title II of the ADA, the Department of Justice promulgated the "integration regulation," which states that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate

to the needs of qualified individuals with disabilities." Thus, removal of patients from institutions is sought when a less restrictive setting would be suitable for that person. The goal is independent, unrestricted living for all persons with disabilities--just like any other person in the United States. Alabama is the venue for the longest running federal case in U.S. history, *Wyatt v. Stickney*, 325 F. Supp. 781 (M.D.Ala. 1971), 334 F. Supp. 1341 (M.D.Ala 1971), 344 F. Supp. 373 (M.D. Ala. 1972), sub nom Wyatt v. Aderholt, 503 F. 2d 1305 (5th Cir. 1974), which similarly to *Ohlmstead* was a landmark case for the civil and constitutional rights of those with mental illness and disabilities. Yet Alabama has no provisions for the rights cited in this section and is therefore unconstitutional.

42. On the ten-year anniversary of *Olmstead*, President Obama named 2009 the "Year of Community Living." He directed federal agencies to form new partnerships to promote integrated living situations for people with disabilities. HUD, for instance, was instructed to make 1000 housing vouchers available for people with disabilities who are transitioning from institutions to the community. The government vowed to aggressively address the barriers that prevent many Americans with disabilities from enjoying meaningful lives as part of their communities. Yet Alabama has regressed in this area due to the unconstitutional deficiencies in its laws.

43. Rights in a Vacuum: How the Law Fails to Address Problems Faced by Persons with Mental Illness in Evictions or Subsidy Termination Hearings: Congress has demonstrated a commitment to eliminating discrimination on the basis of disability in housing, providing housing opportunities to qualified low-income individuals, and preventing homelessness among persons with mental illness. However, the safeguards to ensure that low-income persons with mental illness in subsidized housing are able to remain in suitable housing are severely lacking.

44. In practice, there is no opportunity for persons with mental illness to raise meaningful defenses to eviction or termination proceedings under Alabama law. Tenants often appear pro se in housing court. Unrepresented, these tenants are placed

at a severe disadvantage in the process. They face opposing counsel who have been retained because of their expertise. While housing court is often a stressful experience for pro se plaintiffs generally. it can be even more difficult for individuals with mental disabilities, particularly given the stigma of self-identifying. Social science literature indicates that people with mental health issues sometimes hide their mental disabilities because they have faced stigma and discrimination after past disclosures. People with mental illness report feelings of anxiety before and after disclosure, low self-esteem, and social isolation. In a social science study that interviewed one hundred people who receive mental health treatment, 95% reported that stigma and discrimination affected them permanently.

45. A legal situation that requires a person to openly discuss a mental health problem--such as disclosing a disability in order to raise an affirmative defense to eviction--can add more stress and trauma to the process. Thus, where a mental health issue is apparent to the court, the court should bear the onus of inquiring--tactfully-- whether the person has a disability that she would like to be considered with regard to a reasonable accommodation or as a mitigating circumstance. To require a person with a mental disability to offer this evidence on his or her own is a burden that does not consider the realities of mental illness stigma.

46. It is for these reasons that federal and HUD housing law has emphasized the right to reasonable accommodation. These accommodations, such as Pickard's request for a social worker to function as an intermediary with Defendants, are an effective means of providing for the Constitutional and statutory rights implicated in these circumstances. Although federal law fastidiously provides for such rights, there is no mention of such rights in Alabama Landlord-Tenant law to the extreme detriment of tenants such as Pickard and the abrogation of their constitutional rights.

47. Further, housing court is a revolving door for tenants. The Lawyers' Committee for Better Housing conducted a study of Chicago's eviction courts in the fall of 2002, and found that the hearings were excessively brief and cursory. "[J]udges

only asked tenants if they had a defense in 27% of the cases. When the judge did ask for a defense, tenants presented a defense 55% of the time. If the judge didn't ask for a defense, tenants presented a defense only 9% of the time." It is almost unfathomable that a seriously mentally ill individual would be able to put forth a meaningful defense under these circumstances.

48. The failure to appoint a lawyer or guardian, and instead relying upon the tenant's ability to retain counsel, obtain pro bono counsel or represent himself fails to consider the capacities and circumstances of tenants with mental disabilities in eviction cases. HUD has the requirement that tenants be represented by counsel, but this does not follow in state law or state proceedings, at least not in Alabama, again rendering Alabama eviction law constitutionally infirm.

49. Alabama housing law fails to ensure that the rights that are guaranteed to persons with disabilities are met, and that the individual capacities of persons with mental illness are considered.

   a. First, the law has developed to allow evictions of tenants, including tenants with disabilities, based on actions of people in their household without requiring that the tenant had knowledge of the household member's conduct, or where there is a controversy as to whether other persons' conduct in fact is a violation of the lease and terms of a tenant's occupancy (such as the false assertion of the Defendants that an unauthorized person is living in Pickard's unit).

   b. Second, evictions deny procedural due process to tenants with mental illness because the provided procedure does not ensure that the person actually received notice in all circumstances, and there is no right to free legal counsel, despite the magnitude of the loss that a person faces when evicted.

   c. Third, there is no judicial inquiry into whether a reasonable accommodation could allow a tenant to remain in his or her housing.

Instead, the duty to propose a reasonable accommodation lies with the tenant, who may not know that they even have the right to a reasonable accommodation under the Fair Housing Act, never mind any understanding of how to enforce that right in a courtroom. Evictions from public housing of people with mental health issues are especially problematic because they can result in the permanent loss of a housing subsidy for the individual or family, which could result in homelessness or institutionalization.

On these numerous premises, it is undeniable that Alabama Landlord-Tenant law fails to provide constitutionally demanded due process, equal protection and other rights. Such unconstitutionality constitutes *prima facie* grounds, severally, for relief under Title 42 § 1983. Eviction proceedings against Pickard are due to be dismissed with prejudice due to the unconstitutionality Alabama Landlord-Tenant Law.

## FIFTH CAUSE OF ACTION
### Violations of Due Process Rights
### by All Defendants

The first cause of action is set forth by reference and is incorporated as if fully stated herein. The last previous Fourth Cause of Action is further set forth by reference and is incorporated as if fully stated herein. All of the rights stated in the previous cause of action are due process rights to which Pickard is constitutionally entitled. However, Pickard has been denied these rights of due process and is entitled to relief dismissing the eviction actions against him with prejudice, and expunging all records pertaining to same from any and all files and records.

## SIXTH CAUSE OF ACTION
### Violations of Due Process Rights and Discrimination
### by Defendant Winston

The first cause of action is set forth by reference and is incorporated as if fully stated herein. The last two previous causes of action are further set forth by reference

and are incorporated as if fully stated herein.

To illustrate the issues in the previous cause of action, none other than Defendant Norman Winston Jr., an attorney whom one would presume to be at least minimally knowledgeable in issues regarding mental health law, especially since he claims expertise in eviction actions, is precisely the symptom of the problem, the example of the narrow-minded, discriminatory, unenlightened, biased and prejudiced elitest against the mentally disabled. Defendant Winston has acted with particular discrimination against Pickard solely on account of his mental health disability. Winston's unconstitutionally tortious conduct is an illustration and manifestation precisely of the wrongs that occur as identified in the previous cause of action.

Persons with Pickard's particular illness and disability often suffer episodes of euphoric grandiosity, exceptional energy, extreme restlessness, poor judgment and risky behaviors. In Pickard's teenage years, his condition was not yet included in the DSM-I manual and therefore treatment for the condition was virtually non-existent. This extended to his early adult years as well as in large part into his middle adult years. When in remission, he is stable and capable of normal functioning as any other adult. When not in remission, he can appear to be exceptionally active, engaging, pretentious, idiosyncratic and as some would grievously presume, such as Winston, disreputable.

Winston is an attorney who is charged with objectivity regarding issues of fact not yet determined, or adjudicated. Winston abandoned such objectivity, arguably in violation of the Rules of Professional Conduct and other required professional norms, and expressed this discriminatory misperception in a clear effort to dissuade another from helping Pickard in his current trauma and distress. Winston therefore has discriminated against Pickard and has caused intensive stress, trepidation, and related trauma, specifically inflicting suffering from recurrence of post-traumatic stress disorder that has accompanied and greatly compounded his primary diagnosis.

It is of course a clear violation of professional ethics, if not professional

responsibility, for an attorney to act to prejudice an adversarial party in such a way as to attempt to adversely influence his representation and pursuit of justice. Such conduct specifically and adversely affects his rights of due process and equal protection, warranting remedy and damages under Title 42 § 1983.

## SEVENTH CAUSE OF ACTION
### Violations of Due Process Rights to Recertification
### and Renewal of Tenancy
### All Defendants

The first cause of action is set forth by reference and is incorporated as if fully stated herein. The Defendants are violating Pickard's right to recertification and renewal of his lease absent eviction. In *Swann v Gastonia Housing Authority*, supra, 675 F2d 1342 (§ 8[b]), the court affirmed that portion of a judgment that held that a certain housing authority had to make a finding of good cause before approving the termination of the Section 8 tenancies in question in this class action, and that a tenant in the Section 8 program had a constitutionally protected expectation of remaining in his or her home in the absence of good cause for eviction. The Defendants have admitted that there is not good cause for the eviction of Pickard (see Exhibit "A"). They have no right to withhold recertification which was due under the lease in November, 2019, or renewal of his lease which is due on or before March 13, 2020.

Pickard's protected interest in continued occupancy of public housing finds considerable support in numerous cases holding that tenants of federally funded housing projects have a right or entitlement to continued occupancy under the United States Housing Act and related federal statutes or under the due process clause. See, e.g., *Lopez v. Henry Phipps Plaza South, Inc.*, 498 F.2d 937 (2d Cir. 1974); *Joy v. Daniels*, supra; *Anderson v. Denny*, supra, *McQueen v. Druker; Green v. Copperstone Limited Partnership*, 346 A.2d 686 (1975); *Appel v. Beyer*, 39 Cal.App.3d Supp. 7 (1974).

Holding that Congress required good cause for nonrenewal of an assisted lease

Page | 126

under the Section 8 program (42 U.S.C.A. § 1437f), the court, in *Mitchell v United States Dept. of Housing & Urban Dev.*, 569 F Supp 701 (N.D. Cal. 1983), granted a preliminary injunction in favor of a Section 8 tenant, who alleged that her landlord failed to renew her lease without showing good cause for nonrenewal as in Pickard's case. On February 2, 1982, the tenant entered into a 1-year lease; the landlord, 9 months later, notified the tenant that the landlord did not intend to renew the lease, due to expire on January 31, 1983; the landlord filed a complaint for unlawful detainer; a municipal court judge restored the premises to the landlord. The court, enjoining restoration to the landlord, noted the explicit congressional requirement that a tenancy not be terminated unless good cause is shown. Observing that under the old law of housing assistance prior to October 1, 1981, a mid-term termination could be made only on a determination by the local housing authority that good cause existed, the court noted that the current law, applicable to the tenant's lease, provided that Section 8 leases should be for at least 1 year, and that the owner could not "terminate the tenancy" except for serious or repeated violation of the terms and conditions of the lease; violation of federal, state, or local law; or other good cause (42 U.S.C.A. § 1437f(d)(1)). The court said that if Congress had intended the good cause requirement to apply only to mid-lease evictions, it easily could have selected the phrase "terminate the lease," instead of "terminate the tenancy."

The court rejected the argument that the statutory provision for a specific lease term, and another statutory provision for a maximum term for the assistance contract, were inconsistent with the requirement of good cause for nonrenewal. Also, the court found that a certain regulation, interpreting the current housing assistance law, established an "individual unit loophole" by allowing landlords to refuse to renew a Section 8 tenant's lease without a showing of good cause, as long as the exact rental unit previously subject to the lease was not re-leased to another housing assistance tenant. This portion of the regulation, said the court, appeared to transgress the legislative intent behind 42 U.S.C.A. § 1437f. The "individual unit loophole" also

Page | 127

could be viewed as contrary to the congressional intent to help low-income families secure a decent place to live, and to promote economically mixed housing, the court reasoned. The loophole, said the court, created a situation where a landlord arbitrarily could fail to renew an assisted tenant's lease by transferring the obligation to provide assisted housing to another unit of the apartment complex.

In *Bylsma v. Hawaii Pub. Hous. Auth.*, 951 F. Supp. 2d 1116, 1118 (D. Haw. 2013), the Court ruled that there is a right to pursue claims of involuntary termination of a tenant's lease including upon periodic lease renewal. As with other courts on this issue, the court held that such involuntary termination was not lawful absent good cause. As the Court in *Joy v. Daniels, supra,* 479 F.2d at 1239 explained, a Section 8 tenant can ordinarily only be evicted for "good cause" even at the time for renewal of his or her lease. In reversing the lower court's denial of a property interest, the Court pointed to the right to be free of arbitrary and capricious action on the part of the quasi-governmental/private owner of the housing project. In *Joy* the Court not only relied on the stated congressional purpose of the Housing Act but also on an understanding of "custom." As the Court explained: "The tenant's expectation of some degree of permanency, seemingly shared by the Congress, if not by the landlord, is bolstered by "custom." *Joy v. Daniels,* 479 F.2d at 1241.

In reversing the lower court, the appellate court in *Anchor Pacifica Management Co. v. Green,* 205 Ca. App.4th 232, at 240 and 245 (Cal. App. 2012), made clear that tenants in private housing developments that are government subsidized and regulated, have a right of entitlement to not be deprived of that status until there exists a good cause for non-renewal other than termination of the lease term. The Court in *Anchor Pacifica Management* explained that the landlord may not evict without prior notice and proof of good cause even at the time of the lease's renewal: The absence of an express term in the approved lease or in City regulations is not definitive in determining whether the tenant had a legitimate entitlement to the renewal of her tenancy. Reversing the lower court, the case was remanded and the trial

court was directed to enter judgment in favor of the tenant. (See also: *Geneva Towers,* supra, 504 F.2d at pp. 495–496 (dis. opn. of Hufstedler, J.); see *Doe v. Milwaukee County* (7th Cir.1990) 903 F.2d 499, 503.) Accordingly, it was error for the trial court to reject her defense she was entitled to good cause eviction. *See also Federated Mortgage Investors,* 504 F2d 483, 487-488 (9th Cir. 1974) (tenants in low income housing have a property interest when it comes to involuntary termination of their current tenancy and tenants who seek to retain decent housing at a price within their power to pay" have substantial property interest); *Nozzi v. Housing Authority of City of Los Angeles, supra,* 806 F.3d at 1190–91 (9th Cir. 2015), as amended on denial of reh'g and reh'g en banc (Jan. 29, 2016), cert. denied, 137 S.Ct. 52, 196 L. Ed. 2d 30 (2016) (Section 8 tenants have a legitimate claim of entitlement to continued tenancy and the entitlement of the public benefit of subsidized housing; *Joy v. Daniels, supra,* 479 F.2d at 1239 (a tenant can ordinarily only be evicted for "good cause" even at the time of lease renewal). *Nozzi* made clear that existing Section 8 tenants have a legitimate claim of entitlement to continued tenancy, including that the Section 8 benefits will continue even upon termination of the lease term subject to reasonable procedures when the project is to be discontinued. *Id.* at 1191.

In *Hyland v. Office of Housing & Community Development et al.,* 2018 WL 4119903 (D. Haw. 2018), it was observed that without the security of a sense of permanence in renewal of their leases (absent an issue of good cause) elderly low income tenants are subjected to living in a culture of fear and intimidation as to whether the management will agree to renewal of their lease versus arbitrarily refuse to renewal of their lease. Contrariwise, the government's interest in avoiding the cost and administrative burden of providing some due process procedures does not trump the tenants interest in maintaining decent affordable housing without living in fear of arbitrary and capricious decisions affecting continuation of being able to continue living in the government subsidized housing project without which most would be rendered homeless.

Furthermore there is an equally compelling interest for the government to avoid having low-income elderly live in fear of loss of shelter and its interest in providing shelter for persons who might otherwise be homeless and subject to other related deprivations and harms that could well result in a greater financial burden on the government and harm to the public interest of the community at large.

Balancing of these competing interests in the case of Plaintiff Hyland, like Pickard, as a low income elderly resident, tips in favor of affording some reasonable due process procedures in the case of termination of tenancy by way of eviction or non-renewal of leases and in terms of imposition of violations for alleged grievances that may then be used as the basis for eviction or non-renewal of a lease. Due process procedures would necessarily include pre-termination procedures inclusive of an adequate notice of the reasons and basis for any eviction, proposed non-renewal of the term lease, and of any threatened violations that may be used as the basis for non for termination of tenancy (whether by eviction or non-renewal of a lease); and the availability of review by an impartial, objective person other than the manager who imposed the eviction or non-renewal of lease.

Hyland, like Pickard, undeniably has a legitimate claim of entitlement in not being threatened with withdrawal of his housing benefits under Amendment V and XIV of the US Constitution, including threats concerning renewal and recertification of his lease. Tenants have a private right of action to pursue claims related to core constitutional and personal rights under Section 8 of the National Housing Act of 1937, 42 USC § 1437f, and associated HUD regulations. Being able to continue shelter versus homelessness by way of their government-subsidized housing is a core personal right that is protected through the NHA and related regulations and is enforceable under 42 USC § 1983. *Hyland v. Office of Housing & Community Development, et al.,supra.* As such, low-income elderly tenants have a private right of action to challenge threatened deprivation by the landlord and its management as state actors in order to retain this housing core property interest. In other words, maintaining their

government subsidized housing is a property interest that can only be taken away
based on good cause and subject to meaningful due process. Due process here can only
mean that these low-income elderly have some way to address housing abuses in a
meaningful way rather than being given the sole option to go to court. *Hyland, supra.*

In summary, whatever the format or structure or due process procedure,
federally subsidized facilities must:

(a) provide advance written notice of the charge(s), advance written notice of the
information that will be presented against the resident (no anonymous source
information and no undisclosed evidence),

(b) allow the resident or his representative to provide evidence to rebut the charge
to an impartial third party; and

(c) the impartial third party set forth his/her findings in writing within a reasonable
amount of time.

Due process procedures under these circumstances should encompass a grievance
procedure that provides review by an impartial party before whom the resident is
permitted to refute a determination to terminate tenancy or to refute alleged rule violations
which may form the basis for termination of tenancy as a whether by eviction or non-
renewal of a lease, and could incorporate one or more of these requirements, or as
otherwise determined appropriate by the court to ensure compliance with the resident's
constitutional due process rights. Pickard has been denied these rights, and has the due
process right to recertification and renewal of his lease due to the fact that the Defendants
have failed to show any cause, much less good cause, for denying these rights of
recertification and lease renewal.

## EIGHTH CAUSE OF ACTION
### Violations of Due Process Rights In Constructive Eviction by
### Refusing to Recertify Plaintiff and Renew Lease
### All Defendants

The first cause of action is set forth by reference and is incorporated as if
fully stated herein. The last previous cause of action is further set forth by reference

as if fully stated herein. The Defendants are further committing the procedural due
process violation of constructive eviction by violating due process in annual
recertification and renewal of Pickard's lease. The Defendants have failed to show
cause, particularly good cause, to terminate Pickard's lease as asserted throughout
this Complaint. The Defendants are due to be ordered and/or enjoined to conduct the
recertification of Pickard for continued occupancy of his leasehold and to renew his
lease on or before its expiration on March 13, 2020. Such recertification and lease
renewal should be done by an SPM or Highland Manor employee or representative
other than a defendant in this action.

## NINTH CAUSE OF ACTION

### Violations of Due Process Rights to Property Interests, Grievance Hearing, Notice and Fundamental Fairness
### All Defendants

The first cause of action is set forth by reference and is incorporated as if fully
stated herein. The Defendants have violated plaintiff's rights under the Due Process
Clause of the Fourteenth Amendment to the United States Constitution which he may
enforce under § 1983. The same acts and omissions of defendants described above also
violated plaintiff's rights under the Due Process Clause of the Fourteenth Amendment
to the United States Constitution. (See Complaint, Counts II and IV). By its terms, §
1983 affords a remedy to individuals whose rights under the United States Constitution
have been violated.

The Due Process Clause of the Fourteenth Amendment provides that no state
shall "deprive any person of life, liberty, or property, without due process of law."
U.S. Const., amend. XIV, § 1. The elements of the due process claim are (1) state
action, (2) denying a protectable property interest (3) without due process. *Board of
Regents v. Roth*, 408 U.S. 564, 569 (1972); *Joy v. Daniels*, 479 F.2d 1236, 1238-40
(4th Cir. 1973).

As explained above, the analysis for state action under § 1983 and the 14th

amendment are the same. See *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982)). State action exists here for the reasons previously cited.

As set out above, there is also no question that Section 8 voucher program participants have a protectable interest in their Section 8 voucher assistance. *Basco v. Machin*, 514 F.3d 1177, 1182 n.7 (11th Cir. 2008); *Swann v. Gastonia Housing Authority*, supra, 675 F.2d 1342, 1346 (4th Cir. 1982); *Lowery v. District Of Columbia Housing Authority*, 2006 U.S. Dist. LEXIS 13319, 20 (D.D.C. 2006); *Holbrook v. Pitt*, 643 F.2d 1261,1277 (7th Cir. 1980); *Davis v. Mansfield Metropolitan Housing Authority*, 751 F.2d 180, 184 (6th Cir. 1984);. See also *Kapps v. Wing*, 404 F.3d 105 2d. Cir. 2005. Finally, the "due process" required under the 14th Amendment before a Section 8 Voucher participant's assistance may be terminated are those rights codified in § 1437d(k) and its implementing regulations. These grievance hearing procedures were established to meet the requirements of HUD rules and regulations pertaining to procedural due process. See *Clark v. Alexander*, 85 F.3d 146,150 (4th Cir. 1995); *Edgecomb v. Housing Authority of Town of Vernon*, 824 F. Supp. 312, 314 (D. Conn. 1993) (both citing 55 Fed. Reg. 28538, 28541 (July 11, 1990); *Stevenson v. Willis*, 579 F.Supp.2d 913, 919 (N.D. Ohio 2008). Landlords receiving federal funds for administration of low cost housing projects in accordance with the United States Housing Act are required to comply with regulations concerning tenant grievance procedures promulgated by HUD pursuant to the Housing Act. United States Housing Act of 1937, § 1 et seq., 42 U.S.C.A. § 1401 et seq.; D.C.C.E. § 5–103 et seq.

In *Goldberg, supra*, the Supreme Court made clear that "where recipients have challenged proposed terminations as resting on incorrect or misleading factual premises or on misapplication of rules or policies to the facts of particular cases" they are entitled to fundamental due process rights. *Id.* at 268. These rights, include, *inter alia*, "timely and adequate notice detailing the reasons for a proposed termination" (*Id.* at 267-268) and a decision based solely on the "legal rules and evidence adduced at the hearing" which sets forth the reasons for the decision and indicates the evidence relied

upon. *Id.* at 271.4

Insufficient Notice: Here the pre-termination Notice to plaintiff failed to satisfy due process requirements because it did not explain how he had violated his "family obligation" by being a "registered sex offender." The requirement of proper notice is to inform the participant of the allegations so that he can prepare a defense. .. *supra*. 425 F.2d at 862. The notice to terminate assistance should be "sufficiently specific ... to enable [the] applicant to prepare rebuttal evidence to introduce at his hearing appearance." *Billington v. Underwood*, 613 F.2d 91, 94 (5th Cir. 1980).

In *Edgecomb v. Housing Authority of Vernon*, 824 F. Supp. 312. 314 (D. Conn. 1993) the court held that plaintiffs did not have a constitutionally adequate opportunity to prepare a defense where "[t]he notice sent to the plaintiffs [did] not indicate which family member committed proscribed acts, what the nature of the alleged crime was, or when the relevant acts were committed. " 824 F.Supp. at 315. Rather "[t]he notice merely restated the regulation relied." Id. This is exactly what the Defendants have done in Pickard's case. The notices of lease infractions only restated the regulation relied on. Pickard still has no complete notice for the infractions.

Similarly, in *Driver v. Housing Authority of Racine County*, 713 N.W.2d 670 (WI. App. 2006) the court held that the pre-termination notice was defective not only because it failed to contain the facts underlying the termination but also "deficient for the absence of any legal rationale;" it cited "no policy, regulation, or other authority indicating what a 'family obligation' is or how the plaintiffs' acts or omissions fail to meet the pertinent legal requirements." Id. at 741-742. Due process requires a housing authority to reveal why the tenant's conduct constitutes a violation". Id. at 747. See also *Pratt v. Housing Authority for the City of Camden*, No. 05-0544(NLH), 2006 U.S. Dist. LEXIS 70575 at p. 7 (D. N.J. September 27, 2006) (notice failed to satisfy due process where it did little more than "parrot" the language of the voucher form and did not tell how the activity constituted criminal activity).

Protections against lack of specificity and vagueness are based on due process.

To satisfy the constitutional requirement of due process of law, notice of any infraction or other adverse action must (1) be sufficiently definite to provide adequate notice of the conduct proscribed, and (2) provide sufficiently definite guidelines in order to prevent arbitrary and discriminatory enforcement. *Tobe*, 9 Cal.4th at pp. 1106–1107, 40 Cal.Rptr.2d 402, 892 P.2d 1145.) See also *Concourse Green Associates, LP v. Toby Patterson*, 23851/16 (Civ.Ct., N.Y. 2016).

The starting point for analyzing the sufficiency of the allegations in the predicate notice is Title 24 of the Code of Federal Regulations, Part 886, Subpart A, referenced by petitioner in paragraph 6 of its petition, and Part 247, which governs *"Evictions from Certain Subsidized and HUD-Owned Projects"*. 24 CFR § 247.4(a) contains the requirements of a termination notice, which must be in writing and which must due process requires that an instrument such as an alleged infraction "state the reasons for the landlord's action with enough specificity so as to enable the tenant to prepare a defense." If the notice of termination is insufficient, the case must be dismissed. For example, in *Swords v. Kemp*, 2005 WL 3882063 (N. D. Calif. 2005), an unlawful detainer action against a tenant living in federally subsidized housing based on allegations of various types of objectionable conduct, the court found the predicate notice to be insufficient under 24 CFR § 247.4(a) and granted the tenant's motion for judgment on the pleadings, explaining,

"Without including specific details of the incidents upon which the termination is based, including the date, time and alleged victim, Defendant would be hard pressed to prepare his defense to contest the termination".

See also, e.g., *Swords to Plowshares v. Smith*, 294 F. Supp.2d 1067 (N.D. Calif. 2002)(in an eviction proceeding against a tenant living in federally subsidized housing based on allegations of various types of objectionable conduct, court found insufficient a notice that, although it identified specific allegations of objectionable conduct, failed to identify the alleged victims or the times or dates of the incidents); *Edgecomb v. Housing Authority of Town of Vernon*, 824 F. Supp. 312 (D. Conn. 1993)(in an action brought by former Section 8 tenants who had been notified that their housing subsidies

were to be terminated due to their having engaged in drug related criminal activity, court found insufficient a notice that merely restated the regulation and did not indicate which family member committed the proscribed acts, what the nature of the alleged crimes were or when the relevant acts were committed); *Lambert Houses Redevelopment Co. v. Jobi*, 43 Misc 3d 1227(A)(Civ. Ct. Bx. Co. 2013)(in a nonpayment proceeding against a project-based Section 8 tenant the court found insufficient a predicate notice which failed to include all required information about the applicable annual recertification procedures); and compare *New Greenwich Gardens Assoc. LLC v. Saunders*, 23 Misc 3d 521, 871 N.Y.S.2d 901 (Dist. Ct. Nassau Co. 2009)(in a holdover proceeding against a Section 8 tenant based on allegations about the presence and actions of two specific, named individuals residing with the tenant without the landlord's consent, predicate notice found to be sufficient). (In like manner, allegations against Pickard that an unauthorized person was residing in his apartment was found to be factually insufficient without sufficient predicate notice, together with **the admission of Defendant Bailey that there were no grounds or proof for such allegation (see Exhibit "A").)** Here, as in Pickard's case, where the landlord's vague and general allegations pertain almost exclusively to the behavior of unnamed individuals other than the tenant, more is needed to allow him to mount a defense and prepare for a hearing. The same is true in Pickard's case. Just as in this case where the court granted the tenant's motion to dismiss, Pickard is entitled to judgment dismissing and expunging the unlawful detainer brought against him due to this constitutionally deficient notice as a matter of procedural due process. (Three of the lease infractions fail to state as to how Pickard's acts or omission fail to meet the pertinent legal requirements under the lease, and they **all fail** to contain sufficient specificity in order to enable Pickard to defend against the charges.)

Termination on Grounds not Authorized by Law: The second due process violation occurred in the above cited cases with the Hearing Officer's decision upholding the termination of plaintiff's assistance. "The touchstone of due process is

the protection of the individual against arbitrary action of government." *Wolf v. McDonnell*, 418 U.S. 539, 558 (1974). Here, as explained above, the decision is not based upon evidence adduced at the hearing but instead on an illegal provision in an Administrative Plan and a HUD Notice that conflicts with federal regulations. This arbitrary action does not pass constitutional muster. See *Young v. Maryville Housing Authority*, No. 3:09-CV-37, 2009 U.S. Dist. LEXIS 56539 at p. 6 (E.D. Tenn. July 2, 2009); *Gammons v. Massachusetts Department of Housing and Community Development*, 523. F. Supp. 2d 76, 84 (D. Mass. 2007); *Miller v. McCormick*, 605 F. Supp. 2d 296, 313-14 (D. Maine, 2009)(denying PHA's motion for summary judgment on plaintiff's § 1983 claim that the defendant violated his due process rights); and *Basco v. Machin*, 514 F.3d. 1177, 1184 (11th Cir. 2008).

In a similar manner, Pickard's constitutional rights have been violated. In the first state unlawful detainer case, the attorney for the Defendants (Defendant Winston) acted as the Hearing Officer. This violated due process in many respects, primarily the fact that he certainly was not unbiased and certainly not impartial. He clearly violated due process by acting as Hearing Officer. In the second pending state unlawful detainer action, Pickard requested a neutral Hearing Officer pursuant to HUD rules and regulations, laws and due process. His request was ignored and the Defendants filed an unlawful detainer action against him without a hearing. Pickard has spoken with the HUD representative for this area and a HUD Specialist with the HUD Navigate program who confirm that this is a violation of the Administrative Plan for Highland Manor, and that it will be taken up in HUD's annual review of Highland Manor's Administrative Plan. Pickard is asserting his right to a copy of SPM's and Highland Manor's Administrative Plan filed with HUD, which is in the public domain. Based on Pickard's conversations with HUD officials, the Defendants are in serious violation of this Administrative Plan to Pickard's injuries and detriment.

Unlawful imposition of burden: Pursuant to 11th Circuit law in *Lane v. Fort Walton Beach Housing Authority*, No. 11-15983 (11th Cir 2103), the Defendants have

"implement[ed] a grievance policy that improperly place[d] the initial burden at [the] informal hearing on Pickard, as a Section 8 Assistance recipient, rather than on SPM/Highland Manor, contrary to *Basco v. Machin*, 514 F.3d 1177, 1182 (11th Cir. 2008)":

Pickard's right to proof by Defendants by preponderance standard: The Defendants have (2) fail[ed] to accord Pickard the right to have the burden of proof be upon the Defendants to establish by a preponderance of the evidence, as required by federal regulations, that the Pickard committed lease violations, particularly allowing an unauthorized person in his apartment. *Lane, supra,* p. 10. Once again, the Defendants admit that the alleged lease infractions in this regard are invalid (see Exhibit "A"), yet they continue to violate Pickard's rights of procedural due process.

Misapplication of the evidentiary standard. The Defendants further (3) "misappl[ied] the applicable evidentiary standard and exceed[ed] its legal authority": *Id.*, p.10.

Failure of due process requirement to confront witnesses: The Defendants (4) "fail[ed] to afford [Pickard] the opportunity to confront and cross-examine the persons who supplied information upon which [the Defendants'] action [was] grounded". *Id.*

Failure to follow Defendants' Administrative Plan: The Defendants (5) "fail[ed] to administer [their] program in accordance with [SPM/Highland Manor's] administrative plan" including their attempt to terminate Pickard's assistance without first giving him thirty (30) days notice. *Id.*

Failure to Issue Required Written Statement: The Defendants (6) failed to issue a written statement required by federal regulations that explained the Defendants' decision regarding his grievances beyond a bare and conclusory statement. *Id.*

Violations regarding Hearing Officer: The Defendants have failed to provide a Hearing Officer, much more an impartial Hearing Officer, as required by federal regulations. The Defendants violated due process by failing to provide a Hearing Officer to hear Pickard's grievances and make a determination that would be

consistent with the federal regulations. See 24 C.F.R. § 982.555(e)(6) ("The person who conducts the hearing must issue a written decision, stating briefly the reasons for the decision."). See also, *Lane, supra,* p. 3.

As set out below, SPM and Highland Manor are incompetent and deliberately indifferent and deliberately in violation of applicable statutes, HUD Rules and Regulations, the Housing Act, and other legal premises for operating and administering a HUD facility such as Highland Manor. HUD is due to terminate SPM's administration of Highland Manor and vest its operation and management in another entity who has proven to be competent, willing and able to manage Highland Manor in conformance with law, HUD rules and regulations, and applicable state and federal law and requirements. Pickard is entitled to enforcement of his rights voiding the unlawful eviction proceedings against him that violate his due process rights.

## TENTH CAUSE OF ACTION
## Violation of Due Process Right to a Preliminary Interview and Adequate Notice
## All Defendants Except Marshall

The first cause of action is set forth by reference and is incorporated as if fully stated herein.

In *Ferguson v Metropolitan Development & Housing Agency, supra,* 485 F Supp 517 (§ 8[a]), primarily involving a question of whether Section 8 participants had a right to a pre-termination hearing, the court, granting summary judgment to a class of Section 8 participants, held that, on knowledge or receipt of a complaint of alleged violations, the local housing authority had to conduct a preliminary interview with the Section 8 participants to effect a solution, utilizing termination only as a last resort; and that, on a subsequent decision to terminate Section 8 assistance, the housing authority had to give a 30-day written notice of its intent to the participants.

**The issue here is not the provision of adequate due process for such a hearing, which in this circuit can be provided by state court hearing if state procedures are constitutionally compliant (Alabama state procedures are NOT compliant.) The issue**

**here is a determination as to whether eviction proceedings are warranted and whether unlawful detainer should be filed for in the first place. The purpose of the interview is to determine a solution to the issues without filing for eviction, with eviction/lease termination as a last resort. Defendant Wren scheduled such a meeting, but then rescinded, reneged and refused to hold such a meeting and thus violated due process, HUD rules and regulations, and applicable statutes.** All future adverse actions by the Defendants, particularly their action for lease termination and eviction, are fruit of the poisonous tree of this violation of due process. All actions for lease termination and eviction should cease, as filed for in the appurtenant motion for preliminary injunction, and should be permanently enjoined. Again, SPM should be disqualified as an entity competent and compliant in managing and operating a HUD facility such as Highland Manor, and its operation should be reassigned and invested in an entity who has proven to be competent and compliant in managing a facility such as Highland Manor.

The Defendants are further in violation of the 30-day notice requirement for such a preliminary interview. The Defendants were required to provide a 30-day notice which was required to include the specific good cause rule or regulation a participant allegedly has violated, and a specific description of the nature of the offense against the participant—including, where applicable, dates of violations and the names of witnesses.

In the instant case, Pickard submitted his grievances to Defendant Wren, who promised to meet with him again after she had met with Defendant Bailey. Wren reneged on this obligation. There was no preliminary interview. There was no required effort to effect a solution. Lease termination and termination of Pickard's federal assistance, which is to be a last resort, was the first resort. No effort was made by Defendants otherwise.

The purpose of requiring that a termination notice for a tenant in federally subsidized housing state reasons for the termination is to insure that the tenant is adequately informed of the nature of the evidence against him so that he can

effectively rebut that evidence as stated comprehensively above with numerous authorities (including those of the 11th Circuit) in regard to requirements for notice. U.S.C.A. Const.Amend. 14; 24 C.F.R. §§ 247.4(a)(2), 882.511(d)(2)(i). See also *Nealy v. Southlawn Palms Apartments*, 196 S.W.3d 386 (Tex. App. Houston 1st Dist. 2006)

In order to effectively rebut adverse evidence at a pre-termination hearing, the notice to the tenant receiving section 8 housing assistance benefits must alert the tenant of the nature of the adverse evidence. 24 C.F.R. § 982.555(c)(2)(i). See numerous authorities cited above. See also *Driver v. Housing Authority of Racine County*, 713 N.W.2d 670 (Wis. Ct. App. 2006). There further was no compliance with this due process requirement by the Defendants.

The tenant challenged the landlord's alleged failure to issue proper notice of the proposed proceedings in accordance with 42 U.S.C.A. § 1437f, the regulations promulgated thereunder, and the procedures set forth in the HUD handbook.

Once again, a Plaintiff may sue under Section 1983 to enforce sections of the Housing Act and associated HUD regulations. *McClean v. Delaware Cty. Housing Auth.* , 220 F.Supp.3d 607, 612–13 (E.D. Pa. 2016). Plaintiff therefore states valid complaints under Section 1983 in regard to this cause of action.

The court noted that federal regulations dictated that prior to any termination of tenancy, the landlord had to provide the tenant with written notice; and that this notice had to state when and on what grounds the tenancy was terminated, and advise the tenant that the tenant had an opportunity to be heard on the matter. While observing that one of the grounds for termination of tenancy, pursuant to a certain federal regulation, was "material non-compliance" with the lease, the court noted that the handbook also required that, whatever the cause, the landlord had to give the tenant prior notice that the "non-compliance" would be grounds for termination of the tenancy.

The court concluded that the landlord's failure to serve the tenant with a pre-eviction notice was a fatal jurisdictional defect and mandated that the default judgment

awarding possession of the premises to the landlord be vacated. The defendants failed
to comply with all of these due process requirements, thus constituting a fatal
jurisdictional defect in the proceedings for lease termination and unlawful detainer
case against Pickard thus compelling the dismissal with prejudice of lease termination
and unlawful detainer actions against him.

The court held that it was the intent of the federal regulation implementing 42
U.S.C.A. § 1437f(d)(1) to guard against casually or haphazardly commenced eviction
proceedings against Section 8 tenants; to apprise fully a Section 8 tenant of the
grounds for eviction prior to the institution of summary proceedings; and to give
notice to the landlord administering Section 8 funding that the continued possession of
occupants in whom it has a substantial interest is threatened. These concerns, said the
court, applied with equal force to nonpayment as well as to holdover proceedings such
as those alleged against Pickard. The court reasoned that since the Section 8 statute
and regulations referred to evictions generically, there was no cause to draw any
distinction between holdover and nonpayment proceedings. Thus, the court held that
since the housing authority ultimately denied authorization to commence this
proceeding, the eviction action would be dismissed. Again, dismissal with prejudice of
all lease termination and eviction actions against Pickard is compelled.

The failure by a landlord of a subsidized project to provide specificity required
in termination notice, by itself and without regard to subsequent procedures available
to tenant, renders notice defective. 24 C.F.R. § 247.4. *Swords To Plowshares v. Smith,
supra.* Due to the fact that the lease infractions and termination notice lacked
specificity in Pickard's case as set out in the above-stated facts, the Defendant's notice
was defective and eviction proceedings are further due to be dismissed.

A public housing landlord's notice of lease termination, referring indirectly to
grievance procedure by informing tenants that lease terms required landlord to inform
tenants of their right to request a hearing, failed to properly provide notice to tenants of
their right to request such a hearing; circuitous construction of statement in

conjunction with unnecessarily confusing legal language subverted the informative purpose of notice requirement. Housing and Community Development Act of 1974, § 201(a), 42 U.S.C.A. § 1437; 24 C.F.R. § 966.4(l)(3)(ii). *Bennington Housing Authority v. Lake*, 2012 VT 82, 59 A.3d 149 (Vt. 2012).

As stated in the First Cause of Action, PHAs occupy, as a practical matter, substantially the same footing as private landlords. Private landlords therefore have the same duty to provide a grievance hearing, which was denied Pickard by Defendant Wren. The court in *Simmons v Kemp,*751 F Supp 815 (DC Minn. 1990) granted summary judgment to tenants who were denied their grievance hearing rights and enjoined the PHA, hence private landlords, from initiating evictions of tenants "without first offering opportunity for grievance hearing" and where tenants facing court-ordered eviction would not receive due process absent enforcement of these rights.

The Lease Termination Letter/Eviction Notice to Section 8 subsidized housing tenant must be sent by certified mail. The purpose of this requirement was to provide evidence in the event of a dispute. M.G.L.A. c. 4, § 7, c. 239, § 1A. *Moore Real Estate Trust v. Din-Dayal*, 2006 Mass.App.Div. 123. The Defendants did not send this Notice by certified mail and thus violated this due process requirement further compelling dismissal of the lease termination and eviction actions against Pickard.

The Lease Termination Letter/Eviction Notice must contain more that vague and broad allegations as in the instant case. The Notice sent to Pickard contained only such vague and broad allegations stating only the allegation of material noncompliance with the lease without sufficient specificity as to the allegations. The notice therefore did not comport with due process requirements, because it failed to set forth factual statement of incident which constituted grievance; notice contained vague and broad allegations that "a guest" was operating a business and that an unauthorized person was living in Pickard's apartment. See *Cuyahoga Metro. Hous. Auth. v Younger*, 69 NE2d 1253 (Ohio App. 1994).

The Defendants' due process violations in not providing a preliminary interview and adequate notice have rendered the unlawful detainer action against him void and unenforceable. He is entitled to permanently enjoin and be granted a dismissal of this unlawful detainer action with prejudice.

## ELEVENTH CAUSE OF ACTION
## Violation of Due Process Right to Open a Dialogue and Provide Accommodation
## All Defendants Except Marshall

The first cause of action is set forth by reference and is incorporated as if fully stated herein. The Defendants violated the law under the Fair Housing Act that required them to open a dialogue with Pickard, a disabled tenant who requested reasonable accommodations including the assistance of a social worker regarding matters pertaining to the lease infractions, interactions with Defendants regarding the lease, interactions with the Defendants regarding lease termination and eviction, and related matters. *Douglas v. Kriegsfeld,* 884 A.2d 1109, 1137- (D.C.App. en banc. 2005). Once again. A tenant can sue for a breach of the Fair Housing Act such as this one under 42 U.S.C. § 1983. *Wallace v. Chicago Housing Authority,* 298 F. Supp. 2d. 710, 718 (N.D. Ill. 2003), citing *Cannon v. University of Chicago*, 441 U.S. 677 (1979). A landlord's obligation to elicit additional information about a basically understandable accommodation is no different from its obligation to process the request by identifying the issues and elicit the reasons as to why a requested accommodation will alleviate the issue. When a tenant raises this issue, the burden shifts to the landlord to ask for whatever additional details it considers necessary to evaluate the matter. (884 A.2d 1138).

As in Pickard's case, a reasonable jury could find that the landlord did not cooperate, as required by law. Under these circumstances, he is entitled to a fair hearing and the landlord must open this dialogue to meet its burden of providing for the tenant's rights under the Fair Housing Law in this case. The Defendants' failure to open this dialogue and meet this burden in this case is one more issue for which

Pickard is entitled to relief and damages for his injuries set out in this Complaint.

Furthermore, an undue delay in opening this dialogue and responding to an accommodation request may be deemed to be a failure to provide for the accommodation. As stated above, delay in reasonable accommodation "can be both actual or constructive, as an indeterminate delay has the same effect as an outright denial." *Groome Resources Ltd. v. Parish of Jefferson, supra; U.S. v. Hialeah Housing Authority, supra.*

The Defendants in this case were informed repeatedly in writing, with all requisites including medical documentation from Pickard's physicians and health care providers, of his need for accommodation, almost one year ago. This excessive delay undeniably constitutes a due process violation in failing to provide for the **process**, including opening a dialogue, the required "interactive process" and by therefore denying without due process Pickard's need for same. The failure of the Defendants to provide for the requirement of this "interactive process" violates the Fair Housing Act's statutory process even if the landlord is skeptical of the merits of the need. *Jankowski Lee & Assocs. v. Cisneros*, 91 F.3d 891, 895 (7th Cir.1996) (if landlord is "skeptical of" tenant's alleged disability or landlord's ability to provide accommodation, "it is incumbent upon the landlord to request documentation or open a dialogue"); *Jacobs v. Concord Vill. Condo. X Ass'n, Inc.*, No. 04-60017-CIV, 2004 WL 741384, at *2, 2004 U.S. Dist. LEXIS 4876, at *5 (**D.Fla.** 2004) (same); *Armant v. Chat-Ro Co., L.L.C.*, No. 00-1402, 2000 WL 1092838, at *2, 2000 U.S. Dist. LEXIS 11386, at *6 (E.D.La. 2000) (quoting *Jankowski Lee & Assocs.* and further holding that once apprised of possible need, landlord has duty to inquire or investigate further); *Auburn Woods I Homeowners Ass'n v. Fair Employment & Hous. Comm'n*, (2004), 121 Cal.App.4th 1578, 1598 [18 Cal.Rptr.3d 669, 683] (quoting *Jankowski Lee & Assocs.* and further holding that obligation to "open a dialogue" with party requesting a needed accommodation is part of interactive process in which each party seeks and shares information); *Cornwell & Taylor LLP v. Moore*, 2000 WL 1887528,

at *4, 2000 Minn.App. LEXIS 1317, at *11 (Minn.App.Div. 2000) (quoting *Jankowski Lee & Assocs.*); *Cobble Hill Apts. Co.*, 1999 Mass.App. Div. at 169 (the fact that tenant's need for accommodation is neither specific nor suitable "does not relieve landlord from making one, particularly when tenant is handicapped by mental disability") (as in Pickard's case). See *HUD v. Jankowski Lee & Assocs.*, HUDALJ (June 30, 1995) (once informed of possibility that tenant may need accommodation, landlord has responsibility to explore that need and suggest accommodations). The HUD-DOJ Joint Statement explicitly calls for an "interactive process" in which the landlord and tenant "discuss the [tenant's] disability-related need for the requested accommodation and possible alternative accommodations," in the hope of negotiating "an effective accommodation for the [tenant] that does not pose an undue financial and administrative burden for the [landlord]." Joint Statement 7; see id. 9. Finally, when courts apply the reasonable accommodation provision of the Fair Housing Act, it is their established practice to rely on the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101, 12102, and the Rehabilitation Act (RA), 29 U.S.C. § 794, both of which mandate this interactive process. See 29 C.F.R. § 1630.2(o)(3) (1995); 29 C.F.R. pt. 1630 Appendix (1996); 29 U.S.C. § 794(d); *Giebeler*, 343 F.3d at 1156-57 (stating that court ordinarily applies RA case law in applying accommodation provisions of Fair Housing Act and also generally applies RA and ADA case law "interchangeably"); *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 561 (7th Cir.2003) (holding that Fair Housing Act requirements for showing failure to reasonably accommodate are same as those under ADA); *Shapiro*, 51 F.3d at 335 (the need for accommodation was intended to draw on case law under RA); *Erdman v. City of Fort Atkinson*, 84 F.3d 960, 962 (7th Cir.1996) ("reasonable accommodation" requirement of Fair Housing Act is most often interpreted by analogy to same phrase in RA.

Specifically as applicable in this case, the Court proscribed the denial of accommodation for the defendant's bipolar disorder. *American Univ. v. Comm'n on*

*Human Rights*, 598 A.2d 416 (D.C.1991). Such a mental impairment can serve as a basis for a claim against discrimination and denial of accommodation under the Fair Housing Act, 42 U.S.C. § 3602(h)(1)-(3) (2000); H.R.Rep. No. 100-711, at 22 (1988), reprinted in 1988 U.S.C.C.A.N. 2173, 2183 (making clear Congress's intent that the Fair Housing Act's provisions be interpreted and regulated consistently with the same term in the Rehabilitation Act of 1973); *United States v. Southern Mgmt. Corp.*, 955 F.2d 914 (4th Cir.1992). Accordingly, someone with a mental impairment such as Pickard's must be afforded due process, a dialogue, the interactive process, and accommodation pursuant to the Fair Housing Act. *Samaritan Inns v. District of Columbia*, 11 Am. Disabilities Dec. 1166 (D.D.C.1995), aff'd in relevant part, 325 U.S.App. D.C. 19, 114 F.3d 1227 (1997); *Walker v. Weinberger*, 600 F.Supp. 757 (D.D.C.1985). The Court required resolution of a tenant's request for accommodation prior to eviction, which the Court "suspended on this occasion by the preemptive requirements of federal law." In like manner, and at the very least, eviction proceedings should be suspended in Pickard's case by the preemptive requirements of federal law as stated throughout this Complaint.

The fact that SPM/Highland Manor is aware of Pickard's disabilities and still denied his requests for accommodation violates SPM/Highland Manor's duty under the Fair Housing Act to open a dialogue, engage in the interactive process to inquire further regarding his needs for accommodation. Failure to do so is "simply a ruse to avoid the penalty for violating the FHA"). *Jankowski Lee & Assocs.*, supra note 22, 91 F.3d at 894-895.

Where a landlord knew of a tenant's disabling affective disorder (bipolar disorder in Pickard's case), the landlord must open a dialogue and inquire regarding the tenant's request and need for accommodation and was obligated to request information necessary for processing this request. Failure to do so violates the Fair Housing Act, once again actionable as are all of the violations of the Fair Housing Act stated in this Complaint under §1983. *Auburn Woods I Homeowners Ass'n, supra*,

22. 121 Cal.App.4th at 1598. 18 Cal. Rptr.3d at 683. "The landlord "could not simply sit back and deny request because it did not think sufficient information had been presented."

At least one court has held that a landlord has a duty to try to accommodate a mentally ill tenant even when the particular accommodation requested is not feasible. *Cobble Hill Apts. Co.,* supra note 22. 1999 Mass.App. Div. 166 (when mentally disabled tenant asked for a reasonable request by transfer to another apartment but the court denied the request, the court held that landlord violated the tenant's rights under the Fair Housing Act. The Court held that. "The fact that a tenant does not request a specific or suitable accommodation does not relieve a landlord from making one. particularly when the tenant is handicapped by a mental condition").

SPM/Highland Manor is undeniably culpable for the due process violations stated above which mandate the dismissal of efforts to evict him. Damages are due to be awarded the Plaintiff. His request for review of SPM/Highland Manor's competence to provide for administration of the Highland Manor facility is also due to be granted, where substitution of another management entity rather than SPM is due.

## TWELTH CAUSE OF ACTION
### Violation of Rights to Due Process BEFORE
### Commencement of Eviction Action
### All Defendants Except Marshall

The first cause of action is set forth by reference and is incorporated as if fully stated herein. In action by individuals who resided in federally–funded public housing. brought against a landlord providing low-income public housing alleging that authority had failed to provide due process in eviction proceedings faced by all plaintiffs, court granted plaintiffs' motion for summary judgment and enjoined the landlord from initiating evictions of public housing tenants without first offering opportunity for grievance hearing to all affected tenants where Secretary of Department of Housing and Urban Development had erred in waiving HUD administrative grievance hearing

procedure for state landlords that used judicial eviction process of unlawful detainer and tenants facing court–ordered eviction would not receive due process before unlawful detainer action commenced. *Simmons v Kemp*, 751 F Supp 815 (DC Minn 1990). This is precisely that which is occurring against Pickard who was very specifically and tortiously denied his grievance hearings by Defendant Wren as stated above.

## THIRTEENTH CAUSE OF ACTION
### Violation of Due Process and Equal Protection by Retaliatory Eviction Defendants Bailey, Wren and All Defendants Except Marshall

The first cause of action is set forth by reference and is incorporated as if fully stated herein. Generally speaking, unlawful retaliation occurs when someone in a position of authority (such as a government official, manager, or landlord) punishes an individual for making a legitimate complaint.

A landlord retaliates against a tenant when, for instance, the landlord issues an eviction notice after the tenant raises multiple concerns about leaky pipes or a broken heater. Pickard has reported serious maintenance issues as stated above. A landlord usually may not demand full rent payment for such an action if the tenant can prove that he made a good faith effort to bring the problem to the landlord's attention as Pickard has done repeatedly.

When a party is a tenant of federally subsidized housing, federal law must be followed in addition to state law in a summary process action. United States Housing Act of 1937, § 2 et seq., 42 U.S.C.A. § 1437 et seq. *Housing Authority of City of New Haven v. DeRoche*, 962 A.2d 904 (2009).

The following acts of landlord retaliation are prohibited under HUD and federal law:

- Refusing to renew a lease;
- Filing or threatening to file an eviction notice without good cause;
- Raising rent;

- Not performing services as requested.
- Complaining to the landlord or a government agency about unsafe or illegal living conditions.
- Exercising a legal right (such as organizing tenants to address a grievance)
- Exerting one's legal rights.
- Filing to evict for complaining to a government agency.
- Filing to evict for tenant's filing of grievances.
- Filing to evict for tenant's filing of court action.
- Filing to evict based on premises [such as lease infractions] that can be demonstrated to be invalid or that violate due process.
- Filing to evict without providing proper and lawful notice.
- Requesting legally mandated repairs.

Landlords who try to violate tenant's rights can be stopped and sued. That said, the tenant's path to enforcing their rights may be a time (and money) consuming endeavor, depending on the circumstances of their case.

If a landlord-tenant dispute goes south and a tenant decides to inform the authorities, the tenant is protected from certain retaliatory activity. A landlord is not permitted to go after the tenant in a number of ways. The kinds of retaliatory acts proscribed by HUD and federal law include:

- increasing the rent;
- ending a month-to-month tenancy or refusing to renew a lease;
- filing an eviction lawsuit if a tenant decides to stay put and fight in court; and
- interference with quiet enjoyment of a tenant's leasehold.

It is further a violation of federal law for a landlord to retaliate against a tenant for acting within his or her legal rights by:

- complaining about unsafe or illegal living conditions to a governmental entity (building inspector, fire official, etc.);
- deducting money from the rent and using it to fix defects in the rental unit, or even withholding the rent entirely for an uninhabitable unit; or
- joining or organizing a tenant union.

The landlord has the burden to prove that there was another valid, non-retaliatory motive for his or her actions.

The FHA makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section ... 3604[.]" 42 U.S.C. § 3617. Accordingly, the statute "safeguards members of the protected class from coercion, intimidation, threats, or interference in the exercise or enjoyment of their Fair Housing Rights ... [and] it protects third parties, not necessarily members of the protected class, who aid or encourage protected class members in the exercise or enjoyment of their Fair Housing Act rights." *Frazier v. Rominger*, 27 F.3d 828, 833 (2d Cir.1994) (citations omitted).

It is unlawful to retaliate or discriminate against any person because he or she has opposed practices[,]" including a refusal to "sell, rent, lease or otherwise deny or withhold from any person ... such a housing accommodation because of the race, creed, color, national origin, sexual orientation, military status, sex, age, disability, marital status, or familial status of such person. The same standards that govern retaliation under the FHA apply to retaliation claims. See *Broome v. Biondi*, 17 F.Supp.2d 211, 218–219 (S.D.N.Y.1997) (listing elements of a prima facie case of retaliation under the FHA).

In *Schweiger v. Superior Court of Alameda Count, infra*, the Court "recognize[d] in unlawful detainer actions a defense where eviction is sought in

retaliation for the exercise of statutory rights by the tenant." 476 P.2d 97, 103 (Cal. 1970). Where a landlord seeks eviction in retaliation for the exercise of a right by a tenant, the landlord's retaliatory action is a defense to such eviction action. *San Union INC. dba Harmon Garden Apartments v. Richard Arnold*, No.: CVA16-010 (S.Ct. Guam 2017), citing *Schweiger v. Superior Court of Alameda County*, 476 P.2d 97, 103 (Cal. 1970). As set out in the facts of this case, Pickard has clearly established the facts by which SPM/Highland manor has acted with a retaliatory motive in pursuing eviction action. Where such facts have been established, they should bar eviction. *Id.*, at 103. ("If a tenant factually establishes the retaliatory motive of his landlord in instituting ab eviction action, such proof should bar eviction.") *Id.* at 103. The eviction action by the Defendants against Pickard should therefore be barred as a matter of law.

"[T]he elements of a prima facie retaliation claim under the FHA are (1) the plaintiff engaged in protected activity, (2) the defendant was aware of that activity, (3) the defendant took adverse action against the plaintiff, and (4) a causal connection exists between the protected activity and the adverse action."). *Broome, supra, Ponce v. 480 E. 21st St., LLC*, No. 12–CV–4828, 2013 WL 4543622, at *3 (E.D.N.Y. Aug. 28, 2013); *Cain v. Rambert*, No. 13–CV–5807, 2013 WL 6194294, at *3 (E.D.N.Y. Nov. 26, 2013); *Mazzocchi Windsor v. Owners Corp.*, No. 11–CV–7913, 2013 WL 5295089, at *12 (S.D.N.Y. Sept. 17, 2013).

These elements are undeniably present in Pickard's case. Pickard was exercising his right to file grievances regarding abuse, harassment, disability and other discrimination, extortion, and other wrongs. The filing of grievances or other legal challenges is undeniably protected activity as a matter of law, and specifically so. SPM even specifically has a policy guaranteeing tenants the right to file grievances as protected activity without retaliation. The activity was directly reported to the Defendants, who undeniably were aware of the activity complained of by Pickard. Defendant Wren retaliated by refusing to meet with Pickard after promising to do so, and by taking adverse action in a letter issued to him without adequately investigating

his grievances followed a by lease termination letter based on grounds that were not properly addressed by Wren. After Pickard appealed to federal court, the Defendants filed to evict him. There could be no clearer causal connection between a tenant's protected activity and the Defendants' retaliation.

The Defendants further admitted under oath that four of the five alleged lease infractions were invalid, hence cured. **Terminating lease without giving opportunity to cure violates procedural due process and is retaliatory just as terminating lease when the breach has been cured violates procedural due process and is retaliatory.**

A claim of retaliatory eviction can further be based on proof that the eviction of a tenant was motivated by the tenant's exercise of legally protected rights. 45 Am. Jur. Proof of Facts 3d 375 (1998) . The Restatement of Property states in relevant part: A landlord has taken retaliatory action against a tenant with respect to residential property whenever [the landlord] undertakes to terminate a tenancy that is terminable by an appropriate notice, or refuses to renew a tenancy for a specified term when that term ends, if:

> (1) there is a protective housing statute embodying a public purpose to insure proper conditions of housing, especially multi-unit housing designated for rental to tenants of low or moderate income;

> (2) the landlord is in the business of renting residential property;

> (3) the tenant is not materially in default in the performance of his obligations under the lease at the time the landlord acts;

> (4) the landlord is primarily motivated in so acting because the tenant, either alone or through his participation in a lawful organization of tenants, has complained about a violation by the landlord of a protective housing statute; and

> (5) the tenant's complaint was made in good faith and with reasonable cause.

The Defendants', particularly Defendant Wren's retaliatory eviction actions began in response to Pickard's assertion of legally protected rights to file grievances for redress of serious wrongs, as stated in his grievances filed with Highland Manor through Defendant Wren on June 4, 2019. Pickard was not materially in default in the performance of his obligations under the lease at this time when the Defendants so acted. The landlord/Defendants were clearly motivated in so acting because Pickard, the tenant complained about wrongs including numerous violations by the landlord/ Defendants of protective housing statutes. Pickard's grievances and complaints were made in good faith and undeniably were brought with good cause which has not been denied.

Because a tenant's claim of retaliatory eviction is typically asserted as an equitable defense, the usual remedy for its successful assertion is dismissal of the landlord's action for possession of the premises. The tenant can also be entitled to damages. This may include recovery of a rent abatement for a period of uninhabitability, compensatory damages, damages for emotional distress caused by the retaliatory eviction, and attorney's fees. 45 Am. Jur. Proof of Facts 3d 375 (1998).

"Protected activity under the FHA refers to 'action taken to protest or oppose statutorily prohibited discrimination.' " *Miller v. Bd. of Managers of Whispering Pines at Colonial Woods Cond. II*, 457 F.Supp.2d 126, 131 (E.D.N.Y.2006) (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir.2000)). Such action includes the "[f]iling [of] complaints ... and even less formal means of protest such as letter writing, ... if it is lodged in protest of statutorily prohibited discrimination." *Kendrick v. Greenburgh Hous. Auth.*, No. 07–CV–5859, 2011 WL 1118664, at *9 (S.D.N.Y. Mar. 22, 2011). Pickard protested and opposed the statutorily prohibited discrimination against him based on his handicaps, and was engaged in this protected activity when the Defendants took retaliatory action against him. He is entitled at the very least to the remedy of the dismissal of the Defendant/landlord's action for possession of his leased premises, and also to damages as asserted herein.

## FOURTEENTH CAUSE OF ACTION
### Violation of Due Process and Equal Protection by Discrimination
### Defendants Bailey, Wren, Wright and All Defendants Except Marshall

The first cause of action is set forth by reference and is incorporated as if fully stated herein. A tenant has the right to equal and fair treatment and use of the building's services and facilities, without regard to race, color, religion, gender, disability, familial status, national origin, ethnicity, or age. Federal anti-discrimination law prohibits discrimination on the basis of:

- Race
- Color
- Religion
- National origin
- Sex
- Age
- Familial status
- Physical disability
- Mental disability (including alcoholism and past drug addiction)

Federal housing law prohibits a variety of discriminatory conduct:

1. Advertising cannot contain any statement indicating a preference or limitation based on any of the protected classes listed above.
2. The landlord may not make any similar implication or statement.
3. A landlord cannot say that an apartment is not available when in fact it is available.
4. A landlord cannot use a different set of rules for assessing applicants belonging to a protected class.
5. A landlord cannot refuse to rent to persons in a protected class.

6. A landlord cannot provide different services or facilities to tenants in a protected class or require a larger deposit, or treat late rental payments differently.

7. A landlord cannot end a tenancy for a discriminatory reason.

8. A landlord cannot harass a tenant.

Pickard has been discriminated against due to his disability and has suffered abuse, harassment, disability based discrimination, extortion, bullying and related acts of trauma. He has suffered extreme mental suffering and physical debilitation as a result. He has made a documented request for reasonable accommodation to be moved to a higher elevation due to his condition of metabolic syndrome that improves with elevation. The Defendants have discriminated against him and refused such accommodation. As stated above, their delay alone regarding his rights regarding reasonable accommodation "can be both actual or constructive, as an indeterminate delay has the same effect as an outright denial." *Groome Resources Ltd. v. Parish of Jefferson, supra; U.S. v. Hialeah Housing Authority, supra.* The Defendants have falsely stated that an apartment that meets his physical handicap was not available when such apartments have become available, as confirmed by another tenant who so informed Pickard who moved in after Pickard.

The Defendants are seeking to end Pickard's tenancy for discriminatory reasons as set out above in severe violation of his rights of constitutional due process. The Defendants have viciously harassed Pickard, particularly the harassment of Defendants Bailey, Wren and Winston.

### FIFTEENTH CAUSE OF ACTION
### Violation of Due Process By Retaliatory Eviction by Threats of Eviction and Disability Harassment
### Defendants Bailey, Wren, Wright and All Defendants Except Marshall

The first cause of action is set forth by reference and is incorporated as if fully

stated herein. Pickard was subjected to violations of due process and equal protection by disability-based harassment and threats of eviction which constitute irreparable harm regarding his constitutional rights to continued occupancy in subsidized housing and retention of his federal benefits regarding subsidized housing, and efforts by the Defendants to effectuate retaliatory eviction of Pickard. 42 U.S.C. § 3617 (it is unlawful to coerce, intimidate, threaten, or interfere with any person in exercise or enjoyment of any right granted or protected under §§ 3603-3606 of FHA) See also 42 U.S.C. § 3617; *Sherman v. Runyon,* 235 F.3d 406, 409-10 (8th Cir.2000). Retaliatory conduct can consist only of threats of eviction, which were never carried out. *Harris v. Itzhaki,* 183 F.3d 1043, 1050-52 (9th Cir.1999) (holding in summary judgment case that tenant established prima facie claim where she presented evidence that she suffered emotional distress and feared eviction due to notices she received in alleged retaliation for complaining about racially insensitive remarks; tenant's damages claim was not barred simply because she moved from her apartment and was not evicted); *Neudecker v. Boisclair Corp.,* 351 F.3d 361 (8th Cir. 2003) (harassment and threats of eviction by "reprisals" based on disability and mental impairment constitutes retaliatory eviction and violates due process.)

## SIXTEENTH CAUSE OF ACTION

### Violation of Due Process Right and Equal Protection to a Written Opinion
### Defendants Bailey, Wren and All Other Defendants Except Marshall

The first cause of action is set forth by reference and is incorporated as if fully stated herein. A tenant has the right to a written opinion regarding adjudication, whether informally or by a Court, of a landlord's action for unlawful detainer/eviction. Pickard was not granted this right by the informal hearing held in his first eviction. Pickard's landlord denied him an informal hearing in the second case filed for eviction. Pickard was denied a written opinion by the State District Court regarding the adjudication by this Court of the first case filed for eviction. A set out above, the impact of the Goldberg /ruling-that procedural due process required a hearing prior to

termination of welfare benefits-was felt initially in litigation arising from public housing evictions.

When a party is a tenant of federally subsidized housing, federal law must be followed in addition to state law in a summary process action. United States Housing Act of 1937, § 2 et seq., 42 U.S.C.A. § 1437 et seq. *Housing Authority of City of New Haven v. DeRoche*, 962 A.2d 904 (2009).

In *Escalera v. New York City Housing Authority, supra* and *Caulder v. Durham Housing Authority, supra*, evictions absent prior notice and a hearing at which the aggrieved tenant could contest the action were held to violate due process. Both courts noted that the tenants' interest in a full evidentiary hearing to contest the eviction, coupled with the rights to present evidence and cross-examine, and the right to a written opinion were required to satisfy due process. "No person in the United States shall, on the ground of race, color, religion, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 42 U.S.C. § 2000(d). FHA regulations authorized under 12 U.S.C. § 1701S(f) imply a right to be free from arbitrary and discriminatory action.

Since due process requirements were dependent on a balancing of interests, courts are constrained in setting forth a particular minimum procedure necessary for evictions in public housing. However, a subsequent circular issued by the Department of Housing and Urban Development did establish the required minimum procedures which paralleled those specified for welfare recipients in *Goldberg, supra.* Among them were an administrative hearing before termination, an impartial decision-maker, the right to cross-examine witnesses, and **the necessity of a written opinion**.

Inherent in this scheme is the notion that good cause is required for eviction; to imply otherwise would render the hearing requirement of little value. Once the obstacle of a state action finding was hurdled, new developments proceeded apace. As also set out above, *McQueen v. Drucker, supra,* held that evictions in retaliation for

associational activities or petitions to the FHA violated the first amendment. Pickard has petitioned to the FHA and HUD and has suffered retaliation for this exercise of his due process rights. *McQueen* and its progeny depended, not on the procedural due process considerations of *Goldberg*, but on the narrower prohibition of the attachment of unconstitutional conditions to the granting of a government benefit. Such a prohibition, initially, was amenable to abuse where a landlord evicted without announcing his purpose; yet the judicial trend favoring the tenant's right to occupancy where such a result seemed just, led some courts to infer a retaliatory motive from the circumstances of a given eviction.

An objective review of the circumstances in Pickard's case clearly show a retaliatory motive for eviction following his June 4th, 2019 grievances and his June 10th, 2019 filing of a federal complaint when Defendant Wren reneged in her promise and duty to meet with Pickard and mediate his grievances. Those landlords who used the device of retaliatory evictions openly as a means to deter future organizational or other "troublemaking" activities are forbidden from such a tactic. Without a broader scope of tenant protection in subsidized housing, quasi-public landlords still possessed a formidable arsenal with which to defeat the constitutional rights of their tenants such as Pickard. U.S. Dep't. of Housing and Urban Development, Grievance Procedure in Low Rent Public Housing Projects, HUD Circular RHM 7465.9 (Feb. 22, 1971), 51.

Even if the landlord were permitted to evict arbitrarily, a hearing serves collateral purposes. Publicity generated by a hearing might deter evictions clearly based on unjust grounds. The bothersome and inefficient nature of a hearing requirement imposed on a landlord might deter evictions based on minor or frivolous reasons or where the court's analysis of the statutory purpose was directed at finding a basis for imposing a good cause requirement. *McQueen*, 317 F. Supp. at 1129, n.1, *Fletcher v. Grant Villa*, supra note 33. The Defendants' actions to evict Pickard are more than frivolous, they are false and invalid as the Defendants have admitted under oath. (see Exhibit "A".)

As stated above regarding retaliatory actions, Pickard has also reported plumbing, flooding due to a defective dishwasher appliance and electrical lighting issues which also has contributed to the Defendants retaliation by eviction. See *Edwards v. Habib*, 397 F.2d 687 (D.C. Cir. 1968), cert. denied, 393 U.S. 1016 (1969) (private landlord not permitted to evict in retaliation for reporting housing code violations, as a matter of public policy). See note 35 supra.  See, e.g., *Holt v. Richmond Redev. and Housing Authority*, 266 F. Supp. 397, 400 (E.D. Va. 1966), 55. See, e.g., *McQueen*, 317 F. Supp. at 1125-26. It became evident that those in society who were to be the beneficiaries of government policy fell victim to arbitrary and discriminatory practices within those same government-subsidized projects: It is only the poor whose entitlements, although recognized by public policy, have not been effectively enforced.

The justifiable expectation test enunciated in *Roth* and *Sindermann* created the basis for a finding which would lend itself to procedural protection. Courts began to determine whether a reasonable basis for tenants to expect continued occupancy in quasi-public housing did, in fact, exist. And the considerations of Judge Wyzanski in *McQueen*, the retaliatory eviction decision, did much to strengthen the conviction that there was indeed a protected property interest, or entitlement, to an unencumbered residency in subsidized housing, at least under normal conditions. Thelma Joy's petition in *Joy v. Daniels, supra*, failed in district court due to the expiration of her leasehold as the court upheld the validity of the no cause provision. Thus, the element of entitlement as determined by the higher court was dispositive of the issue, and Joy prevailed on appeal.

Pickard's rights have been violated as stated above, and particularly his right to a written opinion regarding the previous unlawful detainer action. The State court provided no such opinion, and thus violated his due process rights.

## SEVENTEENTH CAUSE OF ACTION
### Violation of Constitutional Due Process Right to a Hearing

## All Defendants Except Marshall

The first cause of action is set forth by reference and is incorporated as if fully stated herein. The hearing requirement stems from a tenant's right to due process. *Bonner v. Park Lake Housing Dev. Fund Corp., supra* note 37; *Tompkins Square Neighbors, Inc. v. Zaragoza*, 326 N.Y.S.2d 665 (New York City Civ. Ct. 1971), modified, 328 N.Y.S.2d 363 (New York City Civ. Ct. 1972). *Joy v Daniels*, supra. A tenant's entitlement is simply that when individuals have insufficient resources to live under conditions of health and decency, society has obligations to provide support, and the individual is entitled to that support as of right. [1973] Catholic University Law Review [Vol. 23:375]. A touchstone of this due process is the review of applicable issues by impartial official or officials.

When a party is a tenant of federally subsidized housing, federal law must be followed in addition to state law in a summary process action. United States Housing Act of 1937, § 2 et seq., 42 U.S.C.A. § 1437 et seq. *Housing Authority of City of New Haven v. DeRoche*, 962 A.2d 904 (2009).

In determining the procedural safeguards to be imposed under a *Goldberg* balancing test, the requirements affording protection to tenants must strike a relative balance with the governmental concern in attracting private investors. The greater the burden imposed on a quasi-public landlord, the greater the likelihood that private investors would seek other investment alternatives. However, persuasive reasons exist for the provision of a full-hearing requirement. First, the deprivation is a complete termination of a governmental benefit. Second, the basis on which an eviction is adjudicated depends upon a trying of facts-readily ascertainable and suitable for the hearing format. Third, an adverse decision may cost a tenant his home and stigmatize him as a wrongdoer; without a hearing he has no recourse by which to challenge his accusers. These are precisely the constitutionally infirm consequences to which Pickard is being subjected, particularly the loss of his home and the stigmatization of him as a wrongdoer, adversely affecting his ability to secure further housing.

Various courts have dealt with the balancing dilemma in two ways. The first solution is represented by *Bonner v. Lake Park Housing Development Fund Corp., supra,* where a quasi-public landlord was required to provide an informal opportunity for a tenant to deny or explain the charges against him. Where HUD housing is involved, the tenant is afforded certain rights including pre-termination due process, that precedes an informal hearing. This hearing can often be dispensed with under 11th Circuit precedent if state court hearing provisions adequately comport with due process (Alabama state court hearing provisions do NOT comport with such due process and are unconstitutional in part as set out herein.)

However, there are instances where an informal hearing is required such as in Pickard's case under 11th Circuit precedent. In *Colvin v. Housing Authority Of Sarasota, Florida,* 71 F.3d 864 (11th Cir. 1996), the 11th Circuit held that "federal regulations (specifically 24 C.F.R. Sec. 882.216) do grant Ms. Colvin the right to an informal hearing regarding the termination of her Section 8 assistance. Although the state court eviction proceeding is sufficient to satisfy constitutional due process requirements, it does not satisfy 24 C.F.R. Sec. 882.216, which requires the decision-maker at the informal hearing to consider whether the [landlord's] decision is in accordance with the law, HUD regulations, and Public Housing Authority rules." The Defendants flagrantly violated Pickard's rights regarding their subjecting and causing him to be subjected to the violation of his rights regarding the termination of his Section 8 assistance. There was no impartial decision-maker in his first informal hearing, and the Defendants denied him an informal hearing altogether regarding their second existing eviction action. The Defendants' action to evict is vitiated and is unconstitutional as a result. As stated above, this eviction action is due to be enjoined, dismissed and expunged with prejudice.

The other solution, adopted by several circuits, requires a hearing in all cases to vindicate the tenants right to procedural due process. Summary state eviction procedures similar to those found in *Escalera* and *Caulder,* will not do because they

do not adequately contain provisions that tenants may not be evicted without **prior proof of good cause.** Alabama Landlord-Tenant law does not contain sufficient provisions that tenants may not be evicted without **prior** proof of good cause as set out herein. Those courts which have adopted constitutionally compliant state court proceedings hold, as a matter of federal law, that tenants may not be evicted without **prior** proof of good cause. See *Escalera, Caulder,* and *Tompkins Square Neighbors, Inc. v. Zaragoza,* supra note 57. Because of the fact that Alabama eviction and Landlord-Tenant law fails to provide for federal and HUD due process and rights, it also is constitutionally infirm and fails to provide for adequate hearing rights. Where a tenant has been evicted from a quasi-public housing project under a constitutionally inadequate eviction statute, the courts will provide a remedy including under Section 1983.

It has also been suggested that the burden of a hearing requirement be placed directly on the FHA, rather than to rely on the landlord, or even a state court procedure. Unlike a private landlord, the FHA possesses the resources by which to develop an effective procedure. The burden of the landlord would thus be reduced to the prosecution of an eviction, the "separation of functions" problem would be eliminated, and the overall effect on private participation in the housing program would be to lessen the discouraging effects. The Defendants, particularly SPM and Highland Manor, have comprehensively and grievously proven that they are incompetent to provide for due process in hearing and other requirements attendant to lease termination and eviction. The extension of procedural due process protection to tenants in government-subsidized housing programs is significant as a judicial resolution of authority, 444 F.2d 158 (5th Cir. 1971); *Housing Authority v. Mosby,* 192 N.W.2d 913 (1972), 62. N.C. GEN. STAT. 42-26 to 42-37 (1966, Supp. 1971), 430 F.2d 1125 (4th Cir. 1970), 64. S.C. CODE ANN. 41-101 to 41-115 (1962). *Joy v. Daniels, supra* at 17; *Id.* 67. See note 8. Accord. *Glover v. Housing Authority,* 444 F.2d at 161-62, n.4; *McQueen,* 317 F. Supp. at 1131. *Note,* 86 HARV. L. REV. 880,

909-10. 1973] Catholic University Law Review [Vol. 23:375].

The inevitability of affording procedural protection to the beneficiaries of social policy, and the necessity of governmental reliance upon private citizens as means to achieve that policy, have produced a substantial reconciliation of interests. The landlord must acquiesce in the application of these legal norms. The Landlord too is a recipient of government benefits in the form of investment and tax incentives. A quasi-public landlord acting pursuant to these incentives must therefore realize that he is not excessively burdened when required only to prove his case in court. The *Joy* approach, however, is limited to those states which have adequate eviction procedures. Alabama is not one of these. In their absence, courts such as this instant federal court are left, by necessity, to their own devices in formulating procedural requirements. In order to avoid piecemeal impositions of excessive burdens or minimal safeguards, the ultimate reconciliation of landlord-tenant interests depend upon a uniform set of rules and guidelines defining the rights and duties of all parties concerned which again would best be administered by HUD or the FHA. At present, equal protection issues are implicated by the disparate state laws regarding adequate protections including that of hearings that provide adequately for due process. Pickard is moving for a special master appointed by the Court to act to address these issues and enforce due process.

Pickard has been denied a fair and constitutionally compliant hearing in this instance, both by the Defendants and State Court. Grievously, it was Defendant Winston also acted under color of state law by acting as the hearing officer in the state process of pre-termination action for eviction. As counsel for the Defendant landlords, he cannot be considered impartial and objective. His conduct as the hearing officer clearly violated Pickard's due process rights to a fair and impartial hearing.

## EIGHTEENTH CAUSE OF ACTION
### Violation of Constitutional Due Process Rights Regarding
### Subjection to Unlawful Ouster and Possession by Landlord
### All Defendants Except Marshall

The first cause of action is set forth by reference and is incorporated as if fully stated herein. It is clear that where a private party acting jointly with or through state officials becomes so allied with the state as to characterize the party as a state actor, the private party acts under color of state law. *Cobb v. Georgia Power Co.*, 757 F.2d 1248 (11th Cir.1985). Defendant Winston is considered an official as acting with state agents in the eviction process. He is acting jointly with and through state officials, primarily Defendant JSmith, a state process server, in the eviction process and the impending and resulting unlawful ouster of tenant from his property interest in his residence and possession thereof. *See also Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 942, 102 S.Ct. 2744, 2756, 73 L.Ed.2d 482 (1982) (A private party's joint participation with state officials in such unlawful ouster and forced possession of the seized property is sufficient to establish the party as a 'state actor' for the purposes of the Fourteenth Amendment.).

When a party is a tenant of federally subsidized housing, federal law must be followed in addition to state law in a summary process action. United States Housing Act of 1937, § 2 et seq., 42 U.S.C.A. § 1437 et seq. *Housing Authority of City of New Haven v. DeRoche*, 962 A.2d 904 (2009).

Moreover, there is a merger of interests between the Defendants and the state as in this case. In *Ressler v. Pierce, infra,* at 1217, the Court found that the owners of the private Section 8 facility merged with the government's interest, especially where Pickard is currently receiving benefits and is threatened with termination of those benefits. The owner's interest deserves less weight in such a case. Such merger further establishes the Defendants' status as state actors.

A category of private defendant Section 1983 cases are joint action and entanglement cases. This category captures a disparate group of situations including cases in which public and private parties act to perpetuate unconstitutional conduct, cases in which public and private parties act to deprive tenants in this case of their constitutional rights, and cases involving private entities that are so entangled with

Page | 165

government that they are considered to be state actors acting under color of law for Fourteenth Amendment and Section 1983 purposes, particularly under the unconstitutional statutory scheme of Alabama Landlord-Tenant law as set out above.

Defendant Winston, together with SPM and all other Defendants, therefore are acting to deprive Pickard of his constitutional due process rights stated above while acting under color of state law.

## NINETEENTH CAUSE OF ACTION
## Violation of Due Process Rights Regarding Lease Termination Letter
## All Defendants Except Marshall

The first cause of action is set forth by reference and is incorporated as if fully stated herein. As stated in the facts of this case, the Lease Termination Letter upon which the present complaint by Defendants for unlawful detainer is based violates due process. Four of the five lease infractions that are the basis of the lease termination have been admitted by Defendant Bailey to be invalid and without merit, hence due to be expunged from Pickard's record (see Affidavit of attorney Jonathan Mok, Exhibit "A").

When a party is a tenant of federally subsidized housing, federal law must be followed in addition to state law in a summary process action. United States Housing Act of 1937, § 2 et seq., 42 U.S.C.A. § 1437 et seq. *Housing Authority of City of New Haven v. DeRoche*, 962 A.2d 904 (2009).

In *Tuggles vs. City of Antioch*, 44 Trials Digest 13th 2, 2010 WL 4260533 (N.D.Cal. 2010), the tenant alleged that termination of her tenancy violated her civil and constitutional rights and subjected her to discrimination, malicious prosecution, abuse of process, intentional torts and infliction of emotional distress. The hearing officer in this case ordered rescission of the termination notice and the landlord's proposed termination and eviction, finding the notice of termination did not meet federal due process requirements. Plaintiff's Section 8 benefits were reinstated.

Plaintiff alleged that the defendants violated her constitutional rights to equal

protection, due process, and privacy. Defendants denied they violated plaintiff's constitutional rights and contended they acted in good faith, believing their conduct to be appropriate under the circumstances.

Plaintiff also alleged that defendants including City of Antioch discriminated against her based on her race, in violation of 42 U.S.C. § 2000d and 42 U.S.C. § 3604(b), which defendants denied. Further, plaintiff alleged that certain defendants violated 42 U.S.C. § 1437d(k)(1) because they terminated her benefits without adequately providing notice and advising plaintiff of the factual basis for the termination.

Plaintiff alleged tort claims including intentional infliction of emotional distress, abuse of process, and malicious prosecution. The case was settled in favor of the Plaintiff.

In a similar manner, Pickard's Lease Termination Letter fails to comply with due process. As stated above, four of the five lease infractions upon which the termination letter is based have been admitted by Defendant Bailey's sworn testimony to be invalid and void. The fifth alleged lease infraction was issued almost thirty days after its occurrence without providing for Pickard's right to appeal and his submitted written dispute of this infraction, which he contends to be falsely alleged as established by the screen shot provided with the infraction and by video surveillance evidence.

Pickard thus claims that the Defendants violated his constitutional rights of due process and subjected him to malicious prosecution, abuse of process, intentional torts and infliction of emotional distress. He is entitled to due process in ameliorating these wrongs, abuse, injuries and damages.

## TWENTIETH CAUSE OF ACTION
### 42 U.S.C. § 1983- 14th Amendment–
### Deprivation of Property Interest in Continued Tenancy
### All Defendants

The first cause of action is set forth by reference and is incorporated as if fully

stated herein. All Defendants are acting under color of State law to deprive the Plaintiff of his Constitutional Property interest in his continued residence and tenancy in his current residence. The Defendants have acted to deprive Pickard of his Constitutional property interest of remaining in his residence, also in violation of the United States Housing Act of 1937 and the Fourteenth Amendment. Housing assistance tenant's statutory entitlement to continue in occupancy in absence of good cause for eviction is protected by due process clause of the Fourteenth Amendment. United States Housing Act of 1937, § 8 as amended 42 U.S.C.A. § 1437f; 42 U.S.C.A. § 1983; U.S.C.A.Const.Amend.14.

The existing housing assistance program, regulations pertaining to same, and lease executed between Defendants/landlord and tenant/Plaintiff taken together, yielded legitimate expectation that tenants under such program would not be evicted from their homes inhabited under existing housing leases without good cause, and as such Pickard has a property interest of which he cannot be deprived without being afforded due process of law. United States Housing Act of 1937, §§ 8, 8(d)(1)(A, B) as amended. Housing assistance tenant's statutory entitlement to continue in occupancy in absence of good cause for eviction is protected by the due process clause. United States Housing Act of 1937, § 8 as amended 42 U.S.C.A. § 1437f; 42 U.S.C.A. § 1983; U.S.C.A.Const.Amend. 14. U.S.C.A. §§ 1437f, 1437f(d)(1)(A, B); U.S.C.A.Const. Amend. 14. When a government benefit may be withdrawn only for cause, a legitimate expectation, entitlement, or property interest arises within purview of the Fourteenth Amendment.

The Defendants in this case are acting under color of law to deprive Pickard of his Constitutional liberty interest of remaining in his residence by attempting to evict him on false premises, unlawfully, and absent good cause as stated in the facts incorporated here by reference and in the additional grounds set out below. Eviction proceedings against Pickard are due to be terminated and expunged immediately on this basis.

## TWENTY-FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983- 14th Amendment–
### Deprivation of Property Interest in Government Benefit
### All Defendants

The first cause of action is set forth by reference and is incorporated as if fully stated herein. All Defendants are acting under color of State law to deprive the Plaintiff of his Constitutional property interest in his continued government benefit. housing and utility subsidies, and entitlements. Pickard is vested with the statutory entitlement to his present government housing assistance program, benefits, housing and utility subsidies, and entitlements. This government benefit can only be withdrawn for cause, therefore Pickard possesses a legitimate expectation, entitlement, or property interest arises within purview of the Fourteenth Amendment. U.S.C.A.Const. Amend. 14. The due process clause of Fourteenth Amendment dictates the procedure to be followed before a tenant entitled to and receiving housing assistance such as Pickard is evicted because Pickard/ has this expectation, rising to status of property interest, of remaining in his home in absence of good cause for eviction, where eviction constitutes state action in this case,. United States Housing Act of 1937, § 8 as amended 42 U.S.C.A. § 1437f; 42 U.S.C.A. § 1983; U.S.C.A. Const.Amend. Pickard is assured by statute that he will continue in occupancy in the absence of good cause for eviction. It is now beyond question that such statutory entitlements are protected by the due process clause. See *Goldberg v. Kelly, supra*, 397 U.S. at 261-62, 90 S.Ct. at 1016-17, 25 L.Ed.2d 287 (statutory entitlements).

There is substantial continuing agency involvement in the tenancy. The government pays a major portion of each month's rent directly to the landlord. The landlord submits to significant regulation. The Landlord is the state actor who alleges grounds for and prosecutes eviction. Pickard, as a tenant receiving housing assistance. therefore has a property interest of which the landlord, acting under color of state law as the instant Defendants are, cannot deprive him without affording the tenants/Plaintiff due process of law. U.S.Const. Amend. XIV. Eviction proceedings

against Pickard are due to be terminated and expunged immediately on this basis.

## TWENTY-SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983- 14ᵗʰ Amendment–
### Constitutionally Non-compliant Service
### Defendant Bailey

The first cause of action is set forth by reference and is incorporated as if fully stated herein. Defendant Bailey is acting under color of law in depriving Pickard of his constitutional right to service of documents, letters, notices and other process.

When a party is a tenant of federally subsidized housing, federal law must be followed in addition to state law in a summary process action. United States Housing Act of 1937, § 2 et seq., 42 U.S.C.A. § 1437 et seq. *Housing Authority of City of New Haven v. DeRoche*, 962 A.2d 904 (2009).

The Defendants have violated due process by failing to provide constitutionally compliant service of eviction documents. The Defendants, particularly Bailey, have falsely alleged lease infractions that are never issued and have illegally drafted and alleged lease infractions that are fraudulently withheld from Plaintiff and not served. Defendants have repeatedly and falsely claimed that they posted letters and notices on Pickard's doorknob that he never received. Federal rules require that notices pertaining to eviction be first sent by first class mail, and the **additionally** delivered to an adult at the residence, or placed **under the door**, not on the doorknob (24 C.F.R. § 247.4(b)). 24 C.F.R. § 247.3(a)(4) stipulates that "No termination shall be valid unless it is in accordance with the provisions of § 247.4. The pertinent portion of § 247.4(b) states:

> 1. "(a) Requisites of termination **notice**. "The landlord's determination to terminate the tenancy shall be in writing and shall * * * (2) state the reasons for the landlord's action with enough specificity so as to enable the tenant to prepare a defense; (3) advise the tenant that if a judicial proceeding for eviction is instituted the tenant may present a defense; and (4) be served on the tenant in the manner prescribed by paragraph

(b) of this section.

2. "(b) Manner of service. The notice provided for in paragraph (a) of this section shall be accomplished by (1) sending a letter by first class mail, properly stamped and addressed, to the tenant at his address at the project, with a proper return address, and (2) by serving a copy of said notice on any adult person answering the door at the leased dwelling unit, or if no adult responds, by placing said notice under or through the door. Service shall not be deemed effective until both notices provided for herein have been accomplished. * * *" (Emphasis added.)

On June 13, 2019, Pickard's apartment was allegedly treated by a pest control technician. Pickard was not given notice that his apartment would be entered as HUD regulations require. Since lease infractions have a direct bearing on eviction process, such notices that attach to lease infractions must comply with 24 C.F.R. § 247.4(b). Bailey/Highland Manor did not comply with 24 C.F.R. § 247.4(b).

The first, third and fourth infractions stated in the Lease Termination Letter issued on July 29, 2019 were not received by Pickard and are void for this reason-federal and constitutional law requires proper and legally compliant notice for a lease infraction to be sustained, and there was no compliant notice regarding these three infractions. It would be egregiously inequitable for a landlord to be able to allege placement of such a document bearing on eviction on a doorknob as adequate service for eviction proceedings. Notice of these infractions, for them to have bearing on eviction proceedings, were required to be made in compliance with 24 C.F.R. § 247.4(b), to be sent by first class mail, AND ALSO to be delivered to an adult at the residence or placed **under** the door. There obviously is good reason for such specific requirements. Pickard did not have notice of three of the four infractions alleged and was unable to contest and defend against them in violation of the most basic principles of due process which 24 C.F.R. § 247.4(b) addresses.

Pickard complained to the HUD representative for this area and HUD

Specialists with the HUD Navigate office. These HUD officials affirmed that the
Defendants are bound by said service requirements, particularly the duty to mail such
notices in addition to serving them personally. The HUD Navigate Specialist took note
of these violations and confirmed that these violations by the Defendants will be a part
of the HUD Annual Review for SPM/Highland Manor.

The pest control technician allegedly told Highland Manor staff that Pickard's
apartment was unclean. His apartment was then unlawfully entered a second time
without notice and was alleged to be unclean and unsanitary. A lease violation was
allegedly issued claiming such condition. This is one of the four lease infractions
based upon which action has been taken to evict Pickard.

None of these three notices were mailed to Pickard, served on any adult
answering the door of his residence, or placed through or under his door as required by
due process. 24 C.F.R. § 247.3(a)(4) stipulates that "No termination shall be valid
unless it is in accordance with the provisions of § 247.4." The Defendants failed to act
in accordance with the provisions of § 247.4. The current termination/eviction action is
invalid. The constitutionally non-compliant service stated above renders the Lease
Termination process unconstitutional and void. Eviction proceedings against Pickard
are due to be terminated and expunged on this ground, severally.

## TWENTY-THIRD CAUSE OF ACTION
### 42 U.S.C. § 1983- 14th Amendment–
### Constitutionally Non-compliant Service
### Defendant Wren

The first cause of action is set forth by reference and is incorporated as if fully
stated herein. Defendant Wren is acting under color of law in depriving Pickard of his
constitutional right to service of documents, letters, notices and other process. The last
previous cause of action is further set forth by reference as if fully stated herein. The
Defendants have violated due process by failing to provide constitutionally compliant
service of eviction documents.

24 C.F.R. § 247.3(a)(4) stipulates that "No termination shall be valid unless it is in accordance with the provisions of § 247.4." The Defendants failed to act in accordance with the provisions of § 247.4. The current termination/eviction action is invalid.The constitutionally non-compliant service stated by reference as set forth in the last previous Cause of Action fully incorporated herein by reference renders the Lease Termination process unconstitutional and void. Eviction proceedings against Pickard are due to be terminated and expunged on this ground, severally.

## TWENTY-FOURTH CAUSE OF ACTION
### 42 U.S.C. § 1983- 14th Amendment–
### Constitutionally Non-compliant Service
### Defendant Highland Manor

The first cause of action is set forth by reference and is incorporated as if fully stated herein. Defendant Highland Manor Wren is acting under color of law in depriving Pickard of his constitutional right to service of documents, letters, notices and other process. The second last previous cause of action is further set forth by reference as if fully stated herein. The Defendants have violated due process by failing to provide constitutionally compliant service of eviction documents.

24 C.F.R. § 247.3(a)(4) stipulates that "No termination shall be valid unless it is in accordance with the provisions of § 247.4." The Defendants failed to act in accordance with the provisions of § 247.4. The current termination/eviction action is invalid. The constitutionally non-compliant service stated by reference as set forth in the second last previous Cause of Action fully incorporated herein by reference renders the Lease Termination process unconstitutional and void. Eviction proceedings against Pickard are due to be terminated and expunged on this ground. severally.

## TWENTY-FIFTH CAUSE OF ACTION
### 42 U.S.C. § 1983- 14th Amendment–
### Constitutionally Non-compliant Service
### Defendant SPM

The first cause of action is set forth by reference and is incorporated as if fully stated herein. Defendant SPM is acting under color of law in depriving Pickard of his constitutional right to service of documents, letters, notices and other process. The third last previous cause of action is further set forth by reference as if fully stated herein. The Defendants have violated due process by failing to provide constitutionally compliant service of eviction documents.

24 C.F.R. § 247.3(a)(4) stipulates that "No termination shall be valid unless it is in accordance with the provisions of § 247.4." The Defendants failed to act in accordance with the provisions of § 247.4. The current termination/eviction action is invalid. The constitutionally non-compliant service stated by reference as set forth in the third last previous Cause of Action fully incorporated herein by reference renders the Lease Termination process unconstitutional and void. Eviction proceedings against Pickard are due to be terminated and expunged on this ground, severally.

## TWENTY-SIXTH CAUSE OF ACTION
## 42 U.S.C. § 1983- 14th Amendment–
### Constitutionally Non-compliant Service
### Defendants Winston, JSmith Welden, ASmith, Wright, and Bearden

Defendants Winston, Welden, Smith, Wright, and Bearden have joined Defendants Bailey, Wren, Highland Manor and SPM and are acting under color of law in depriving Pickard of his constitutional right to service of documents, letters, notices and other process. Defendant Winston has heightened culpability and liability due to his knowledge and experience as an attorney and former judge.

The first cause of action is set forth by reference and is incorporated as if fully stated herein. The fourth last previous cause of action is further set forth by reference as if fully stated herein. The Defendants have violated due process by failing to provide constitutionally compliant service of eviction documents.

24 C.F.R. § 247.3(a)(4) stipulates that "No termination shall be valid unless it is in accordance with the provisions of § 247.4." The Defendants failed to act in

accordance with the provisions of § 247.4. The current termination/eviction action is invalid. The constitutionally non-compliant service stated by reference as set forth in the fourth last previous Cause of Action fully incorporated herein by reference renders the Lease Termination process unconstitutional and void. Eviction proceedings against Pickard are due to be terminated and expunged on this ground, severally.

## TWENTY-SEVENTH CAUSE OF ACTION
### 42 U.S.C. § 1983- 14th Amendment–
### Constitutionally Non-compliant Notice
### Defendants Bailey and Wren

The first cause of action is set forth by reference and is incorporated as if fully stated herein. Defendants Bailey and Wren acting under color of law in depriving Pickard of his right to constitutionally compliant Notice. The contents of the Notice of Termination must comply with due process. The notice of termination must comply with certain requirements. It must state the date the tenancy is terminated; state the reasons for the eviction with sufficient specificity to enable the tenant to prepare a defense; advise the tenant that if he or she remains in the apartment on the date specified for termination, the landlord may seek to enforce the termination only by bringing a judicial action, at which time the tenant may present a defense; advise the tenant that he has ten days in which to discuss the proposed termination of tenancy with the landlord; and advise that persons with disabilities have the right to request reasonable accommodations to participate in the hearing process. In addition, the landlord must also comply with all requirements of state law. No termination is valid unless the landlord has complied with the federal notice requirements.

The Defendants, as subsidized landlords, have failed to give adequate notice of termination:

(1) It does not state the reasons for the eviction with sufficient specificity to enable Pickard to prepare a defense. The Lease Infractions only state the rules violations, without facts sufficient to state who, when, why, where and other necessary facts to provide Pickard with adequate means to defend

against the allegations;

(2) It does not advise Pickard who is disabled that he has the right to request
reasonable accommodations.

It is a violation of due process and a defense to eviction when the landlord fails
to give proper notice of lease termination. One frequent mistake is failure of the notice
to state the reasons for the eviction with sufficient specificity. Conclusory allegations
that the tenant is being evicted for "violation of paragraph six of the lease," "material
noncompliance with the lease," or for "conduct that disturbs the quiet enjoyment of the
premises neighbors" are all insufficient. Another common mistake is the failure to
state the facts and evidence against the tenant. Further examples of such due process
violations are stated in *Leake v. Ellicott Redevelopment Phase II, supra* note 26, 470
F. Supp. at 602 (finding termination notice failed to comply with the requirements of
24 C.F.R. Part 450, the predecessor to Part 247); *Stewart v. Tacoma Rescue Mission,*
228 P.3d 1289 (Wash. Ct. App. 2010 (reversing judgment of eviction because the
termination notice did not adequately identify "threatening and intimidating behavior);
*Riverview Towers Associates v. Jones,* 817 A.2d 324 (N.J. Super. Ct. App. Div. 2003)
(landlord must comply with HUD lease termination notice requirements); *Lincoln
Terrace Associates, Ltd., v. Kelly,* 635 S.E.2d 434, 438 (N.C. Ct. App. 2006)
(subsidized landlord failed to prove that notice of termination complied with lease
requirements); *Hedco v. Blanchette,* 763 A.2d 639 (R.I. 2000) (notice of proposed
termination that failed to specify the termination date of the lease but that merely
stated "unless you make payment of all rent in arrears within ten (10) days of the date
that this Notice was mailed to you, your tenancy will be terminated and an eviction
notice may be initiated in court against you on or after June 29, 1998." does not
comply with the requirement of 24 C.F.R. § 247.4(a)(1), which requires a specific
termination date for a federally subsidized tenancy); *Moon v. Spring Creek
Apartments,* 11 S.W.3d 427 (Tex. App. – Texarkana 2000, no pet.) (termination notice
failed to meet the specificity requirement mandated by the federal regulations and

constitutional due process and, therefore, tenant's lease was not lawfully terminated); *Lakeside Gardens v. Lashay*, No. 2007AP1246, 2008 Wisc. App. LEXIS 43, *3-8 (Wis. Ct. App. Jan. 16, 2008) (subsidized owner must comply with federal rules relating to notice of lease termination even if the terms are not included in the lease); *see also Swords to Plowshares v. Smith, supra*, 294 F. Supp. 2d at 1070-72 . (recognizing that landlord must comply with applicable federal regulations when serving lease termination notice). *Fairview Co. v. Idown*, 559 N.Y.S.2d 925, 928-30 (N.Y. Civil Ct. 1990) (termination notice not sufficiently specific); *Associated Estates Corp. v. Bartell*, 492 N.E.2d 841, 846 (Ohio Ct. App. 1985) (notice that claimed "serious, repeated damage to unit. Repeated disturbance." was inadequate because it did not refer to specific instances of conduct; *Moon v.Spring Creek Apartments, supra*, note 27 (termination notice failed to meet the specificity requirement mandated by the federal regulations and constitutional due process and, therefore, tenant's lease was not lawfully terminated); *see also Escalera v. New York City Housing Authority*, 425 F.2d 853, 862 (2d Cir.), *cert denied*, 400 U.S. 853 (1970).

Defendants further violated the provision that a thirty-day notice of termination is required for termination based on good cause. The landlord may not rely on any grounds in court which are different from the reasons set forth in the termination notice, except those grounds of which the landlord had no knowledge at the time the termination notice was sent.

## TWENTY-EIGHTH CAUSE OF ACTION
### 42 U.S.C. § 1983- 14th Amendment–
### Constitutionally Non-compliant Notice
### Defendants Highland Manor and SPM

The first cause of action is set forth by reference and is incorporated as if fully stated herein. Defendants Highland Manor and SPM are acting under color of law in depriving Pickard of his right to constitutionally compliant Notice. The contents of the Notice of Termination must comply with due process. The notice of termination must comply with certain requirements. It must state the date the tenancy is terminated; state

the reasons for the eviction with sufficient specificity to enable the tenant to prepare a defense; advise the tenant that if he or she remains in the apartment on the date specified for termination, the landlord may seek to enforce the termination only by bringing a judicial action, at which time the tenant may present a defense; advise the tenant that he has ten days in which to discuss the proposed termination of tenancy with the landlord; and advise that persons with disabilities have the right to request reasonable accommodations to participate in the hearing process. In addition, the landlord must also comply with all requirements of state law. No termination is valid unless the landlord has complied with the federal notice requirements.

The Defendants, as subsidized landlords, have failed to give adequate notice of termination:

(1) It does not state the reasons for the eviction with sufficient specificity to enable Pickard to prepare a defense. The Lease Infractions only state the rules violations, without facts sufficient to state who, when, why, where and other necessary facts to provide Pickard with adequate means to defend against the allegations;

(2) It does not advise Pickard who is disabled that he has the right to request reasonable accommodation(s).

It is a violation of due process and a defense to eviction when the landlord fails to give proper notice of lease termination. One frequent mistake is failure of the notice to state the reasons for the eviction with sufficient specificity. Conclusory allegations that the tenant is being evicted for "violation of paragraph six of the lease," "material noncompliance with the lease," or for "conduct that disturbs the quiet enjoyment of the premises neighbors" are all insufficient. Another common mistake is the failure to state the facts and evidence against the tenant. Further examples of such due process violations are stated in: *Leake v. Ellicott Redevelopment Phase II, supra* note 26, 470 F. Supp. at 602 (finding termination notice failed to comply with the requirements of 24 C.F.R. Part 450, the predecessor to Part 247); *Stewart v. Tacoma Rescue Mission,*

228 P.3d 1289 (Wash. Ct. App. 2010 (reversing judgment of eviction because the termination notice did not adequately identify "threatening and intimidating behavior); *Riverview Towers Associates v. Jones*, 817 A.2d 324 (N.J. Super. Ct. App. Div. 2003) (landlord must comply with HUD lease termination notice requirements); *Lincoln Terrace Associates, Ltd., v. Kelly*, 635 S.E.2d 434, 438 (N.C. Ct. App. 2006) (subsidized landlord failed to prove that notice of termination complied with lease requirements); *Hedco v. Blanchette*, 763 A.2d 639 (R.I. 2000) (notice of proposed termination that failed to specify the termination date of the lease but that merely stated "unless you make payment of all rent in arrears within ten (10) days of the date that this Notice was mailed to you, your tenancy will be terminated and an eviction notice may be initiated in court against you on or after June 29, 1998." does not comply with the requirement of 24 C.F.R. § 247.4(a)(1), which requires a specific termination date for a federally subsidized tenancy); *Moon v. Spring Creek Apartments*, 11 S.W.3d 427 (Tex. App. – Texarkana 2000, no pet.) (termination notice failed to meet the specificity requirement mandated by the federal regulations and constitutional due process and, therefore, tenant's lease was not lawfully terminated); *Lakeside Gardens v. Lashay*, No. 2007AP1246, 2008 Wisc. App. LEXIS 43, \*3-8 (Wis. Ct. App. Jan. 16, 2008) (subsidized owner must comply with federal rules relating to notice of lease termination even if the terms are not included in the lease); *see also Swords to Plowshares v. Smith, supra*, 294 F. Supp. 2d at 1070-72 (again, recognizing that landlord must comply with applicable federal regulations when serving lease termination notice). *Fairview Co. v. Idowu*, 559 N.Y.S.2d 925, 928-30 (N.Y. Civil Ct. 1990) (termination notice not sufficiently specific); *Associated Estates Corp. v. Bartell*, 492 N.E.2d 841, 846 (Ohio Ct. App. 1985) (notice that claimed "serious, repeated damage to unit. Repeated disturbance." was inadequate because it did not refer to specific instances of conduct; *Moon v.Spring Creek Apartments, supra*, note 27 (termination notice failed to meet the specificity requirement mandated by the federal regulations and constitutional due process and, therefore, tenant's lease was not

lawfully terminated); *see also Escalera v. New York City Housing Authority*, 425 F.2d 853, 862 (2d Cir.), *cert denied*, 400 U.S. 853 (1970).

Defendants further violated the provision that a thirty-day notice of termination is required for termination based on good cause. The landlord may not rely on any grounds in court which are different from the reasons set forth in the termination notice, except those grounds of which the landlord had no knowledge at the time the termination notice was sent.

## TWENTY-NINTH CAUSE OF ACTION
### 42 U.S.C. § 1983- 14th Amendment–
### Constitutionally Non-compliant Notice
### Defendants Winston, Welden, Smith, Wright, and Bearden

The first cause of action is set forth by reference and is incorporated as if fully stated herein. The last previous cause of action is further set forth by reference as if fully stated herein. Defendants Winston, Welden, Smith, Wright, and Bearden have joined Defendants Bailey, Wren, Highland Manor and SPM in acting under color of law to deprive Pickard of his right to constitutionally compliant Notice as set out in said last previous cause of action. Defendant Winston has heightened culpability and liability due to his knowledge and experience as an attorney and former judge.

## THIRTIETH CAUSE OF ACTION
### 42 U.S.C. § 1983- 14th Amendment–
### Denial of Constitutionally compliant procedural due process
### All Defendants

The first cause of action is set forth by reference and is incorporated as if fully stated herein. Defendants Bailey, Wren, Highland Manor and SPM are acting under color of state law in depriving Plaintiff of his constitutional procedural due process rights. In the 11th circuit, a § 1983 claim alleging a denial of procedural due process requires proof of three elements: "(1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate

process." *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003). All three elements stated herein provide proof of these elements. The first two elements are established for each instance complained of. The element of constitutionally inadequate process is further established for each on a case by case basis. All of the issues stated below are elements of constitutional due process, and are rights protected by the U.S. Constitution regarding procedural due process.

> (1) <u>Right to Meet to Discuss Proposed Eviction</u>. As noted, the notice of termination must state that the tenant has ten days in which to discuss the proposed eviction with the landlord. This ensures that Pickard has an opportunity to talk with management. The purpose of the meeting "is to attempt to resolve the controversy in a mutually satisfactory matter that will, if possible, avoid the tenant's loss of subsidized housing." This gives the Tenant the opportunity to resolve the eviction and as an informal discovery opportunity. The meeting requirement may lead to several possible defenses. For example, if management refuses to meaningfully discuss the proposed termination but merely insists that the tenant must move, the tenant should argue that the landlord has failed to comply with the meeting requirement of the lease and *Handbook 4350.3*, because *Handbook 4350.3* and the lease require a discussion regarding the issues and underlying facts for the eviction with review of the tenant's file. In this case, the management refused to discuss the proposed termination at all, but sat silent during the meeting. Management refused to acknowledge the assertion that the infractions were invalid and thus cured, without merit. Management refused to halt eviction proceedings on these bases. Failure to engage in such a discussion violates the due process rights of the tenant.

(2) This refusal by the Defendants in this case violates procedural due
process, and thus establishes another issue of constitutionally inadequate
grounds for the eviction action taken against Pickard.

This clearly constitutes constitutionally inadequate process by refusing to
engage in the due process procedure that is mandated warranting cessation of the lease
termination procedure initiated by the Defendants.

(2) "Cure Period." In addition, the tenant attempted use the ten-day meeting
requirement as an opportunity to cure any breach of the lease (by providing proof that
the alleged lease infractions do not state infractions or lack proof, notice, and service)
and are "cured" or by the non-existence of conduct of which management has
complained. Since notwithstanding the landlord is proceeding with the eviction, the
tenant asserts that the ten-day period is a cure period, and that lease termination
procedures should cease. This clearly constitutes constitutionally inadequate process
by refusing to engage in the due process procedure that is mandated warranting
cessation of the lease termination procedure initiated by the Defendants.

(3) State Law Opportunity to Cure. Under State law, *Code of Alabama* § 35-
9A-421(a), there is a seven day period within which to cure and remedy a breach in a
lease. If not remedied, the lease terminates. If remedied, "the rental agreement shall
not terminate."

Pickard provided notice immediately upon being informed of lease infractions,
certainly within said 7 day period of the cure of the lease infractions alleged. At the 10
day meeting following the first lease termination letter, Pickard provided proof that all
alleged instances of breach were cured and remedied notwithstanding that 3 of the 4
did not properly allege any infraction. The Defendants did not contest these facts and
the remedy. However, the Defendants went forward and filed action for unlawful
detainer, where State law stipulated that "the rental agreement shall not terminate."
This clearly constitutes a blatant violation of constitutional due process by refusing to
engage in the due process procedure that is mandated warranting cessation of the lease

termination procedure initiated by the Defendants.

(4) Right to Review File. The meeting requirement also allows for informal discovery about the landlord's case. This can be accomplished by asking questions of the landlord about the underlying facts for the eviction and by reviewing the tenant's file. Landlords often attempt to deny the tenant access to his file. However, HUD Handbook 4350.3 effective June 29, 2007, mandate that owners permit tenants and their authorized representatives to review the tenant's file. Due process requires review of the landlord's tenant file, because it can lead to many possible defenses. For example, the landlord may claim nonpayment of rent, but may have failed to properly calculate the tenant's rent. That can be determined only by reviewing the HUD Form 50059 completed by the landlord on the tenant. Or, the file may reveal that the landlord retaliated against the tenant by sending a notice of lease termination after the tenant complained about failure to repair or management practices (as in the instant case). The Landlord and her representative refused Pickard access to his file at the 10 day meeting, hence violating due process that constitutes constitutionally inadequate process warranting cessation of the lease termination procedure initiated by the Defendants.

(5) Right to constitutionally compliant notice: Subsidized housing tenants are entitled to notice and an opportunity to be heard before initiation of eviction proceedings. Failure to provide such notice violates procedural due process, and is unconstitutional. U.S.C.A. Const.Amend. 14; *Linares v. Jackson,* 531 F.Supp.2d 460 (E.D. N.Y. 2008). The notice must contain sufficient specificity to enable the tenant to understand the basis for lease infraction or termination and allow for him to adequately defend against the allegations. The notice must inform the tenant of his rights regarding allegations made against him and the opportunity to challenge same in due process procedures prior to unlawful detainer action, during such action and following such action. Pickard has been comprehensively denied these rights to notice first by the violations of the Defendants in not serving him with notice as required by 24

C.F.R. 247.4. The notices sent failed to provide virtually any specificity, only in most cases simply stating the rules violations without any details necessary for him to be apprised of the lease infractions and to defend against them. The notices failed to inform him of his rights including the right to challenge same in pre-termination proceedings and those proceedings that follow in the event of lease termination and eviction actions.

(6) Reliance by Landlord on Any Grounds not Stated in Notice. Section 8 landlords may not rely on any grounds that are different from the grounds set forth in the termination notice may not rely on grounds about which the owner had no knowledge at the time the owner sent the termination notice to the tenant. This is a critical distinction in that such owners cannot add new grounds in the judicial proceeding without first serving the tenant with a new notice of lease termination for the new ground. The Defendants concocted new grounds not stated in the lease termination notice, including allegations by witnesses at the state court hearing held November 21, 2019, which violated constitutional due process and require the dismissal of the eviction actions taken against him.

(7) Right to file grievances. Pickard had the right to file grievances regarding his allegations of wrongdoing and violation of due process by the Defendants as provided and promulgated by the Defendants. Where a Landlord establishes such a procedure, they create an avenue of redress that invokes the due process clause. The Landlord cannot then ignore grievances and proceed to act adversely based on the underlying grievance without affording the tenant to process that is due in the instances. This grievance procedure thus invokes due process and may be enforced under 42 U.S.C. § 1983. Pickard filed 12 grievances on June 4, 2019, which were essentially ignored by the Defendants, whose response was vague, conclusory and non-responsive regarding most issues presented. A Landlord may not ignore valid grievances and then proceed to act adversely without first addressing the grievances and responding in a cognizable fashion. Procedural due

process requires cognizable responses. This clearly constitutes constitutionally inadequate process by refusing to engage in the due process procedure that is mandated warranting cessation of the lease termination procedure initiated by the Defendants.

(8) <u>Right to copy of all relevant documents</u>. A tenant against whom action for unlawful detainer has been filed has a right to a copy all relevant Landlord documents before the initial hearing (in District Court). The Landlord must provide reasonable accommodations for person with disabilities as needed for them to participate in the hearing. The Defendants have not provided for either. This clearly constitutes constitutionally inadequate process by refusing to engage in the due process procedure that is mandated warranting cessation of the lease termination procedure initiated by the Defendants. *e.g., Blatch v. Hernandez*, 360 F. Supp. 2d 595, 621-27 (S.D. N.Y. 2005) (finding due process violations in PHA's eviction procedures as applied to persons with mental disabilities); *see also Padilla v. Martinez*, 752 N.Y.S.2d 28 (N.Y. App. Div. 2002) (when it is clear tenant has a mental disability that renders her incapable of representing self adequately at grievance hearing, the hearing violates due process). Pickard has been repeatedly denied copies of his file and relevant documents regarding adverse actions taken against him.

(9) <u>Reasonable Accommodation regarding handicap</u>. Pickard also possesses the due process right to a reasonable accommodation regarding actions to evict, where, because of his handicap, a reasonable accommodation could mitigate an issue of lease infraction. Those with handicaps have the equal protection right to be able to avail themselves of the property interests in remaining in their residence and retaining entitlement to housing assistance. In this case, Pickard had engaged a friend to assist in housekeeping in exchange for babysitting. However, she was one of his guests so severely harassed and abused by Defendant Bailey that she declined to continue visiting him at Highland Manor. A reasonable accommodation that would allow for

her, or another person, to visit and assist in housekeeping chores would have cured and
remedied the lease infraction alleged on June 13, 2019, that Pickard's residence was
allegedly unclean and unsanitary. Some jurisdictions, like the District of Columbia,
have assistance programs paid for by public funds to assist the handicapped in
maintaining clean residences. This would be a very reasonable accommodation, where
there would be no cost to the Defendants, only their fealty in not harassing Pickard's
guests.

(10) Right to Writtent Pre-Termination Hearing Procedures: The landlord must
adopt written pre-termination hearing procedures for tenants which fully meet the
requirements of *Goldberg v. Kelly, supra,* 397 U.S. 254, 266-71.

(11) Right to a Hearing/Administrative Review: As stated above, the 11th
Circuit held in *Colvin v. Housing Authority Of Sarasota, Florida, supra,* 71 F.3d 864,
that "federal regulations (specifically 24 C.F.R. Sec. 882.216) do grant tenants such as
Pickard the right to an informal hearing regarding the termination of her Section 8
assistance. Although state court eviction proceeding is sufficient to satisfy
constitutional due process requirements, it does not satisfy 24 C.F.R. Sec. 882.216,
which requires the decision-maker at the informal hearing to consider whether the
[landlord's] decision is in accordance with the law, HUD regulations, and Public
Housing Authority rules." As stated above, the Defendants flagrantly violated
Pickard's rights regarding their subjecting and causing him to be subjected to the
violation of his rights regarding the termination of his Section 8 assistance. There was
no impartial decision-maker in his first informal hearing, and the Defendants denied
him an informal hearing altogether regarding their second existing eviction action. The
Defendants' action to evict is vitiated and is unconstitutional as a result. Pickard
therefore has a right to a hearing to determine the validity of the landlord's grounds for
termination of benefits to guard against erroneous termination. *Goldberg ,* 397 U.S. at
266-67. The denial of this right to Pickard deprived him of the right to a determination
that the four lease infractions admitted to be invalid by Defendant Bailey testifying

under oath. which would have ended the eviction proceedings and prevented further efforts of the Defendants to evict him. The denial of a hearing further violated his due process rights mandating the dismissal with prejudice of lease termination/eviction proceedings and expungement of all records pertaining to same.

(12) Right to Consitutionally Compliant Termination Process: *Goldberg* places five requirements on the termination process:

(a) timely notice from the housing authority stating the basis for the proposed Termination together with the procedural rights that the tenant has:

(b) an opportunity by the tenant to confront and cross-examine each witness relied on regarding the proposed termination;

(c) the right of the tenant to be represented by counsel:

(d) a decision, based solely on evidence adduced at the hearing, in which the reasons for the decision are set forth, and

(d) an impartial decision maker.

Goldberg, 397 U.S. at 266-71; see also Caulder v. Durham Housing Authority, 433 F.2d 998, 1003-04 (4th Cir. 1970), cert. denied, 401 U.S. 1003 (1971) (Goldberg applies to Section 8 terminations). Federal regulations set out the basic procedural requirements of informal hearings in almost literal compliance with *Goldberg* under 24 C.F.R. § 882.216(b)(6). Pickard has been denied all of these due process requirements. The lease termination/eviction action against him is due to be dismissed with prejudice and expunged. (see Exhibit "A").

(13) Right to a decision by Hearing Officer: The landlord "may not terminate assistance until the hearing officer issues a decision affirming the initial determination." 5 NW J. L. & Soc. Policy 118 *23. If the PHA or private landlord has not followed the prescribed procedures. that deficiency is a basis for dismissal of the action. *Id.*

(14) Denial of due process to persons with mental illness: Evictions "deny procedural due process to tenants with mental illness." 5 NW J. L. & Soc. Policy 118.

pre-segment

\*43. Together with the Defendants discrimination against Pickard due to his mental illness and disability, Pickard is being denied constitutional due process mandating the dismissal with prejudice of the lease termination/eviction actions taken against him by the Defendants.

(15) <u>Right to a judicial inquiry regarding reasonable accommodation</u>. Tenants have the right to a judicial inquiry into whether a reasonable accommodation could allow a tenant to remain in his or her housing to prevent evictions from subsidized housing for persons with mental health issues which are especially problematic because they can result in the permanent loss of a housing subsidy for the individual or family, which could result in homelessness or institutionalization. Moreover, it is critical to note that under the FHAA:

> **"if a tenant with a disability requests a reasonable accommodation that would keep him or her in housing, it must be granted."** 5 NW J. L. & Soc. Policy 118.\*67.

Pickard has repeatedly requested such a reasonable accommodation, but the Defendants have delayed, hence denied same. Again, as stated above, delay in reasonable accommodation "can be both actual or constructive, as an indeterminate delay has the same effect as an outright denial." *Groome Resources Ltd. v. Parish of Jefferson, supra; U.S. v. Hialeah Housing Authority, supra.* Pickard is entitled to be granted such reasonable accommodation that would keep him in his housing, and all actions to terminate his lease and evict him must cease and be dismissed with prejudice. This includes the provision that "evictions and subsidy terminations of persons with mental illness should be handled by special courts." 5 NW J. L. & Soc. Policy 118, \*81, such as mental health courts provided by Probate Courts or Family Courts.

(16) <u>Equal Protection Right to Subsidized Housing</u>: The right to equal protection under the 14th Amendment requires that " Subsidized housing must be provided on a fair and equal basis not only as a matter of law for the individuals who

qualify for housing, but as a matter of good social policy." 5 NW J. L. & Soc. Policy 118, \*87. It is axiomatic that an individual needs to have reliable housing before he or she can function in society. A lack of decent, affordable, safe, and independent housing is a significant barrier to full participation in community life for people with serious mental illnesses. The Defendants have no regard for Pickard's equal protection rights in this issue, and the violation of his equal protection rights mandate that lease termination/eviction actions against him be dismissed with prejudice and that his constitutional rights to equal protection in this matter be enforced.

## THIRTY-FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983- 14th Amendment–
### Denial of Constitutionally compliant procedural due process
### By Defendant Bailey

The first cause of action is set forth by reference and is incorporated as if fully stated herein. Defendant Bailey is acting under color of state law in depriving Plaintiff of his constitutional procedural due process rights. In the 11th circuit, a § 1983 claim alleging a denial of procedural due process requires proof of three elements: "(1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." Grayden v. Rhodes, 345 F.3d 1225, 1232 (11th Cir. 2003). All three elements stated herein provide proof of these elements. The first two elements are established for each instance complained of. The element of constitutionally inadequate process is further established for each on a case by case basis.

(1) Defendant Bailey violated Pickard's procedural due process rights by refusing to provide the reason for adverse action taken in denying the application of his godson, John Mckinney, as his live-in aid.

(2) As stated above, Pickard has the due process right to notice, to review his file, to all relevant documents, and specifically the right to documentation of disclosure of adverse action taken against him.

(3) Pickard had the procedural due process right to disclosure of the reason for rejecting the application of his long-term, twice previously approved live-in aid (John Mckinney).

(4) Defendant Bailey denied him his constitutional due process right to be provided with "fundamentally fair admissions, rejection, and vacancy policies, procedures, and practices as required by the Due Process and Equal Protection guarantees of the Fourteenth Amendment." *Tedder v. Housing Authority of Paducah,* 574 F. Supp. 240, 244 (W.D.Ky. 1983).

(5) Pickard was denied the due process right to be informed of the reasons for Mr. Mckinney's rejection as his live-in aid.

(6) Pickard was not informed of this reason until July 30, 2019 when Bailey's attorney disclosed in a federal status conference that the reason was that there was a warrant for Mr. Mckinney.

(7) Pickard at first could not verify the existence of any warrant. Indeed, Mr. Mckinney had been stopped by police authorities in Vestavia Hills, the jurisdiction from which the warrant originated, but was not informed of any warrant by these very police authorities, nor was he held based on any warrant.

(8) When Pickard was able to find the warrant, it turned out that it was an erroneously issued FTP warrant on a case that Pickard and Mckinney long believed to have been nolle prossed.

(9) Counsel has been engaged and the matter is due to be cleared up in short order.

(10)   Had Bailey complied with her constitutionally required duty to disclose this pursuant to procedural due process, this matter could have been cleared up long before Pickard signed the lease and Mckinney could have been his live-in aide.

(11)  This cause of action could have been obviated in significant part, and possibly even settled without litigation.

(12)  The Defendants are falsely alleging that Mckinney was the "guest" alleged to be operating a business under the first infraction of March 20, 2019;

(13)  The Defendants are falsely alleging that Mckinney is the unauthorized person they claim to be living in the apartment pursuant to the second and fourth infractions of May 24, 2019 and July 24, 2019.

(14)  Had Bailey complied with her constitutionally mandated duty as stated above, Mckinney would have moved with Pickard to the apartment as his live-in aide. There would be no basis for any of these three infractions. There would be no basis for Lease Termination. There would be no unlawful detainer filed.

(15)  This amounts to a constitutional tort of outrage by Bailey, such extreme trauma, abuse, harassment and other injuries could have been averted.

(16)  Bailey has consistently demonstrated no interest in constitutional compliance with duties that do not suit her.

Pickard has suffered severely as a result of these actions. He is entitled to dismissal of the unconstitutional violations stated above and efforts to terminate his tenancy and to damages as set out in this Complaint.

<h3 style="text-align:center">THIRTY-SECOND CAUSE OF ACTION</h3>
<p style="text-align:center">42 U.S.C. § 1983- 14th Amendment–<br>
Denial of Constitutionally compliant procedural due process<br>
By Defendant Highland Manor</p>

The first cause of action is set forth by reference and is incorporated as if fully stated herein.

The full text of the last previous Cause of Action is further set forth as if fully stated herein. Defendant Highland Manor is acting under color of state law in

depriving Plaintiff of his constitutional procedural due process rights as stated in said last previous cause of action.

### THIRTY-THIRD CAUSE OF ACTION
### 42 U.S.C. § 1983- 14th Amendment–
### Denial of Constitutionally compliant procedural due process
### By Defendant Wren

The first cause of action is set forth by reference and is incorporated as if fully stated herein. The full text of the second last previous Cause of Action is further set forth as if fully stated herein. Defendant Wren is acting under color of state law in depriving Plaintiff of his constitutional procedural due process rights as stated in said second last previous cause of action.

### THIRTY-FOURTH CAUSE OF ACTION
### 42 U.S.C. § 1983- 14th Amendment–
### Denial of Constitutionally compliant procedural due process
### By Defendant SPM

The first cause of action is set forth by reference and is incorporated as if fully stated herein. The full text of the third last previous Cause of Action is further set forth as if fully stated herein. Defendant SPM is acting under color of state law in depriving Plaintiff of his constitutional procedural due process rights as stated said third last previous Cause of Action.

### THIRTY-FIFTH CAUSE OF ACTION
### 42 U.S.C. § 1983- 14th Amendment–
### Denial of Constitutionally compliant procedural due process
### Defendant Welden

The first cause of action is set forth by reference and is incorporated as if fully stated herein.

Defendant Welden is acting under color of law in depriving Pickard of his constitutional procedural due process rights . In the 11th circuit, a § 1983 claim

alleging a denial of procedural due process requires proof of three elements: "(1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." Grayden v. Rhodes, 345 F.3d 1225, 1232 (11th Cir. 2003). All three elements stated herein provide proof of these elements. The first two elements are established for each instance complained of. The element of constitutionally inadequate process is further established for each on a case by case basis.

(1) First element of procedural due process: Right to Meet to Discuss Proposed Eviction. As noted, the notice of termination must state that the tenant has ten days in which to discuss the proposed eviction with the landlord. This ensures that Pickard has an opportunity to talk with management. The purpose of the meeting "is to attempt to resolve the controversy in a mutually satisfactory matter, that will, if possible, avoid the tenant's loss of subsidized housing." This gives the Tenant the opportunity to resolve the eviction and as an informal discovery opportunity. The meeting requirement may lead to several possible defenses. For example, if management refuses to meaningfully discuss the proposed termination but merely insists that the tenant must move, the tenant should argue that the landlord has failed to comply with the meeting requirement of the lease and *Handbook 4350.3*, because *Handbook 4350.3* and the lease require a discussion regarding the issues and underlying facts for the eviction with review of the tenant's file. In this case, the management refused to discuss the proposed termination at all, but sat silent during the meeting. Management refused to acknowledge the assertion that the infractions were invalid and thus cured, without merit. Management refused to halt eviction proceedings on these bases. Failure to engage in such a discussion violates the due process rights of the tenant. This refusal by the Defendants in this case violates procedural due process, and thus establishes another issue of constitutionally inadequate process. This clearly constitutes constitutionally inadequate process by refusing to engage in the due

process procedure that is mandated warranting cessation of the lease termination procedure initiated by the Defendants.

(2) Second element of procedural due process: "Cure Period." In addition, the tenant attempted use the ten-day meeting requirement as an opportunity to cure any breach of the lease (by providing proof that the alleged lease infractions do not state infractions or lack proof, notice, and service) and are "cured" or by the non-existence of conduct of which management has complained. Since notwithstanding the landlord is proceeding with the eviction, the tenant asserts that the ten-day period is a cure period, and that lease termination procedures should cease. This clearly constitutes constitutionally inadequate process by refusing to engage in the due process procedure that is mandated warranting cessation of the lease termination procedure initiated by the Defendants.

(3) Third element of procedural due process: State Law Opportunity to Cure. Under State law, *Code of Alabama* § 35-9A-421(a), there is a seven day period within which to cure and remedy a breach in a lease. If not remedied, the lease terminates. If remedied, "the rental agreement shall not terminate."

At the 10 day meeting, Pickard provided proof that all alleged instances of breach were remedied. The Defendants did not contest these facts and the remedy. However, the Defendants went forward and filed action for unlawful detainer, where State law stipulated that "the rental agreement shall not terminate." This clearly constitutes constitutionally inadequate process by refusing to engage in the due process procedure that is mandated warranting cessation of the lease termination procedure initiated by the Defendants.

(4) Fourth element of procedural due process: Right to Review File. The meeting requirement also allows for informal discovery about the landlord's case. This can be accomplished by asking questions of the landlord about the underlying facts for the eviction and by reviewing the tenant's file. Landlords often attempt to deny the tenant access to his file. However, HUD Handbook 4350.3 effective June 29, 2007,

mandate that owners permit tenants and their authorized representatives to review the tenant's file. Due process requires review of the landlord's tenant file, because it can lead to many possible defenses. For example, the landlord may claim nonpayment of rent, but may have failed to properly calculate the tenant's rent. That can be determined only by reviewing the HUD Form 50059 completed by the landlord on the tenant. Or, the file may reveal that the landlord retaliated against the tenant by sending a notice of lease termination after the tenant complained about failure to repair or management practices (as in the instant case). The Landlord and her representative refused Pickard access to his file at the 10 day meeting, hence violating due process that constitutes constitutionally inadequate process warranting cessation of the lease termination procedure initiated by the Defendants.

(5) Fifth element of procedural due process: Reliance by Landlord on Any Grounds not Stated in Notice. But section 8 new construction landlords may not rely on any grounds that are different from the grounds set forth in the termination notice may not rely on grounds about which the owner had no knowledge at the time the owner sent the termination notice to the tenant. This is a critical distinction in that such owners cannot add new grounds in the judicial proceeding without first

One final significant difference is that Section 8 new construction, substantial rehabilitation, and state agency properties may rely only on the grounds cited in the termination notice, and, unlike other subsidized owners, may not rely on grounds about which the owner had no knowledge at the time the owner sent the termination notice to the tenant. This is a critical distinction in that such owners cannot add new grounds in the judicial proceeding without first serving the tenant with a new notice of lease termination for the new ground.

(6) Sixth element of procedural due process: Right to file grievances. Pickard had the right to file grievances regarding his allegations of wrongdoing and violation of due process by the Defendants as provided and promulgated by the Defendants. Where a Landlord establishes such a procedure, they create an avenue

of redress that invokes the due process clause. The Landlord cannot then ignore grievances and proceed to act adversely based on the underlying grievance without affording the tenant to process that is due in the instances. This grievance procedure thus invokes due process and may be enforced under 42 U.S.C. § 1983. Pickard filed 12 grievances on June 4, 2019, which were essentially ignored by the Defendants, whose response was vague, conclusory and non-responsive regarding most issues presented. A Landlord may not ignore valid grievances and then proceed to act adversely without first addressing the grievances and responding in a cognizable fashion. Procedural due process requires cognizable responses. This clearly constitutes constitutionally inadequate process by refusing to engage in the due process procedure that is mandated warranting cessation of the lease termination procedure initiated by the Defendants.

(7) Seventh element of procedural due process: Right to copy of all relevant documents. A tenant against whom action for unlawful detainer has been filed has a right to a copy all relevant Landlord documents before the initial hearing (in District Court). The Landlord must provide reasonable accommodations for person with disabilities as needed for them to participate in the hearing. The Defendants have not provided for either. This clearly constitutes constitutionally inadequate process by refusing to engage in the due process procedure that is mandated warranting cessation of the lease termination procedure initiated by the Defendants, e.g., *Blatch v. Hernandez*, 360 F. Supp. 2d 595, 621-27 (S.D. N.Y. 2005) (finding due process violations in PHA's eviction procedures as applied to persons with mental disabilities); see also *Padilla v. Martinez*, 752 N.Y.S.2d 28 (N.Y. App. Div. 2002) (when it is clear tenant has a mental disability that renders her incapable of representing herself adequately at grievance hearing, the hearing violates due process).

(8) Eighth element of procedural due process: Reasonable Accommodation. Pickard also possesses the due process right to a reasonable accommodation

regarding actions to evict, where, because of his handicap, a reasonable accommodation could mitigate an issue of lease infraction. Those with handicaps have the equal protection right to be able to avail themselves of the property interests in remaining in their residence and retaining entitlement to housing assistance. In this case, Pickard had engaged a friend to assist in housekeeping in exchange for babysitting. However, she was one of his guests so severely harassed and abused by Defendant Bailey that she declined to continue visiting him at Highland Manor. A reasonable accommodation that would allow for her, or another person, to visit and assist in housekeeping chores would have cured and remedied the lease infraction alleged on June 13, 2019, that Pickard's residence was allegedly unclean and unsanitary. Some jurisdictions, like the District of Columbia, have assistance programs paid for by public funds to assist the handicapped in maintaining clean residences. This would be a very reasonable accommodation, where there would be no cost to the Defendants, only their fealty in not harassing Pickard's guests.

Plaintiff also began to have difficulties due to the absence of his live-in aide during office hours when Bailey is present, due to her harassment and abuse of him which he understandably began to avoid. The presence of persons who are members of the small business operated in compliance with the Lease and Rules by Pickard could offset his live-in aide's absences and provide assistance by members of the business when his aide was absent.

Each of the above elements were violated constituting a denial of due process for which Pickard should be granted injunctive relief and damages.

### THIRTY-SIXTH CAUSE OF ACTION
### U.S.C. § 1983- 14th Amendment–
### Denial of Constitutionally compliant procedural due process
### Defendant ASmith

The first cause of action is set forth by reference and is incorporated as if fully stated herein.

The last previous Cause of Action is set forth by reference as if fully stated herein. Defendant Allen Smith is acting under color of law in depriving Pickard of his constitutional procedural due process rights as stated in said Causes of Action. Each of the elements of due process as stated in the Seventeenth Cause of Action were violated constituting a denial of due process for which Pickard should be granted injunctive relief, judgment and damages.

## THIRTY-SEVENTH CAUSE OF ACTION
## 42 U.S.C. § 1983- 14th Amendment–
## Denial of Constitutionally compliant procedural due process
## Defendant Wright

The first cause of action is set forth by reference and is incorporated as if fully stated herein. The second last previous Cause of Action is set forth by reference as if fully stated herein. Defendant Moses Wright is acting under color of law in depriving Pickard of his constitutional procedural due process rights as stated in said Cause of Action. Each of the elements of due process as stated in said Cause of Action were violated constituting a denial of due process for which Pickard should be granted injunctive relief, judgment and damages.

## THIRTY-EIGHTH CAUSE OF ACTION
## 42 U.S.C. § 1983- 14th Amendment–
## Denial of Constitutionally compliant procedural due process
## Defendant Bearden

The first cause of action is set forth by reference and is incorporated as if fully stated herein. The fifth last previous Cause of Action is set forth by reference as if fully stated herein. Defendant Miriam Bearden is acting under color of law in depriving Pickard of his constitutional procedural due process rights as stated in said

Cause of Action. Each of the elements of due process as stated in said Cause of Action was violated constituting a denial of due process for which Pickard should be granted injunctive relief, judgment and damages.

Defendant Bearden also violated Pickard's due process rights by her attendance at the informal hearing regarding the first lease termination letter, where she stated that she only had settlement authority regarding the federal lawsuit filed by Pickard on June 10, 2019, and not the eviction action. Her effort was to extort a settlement of this federal lawsuit in the meeting where lease termination was the issue. There was no other valid pretext for her presence than extortion at this hearing since she had no authority to settle the lease termination matter.

## THIRTY-NINTH CAUSE OF ACTION
## 42 U.S.C. § 1983- 14th Amendment–
## Unconstitutional State Landlord-Tenant Law
## Defendant Marshall

The first cause of action is set forth by reference and is incorporated as if fully stated herein. Defendant and Honorable Steve Marshall is acting under color of State law in depriving Plaintiff of his constitutional rights and protections by subjecting him to unconstitutional application of Section 35-9A-461 of the *Code of Alabama*, which is unconstitutional on its face and violates the due process clause of the Fourteenth Amendment. This statute fails to provide federally mandated due process for tenants living in HUD assisted housing and receiving HUD and related federal housing benefits, to which they possess a property interest protected by the U.S. Constitution. Under the Supremacy Clause, federal law supersedes and controls over State law. This statute must therefore be enacted by the Alabama legislature to bring it within compliance with federal law.

Section 35-9A-461 fails to provide for the due process requirements stated above, including constitutionally required protection of property interest in remaining in one's subsidized residence without being deprived thereof in violation of federal

law, the constitutionally required protection of property interest in not being depriving of one's entitlement to federally assisted housing benefits, the due process requirement of proper service regarding eviction matters, the due process requirement of notice regarding constitutionally compliant notice of grounds and issues for eviction action, constitutional rights regarding procedural due process that must be enforced for a lawful eviction process to proceed, violation of the elements for procedural due process state above and other federal law requirements for a constitutionally compliant eviction process.

Alabama law should require that Constitutional due process be provided for tenants who are in HUD or other federally subsidized housing, wherein the tenants have the Constitutional due process and equal protection rights granted under applicable federal law. State eviction laws should therefore be bifurcated into tenant rights and regulations who are solely under contractual lease or rental agreements with private landlords, and tenant rights and regulations who are under contractual lease or rental agreements with federally subsidized landlords, including HUD subsidized lease agreements such as that of the Plaintiff who has the Constitutional rights stated above regarding his tenancy. It is incontrovertibly incumbent on state authorities to provide for protection and enforcement of these rights secured by the United States Constitution. Current Alabama state law does not protect and enforce said rights. Again therefore, Section 35-9A-461 section regarding eviction proceedings is therefore unconstitutional, as are, therefore, any state eviction proceedings against the Plaintiff.

When a party is a tenant of federally subsidized housing, federal law must be followed in addition to state law in a summary process action. United States Housing Act of 1937, § 2 et seq., 42 U.S.C.A. § 1437 et seq. *Housing Authority of City of New Haven v. DeRoche*, 962 A.2d 904 (2009).

An injunction is due to issue ordering Defendant and Honorable Steve Marshall to issue a state prohibition that any and all unlawful detainer/eviction actions

immediately cease and desist against persons living in HUD housing and receiving HUD/federally assisted housing benefits and entitlements. and enjoining further eviction action of residents and citizens of the State of Alabama who live in HUD housing and HUD/federally assisted housing programs receiving HUD/federal housing benefits until the Alabama Legislature complies with the constitutional rights of Pickard by amending this section to bring it in compliance with federal law and the United States Constitution as set out above.

Plaintiff moves that the current state unlawful detainer/eviction action pending against him. which is proceeding under said unconstitutional state law, be enjoined from proceeding further unless and until a Constitutional State eviction law is enacted by the State of Alabama Legislature.

## FORTIETH CAUSE OF ACTION
### 42 U.S.C. § 1983- 1ˢᵗ and 14ᵗʰ Amendments–
### Rights of Association
### Defendant Bailey

The first cause of action is set forth by reference and is incorporated as if fully stated herein. Defendant Bailey has acted under color of state law to "ban" (permanently exclude) Pickard's friends and guests without any cause in violation of the first amendment guarantee of rights of association.  Freedom of association is a protected Constitutional right: to wit: "In a free society, any person or group of persons has the right to associate with any other person or group of persons willing to associate with him or it on the basis of any standard and for any reason[5] (subject to non-discriminatory HUD Rules and Regulations.) Bailey's acts violate the first amendment and fail to preserve his covenant of quiet enjoyment of his residence under 42 U.S.C.§3617.

The Defendants have substantially deprived Pickard of the beneficial use of his

---

[5] *https://www.jff.org/explore- freedomlarticle/does-the-first-amendment-protect-the-freedom-of-association/*

leased premises constituting constructive eviction due to the fact that their actions to attempt eviction are meritless, are done in malice or bad faith, and are so severe as to interfere with Pickard's quiet enjoyment of the premises. *El Paso Natural Gas Co. v. Kysar Ins. Agency*, 98 N.M. 86, 87, 645 P.2d 442, 443 (1982). Pickard is entitled to relief and damages as set out below.

## FORTY-FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983- 1ˢᵗ and 14ᵗʰ Amendments–
### Rights of Association
### Defendant Wren

The first cause of action is set forth by reference and is incorporated as if fully stated herein. Defendant Wren has acted under color of law to "ban" (permanently exclude) Pickard's friends and guests without any cause in violation of the first amendment guarantee of rights of association. Freedom of association is a protected Constitutional right; to wit: "In a free society, any person or group of persons has the right to associate with any other person or group of persons willing to associate with him or it on the basis of any standard and for any reason (subject to non-discriminatory HUD Rules and Regulations.)" Wren's acts violate the first amendment and fail to preserve his covenant of quiet enjoyment of his residence under 42 U.S.C.§3617.

The Defendants have substantially deprived Pickard of the beneficial use of his leased premises constituting constructive eviction due to the fact that their actions to attempt eviction are meritless, are done in malice or bad faith, and are so severe as to interfere with Pickard's quiet enjoyment of the premises. *El Paso Natural Gas Co. v. Kysar Ins. Agency*, 98 N.M. 86, 87, 645 P.2d 442, 443 (1982). Pickard is entitled to relief and damages as set out below.

## FORTY-SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983- 1ˢᵗ and 14ᵗʰ Amendments–
### Rights of Association

## Defendants Highland Manor and SPM

The first cause of action is set forth by reference and is incorporated as if fully stated herein. Defendants Highland Manor and SPM have acted under color of law to "ban" (permanently exclude) Pickard's friends and guests without any cause in violation of the first amendment guarantee of rights of association. Freedom of association is a protected Constitutional right; to wit: "In a free society, any person or group of persons has the right to associate with any other person or group of persons willing to associate with him or it on the basis of any standard and for any reason (subject to non-discriminatory HUD Rules and Regulations.)" Wren's acts violate the first amendment and fail to preserve his covenant of quiet enjoyment of his residence under 42 U.S.C.§3617.

The Defendants have substantially deprived Pickard of the beneficial use of his leased premises constituting constructive eviction due to the fact that their actions to attempt eviction are meritless, are done in malice or bad faith, and are so severe as to interfere with Pickard's quiet enjoyment of the premises. *El Paso Natural Gas Co. v. Kysar Ins. Agency*, 98 N.M. 86, 87, 645 P.2d 442, 443 (1982). Pickard is entitled to relief and damages as set out below.

## FORTY-THIRD CAUSE OF ACTION
## 42 U.S.C. § 1983- 1ˢᵗ and 14ᵗʰ Amendments–
### Rights of Association
### Defendants Welden, Smith, Wright, and Bearden

The first cause of action is set forth by reference and is incorporated as if fully stated herein. Defendants Welden, Smith, Wright, and Bearden have joined Bailey, Wren, SPM and Highland Manor in acting under color of state law to "ban" (permanently exclude) Pickard's friends and guests without any cause in violation of the first amendment guarantee of rights of association. Freedom of association is a protected Constitutional right; to wit: "In a free society, any person or group of persons has the right to associate with any other person or group of persons willing

to associate with him or it on the basis of any standard and for any reason (subject to non-discriminatory HUD Rules and Regulations.)" These Defendants' acts violate the first amendment and fail to preserve his covenant of quiet enjoyment of his residence 42 U.S.C.§3617.

The Defendants have substantially deprived Pickard of the beneficial use of his leased premises constituting constructive eviction due to the fact that their actions to attempt eviction are meritless, are done in malice or bad faith, and are so severe as to interfere with Pickard's quiet enjoyment of the premises. *El Paso Natural Gas Co. v. Kysar Ins. Agency,* 98 N.M. 86, 87, 645 P.2d 442, 443 (1982). Pickard is entitled to relief and damages as set out below.

## FORTY-FOURTH CAUSE OF ACTION
### 42 U.S.C. § 1983- 1ˢᵗ and 14ᵗʰ Amendments– Rights of Association - Correspondence Defendant Bailey

The first cause of action is set forth by reference and is incorporated as if fully stated herein. Defendant Bailey has acted and is acting under color of state law to withhold, handle, obstruct, delay, pilfer and tamper with, infringe intercept, quit, illegally convey, desert, destroy, and otherwise act illegally regarding the United States Mail addressed and delivered to the Plaintiff (and generally the residents of Highland Manor) and correspondence in violation, *inter alia,* of the first amendment guarantee of rights of association. There is a sign illegally posted in the first floor lobby of Highland Manor next to the residents' mailboxes that states, "NO ONE TO HANDLE MAIL EXCEPT MANAGER & POSTMAN." This sign illegally states that the Highland Manor Manager (presently Bailey) is illegally handling the United States Mail as stated above.

Pickard has repeatedly objected to this sign being posted and the corresponding handling being unlawfully committed without success. The sign illegally remains posted and the illegal 'handling' of the mail described above outrageously continues.

Page | 204

On too frequent occasions, residents find the door to the mailroom open with all mail exposed to any manner of tampering or illegality. This includes the date of September 20, 2019, when Plaintiff encountered Postal employee Richard Stewart who confirms that he found the door unlocked and open on this date. Bailey refuses to obey postal laws and keep the mail of residents secure, and to cease from allowing Defendants and other unauthorized persons access to the mail.

Plaintiff's mail has admittedly been obstructed and tampered with. Bailey has access to the private mail of all Highland Manor residents, and is suspected in items of missing mail that Pickard has not received. This is an outrageous travesty. Freedom of association is a protected Constitutional right: to wit: "In a free society, any person or group of persons has the right to associate with any other person or group of persons willing to associate with him or it on the basis of any standard and for any reason (subject to non-discriminatory HUD Rules and Regulations.) The United States Mail is an indispensable, invaluable and irreplaceable source by which to associate with others, personal as well as business and other contacts. Bailey's acts in this regard violate the first amendment and fail to preserve his covenant of quiet enjoyment of his residence 42 U.S.C.§3617. Pickard is entitled to relief and damages as set out below.

## FORTY-FIFTH CAUSE OF ACTION
### 42 U.S.C. § 1983- 1st and 14th Amendments–
### Rights of Association - Correspondence
### Defendant Wren

The first cause of action is set forth by reference and is incorporated as if fully stated herein.

Defendant Wren has acted and is acting under color of state law to withhold, handle, obstruct, delay, pilfer and tamper with, infringe intercept, quit, illegally convey, desert, destroy, and otherwise act illegally regarding the United States Mail addressed and delivered to the Plaintiff (and generally the residents of Highland

Manor) and correspondence in violation, *inter alia*, of the first amendment guarantee of rights of association as stated in said Twenty-Eighth Cause of Action incorporated herein. Wren's acts in this regard violate the first amendment and fail to preserve Pickard's covenant of quiet enjoyment of residence 42 U.S.C.§3617. Pickard is entitled to relief and damages as set out below.

### FORTY-SIXTH CAUSE OF ACTION
### 42 U.S.C. § 1983- 1st and 14th Amendments–
### Rights of Association - Correspondence
### Defendants Highland Manor and SPM

The first cause of action is set forth by reference and is incorporated as if fully stated herein.

Defendants Highland Manor and SPM have acted and are acting under color of state law to withhold, handle, obstruct, delay, pilfer and tamper with, infringe intercept, quit, illegally convey, desert, destroy, and otherwise act illegally regarding the United States Mail addressed and delivered to the Plaintiff (and generally the residents of Highland Manor) and correspondence in violation, *inter alia*, of the first amendment guarantee of rights of association as stated in said Twenty-Eighth Cause of Action incorporated herein. Highland Manor's and SPM's acts in this regard violate the first amendment and fail to preserve Pickard's covenant of quiet enjoyment of his residence 42 U.S.C.§3617. Pickard is entitled to relief and damages as set out below.

### FORTY-SEVENTH CAUSE OF ACTION
### 42 U.S.C. § 1983- 1st and 14th Amendments–
### Rights of Association - Correspondence
### Defendants Welden, Smith, Wright, and Bearden

The first cause of action is set forth by reference and is incorporated as if fully stated herein. Defendants Welden, Smith, Wright, and Bearden have acted and are acting under color of state law to withhold, handle, obstruct, delay, pilfer and tamper with, infringe intercept, quit, illegally convey, desert, destroy, and otherwise act

illegally regarding the United States Mail addressed and delivered to the Plaintiff (and generally the residents of Highland Manor) and correspondence in violation, *inter alia,* of the first amendment guarantee of rights of association as stated in said Twenty-Eighth Cause of Action incorporated herein. Wren's acts in this regard violate the first amendment and fail to preserve Pickard's covenant of quiet enjoyment of his residence 42 U.S.C.§3617. Pickard is entitled to relief and damages as set out below.

## FORTY-EIGHTH CAUSE OF ACTION
### 42 U.S.C. § 1983- 1st and 14th Amendments–
### Denial of Speech and Due Process Rights to Organize, Complain, Speak
### Retaliatory Action or Eviction
### All Defendants except Marshall

The first cause of action is set forth by reference and is incorporated as if fully stated herein. Pickard also alleges a claim of violation of his constitutional speech and due process rights for retaliation or interference under 42 U.S.C. § 3617, which states that it is "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed...any right granted or protected by section...3604...of this title." The applicable regulations prohibit "[t]hreatening, intimidating or interfering with persons in their enjoyment of a dwelling because of the race [or]…handicap...of such persons."

In affirmation of these violations, Pickard (1) is a protected individual under the FHA; (2) he was engaged in the exercise of his fair housing rights by presenting grievances pursuant to HUD policies posted by SPM/Highland Manor; (3) the Defendants have coerced, threatened, intimidated and interfered with Pickard, his tenancy rights, his rights to benefits under housing assistance programs, his rights to benefits under food assistance programs, his rights to communal assistance programs at Highland Manor, and his rights to further protected activity by the grievances, complaints and related actions that he has undertaken all under the auspices of the FHA and United States Constitution; and the Defendants have established that they are motivated by intent to discriminate including incontrovertible acts of discrimination.

Pickard alleges that he was subjected to further harassment in the form of elder abuse, threats of eviction, harassment of self, live-in aide and guests, continual baseless lease infractions, bullying, stalking and other trauma. Defendant Wren further threatened Pickard in her June 7, 2019 letter to cease from making claims because she believed them to be malicious and slanderous. Pickard has presented facts and events, where the truth is an absolute defense to allegations of malice or slander.

Wren's cynicism is palpable where she implies that protests of being threatened with and subjected to the extreme abuse and harassment and threats of eviction and homelessness are somehow benign. The malice in this case is clearly on the part of Defendant Bailey, joined by Wren and the other Defendants. Pickard has further stated evidence and proof of discrimination. Pickard has alleged harassment and abuse "sufficiently severe or pervasive as to create a hostile environment," warranting this claim.

Plaintiff's speech and due process rights have further been abridged by retaliation by the Defendants for filing grievances and complaints. SPM policy, posted on the bulletin board by the mailboxes, proscribes reprisals for filing grievances and complaints. Defendant Wren, in complicity with Defendant Bailey, is acting with hostility and adverse intimidation and actions for Pickard's filing of grievances and complaints, despite Defendant Wren's assurances that there would be no such reprisals. HUD Rules and Regulations, affirmed by SPM, proscribe such reprisals. These reprisals are motivated by the discrimination instigated by Defendant Bailey on November 19, 2019, when she ridiculed and expressed prejudice and bias against Pickard due to his mental health disability, and numerous subsequent acts of discrimination, adverse actions, emotional abuse and trauma, joined by Defendant Wren with the same that Wren inflicted on Friday, June 7, 2019 with her letter of even date. Defendant Wren's reprisals are particularly and extremely cruel in light of Pickard's vulnerability and past abuses and trauma at the hands of Defendant Bailey at Highland Manor and her bullying,

threats and intimidation regarding the cruel and false threat of eviction and homelessness.

Defendants have therefore retaliated against Pickard for engaging in protected acts in violation of his 1st and 14th amendment rights regarding his housing conditions. He has sufficiently alleged a retaliation claim under the FHA and Rehabilitation Act of 1973 ("RA") because of his assertions that Defendant Bailey threatened him with eviction regarding his objections to her disability harassment. Pursuant to 42 U.S.C. § 3617. she has unlawfully coerced. intimidated. threatened and interfered with Pickard in exercise and enjoyment of his rights granted and protected under§§ 3603-3606 of the FHA. Pickard has been protesting what he perceived as discriminatory acts as stated herein. and has therefore been engaged in protected activity under the RA, together with the FHA and ADA. Pickard (1) engaged in statutorily protected activity including his right to file grievances: (2) the Defendants took adverse action against him as set out in detail herein and subjected him to the adversity of the circum-stances in Wren's letter of June 7, 2019: and (3) there is a direct causal connection between the adverse action and the protected activity. As stated above. the **threat** of eviction alone can be tantamount in effect to the actual instigation of the **process** of eviction. Defendants have impaired and attempted to prevent Pickard from being able to defend against retaliatory adverse actions.

The Defendants. particularly Wren. retaliated against Pickard for engaging in protected acts "in order to ensure fair housing conditions. ... The purpose of Defendants ... was to squelch any such speech or association and to have a chilling impact on the desire of tenants to speak out ... in protection of their FHA rights. Finally, a "threat" is "an expression to inflict evil. injury. or other damage on another. " *Edwards v. Marin Park, Inc.*, 356 F.3d 1058 (9th Cir. 2004). citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512. 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). In like manner.

Pickard is entitled to relief from the threats and retaliatory actions of Wren and the Defendants by award of damages and injunctive or such other relief to arrest these injuries.

## FORTY-NINTH CAUSE OF ACTION
### 42 U.S.C. § 1983- 1ˢᵗ Amendment–
### Denial of Right to Quiet Enjoyment
### By Defendant Winston, Wren and Bailey

The first cause of action is set forth by reference and is incorporated as if fully stated herein. In addition to Winston's violations stated in the causes of action above, he has violated Pickard's right of enjoyment of his residence in violation of the Fair Housing Act as set out in 42 U.S.C. §3617. The Supreme Court has held that Pickard's allegations of harassment would constitute interference with quiet enjoyment, even absent economic injury within prohibitions of discrimination if it creates a hostile environment. *Meritor Sav. Bank v. Vinson.* 477 U.S. 57, 66 (1986) The Defendants, particularly Winston, Wren and Bailey, have created an intensely hostile environment for Pickard at Highland Manor, and have caused him extreme mental suffering and other injuries.

Breaches of the Fair Housing Act, specifically including 42 U.S.C. §3617, are grounds for bringing suit under 42 U.S.C. § 1983 (See *Wallace v. Chicago Housing Authority*, 298 F. Supp. 2d. 710, 718 (N.D. Ill. 2003) (allowing use of § 1983 to sue for breach of Fair Housing Act, (citing *Cannon v. University of Chicago*, 441 U.S. 677 (1979).)

Winston has severely interfered with Plaintiff's enjoyment of his residence by sending him three letters (copies attached as Exhibit "C")) alleging sums of money on outrageously fraudulent and extortionate premises. The first letter falsely alleges that Plaintiff owes $801.99. Plaintiff objected to the validity of the falsely, so-called debt and invoking his right to the identity of the original creditor, but Winston has failed in his obligation and duty under law to provide this information.

The second letter falsely alleges that Plaintiff owes the sum of $1,484.97 based on the state eviction case regarding which there has not even been a hearing, much less a judgment and award of costs or attorney's fees claimed by Winston, nor is there any legitimate basis to charge Pickard rent (he has tendered his rent in a timely fashion each of the months alleged to be late but the Defendants have refused them) (see Defendants' letters, attached), attorney's fees, "additional cost", process server charge, unlawful detainer attorney fee and court cost, all of which are false, and are fraudulently and extortionately alleged including outrageous late fees, claimed by Winston on outrageously false and extortionate premises.

Winston's third letter alleges that Pickard owes the sum of $2,320.65. This amount is not itemized. Pickard again has disputed this debt which he does not owe. There has been no court judgment or other lawful basis for Winston to allege such a debt. This is a third false and extortionate attempt to induce Pickard to pay a sum that he does not owe. The purpose of such abuse is stated, *inter alia*, to vex, harass, defraud and extort.

Additionally, Winston also attempted to coerce Pickard to move from his residence in exchange for the cancellation by the Defendants for any fees and costs, attempting to deceive Pickard into believing that his unlawful eviction was inevitable. This fraud and violation of the Fair Housing Act has certainly and severely violated Pickard's enjoyment of his residence in violation of said sections 3617 and 1983. As an attorney, Winston should be particularly liable for the ongoing injuries and damages sustained by the Plaintiff in this Count.

Winston has further slandered Pickard based on his past history during which he was suffering from the manic phase of his mental health disorder, bipolar disorder. Manifestations of this disorder include grandiosity, overspending, impulsiveness, inflated mood, and impulsiveness. Because Winston and all other Defendants have been made specifically aware of Pickard's mental health/bipolar disorder, it was incumbent on Winston to acknowledge this and to not slander him on the basis of his

mental disability. This is the same type of slander committed against Gary Neudecker in *Neudecker v Boisclair Corp.*, 351 F.3d 361 (8th Cir. 2003).

Winston has substantially deprived Pickard of the beneficial use of his leased premises constituting constructive eviction due to the fact that his actions to attempt eviction are meritless, are done in malice or bad faith, and are so severe as to interfere with Pickard's quiet enjoyment of the premises. *El Paso Natural Gas Co. v. Kysar Ins. Agency*, 98 N.M. 86, 87, 645 P.2d 442, 443 (1982).

The cause and effect these due process violations is stated, *inter alia,* to abuse, vex, discriminate, bully and harass. This resulted in the further an attempt to dissuade others from assisting Pickard in this cause of action. Defendant Winston has heightened culpability and liability due to his knowledge and experience as an attorney and former judge. His conduct should be sanctioned particularly as they violate Pickard's civil and constitutional rights under 42 U.S.C. § 1983.

## FIFTIETH CAUSE OF ACTION
### 42 U.S.C. § 1983- 1st Amendment–
### Denial of Right to Quiet Enjoyment
### By Defendant Bearden

The first cause of action is set forth by reference and is incorporated as if fully stated herein. In addition to Bearden's violations stated in the causes of action above, she has violated Pickard's right of enjoyment of his residence in violation of the Fair Housing Act as set out in 42 U.S.C. §3617. She was present and colluded with Winston when he attempted to coerce Pickard into moving. She has joined him in severely interfering with Plaintiff's enjoyment of his residence. Also pursuant to this collusion, she is further directly complicit with Winston in his attempt to coerce, defraud and extort the monies stated in said letters (copies attached). Defendant Winston has heightened culpability and liability due to his knowledge and experience as an attorney and former judge.

The cause and effect of such abuse is stated, *inter alia,* to vex, harass, defraud

and extort. Beard also colluded in Winston's attempt to coerce Pickard to move from his residence in exchange for the withdrawal of the Defendants for any fees and costs. This fraud and violation of the Fair Housing Act has certainly and severely violated Pickard's enjoyment of his residence in violation of said sections 3617 and 1983.

Bearden has also colluded in Winston's slander of Pickard. Again, this is the same type of slander against Gary Neudecker in *Neudecker v Boisclair Corp.*, 351 F.3d 361 (8th Cir. 2003).

Wren has substantially deprived Pickard of the beneficial use of his leased premises constituting constructive eviction due to the fact that her actions to attempt eviction are meritless, are done in malice or bad faith, and are so severe as to interfere with Pickard's quiet enjoyment of the premises. *El Paso Natural Gas Co. v. Kysar Ins. Agency*, 98 N.M. 86, 87, 645 P.2d 442, 443 (1982).

The cause and effect of such abuse is stated, *inter alia,* to abuse, vex, and harass. This is further an attempt to dissuade others from assisting Pickard in this cause of action. Defendant Winston has heightened culpability and liability due to his knowledge and experience as an attorney and former judge.

## FIFTY-FIRST CAUSE OF ACTION
## 42 U.S.C. § 1983- 1st Amendment–
## Denial of Right to Quiet Enjoyment
## By Defendant Bailey

The first cause of action is set forth by reference and is incorporated as if fully stated herein. Bailey has violated Pickard's right of enjoyment of his residence in violation of the Fair Housing Act as set out in 42 U.S.C. §§3617. Breaches of the Fair Housing Act, specifically including 42 U.S.C. §3617, are grounds for bringing suit under 42 U.S.C. § 1983.

Defendant Bailey has committed numerous acts that have eviscerated Pickard's enjoyment of his property, commencing with her undocumented allegation that he damaged the drainpipe on the rear of the building on March 13, 2019, the date that he

moved in. This caused Pickard severe distress and trauma, and shattered his enjoyment of his property from the onset.

Bailey continued to abuse, harass, intimidate, bully and otherwise inflict trauma on Pickard, including false allegation of lease infractions and threats of eviction. Again, his enjoyment of his residence has been eviscerated from the date he moved in to Highland Manor. This includes direct abuse and harassment regarding his lease, legitimate lease activities, guests, associations, his small business, his rights of privacy, and other issues described in more detail in his other pending federal lawsuit which are incorporated herein by reference.

Bailey has substantially deprived Pickard of the beneficial use of his leased premises constituting constructive eviction due to the fact that her actions to attempt eviction are meritless, are done in malice or bad faith, and are so severe as to interfere with Pickard's quiet enjoyment of the premises. *El Paso Natural Gas Co. v. Kysar Ins. Agency*, 98 N.M. 86, 87, 645 P.2d 442, 443 (1982).

She is particularly liable for these infringements of his right of enjoyment of this residence at Highland Manor. Pickard is entitled to relief and damages as set out below.

## FIFTY-SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983- 1st Amendment–
### Denial of Right to Quiet Enjoyment
### By Defendant Wren

The first cause of action is set forth by reference and is incorporated as if fully stated herein. Wren has violated Pickard's right of enjoyment of his residence in violation of the Fair Housing Act as set out in 42 U.S.C. §§3617. Breaches of the Fair Housing Act, specifically including 42 U.S.C. §3617, are grounds for bringing suit under 42 U.S.C. § 1983 (See *Wallace v. Chicago Housing Authority*, 298 F. Supp. 2d. 710, 718 (N.D. Ill. 2003) (allowing use of § 1983 to sue for breach of Fair Housing Act, (citing *Cannon v. University of Chicago*, 441 U.S. 677 (1979)).

Wren has substantially deprived Pickard of the beneficial use of his leased premises constituting constructive eviction due to the fact that her actions to attempt eviction are meritless, are done in malice or bad faith, and are so severe as to interfere with Pickard's quiet enjoyment of the premises. *El Paso Natural Gas Co. v. Kysar Ins. Agency*, 98 N.M. 86, 87, 645 P.2d 442, 443 (1982).

Wren was made specifically aware of Bailey's traumatic actions and infringements of Pickard's enjoyment of his property. Not only did she fail to act to stop these abuses, but she joined them and is directly complicit with Bailey in this matter. She too is therefore particularly liable for these infringements of his right of enjoyment of this residence at Highland Manor. Pickard is entitled to relief and damages as set out below.

## FIFTY-THIRD CAUSE OF ACTION
### 42 U.S.C. § 1983- 1st Amendment–
### Denial of Right to Quiet Enjoyment
### By Defendant Highland Manor

The first cause of action is set forth by reference and is incorporated as if fully stated herein. Defendant Highland Manor has violated Pickard's right of enjoyment of his residence in violation of the Fair Housing Act as set out in 42 U.S.C. §3617. Breaches of the Fair Housing Act, specifically including 42 U.S.C. §3617., specifically including 42 U.S.C. §3617, are grounds for bringing suit under 42 U.S.C. § 1983 (See *Wallace v. Chicago Housing Authority*, 298 F. Supp. 2d 710, 718 (N.D. Ill. 2003) (allowing use of § 1983 to sue for breach of Fair Housing Act, (citing *Cannon v. University of Chicago*, 441 U.S. 677 (1979)).

Highland Manor has substantially deprived Pickard of the beneficial use of his leased premises constituting constructive eviction due to the fact that her actions to attempt eviction are meritless, are done in malice or bad faith, and are so severe as to interfere with Pickard's quiet enjoyment of the premises. *El Paso Natural Gas Co. v. Kysar Ins. Agency*, 98 N.M. 86, 87, 645 P.2d 442, 443 (1982).

Highland Manor has joined Winston, Bailey and Wren in violating Pickard's right to enjoyment of his residence as set out in all Counts above regarding infringement of these rights. Highland Manor is equally for these infringements of his these rights. Defendant Winston has heightened culpability and liability due to his knowledge and experience as an attorney and former judge warranting the relief and damages requested below.

## FIFTY-FOURTH CAUSE OF ACTION
### 42 U.S.C. § 1983- 1st Amendment–
### Denial of Right to Quiet Enjoyment
### By Defendant SPM

The first cause of action is set forth by reference and is incorporated as if fully stated herein. Defendant SPM has violated Pickard's right of enjoyment of his residence in violation of the Fair Housing Act as set out in 42 U.S.C. §§3617. Breaches of the Fair Housing Act, specifically including 42 U.S.C. §3617, are grounds for bringing suit under 42 U.S.C. § 1983(See *Wallace v. Chicago Housing Authority*, 298 F. Supp. 2d. 710, 718 (N.D. Ill. 2003) (allowing use of § 1983 to sue for breach of Fair Housing Act, (citing *Cannon v. University of Chicago*, 441 U.S. 677 (1979).)

SPM has substantially deprived Pickard of the beneficial use of his leased premises constituting constructive eviction due to the fact that her actions to attempt eviction are meritless, are done in malice or bad faith, and are so severe as to interfere with Pickard's quiet enjoyment of the premises. *El Paso Natural Gas Co. v. Kysar Ins. Agency*, 98 N.M. 86, 87, 645 P.2d 442, 443 (1982).

SPM has joined Winston, Bailey and Wren in violating Pickard's right to enjoyment of his residence as set out in all Counts above regarding infringement of these rights. Highland Manor is equally for these infringements of his these rights.

## FIFTY-FIFTH CAUSE OF ACTION
### 42 U.S.C. § 1983- 1st Amendment–

## Denial of Right to Quiet Enjoyment
## By Defendants Welden and ASmith

The first cause of action is set forth by reference and is incorporated as if fully stated herein. Welden and Smith have violated Pickard's right of enjoyment of his residence in violation of the Fair Housing Act as set out in 42 U.S.C. §§3617. Breaches of the Fair Housing Act, specifically including 42 U.S.C. §3617, are grounds for bringing suit under 42 U.S.C. § 1983 (See *Wallace v. Chicago Housing Authority*, 298 F. Supp. 2d. 710, 718 (N.D. Ill. 2003) (allowing use of § 1983 to sue for breach of Fair Housing Act, (citing *Cannon v. University of Chicago*, 441 U.S. 677 (1979).)

Welden and Smith have substantially deprived Pickard of the beneficial use of his leased premises constituting constructive eviction due to the fact that their actions to attempt eviction are meritless, are done in malice or bad faith, and are so severe as to interfere with Pickard's quiet enjoyment of the premises. *El Paso Natural Gas Co. v. Kysar Ins. Agency*, 98 N.M. 86, 87, 645 P.2d 442, 443 (1982).

Welden and Smith are chief executive officers of SPM. As such they undoubtedly were aware, or should have been aware specifically of Winston's and Bailey's traumatic actions and infringements of Pickard's enjoyment of his property. Not only did they fail to act to stop these abuses, but they joined them and are directly complicit with Bailey in this matter. They too are therefore particularly liable for these infringements of his right of enjoyment of this residence at Highland Manor.

## FIFTY-SIXTH CAUSE OF ACTION
## 42 U.S.C. § 1983- 1st Amendment–
## Denial of Right to Quiet Enjoyment
## By Defendant Wright

The first cause of action is set forth by reference and is incorporated as if fully stated herein. Defendant Wright has violated Pickard's right of enjoyment of his residence in violation of the Fair Housing Act as set out in 42 U.S.C. §§3617.

Breaches of the Fair Housing Act, specifically including 42 U.S.C. §3617, are grounds for bringing suit under 42 U.S.C. § 1983(See *Wallace v. Chicago Housing Authority*, 298 F. Supp. 2d. 710, 718 (N.D. Ill. 2003) (allowing use of § 1983 to sue for breach of Fair Housing Act. (citing *Cannon v. University of Chicago*, 441 U.S. 677 (1979).)

Wright has substantially deprived Pickard of the beneficial use of his leased premises constituting constructive eviction due to the fact that their actions to attempt eviction are meritless, are done in malice or bad faith, and are so severe as to interfere with Pickard's quiet enjoyment of the premises. *El Paso Natural Gas Co. v. Kysar Ins. Agency*, 98 N.M. 86, 87, 645 P.2d 442, 443 (1982).

Wright is the officer of SPM in charge of human resources. As such he was undoubtedly aware, or should have been aware specifically of Winston's and Bailey's traumatic actions and infringements of Pickard's enjoyment of his property and the wrongfulness and injuriousness thereof. Not only did he fail to act to stop these abuses, but he joined them and is directly complicit with Bailey in this matter. As Vice President of SPM for Human Resources, he too is therefore particularly liable for these infringements of his right of enjoyment of his residence at Highland Manor.

## FIFTY-SEVENTH CAUSE OF ACTION
### Violation of Constitutional Right to Association and Quiet Enjoyment
### All Defendants Except Marshall

The first cause of action is set forth by reference and is incorporated as if fully stated herein. The law gives tenants the right to quiet enjoyment and privacy. The right to quiet enjoyment means tenants have the right to consider the property they are leasing as their home. They have a right to invite people and engage in activities that don't violate any other laws. Tenants also have the right to privacy, meaning the landlord doesn't have the right to intrude upon a tenant's home unless there is an emergency. A Landlord cannot ban a guest or otherwise intrude on one's privacy without valid cause. The Defendants have acted to violate Pickard's Constitutional

rights of association, quiet enjoyment and property by harassing guests and banning some without a stated or valid cause. Pickard's landlord is unreasonably banning his guests.

The Defendants have substantially deprived Pickard of the beneficial use of his leased premises constituting constructive eviction due to the fact that their actions to attempt eviction are meritless, are done in malice or bad faith, and are so severe as to interfere with Pickard's quiet enjoyment of the premises. *El Paso Natural Gas Co. v. Kysar Ins. Agency*, 98 N.M. 86, 87, 645 P.2d 442, 443 (1982).

Tenants also have the right to live in decent, safe, and sanitary housing. Included in this right are repairs performed in a timely manner, upon request, and a quality maintenance program run by management. Pickard has been suffering plumbing drainage issues, flooding from a defective dishwasher appliance, and failure to replace permanent lighting fixtures that require an electrician to install and replace. Despite numerous requests for essential maintenance, the Defendants refuse to provide essential repairs that have caused such severe issues as flooding of his apartment, requiring him to constantly combat this menace.

Pickard's apartment has also been entered constantly in non-emergency situations without compliance with the notice requirements of his lease and HUD rules and regulations. The lease and HUD rules and regulations require that management should give reasonable notice, in writing, of any non-emergency inspection or other entry into a tenant's apartment. Defendants, primarily Bailey, have repeatedly violated this right. Defendants have also refused to recognize Pickard's right to having a voice in residential community affairs.

## FIFTY-EIGHTH CAUSE OF ACTION
### Violation of Due Process And Right To Injunctive Relief
### For Denial of Hearing on Critical Issue
### All Defendants Except Marshall

The first cause of action is set forth by reference and is incorporated as if fully

stated herein. Pickard had the due process right to a hearing on the issue of the
Defendants' false and undocumented assertion in two of the five lease infractions
falsely alleged against him on the issue of whether there was an unauthorized person
living in his apartment. Recent cases have specifically addressed the necessity for
pretermination hearings in the Section 8 context. In granting plaintiff's motion for a
preliminary injunction, *Watkins v. Mobile Housing Bd.*, No. 79-0067-P (S.D.Ala.
1979) held that full *Goldberg* protections were necessary before terminating the
benefits of a program participant who allegedly shared the apartment with persons
unauthorized by the lease. In so holding, the court specifically held: (1) that the
interest of the program participant was such that irreparable harm would result if the
participant were not afforded a pre-termination hearing; (2) that the burden on the
housing agency of providing such hearings was relatively light; (3) that public interest
in the purposes for which the Section 8 program was created would be best served by
requiring the pre-termination hearing; and (4) that, therefore, full hearings would be
required, including written notice, a right to an impartial decision-maker, a right to
counsel, a right to confront and cross-examine witnesses, a right to present oral and
written evidence, a right to a decision, based on the evidence presented, that explains
the reasons for the decision, and a right to appeal.

In a similar vein, the court in *Cortez v. Housing Auth. of Corpus Christi*, No. C-
79-30 (S.D.Tex. Apr. 16, 1979), considered the question of pre-termination hearings in
the Section 8 context, and again the substantive issue was unauthorized persons living
in the apartment. The *Cortez* court also found *Goldberg* to be the controlling authority
and required a pre-termination hearing. *See also Brezina v. Dowdall*, 472 F.Supp.
82 (N.D.Ill. 1979). The Defendants have caused incalculable harm in denying this due
process right to Pickard. To illustrate the due process necessity for such a right, the
eviction actions against Pickard, and indeed this entire controversy, could have been
obviated had the Defendants provided for this right.

## FIFTY-NINTH CAUSE OF ACTION

### Violation of Due Process Regarding Requirement that HUD, Not the Private Landlord, Issue Eviction Notices All Defendants Except Marshall

The first cause of action is set forth by reference and is incorporated as if fully stated herein.

In *Wiggins v United States Dept. of Housing & Urban Dev.*, 523 F Supp 1170 (DC Md 1981), the Court granted relief on the notice issue and ordered HUD—which assumed the administration of the program itself, rather than administering it through a PHA or private landlord—to act according to what it had undertaken to do, if it involved itself in the eviction process, which included giving notice. Rejecting HUD's argument that landlords in the Section 8 program should be permitted to issue eviction notices by themselves, the court said that Congress indicated its unwillingness to allow landlords in existing housing programs to issue such notices by themselves, when it rejected a proposal to permit landlords to evict Section 8 tenants without review by HUD in the instant case.

The lease termination letter/eviction notice given by the Defendants was therefore unlawful and the present complaint by Defendants for unlawful detainer/eviction is void. This court is due to issue an order prohibiting current eviction proceedings and voiding this unlawful detainer action as a matter of law.

## SIXTIETH CAUSE OF ACTION
### 42 U.S.C. § 1983- 1st Amendment–
### Violation of Due Process Requirement to a Pre-termination Hearing By Defendants Wren, Bailey, Winston and Bearden

The first cause of action is set forth by reference and is incorporated as if fully stated herein. Some form of pre-termination hearing is required where the threatened property right consists of need-based benefits. This is because the recipient or applicant "may be deprive[d] of the very means by which to live...." *Goldberg v. Kelly*,

397 U.S. 254, 264 (1970). As explained in *Nozzi, supra,* Section 8 subsidized housing providing stable and renewable housing is the "difference between safe, decent housing and being homeless." Id. 806 F. 3d at 1193. (citations omitted). The *Nozzi* Court went on to state: "This deprivation is especially dire considering the vulnerability of Section 8 recipients, a large portion of whom are elderly or disabled." Id. 806 F. 3d at 1193.

Defendants Wren, Bailey, Winston and Bearden are seeking to deprive Pickard of these property rights in the form of need-based benefits in housing and federal subsidy benefits for housing. Pickard is threatened with deprivation of the protected property interest in remaining in federally subsidized housing and federal benefits providing same, otherwise he would be rendered homeless.

As set out above, once deprivation or threatened deprivation of a protected constitutional property interest has been identified, the second inquiry is what procedural due process is due under the circumstances presented. *Goldberg v. Kelly,* 397 U.S. 254, 90 S. Ct 1011, 25 L.Ed287 (1970). To be clear, the procedural minimums are governed by the Due Process Clause requirements, and not by asserted compliance with regulatory procedures set forth in a statute or regulation. *Nozzi v. Housing Authority of City of Los Angeles, supra,* 806 F. 3d at 1191. The basic principle of the constitutional right to procedural due process is opportunity to be heard at a meaningful time and in a meaningful manner. *Goldberg v. Kelly,* 397 U.S. 254, 267, 90 S. Ct. 1011, 1020, 25 L. Ed. 2d 287 (1970) 278. Citing *Mathews v. Eldridge ,* 424 US 319, 334-335, 96S.Ct 893, 47 L.Ed. 2d 18 (1976), the Court in *Nozzi* elaborated upon the three part inquiry that must be carried out the procedures necessary to be constitutionally sufficient. The three considerations are: (1) "the nature of the interest that will be affected by the official action, and in particular the degree of potential deprivation that may be created" Id. 806 F. 3d at 1192 (citations omitted); (2) the 'fairness and reliability' of the existing procedures and the 'probable value' if any of additional procedural safeguards' Id. 806 F. 3d at 1192-1193 (citations omitted);

and (3) "the public interest, which "includes the administrative burden and other societal costs that would be associated with" additional or substitute procedures. Id. 806 F. 3d at 1193 (citations omitted).

The legitimate interest of a tenant who is residing in a Section 8 program is in being able to continue residing in that government subsidized and administered housing absent "good cause" explained in *Joy v. Daniels, supra*, 479 F.2d at 1240. With regard to the second inquiry, risk of erroneous deprivation, the Court in *Nozzi* discussed fair notice of the threatened deprivation. The Court explained: [W]hen notice is a person's due, process which is a mere gesture is not due process. To be constitutionally adequate, notice must be "reasonably calculated, under all the circumstances, to apprise interested parties ... with due regard for the practicalities and particularities of the case[.]" The means employed must be "reasonably certain" to "actually inform" the party, and in choosing the means, one must take account of the "capacities and circumstances" of the parties to whom the notice is addressed. Id. 806 F. 3d at 1194 (citations and quotations omitted). And when it comes to providing due process to which certain persons are entitled, a recent prison case has pointed out: "Saving a few dollars is not a compelling interest, nor is a bureaucratic desire to follow [the institution]'s rules." *Schlemm v. Wall*, 784 F.3d 362 (7th Cir. 2015). With regard to the element of "substantiality," the interest in procedural safeguards "to seek to retain decent housing at a price that is within their power to pay" is substantial. *Geneva Towers, supra*, 504 F.2d at 491.

Having met these due process requirements, it is clear that a form of pre-termination hearing is required to provide for and to protect these interests in providing stable and renewable housing, particularly since this is "difference between safe, decent housing and being homeless," *Id.* 806 F. 3d at 1193, where the deprivation is especially dire as in Pickard's case considering his vulnerability as a Section 8 recipient who is both elderly and disabled. Id. 806 F. 3d at 1193.

Defendants Wren and Bailey provided him no pre-termination hearing at all

despite their duty to do so under rules and HUD regulations, and as affirmed above, their due process right duty to do so. Defendants Winston and Bearden held a sham hearing without an impartial decision-maker and without any due process provisions regarding the first unlawful detainer action. Defendant Winston filed the second unlawful detainer action without providing for any pre-termination hearing at all. These Defendants therefore failed to provide a due process compliant form pre-termination hearing, or any such hearing at all, where the threatened property right consists of need-based benefits and where Pickard is threatened with being deprived of the very means by which to live. These Defendants are therefore particularly liable under Section 1983 in this regard.

## SIXTY-FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983- 1ˢᵗ Amendment–
### Violation of Due Process Requirement that Only the Evidence
### Presented in a Lease Infraction can be considered
### By Defendant Bailey

The first cause of action is set forth by reference and is incorporated as if fully stated herein. The fifth lease infraction upon which the current lease termination is based contains a photograph alleging to be in support of the lease infraction which alleges that John Mckinney pushed a resident. Under the facts of this incident, Mckinney and Pickard were exiting the elevator on the first floor of Highland Manor while Leonard James, another Manor resident, was entering the elevator. The photo clearly shows that Mr. Mckinney was extending his arm to prevent a collision with Mr. James, who is not being pushed in the photo. Due process under federal and HUD procedures forbids any collateral evidence not included in the lease infraction from being considered in the allegation of a lease infraction. Defendant Bailey used collateral video evidence to attempt to establish the lease infraction in violation of due process. This evidence is exculpatory, but still, it was improperly used and was fraudulently alleged to form a basis for a lease infraction. Bailey violated due process in attempting to establish a lease infraction. The infraction is due to be considered only

on the basis of the contents of the infraction, which are exculpatory, hence the infraction is due to be dismissed on the merits and on the basis of the prejudicial attempt to introduce evidence not permitted by law.

## SIXTY-SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983- 1ˢᵗ Amendment–
### Denial of Right to Procedural Due Process Regarding Fraudulent Attempt to Falsely Allege, Create and Collect a Debt
### By Defendant Bailey

The first cause of action is set forth by reference and is incorporated as if fully stated herein. On March 13, 2019, Bailey alleged that Pickard damaged a drain pipe and the rear of the Highland Manor building. She claimed to have video evidence but never produced any such evidence. Pickard attempted to simulate the means by which his U-Haul van could maneuver in the narrow alleyway where the drain pipe is located, and moreover to do so where the van would not impact and damage the wall where the drain pipe was located, all without success. The alley way is simply too narrow for such damage.

Almost a month later, on April 11, 2019, Bailey placed two letters on Plaintiff's door demanding that he meet with her regarding "a very important matter" no later than the next day. Plaintiff did so, and Bailey again accused Plaintiff of causing the damage without any proof, and, presuming there was proof, without allowing him to report the damage to his auto insurance policy, and without allowing him to take bids and have the damage fixed by the lowest bidder. She had alleged three lease infractions and had stated that with one more infraction, he would be evicted. She insisted that Plaintiff sign and promise to pay debtor's agreement for the damage alleged to be $330.00, without itemization or proof, identified as a "cash sale," un-itemized. Under threat of eviction, Pickard was involuntarily coerced, bullied and intimidated against his will to sign this agreement, and to pay the first installment demanded of $50.00. When Bailey could not provide proof, Pickard stopped paying

the installments and filed a grievance on this matter on June 4, 2019. The merits of his grievance, including the refusal of Bailey to allow him to report to his insurance company and/or take bids, have not been addressed.

Bailey has refused him his procedural due process right to be given proper notice, including proof or some corroboration, of this alleged attempt to deprive him of property. Bailey is liable for violation of his due process rights in this matter.

### SIXTY-THIRD CAUSE OF ACTION
### 42 U.S.C. § 1983- 1st Amendment–
### Violation and Extortionate Action Regarding
### Payment of Landlord's Attorney's Fees And Cost of Collection
### By Defendant Winston

Defendant Winston, acting under color of state law, is violating § 35-9A-163(3) which prohibits a party from imposing in a rental agreement that a tenant must agree to pay the landlord's attorney's fees or cost of collection. Winston has made three attempts to extort from Pickard the landlord's (SPM/Highland Manor's) attorney's fees and cost of collection with three letters charging attorney's fees and brandished with a stamp that the letters are an attempt to collect a debt (see Exhibit "C"). Winston, an attorney alleging competence, if not expertise, in representing landlords in eviction actions, and also a former judge, has a heightened liability to Pickard for such action in subjecting and causing him to be subjected to the deprivation of rights under said state statute and the federal Fair Debt Collection Practices Act while acting color of state law in this matter. Pickard is entitled to relief and damages as set out below.

### SIXTY-FOURTH CAUSE OF ACTION
### 42 U.S.C. § 1983- 1st Amendment–
### Denial of Right to Procedural Due Process Regarding Fraudulent
### Attempt to Falsely Allege, Create and Collect a Debt
### By Defendant Wren

The first cause of action is set forth by reference and is incorporated as if fully stated herein. On March 13, 2019, Defendant Bailey alleged that Pickard damaged a

drain pipe and the rear of the Highland Manor building. She claimed to have video evidence but never produced any such evidence. Pickard attempted to simulate the means by which his U-Haul van could maneuver in the narrow alleyway where the drain pipe is located, and moreover to do so where the van would not impact and damage the wall where the drain pipe was located, all without success. The alley way is simply too narrow for such damage. Almost a month later, on April 11, 2019, Bailey placed two letters on Plaintiff's door demanding that he meet with her regarding "a very important matter" no later than the next day. Plaintiff did so, and Bailey again accused Plaintiff of causing the damage without any proof, and, presuming there was proof, without allowing him to report the damage to his auto insurance policy, and without allowing him to take bids and have the damage fixed by the lowest bidder. She had alleged three lease infractions and had stated that with one more infraction, he would be evicted. She insisted that Plaintiff sign and promise to pay debtor's agreement for the damage alleged to be $330.00, without itemization or proof, identified as a "cash sale," un-itemized. Under threat of eviction, Pickard was involuntarily coerced, bullied and intimidated against his will to sign this agreement, and to pay the first installment demanded of $50.00. When Bailey could not provide proof, Pickard stopped paying the installments and filed a grievance on this matter on June 4, 2019. Defendant Wren responded to this grievance, but the merits thereof, the merits of his grievance, including the refusal of Bailey to allow him to report to his insurance company and/or take bids, have not been addressed.

Wren has joined Bailey in complicity and direct Bailey has refused him his procedural due process right to be given proper notice, including proof or some corroboration, of this alleged attempt to deprive him of property. Bailey is liable for violation of his due process rights in this matter.

## SIXTY-FIFTH CAUSE OF ACTION
### 42 U.S.C. § 1983- 1st Amendment–
### Denial of Right to Due Process by a Probationary Period

**All Defendants except Marshall**

The first cause of action is set forth by reference and is incorporated as if fully stated herein. Pickard reaffirms that he has not violated his lease or any other matters that would warrant a lease infraction or any other adverse action regarding his tenancy. However, it has been held that even if he were culpable, "the Court [found] as matters of law that it is shocking to the conscience for [a tenant] to be evicted without a probationary period." *Feister v. Olatoye*, 100971/2014 (S.Ct. NYC 2015). The Court noted that like Pickard, Feister received only meager SSI income and that "losing this apartment would likely result in homelessness for her." Notwithstanding that Feister was implicated in the most serious of all HUD transgressions (drug-related), the Court found that it shocked the conscience to terminate her benefits and render her homeless absent at the very least a probationary period. Pickard has not transgressed, but even if the allegations against him were considered, they are repeated minor violations that arguably should not be grounds for eviction at all, particularly considering the fact that at the very least they were cured. However, for the Defendants to persist in attempting to evict him and render him homeless without even providing for a probationary period indeed shocks the conscience and further establishes Pickard's injuries, particularly emotional distress, mental anguish and trauma, warranting substantial damages as herein requested.

## SIXTY-SIXTH CAUSE OF ACTION
### 42 U.S.C. § 1983- 1st Amendment–
### Intentional Infliction of Emotional Distress in Subjecting Plaintiff To Attempts to deny him due process by evicting him and terminating his benefits
### All Defendants except Marshall

The first cause of action is set forth by reference and is incorporated as if fully stated herein. The Defendants purposefully and intentionally discriminated against Pickard on the basis of his mental and physical handicaps. Defendant Bailey stalked him in an effort to carry-out Defendants' discriminatory purpose. Defendants engaged

in a calculated campaign to evict Pickard from the property and to disqualify him from receiving his constitutionally protected housing benefits. Pickard was and is aware of Defendants' conduct and as a result suffered severe emotional distress and anxiety for which he is forced to seek treatment. Pickard became extremely apprehensive about leaving his apartment and conducting day-to-day activities as a result of Defendants' conduct. Defendants' conduct was so extreme and outrageous that it passed the boundaries of decency and is utterly intolerable to a civilized community. Defendants conduct was intentional and malicious. The distress Pickard suffered was so severe that no reasonable person could be expected to endure it. As a direct and proximate result of Defendants' intentional infliction of emotional distress, Plaintiff has suffered severe emotional distress, mental anguish, anxiety, humiliation and other damages.

## SIXTY-SEVENTH CAUSE OF ACTION
### 42 U.S.C. § 1983- 1st Amendment–
### Abuse of Process in Subjecting Plaintiff To Attempts to deny him
### due process by evicting him and terminating his benefits
### All Defendants except Marshall

The first cause of action is set forth by reference and is incorporated as if fully stated herein. The Defendants had an ulterior purpose for filing countless eviction actions against Pickard, which was to force him out of his premises in violation of his constitutional, civil and federal rights and as retaliatory and discriminatory acts pursuant to 42 U.S.C. § 1983 in bad faith and without cause. Defendants used and are using court process to accomplish a result not within the scope of the proceeding in which it was issued. As a direct result, Pickard has suffered extreme injuries and damages as set out herein and is entitled to relief and damages as stated below.

## SIXTY-EIGHTH CAUSE OF ACTION
### 42 U.S.C. § 1983- 1st Amendment–
### Invasion of Privacy in Subjecting Plaintiff To Attempts to deny him
### due process by evicting him and terminating his benefits
### All Defendants except Marshall

The first cause of action is set forth by reference and is incorporated as if fully stated herein. Defendants intentionally interfered with Pickard's solitude, seclusion, private affairs, and concerns during Defendants' calculated campaign to evict him from the property. Pickard had a reasonable expectation of privacy in his apartment, personal spaces, solitude, seclusion, private affairs, and concerns. Defendant's intentional intrusion is highly offensive to the reasonable person in Pickard's position. Defendants' intrusion on Plaintiff's privacy forced him seek additional therapy beginning in March, 2019 and continuing to the present. As a direct and proximate result of Defendants' intrusion, Pickard has suffered severe mental distress, mental anguish, anxiety, humiliation and other damages as set out below, and is entitled to relief and damages as stated below.

<div align="center">

**SIXTY-NINTH CAUSE OF ACTION**
**42 U.S.C. § 1983- 1ˢᵗ Amendment--**
**Denial of Right to Due Process To Mediation**
**Defendants Wren, Bailey, Welden, and Winston**

</div>

The first cause of action is set forth by reference and is incorporated as if fully stated herein. The above-named Defendants failed in their duty under procedural due process to conduct the required interview and to mediate and resolve Pickard's grievances. This wrong has had incalculable consequences and could have averted this entire controversy and cases. Congress endorsed mediation for cases such as this in the First Session of the 116th Congress, S.2486, to authorize the Secretary of Housing and Urban Development to award grants for landlord-tenant mediation programs under the pending 'Prevent Evictions Act of 2019' whose premises are that:

> (6) landlord-tenant mediation is a valuable and cost-effective way to keep tenants in their homes, and more investment in that type of mediation is warranted;

> (7) there is a lack of research on the potential for certain types of insurance to be cost-effective interventions that keep tenants in their homes, which

warrants future study;

(8) eviction should be a last resort

The Act affirms that landlord-tenant mediation is a valuable and cost-effective way to keep tenants in their homes, and more investment in that type of mediation is warranted.

Pickard asserts pursuant to this Congressional intent that court ordered mediation should be ordered in this case particularly due to the Defendants' abrogation of their duty to mediate, and to further the resolution of this controversy in as equitable and fair a manner as possible.

## AMENDMENT

Plaintiff is seeking pro bono assistance and will otherwise continue to research and attempt to ascertain further issues and causes of action which he will promptly submit by amendment including causes that may require a motion for the court to exercise discretion in conferring supplemental jurisdiction. Plaintiff will further seek to identify any other liable parties in this action and will name and submit such parties as defendants when ascertained.

## INJUNCTIVE RELIEF

Plaintiff is filing concomitantly for injunctive relief by separate motion. He avers that a preliminary injunction is due to be issued followed by permanent injunctive relief enjoining the Defendants from, *inter alia,* maintaining the current action for unlawful detainer/eviction which they admit to be based on invalid premises (invalid lease infractions- see Exhibit "A"). Plaintiff is further seeking to enjoin Defendant Marshall from enforcing unconstitutional Alabama Landlord-Tenant statutes against Plaintiff and others similarly situated as tenants in federally subsidized facilities receiving federal benefits governed by HUD, the FHA and other federal law. Plaintiff has ascertained numerous dispositive authorities for injunctive relief.

## SUPPLEMENTAL JURISDICTION

Plaintiff will move that the court exercise discretion in conferring supplemental jurisdiction regarding any matters that may require the same.

**WHEREFORE,** Pickard prays that this Court:

(a) Enter judgment against the Defendants;

(b) Enter summary judgment pursuant to *King v. Smith*, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968) wherein the Court granted summary judgment to the tenant, in this case Pickard, reversing unauthorized eligibility criteria unlawfully imposed by the landlord, in this case SPM/Highland Manor, regarding the issue of creditworthiness, reversing the unauthorized determination that Pickard should be required to have a guarantor regarding eligibility and execution of his lease, and regarding the issue of resident selection eligibility, reversing the unauthorized and falsely premised rejection of John Mckinney as Pickard's live-in aide by SPM/Highland Manor.

(c) Enter an order prohibiting Defendants from acting to deprive Pickard of his constitutional property interests in continued occupancy of his HUD subsidized apartment at Highland Manor and his current federally subsidized benefits.

(d) Enter an order in the nature of prohibition under the All-Writs Act, 28 U.S.C. §1651, enforcing the Court's jurisdiction under the U.S. Constitution, federal laws, regulations, HUD laws, rules and regulations, to prohibit the Defendants from acting to subject or to cause Pickard to be subjected to deprivation of his continued tenancy in federally subsidized housing and loss of related federal benefits due to the numerous due process, procedural due process, equal protection, and other violations of constitutional rights, federal laws, rule and regulations as set out in the applicable Causes of Action stated above and throughout this Complaint.

(e) Enter an order in the nature of prohibition under the All-Writs Act, 28 U.S.C. §1651, prohibiting the Defendants from pursuing their current action for

unlawful detainer/eviction due to their admissions that the grounds for said action are invalid, to wit: the falsely alleged lease infractions admitted to be invalid by Defendant Bailey under oath (see Exhibit "A").

(f) Enter an order in the nature of prohibition under the All-Writs Act, 28 U.S.C. §1651, prohibiting the Defendants from any action pursuant to their current prohibited eviction notice and prohibiting the Defendants from issuing any further eviction notices.

(g) Enter an order in the nature of prohibition under the All-Writs Act, 28 U.S.C. §1651, prohibiting the current state action for eviction and prohibiting the Defendants from initiating any further state actions for eviction due to the unconstitutionality of state eviction laws that are being applied in this case.

(h) Enter an order requiring the Defendants to show cause as to why their actions for lease termination, eviction and related actions should not be prohibited due to the facts that demonstrate that these actions are retaliatory against the Plaintiff.

(i) Enter an order under the All-Writs Act, 28 U.S.C. §1651 pursuant to the Court's jurisdiction under federal and HUD laws governing tenancies in federally subsidized housing directing the Defendants to effectuate recertification of the Plaintiff and, under the facts of this case where there is no good cause to terminate Plaintiff's tenancy, to renew his lease on or before March 13, 2020.

(j) Enter an order in the nature of prohibition under the All-Writs Act, 28 U.S.C. §1651, prohibiting the Defendants from violating the Plaintiff's constitutional rights of association.

(k) **Declaratory judgment**:

(1) Enter a declaratory judgment declaring the pertinently stated acts of the Defendants identified as violations of his rights of due process, equal protection, freedom of speech, and association to be violations of Pickard's constitutional rights:

(2) Enter a declaratory judgment that Alabama statutes are unconstitutional in part regarding provision for the constitutional and federal statutory rights for persons who are tenants in federally subsidized housing who also receive federal and state subsidies and benefits.

(3) Enter a declaratory judgment specifically declaring that Section 35-9A-461 of the Code of Alabama is unconstitutional on its face as it applies to persons residing in HUD subsidized housing such as Highland Manor by failing to provide for the numerous rights of due process, procedural due process, equal protection, quiet enjoyment, and other constitutional rights as stated above in this Complaint.

(l) Enter an order that all Defendants must comply with 24 C.F.R. § 247.4(b) regarding any and all notices, letters, documents, correspondence of any kind, any activity calendars, letters, notices and other items delivered to other resident/s or to any resident that would pertain to the Plaintiff, by timely mailing of same by first class mail and by placing same UNDER Plaintiff's door (not on his doorknob) in compliance with due process and equal protection as set out in 24 C.F.R. § 247.4(b), particularly in light of Defendants repeated abuses in not providing same to Plaintiff by any means.

(m) Enter an order appointing a special master and ordering that Plaintiff's resident file and any other file or document/s in the possession of any Defendant be transferred to the possession and custody of that special master, and that the special master keep Defendant informed of the contents of his file as required by applicable federal statutes stated above, and by due process and equal protection, regarding any entry or alteration to the file/s and document/s, particularly in light of the Defendants refusal to allow Plaintiff his right to access to his file, his right to the integrity of the file without destruction of its contents, alteration of its contents, addition of undisclosed documents to its contents, or other improprieties or wrongful or unlawful

acts as have been done by the Defendants in the past as affirmed in part by Plaintiff's medical providers.

(n) Enter an order directing the Defendants to provide updates regarding apartment unit vacancies and parking space vacancies as of the date that the Defendants are informed of such vacancies, pursuant to Plaintiff's further requests for reasonable accommodations by transfer to a unit at higher elevation pursuant to his medical condition as stated above, and pursuant to his physical disabilities that impair his mobility.

(o) Enter an order granting Plaintiff's request for reasonable accommodation in part by appointing a social worker (many similar properties and entities employ a social worker including Pickard's former HUD subsidized facility, Birmingham Tower) and directing Defendants not to proceed in any further adverse action against Pickard, particularly lease infractions or any matter that may related to alleged lease violation, breach, termination or other related action, without informing the social worker and arranging a meeting with Pickard and the social worker regarding any such matter, in light of the Defendants' abuses not only in bringing adverse actions against the Plaintiff but in doing so covertly in violation of Constitutional due process and equal protection including lack of Service, Notice, and facial validity as set out above in the Complaint, and that this provision remain a permanent and reasonable accommodation for the Plaintiff.

(p) Enter an order that any matters regarding Plaintiff's lease, its terms, provisions, enforcement, or any other issue relating to Plaintiff's tenancy be referred for mediation with the social worker, and if not resolved with this assistance, to be further referred to the special master for mediational determination reviewable by the court as the ends of justice may then require.

(q) Enter an order demanding that Defendants remove the sign in the lobby that states "NO ONE TO HANDLE MAIL EXCEPT MANAGER & POSTMAN" be permanently taken down and removed, and that no sign stating that any party other

than U.S. postal employees and their agents can handle the mail be posted.

(r) Enter an order that no person except postal carriers, authorities, contractors and sub-contractors, particularly any of the Defendants, be permitted to handle or in any way be involved with the United States Mail at Highland Manor;

(s) Enter an order directing the Defendants to cooperate with the Postal Service by changing the lock on the door to the Highland Manor mailroom, and that the **ONLY** key(s) to this lock be given to the Postal Service **ONLY** so that only the Postal Service shall have this key and access to the Highland Manor mailroom.
On October 24, 2019, Plaintiff went to the primary carrier United States Postal station for his address as directed by the postal carrier who was delivering mail to Highland Manor, and who admitted that he frequently found the door to be unlocked when arriving to deliver mail. The Postal supervisor at this facility stated that the regular procedure to secure the mail at a multi-unit address such as Highland Manor was to change the lock to the mail room, and to be certain that only the Postal Service/Carriers had a key.

(t) Enter an order prohibiting Defendants from imposing any resident eligibility determination criteria not authorized by Congress;

(u) Enter an order directing HUD to conduct an immediate review of SPM's compliance with all applicable laws, rules and regulations regarding the management of Highland Manor, and a review of their competence to manage Highland Manor as a federally subsidized housing facility, and thereafter to hold a hearing regarding the compliance and competence of SPM in this regard, and if found to be negative, to order that management of Highland Manor be transferred to another management company.

(v) Enter an order prohibiting Defendants from imposing eligibility requirements not authorized by Congress regarding Pickard and his federally subsidized housing and benefits, including the use of an anonymous, unaccountable, unlawful "third party" to impose eligibility requirements not even promulgated, much

less not authorized by Congress.

(w) Enter an order that this Court take jurisdiction over the pending state court action for unlawful detainer against Plaintiff due to the numerous federal questions and the jurisdiction of this court over such matter pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §1651 and presented with this Complaint.

(x) Enter an order that any and all records of any and all unlawful detainer/eviction actions in state courts or otherwise be expunged in their entirety. Any other remedy provided at law is inadequate because the mere filing of an unlawful detainer action carries with it the stigma of eviction and creates negative rental history. *Mendoza v. Frenchman Hill Apartments, et al.*, 2005 WL 6581642 (E.D. Wa. 2005). There were no valid grounds for the filing of the actions for unlawful detainer, hence it would be a miscarriage of justice for any records of same not to be expunged.

(y) Enter an order requiring Defendants to repair the plumbing in the unit and the permanent lighting fixtures that have been in disrepair for more than six months despite Plaintiff's repeated requests for repair, constituting efforts at constructive eviction.

(z) That the Court grant jurisdiction over any of the matters presented in this Complaint pursuant to its exercise of discretion in granting supplemental jurisdiction over any such matter pursuant to 28 U.S.C. §1367.

## DAMAGES

(a) Award compensatory damages in an amount not less than $4,000.00 for injuries including severe mental pain and suffering, and debilitation of Plaintiff's physical condition including his first cardiac attack of its kind and emergency hospitalization therefor on September 28, 2019. This must include the refund of the $50.00 payment extorted from Pickard by Bailey regarding the alleged damage to the drain pipe on March 13, 2019 and the extortionate promise to pay elicited by Bailey under threat of evicting Pickard.

(b) Award compensatory damages of $4,607.61 against Defendant Winston personally in compensation for his attempts to extort funds from Plaintiff.

(c) Award compensatory damages of $20,000.00 for humiliation, embarrassment, mental anguish resulting from fear of eviction, mental distress resulting from landlord's abusive language or conduct, physical consequences of emotional distress, shame and indignity of attempts at eviction, nervous shock resulting from threats at eviction, ancillary litigation costs, and punitive damages for wanton and malicious conduct. It is well established that the amount of compensatory damages which may be awarded in a civil rights case is not limited to money losses or other damages directly incurred, but includes intangible damages suffered as a result of the discriminatory activity. See, e.g., *Marable v. Walker*, 704 F.2d 1219 (11th Cir. 1983), *Parker v. Shonfeld*, 409 F. Supp. 876, 879 (N.D. Ca. 1976). These damages can be shown by testimony and other evidence and can also be inferred from the circumstances of the case. See *Marable, supra*, 704 F.2d at 1220 (11th Cir. 1983); *Gore v. Turner*, 563 F.2d 159, 164 (5th Cir. 1977). The Court held that "[b]ecause of the difficulty of evaluating emotional injuries which result from deprivation of civil rights, courts do not demand precise proof to support a reasonable award of damages for such injuries." Fair Housing-Fair Lending (P-H) at 25,011, citing *Block v. R.H. Macy & Co., Inc.*, 712 F.2d 1241, 1245 (8th Cir. 1983). See also *Pfaff v. H.U.D.*, 88 F.3d 739 (9th Cir. 1996) (awarding $4,212.61 in compensatory damages and $20,000.00 in damages for emotional distress.)

In *Marable*, where the defendant challenged the plaintiff's claim for compensatory damages on the basis that it was based solely on mental injuries and that there was no evidence of "pecuniary loss, psychiatric disturbance, effect on social activity, or physical symptoms," the court stated: "It strikes us that these arguments may go more to the amount, rather than the fact, of damage. That the amount of damages is incapable of exact measurement does not bar recovery for the harm suffered. The plaintiff need not prove a specific loss to recover general, compensatory

damages, as opposed to actual or special damages." 704 F.2d at 1220-21; Fair
Housing-Fair Lending (P-H) at 25.012. The Defendants acts of harassment, emotional
distress, threats of eviction, elder abuse, discrimination, humiliation particularly
regarding his mental disability, and other such acts stated in the facts of this Complaint
were severely traumatic, and caused him to become terrified that he would be forced
out of his housing and again be rendered homeless. He was further humiliated that his
landlord and other tenants had learned of his condition and that his privacy had been
invaded. Due to the fact that his mental disability is predominantly affective, the
emotional distress caused him was particularly and severely acute.

There is difficulty in determining how to assess the amount of damage
attributable to embarrassment, humiliation, and emotional distress in terms that can be
paid to a respondent. As recognized in *Shaw v. Cassar*, 558 F. Supp. 303, 315 (E.D.
Mich. 1983), there is no formula for determining intangible damages, and
consequently the determination must be left to the discretion and judgment of the trier
of fact, who has great discretion but is guided by the circumstances of the particular
case. The key factors in ascertaining the size of such an award are the egregiousness
of the respondent's behavior and the complainant's reaction to the discriminatory
conduct. See *Schwemm, Housing Discrimination Law*, 260-62. As a further general
rule, while the amount of damages awarded should compensate for the injury suffered,
it should not provide the injured party with a windfall. See *Albemarle Paper Co. v.
Moody*, 422 U.S. 405, 418 (1975). There should be a rational relationship between
what the Defendants did to the complainant and how much he has been made to suffer
as a consequence. See *HUD v. Gugliehmi*, Fair Housing-Fair Lending (P-H) para.
25.004 at 25.078-079 (HUDALJ No. 02-89-0450-1 (Sept. 21, 1990)).

The award sought for Kelly's embarrassment, humiliation, and emotional
distress was $50,000.00 . Its rationale in support of this figure is based upon its view
that the defendants' behavior was egregious and that it had tremendous consequences
for him. His advocates also argued that the defendants' activities were "devastating" to

Complainant, resulting in difficulty eating and sleeping, tiring easily, and nervousness. Pickard suffered this trauma and much more as set out above.

In spite of its revealing a large range of awards, a review of decisions in which damages were assessed for violations of the Fair Housing Act has some limited usefulness in reaching a decision on intangible damages. For example, $40,000 was awarded for emotional distress under similar circumstances. *Blackwell*, Fair Housing-Fair Lending (P-H) at 25,001. An administrative law judge awarded $20,000 for emotional distress also in a similar case.

Similar cases involving handicap discrimination provide further guidance. For example, in *HUD v. Purkett*, Fair Housing-Fair Lending (P-H) para. 19,372 (HUDALJ No. 09-89-1495-1 (July 31, 1990)), the manager, owner, and general partner of an apartment complex entered into an agreement to pay a tenant with a handicap $60,000 in damages in addition to injunctive and equitable relief. In *Baxter v. City of Belleville*, Fair Housing-Fair Lending (P-H) para. 19,368 (No. 89-3354 (S.D. Ill. 1989)), a municipality agreed to settle a claim of handicap discrimination to include payment of $29,000.00 to the plaintiff. Based on the precedents for award of compensatory damages in this area, Pickard's request for damages in the amount of $20,000.00 is reasonable and justified.

(d) Award compensatory damages of $2,500.00 for loss of civil rights. The Court in *H.U.D. on behalf of Ronnie Kelly v. Williams*, HUDALJ 02-89-0459-1 (1991) ordered separate compensatory damages for loss of civil rights. See *Bradley v. John Branham Agency, Inc.*, 463 F. Supp. 27 (D.S.C. 1978) (plaintiff awarded $2,000 for emotional distress and $5,000 for loss of civil rights); see also *HUD v. Baumgardner*, Fair Housing-Fair Lending (P-H) para. 25,006 at 25,101 (HUDALJ No. 05-89-0306-1 (Nov. 15, 1990)). In *Baumgardner*, the complainant was awarded $500 for emotional distress and $2,500 for loss of civil rights four housing discrimination. Id. at 25,100-01. See also 42 U.S.C. Sec. 3612(g)(3); 24 CFR 104.910(b). Courts have held that damage from the deprivation of a constitutional right can be presumed "even in the

absence of evidence that the complainant has suffered any emotional distress, embarrassment, or humiliation." See *Hodge v. Seiler*, 558 F.2d 284 (5th Cir. 1977). It has also been held that the amount of compensatory damages should be adequate to redress the deprivation of a complainant's civil rights. See *Corriz v. Narajo*, 667 F.2d 892 (10th Cir. 1981). Courts have further held that loss of civil rights can constitution a "frontal attack on a Complainant's dignity" and a grievous intrusion upon a Complainant's privacy. In Baumgardner, the defendant was found to have deprived him of his civil rights, and $2,500 was awarded for this deprivation. This amount is therefore reasonable and justifiable by precedent to be awarded to Pickard.

(e) Award exemplary damages in an amount not less than $25,000.00 pursuant to the principle that exemplary damages must be sufficient in amount to act as a deterrent regarding the financial standing of the defendant(s)[6], and according to the Defendants willful acts that were malicious, oppressive, fraudulent, willful, wanton, violent and grossly reckless towards the Plaintiff whose constitutional rights, personal injuries, peaceful enjoyment of his residence and other sources of damages and injuries have been marred by almost one year of trauma and duress, where from the onset of his tenancy the Defendants have acted in the severely injurious manner against him as set out in this Complaint, requiring innumerable hours and expenses on Plaintiff's part in defending against the severe onslaught against him by the Defendants and their attorneys.

(f) If Plaintiff is able to secure representation of counsel, he further prays for the award Plaintiff costs, interest and reasonable attorneys' fees for this action pursuant to 42 U.S.C. §1988 and other provisions of law.

(g) For such other and further relief as the Court may deem just and proper.

---

[6] SPM and Highland Manor are entities of significant wealth, hence a sufficient amount to deter future damages and conduct by same is reasonably determined to require this amount of not less than $25,000.00.

Respectfully submitted on this 20th day of February, 2020.

William M. Pickard III, Plaintiff, *Pro Se*
2040 Highland Ave S Apt. 401
Birmingham, AL 35205-3438
(205 586-9055
m*arshall3d@hotmail.com*

**TRIAL DEMANDED STRUCK BY JURY**

𝕾𝖙𝖆𝖙𝖊 𝖔𝖋 𝕬𝖑𝖆𝖇𝖆𝖒𝖆          )
                               )
𝕮𝖔𝖚𝖓𝖙𝖞 𝖔𝖋 𝕵𝖊𝖋𝖋𝖊𝖗𝖘𝖔𝖓       )

### Affidavit of Attorney Jonathan Mok

COMES NOW the affiant, Jonathan Mok, who by me being first duly sworn, deposes on oath and states the following:

1. My name is Jonathan Mok. I am over the age of 21 years and a resident of Jefferson County, Alabama. I am an attorney in good standing and am an officer of the Court.

2. A court hearing was held on November 21, 2019 before the Honorable Sherra Grant regarding unlawful detainer proceedings against William Marshall Pickard III. I am an attorney for Mr. Pickard together with Kenneth J. Lay, esq. I was a witness to the entirety of this hearing.

3. One of the witnesses who testified under oath was Nikeshia Bailey.

4. Ms. Bailey testified regarding a first lease infraction alleged against Mr. Pickard dated March 20, 2019. This infraction alleged that Mr. Pickard "stated guest are running business online in his apartment." On cross-examination by Mr. Lay, Ms. Bailey was asked if it was a violation of Mr. Pickard's lease for another person such a guest to participate in a business operated by a tenant. Ms. Bailey answered that it was not against the lease terms. This testimony affirmed that there was no lease violation regarding this first alleged lease infraction.

5. Ms. Bailey also testified regarding two lease infractions alleging that Mr. Pickard was "allowing unauthorized person to liven in an apartment." The first violation was dated on May 24, 2019 and the second violation was dated on July 24,



Exhibit "A"

2019. On cross-examination by Mr. Lay, Ms. Bailey admitted that
her proof for such a violation was video surveillance evidence
that showed the coming and going of Mr. John Mckinney, whom she
alleged to be the unauthorized person. Mr. Lay then pointed out
that if Mr. Mckinney were coming and going, he was not staying
there overnight. Mr. Pickard's lease states that a person only
becomes an unauthorized resident after staying overnight for 7
nights. Mr. Lay then asked Ms. Bailey if there was a limit to
the number of times that a guest could visit. She stated that
there was no limitation. The fact that Mr. Mckinney was coming
and going as a guest disproved that he was an unauthorized
person living in the apartment as alleged by Ms. Bailey.

7. Ms. Bailey also testified regarding a third infraction
dated on June 13, 2019, which alleged that on that date, that
Mr. Pickard's apartment was not clean and sanitary. On cross
examination, Mr. Lay asked Ms. Bailey if this violation had been
cured. (Under Alabama law, a violation such as this that is
cured is withdrawn as an infraction that the law specifies that
the lease "shall not terminate.") Ms. Bailey therefore confirmed
that by being cured, this alleged violation cannot be sustained
as a lease infraction.

8. I therefore witnessed Ms. Bailey's testimony that
invalidated all four lease infractions that were the basis for
the lease termination proceedings against Mr. Pickard.

FURTHER, the affiant sayeth not.

Jonathan Mok, Affiant

BEFORE ME, a Notary Public in and for the State of Alabama
at large, personally appeared Jonathan Mok, who is personally
known to me and who by me being first duly sworn under penalty

of perjury, subscribed and swore to the foregoing affidavit on this __12th__ day of December, 2019.

_Lisa Woodard Overton_
NOTARY PUBLIC
My Commission expires: _5/8/2023_



# WINSTON, WINSTON, JENKINS & CHASTAIN, LLC

ATTORNEYS AT LAW

NORMAN G. WINSTON, JR.
HON. ROBERT P. (Bobby) BYNON, JR. (Ret.)

1800 12TH AVENUE SOUTH
BIRMINGHAM, AL 35205

PHONE: (205) 933-2300
FAX: (205) 933-2321

DAVID J. CHASTAIN (OF COUNSEL)
RAYMOND C. WINSTON (OF COUNSEL)

W. A. JENKINS JR (1920-1995)

October 07, 2019

58107

William M. Pickard, III
2040 Highland Avenue #401
Birmingham, AL 35205

RE: SPM, LLC ag f/Highland Manor, Ltd
vs.
William M. Pickard, III
Case No.: DV19-904330 SCG

| Description | Amount: |
|---|---|
| August -September 2019 rent | $396.00 |
| Late Charge: | $60.00 |
| October 2019 rent | $198.00 |
| Late Charge: | $30.00 |
| Additional Cost | $1.50 |
| Attorney Fee - October 2019 | $228.00 |
| Process Server charge | $25.00 |
| Unlawful Detainer Attorney Fee | $200.00 |
| **Total due to date:** | $1,138.50 |
| Court cost | $346.47 |
| **Total due to date plus costs** | $1,484.97 |

Dear William M. Pickard, III:

As requested per your letter dated September 20, 2019, enclosed is a copy of your lease agreement and application with respect to the above matter.

Sincerely,

Norman G. Winston. Jr.

NGW/nkc
Enclosures

$Exhibit$ "B"

THIS DEBT COLLECTOR IS ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

# WINSTON, WINSTON, JENKINS & CHASTAIN, LLC

ATTORNEYS AT LAW

NORMAN G. WINSTON, JR.
HON. ROBERT P. (Bobby) BYNON, JR. (Ret.)

DAVID J. CHASTAIN (OF COUNSEL)
RAYMOND C. WINSTON (OF COUNSEL)

W. A. JENKINS JR (1920-1995)

1800 12TH AVENUE SOUTH
BIRMINGHAM, AL 35205

PHONE: (205) 933-2300
FAX: (205) 933-2321

August 21, 2019

William M. Pickard, III
2040 Highland Avenue #401
Birmingham, AL 35205

RE:  SPM, LLC ag f/Highland Manor, Ltd
     vs.
     William M. Pickard, III
     File No.: 58107
     Case No.:
     Balance due to date : $801.99

Dear William M. Pickard, III:

Please be advised this office represents SPM, LLC ag f/Highland Manor, Ltd with respect to the above matter.

Your Landlord has given us permission to discuss this matter with you. The balance above is subject to change. Contact this office for your exact amount upon receipt of this letter.

Sincerely,

Norman G. Winston, Jr.

NGW/pdd

NOTICE TO DEBTOR

Unless within thirty (30) days of your receipt of this letter you notify this office that you dispute the validity of this debt, or any portion thereof, the debt will be assumed to be valid debt. The law does not require me to wait until the end of the 30 day period before proceeding with further legal action. If, however, you request proof of the debt or the name and address of the original creditor within the 30 day period that begins with your receipt of this letter, the law requires me to suspend my efforts (through litigation or otherwise) until I mail the requested information to you. Any information obtained will be used for the purpose of collecting this debt.

Exhibit "C"

# WINSTON, WINSTON, JENKINS & CHASTAIN, LLC

ATTORNEYS AT LAW

NORMAN G. WINSTON, JR.
HON. ROBERT P. (Bobby) BYNON, JR. (Ret.)

DAVID J. CHASTAIN (OF COUNSEL)
RAYMOND C. WINSTON (OF COUNSEL)

W. A. JENKINS JR (1920-1995)

1800 12TH AVENUE SOUTH
BIRMINGHAM, AL 35205

PHONE: (205) 933-2300
FAX: (205) 933-2321

October 07, 2019

58107

William M. Pickard, III
2040 Highland Avenue #401
Birmingham, AL 35205

RE: SPM, LLC ag f/Highland Manor, Ltd
vs.
William M. Pickard, III
Case No.: DV19-904330 SCG

| Description | Amount: |
|---|---|
| August -September 2019 rent | $396.00 |
| Late Charge: | $60.00 |
| October 2019 rent | $198.00 |
| Late Charge: | $30.00 |
| Additional Cost | $1.50 |
| Attorney Fee - October 2019 | $228.00 |
| Process Server charge | $25.00 |
| Unlawful Detainer Attorney Fee | $200.00 |
| **Total due to date:** | $1,138.50 |
| Court cost | $346.47 |
| **Total due to date plus costs** | $1,484.97 |

Dear William M. Pickard, III:

As requested per your letter dated September 20, 2019, enclosed is a copy of your lease agreement and application with respect to the above matter.

Sincerely,

Norman G. Winston. Jr.

NGW/nkc
Enclosures

THIS DEBT COLLECTOR IS ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

# WINSTON, WINSTON, JENKINS & CHASTAIN, LLC

ATTORNEYS AT LAW

NORMAN G. WINSTON, JR.
HON. ROBERT P. (Bobby) BYNON, JR. (Ret.)

DAVID J. CHASTAIN (OF COUNSEL)
RAYMOND C. WINSTON (OF COUNSEL)
W. A. JENKINS JR (1920-1995)

1800 12TH AVENUE SOUTH
BIRMINGHAM, AL 35205

PHONE: (205) 933-2300
FAX: (205) 933-2321

January 13, 2020

William M. Pickard, III
2040 Highland Avenue #401
Birmingham, AL 35205

RE:  SPM, LLC ag f/Highland Manor, Ltd
     vs.
     William M. Pickard, III
     File No.: 58679
     Case No.: DV20-900188
     Balance due to date  $2,320.65

Dear William M. Pickard, III:

Please be advised this office represents SPM, LLC ag f/Highland Manor, Ltd with respect to the above matter.

Your Landlord has given us permission to discuss this matter with you.  The balance above is subject to change.   Contact this office for your exact amount upon receipt of this letter.

Sincerely,

Norman G. Winston, Jr.

NGW/pdd

NOTICE TO DEBTOR

Unless within thirty (30) days of your receipt of this letter you notify this office that you dispute the validity of this debt, or any portion thereof, the debt will be assumed to be valid debt. The law does not require me to wait until the end of the 30 day period before proceeding with further legal action. If, however, you request proof of the debt or the name and address of the original creditor within the 30 day period that begins with your receipt of this letter, the law requires me to suspend my efforts (through litigation or otherwise) until I mail the requested information to you. Any information obtained will be used for the purpose of collecting this debt.

# WINSTON, WINSTON, JENKINS & CHASTAIN, LLC

ATTORNEYS AT LAW

NORMAN G. WINSTON, JR.
HON. ROBERT P. (Bobby) BYNON, JR.

1800 12TH AVENUE SOUTH
BIRMINGHAM, AL 35205

PHONE: (205) 933-2300
FAX: (205) 933-2321

DAVID J. CHASTAIN (OF COUNSEL)
RAYMOND C. WINSTON (OF COUNSEL)

W. A. JENKINS JR (1920-1995)

January 07, 2020

58107

William M. Pickard, III
2040 Highland Avenue #401
Birmingham, AL 35205

RE: SPM, LLC ag f/Highland Manor, Ltd
vs.
William M. Pickard, III
Case No.: DV19-904330 SCG

| Description | Amount: |
|---|---|
| August 2019 rent | $198.00 |
| September - December 2019 rent | $792.00 |
| January 2020 rent | $198.00 |
| Unlawful Detainer Attorney  Fee | $0.00 |
| Payments received | |
| | |
| **Sub Total due to date:** | $1,188.00 |
| | |
| **Total due to date:** | $1,188.00 |
| **Total due to date plus costs** | $1,188.00 |

**Lease Term date:**
03/12/2020

**Monthly rental rate:**
$198.00

**Montly late charge rate:**
$0.00

**Termination Notice posted:**
12/20/2019

**Unl. Detainer Filed:**

**File Status:**
Pending

**Waiver?** Without Waiver